**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| BCBSM, INC. (D/B/A BLUE CROSS AND BLUE SHIELD OF MINNESOTA); HMO MINNESOTA (D/B/A BLUE PLUS); BLUE CROSS AND BLUE SHIELD OF FLORIDA, INC. (D/B/A FLORIDA BLUE); HEALTH OPTIONS, INC. (D/B/A FLORIDA BLUE HMO); BLUE CROSS AND BLUE SHIELD OF NORTH CAROLINA; BLUE CROSS BLUE SHIELD OF NORTH DAKOTA; BLUE CROSS AND BLUE SHIELD OF ALABAMA; BLUE CROSS AND BLUE SHIELD OF KANSAS, INC.; BLUE CROSS AND BLUE SHIELD OF NEBRASKA, INC.; BLUE CROSS AND BLUE SHIELD OF MASSACHUSETTS, INC.; BLUE CROSS AND BLUE SHIELD OF MASSACHUSETTS HMO BLUE, INC.; WELLMARK, INC. (D/B/A WELLMARK BLUE CROSS AND BLUE SHIELD AND D/B/A WELLMARK BLUE CROSS AND BLUE SHIELD OF IOWA); WELLMARK OF SOUTH DAKOTA, INC. (D/B/A WELLMARK BLUE CROSS AND BLUE SHIELD OF SOUTH DAKOTA); WELLMARK HEALTH PLAN OF IOWA, INC.; WELLMARK SYNERGY HEALTH, INC.; AND WELLMARK VALUE HEALTH PLAN, INC., | Civil Case No. 1:20-cv-1853<br><br>**COMPLAINT AND JURY DEMAND** |
| Plaintiffs, | |
| v. | |
| WALGREEN CO. AND WALGREENS BOOTS ALLIANCE, INC., | |
| Defendants. | |

## <u>TABLE OF CONTENTS</u>

INTRODUCTION.................................................................................................................3

I.     PRELIMINARY STATEMENT .....................................................................3

II.    THE PARTIES.............................................................................................7

      A.    Plaintiffs ....................................................................................... 7

      B.    Defendants .................................................................................. 11

III.   JURISDICTION AND VENUE ..................................................................14

      A.    Jurisdiction ................................................................................ 14

      B.    Venue......................................................................................... 14

IV.   FACTS APPLICABLE TO ALL CLAIMS .................................................15

      A.    U&C Is The Price Paid By Customers Without Insurance. ................... 15

      B.    The Pharmacy Claims Reimbursement Process. ................................ 26

      C.    Walgreens Developed its Prescription Savings Club to Compete With "Big Box" Retailers While Maintaining Fraudulently Inflated Reimbursements from Plaintiffs. ........................ 29

      D.    Walgreens Reported False U&C Charges. .......................................... 34

      E.    Tolling of the Statute of Limitations. ................................................. 35

COUNT I: Fraud...........................................................................................39

COUNT II: Fraudulent Concealment ...........................................................41

COUNT III: Negligent Misrepresentation.....................................................42

COUNT IV: Illinois Uniform Deceptive Trade Practices Act .......................44

COUNT V: Illinois Consumer Fraud and Deceptive Business Practices Act...................................46

COUNT VI: Minnesota Unlawful Trade Practices Act...................................48

COUNT VII: Minnesota Uniform Deceptive Trade Practices Act .................50

COUNT VIII: Massachusetts Consumer Protection Law...............................52

COUNT IX: South Dakota Deceptive Trade Practices and Consumer Protection Law .................54

COUNT X: Nebraska Uniform Deceptive Trade Practices Act .....................56

COUNT XI: Nebraska Consumer Protection Act...........................................57

COUNT XII: Florida Deceptive and Unfair Trade Practices Act ..................59

COUNT XIII: North Carolina Unfair and Deceptive Trade Practices Act .....61

COUNT XIV: North Dakota Unlawful Sales or Advertising Practices Act .....63

COUNT XV: Unjust Enrichment ..................................................................65

NOTICE TO STATE ATTORNEYS GENERAL .............................................66

PRAYER FOR RELIEF ................................................................................66

JURY DEMAND...........................................................................................68

## INTRODUCTION

Plaintiffs BCBSM, Inc. (d/b/a Blue Cross and Blue Shield of Minnesota); HMO Minnesota (d/b/a Blue Plus); Blue Cross and Blue Shield of Florida, Inc. (d/b/a Florida Blue); Health Options, Inc. (d/b/a Florida Blue HMO); Blue Cross and Blue Shield of North Carolina; Blue Cross Blue Shield of North Dakota; Blue Cross and Blue Shield of Alabama; Blue Cross and Blue Shield of Kansas, Inc.; Blue Cross and Blue Shield of Nebraska, Inc.; Blue Cross and Blue Shield of Massachusetts, Inc.; Blue Cross and Blue Shield of Massachusetts HMO Blue, Inc.; Wellmark, Inc. (d/b/a Wellmark Blue Cross and Blue Shield and d/b/a Wellmark Blue Cross and Blue Shield of Iowa); Wellmark of South Dakota, Inc. (d/b/a Wellmark Blue Cross and Blue Shield of South Dakota); Wellmark Health Plan of Iowa, Inc.; Wellmark Synergy Health, Inc.; and Wellmark Value Health Plan, Inc. (collectively, "BCBS Plans" or "Plaintiffs") bring this Complaint against Defendants Walgreen Co. and Walgreens Boots Alliance, Inc. (collectively, "Walgreens" or "Defendants") seeking damages for fraud, fraudulent nondisclosure, negligent misrepresentation, unjust enrichment, and related claims. In support of this action, Plaintiffs state and allege as follows:

## I.   PRELIMINARY STATEMENT

1.     For more than a decade, Walgreens—the largest retail drugstore chain in the United States—has knowingly and intentionally engaged in a fraudulent scheme to overcharge Plaintiffs for prescription drugs by submitting claims for payment at artificially inflated prices. To conceal its scheme, Walgreens has made false statements and omitted material facts in connection with its *true* usual and customary ("U&C") prices—the payment ceiling generally defined as the cash price to a member of the general public paying for a prescription drug without insurance—for prescription drugs dispensed to individuals covered by Plaintiffs' health

3

plans.  Walgreens fraudulently submitted inflated U&C prices on millions of claims reimbursed by Plaintiffs.  Through its fraudulent scheme, Walgreens has overcharged Plaintiffs hundreds of millions of dollars for prescription drugs.

2.    Significantly, on January 15, 2019, Walgreens settled claims brought by the United States, 39 states, and the District of Columbia alleging that, from January 2008 through December 2017, Walgreens violated the False Claims Act, 31 U.S.C. § 3729 *et seq.*, by submitting false U&C prices that were higher than the prices it charged for the same drugs sold through its Prescription Savings Club cash discount program ("PSC Program"), thereby obtaining more money in reimbursements for Medicaid fee-for-service claims than it was entitled to receive.[1]  Walgreens admitted—for the first time—that "in submitting claims for reimbursement," Walgreens "did not identify its PSC program prices as its U&C prices for drugs on the PSC program formulary," despite being so required.[2]  Walgreens further admitted—for the first time—facts demonstrating that the PSC Program itself was a sham, including that it "offered a savings guarantee pursuant to which PSC program members could recoup (in the form of store credit) the difference between the amount they paid to enroll in the program in a given year and the amount they received in discounted savings under the program in that year."[3]  Plaintiffs similarly have been damaged by the same fraudulent course of conduct, as described and admitted to by Walgreens in the Walgreens' DOJ Settlement.

3.    Plaintiffs are health care plans offering comprehensive health care services and coverage, including prescription drug coverage, to their members in respective states in which

---

[1] Stipulation and Order of Settlement and Dismissal, *U.S. ex rel. Baker v. Walgreens, Inc. and Walgreen Co.*, No. 12 Civ. 0300, ¶ 2(e) (S.D.N.Y. Jan. 15, 2019) (hereinafter "Walgreens' DOJ Settlement").

[2] *Id.* at ¶ 2.

[3] *Id.* at ¶ 2.

they operate.  When plan members fill prescriptions covered by Plaintiffs at a Walgreens pharmacy, Walgreens submits electronic claims to Plaintiffs for reimbursement for those prescriptions (through Plaintiffs' contracted pharmacy benefit managers ("PBMs")).  In submitting electronic claims for payment, Walgreens is required to truthfully and accurately submit its U&C price for each dispensing event, in accordance with the National Council for Prescription Drug Program ("NCPDP") requirements.  Plaintiffs calculate the drug price to be paid to the pharmacy based on whether the U&C submitted is less than or greater than the negotiated price.  At all relevant times, Walgreens' reimbursement for prescription drugs shall not exceed its U&C price, which functions as a reimbursement ceiling.  This is clear in contracts, network pharmacy manuals, payor sheets, and industry standards, which recognize that reimbursements are to be adjudicated under this formula.

4.      In 2006, "big box" retailers like Walmart, Target, and Costco disrupted the retail pharmacy market by offering deeply discounted generic drugs—$4 for 30-day supplies—to their customers while also giving third party payors, including Plaintiffs, the benefit of that deal by lowering their U&C prices for the same drugs.  Federal health regulators at the Centers for Medicare and Medicaid Services ("CMS") also made clear that generic discount program prices were to be considered the pharmacy's U&C prices for the purposes of billing government healthcare programs.

5.      Walgreens recognized the need to retain and attract new customers, but—unlike the "big box" retailers—decided not to absorb substantially reduced margins in connection with lowering its U&C prices submitted to third party payors, including Plaintiffs.  Concerned with maintaining its massive pharmacy revenue, which historically accounts for a vast majority of Walgreens' total revenue, and at the same time competing with "big box" retailers and other

pharmacies for in-store traffic and cash sales, Walgreens developed and carried out a massive fraud that resulted in substantial financial harm to Plaintiffs.

6.    In or around 2007, Walgreens created the PSC Program as an integral part of its systemic overcharging of Plaintiffs for brand and generic prescription drugs dispensed to their members.  Walgreens created the PSC Program for two reasons: *first*, to maintain and increase its market share for cash customers by offering deep discounts on prescription drugs, and *second*—and more importantly—to obfuscate its true U&C prices from third party payors, including Plaintiffs.  Walgreens artificially divided its cash business, which formerly consisted solely of customers who pay cash, into two segments: customers who pay the high cash price (which it would include in its U&C) and customers who pay the low cash price (*i.e.*, the price offered by the PSC Program or other similar programs, which would be excluded from U&C). In short, Walgreens created the PSC Program in a covert attempt to insulate its high U&C prices by artificially dividing its customer base in a way that would undermine the central purpose of any health company's prescription drug benefit—that Plaintiffs do not pay more than what cash customers pay for the same drugs.

7.    But unbeknownst to Plaintiffs, Walgreens' cash sales under the PSC Program (and other similar programs) far exceeded—in many multiples—Walgreens' sales at its fraudulently inflated U&C prices.  In fact, Walgreens submitted U&C prices that were paid by few—***if any***—actual cash customers, and were regularly five, ten, or even twenty times higher than what Walgreens actually charged cash customers.  Still, on its claims for reimbursement to Plaintiffs, Walgreens reported those artificially inflated "U&C" prices, which were neither usual nor customary, as its U&C prices.  By submitting false and inflated U&C prices to Plaintiffs, Walgreens knowingly and wrongfully overcharged Plaintiffs on millions of claims.

6

8.      Walgreens knowingly and intentionally concealed from Plaintiffs the ***actual*** cash prices offered to members of the general public paying without insurance—*i.e.*, its ***true*** U&C prices—on both brand and generic prescription drugs.  To conceal its fraudulent scheme, Walgreens knowingly made false statements and omitted material facts in connection with its true U&C prices, including, but not limited to, the scope of PSC Program membership; PSC Program eligibility; the enrollment process; the enrollment "fee"; and frequency, share, number, and other key data points related to Walgreens' cash sales under the PSC Program and other similar discount programs; and other discounts (not associated with a discount program) offered to the individuals paying without insurance for drugs also dispensed to Plaintiffs' members.[4]

9.      As a result of Walgreens' fraudulent scheme, Walgreens has substantially overcharged Plaintiffs for prescription drugs purchased by their members at Walgreens' pharmacies.  Plaintiffs reimbursed Walgreens for its members' brand and generic prescription drugs based on Walgreens' inflated U&C prices and, as a result, Plaintiffs were overcharged hundreds of millions of dollars.

**II.     THE PARTIES**

**A.     Plaintiffs**

10.      Plaintiff **BCBSM, Inc. (d/b/a Blue Cross and Blue Shield of Minnesota) ("BCBS of Minnesota")** is a Minnesota corporation and is a wholly-owned subsidiary of Aware Integrated, Inc., which is an independent licensee of the Blue Cross and Blue Shield Association. BCBS of Minnesota has its principal place of business in Eagan, Minnesota.  Along with

---

[4] For example, Walgreens also effectuated this fraud by offering a prescription savings club called "JustRx" ("JustRx Program") to customers at more than 1,900 Walgreens-owned Rite Aid-branded pharmacy locations and at Walgreens and Duane Reade pharmacy locations and failing to report these prices as U&C.  Additionally, Walgreens further effectuated this fraud by charging third party branded discount card prices to individuals that pay without insurance, *e.g.*, RxSaver and GoodRx ("third party discount card programs") and, similarly, failing to report these prices as U&C.

Plaintiff HMO Minnesota, BCBS of Minnesota provides a full spectrum of health care plans and services to approximately 2,647,023 members.

11.     Plaintiff **HMO Minnesota (d/b/a Blue Plus) ("HMO Minnesota")** is a Minnesota corporation and is a wholly-owned subsidiary of Aware Integrated, Inc., which is an independent licensee of the Blue Cross and Blue Shield Association. HMO Minnesota has its principal place of business in Eagan, Minnesota. HMO Minnesota offers a range of commercial health plans for individuals, families, and employers. Plaintiffs BCBS of Minnesota and HMO Minnesota are described herein collectively as "BCBS of Minnesota Plaintiffs."

12.     Plaintiff **Blue Cross and Blue Shield of Florida, Inc. (d/b/a Florida Blue) ("Florida Blue")** is a Florida corporation. Florida Blue has its principal place of business in Jacksonville, Florida, and is an independent licensee of the Blue Cross and Blue Shield Association. Along with Plaintiff Health Options, Inc., Florida Blue provides a full spectrum of health care plans and services to approximately 3,918,850 members.

13.     Plaintiff **Health Options, Inc. (d/b/a Florida Blue HMO) ("Florida Blue HMO")** is a Florida corporation with its principal place of business in Jacksonville, Florida, and is an independent licensee of the Blue Cross and Blue Shield Association. Florida Blue HMO is an HMO affiliate of Plaintiff Florida Blue. Plaintiffs Florida Blue and Florida Blue HMO are described herein collectively as "Florida Blue Plaintiffs."

14.     Plaintiff **Blue Cross and Blue Shield of North Carolina ("BCBS of North Carolina")** is a North Carolina corporation. BCBS of North Carolina has its principal place of business in Durham, North Carolina, and is an independent licensee of the Blue Cross and Blue Shield Association. BCBS of North Carolina provides a full spectrum of health care plans and services to approximately 2,526,856 members.

15.     Plaintiff **Blue Cross Blue Shield of North Dakota (f/k/a Noridian Mutual Insurance Company d/b/a Blue Cross Blue Shield of North Dakota) ("BCBS of North Dakota")** is a North Dakota corporation. BCBS of North Dakota has its principal place of business in Fargo, North Dakota, and is an independent licensee of the Blue Cross and Blue Shield Association. BCBS of North Dakota provides a full spectrum of health care plans and services to approximately 362,666 members across the country, including approximately 273,223 members in North Dakota.

16.     Plaintiff **Blue Cross and Blue Shield of Alabama ("BCBS of Alabama")** is an Alabama corporation. BCBS of Alabama has its principal place of business in Birmingham, Alabama, and is an independent licensee of the Blue Cross and Blue Shield Association. BCBS of Alabama provides a full spectrum of health care plans and services to approximately 2,905,000 members across the country, including approximately 2,075,000 members in Alabama.

17.     Plaintiff **Blue Cross and Blue Shield of Kansas, Inc. ("BCBS of Kansas")** is a Kansas corporation. BCBS of Kansas has its principal place of business in Topeka, Kansas, and is an independent licensee of the Blue Cross and Blue Shield Association. BCBS of Kansas provides a full spectrum of health care plans and services to approximately 685,374 members.

18.     Plaintiff **Blue Cross and Blue Shield of Nebraska, Inc. (d/b/a "Nebraska Blue") ("BCBS of Nebraska")** is a Nebraska corporation. BCBS of Nebraska has its principal place of business in Omaha, Nebraska, and is an independent licensee of the Blue Cross and Blue Shield Association. BCBS of Nebraska provides a full spectrum of health care plans and services to approximately 707,794 members.

19.      Plaintiff **Blue Cross and Blue Shield of Massachusetts, Inc. ("BCBS of Massachusetts")** is a Massachusetts corporation.  BCBS of Massachusetts has its principal place of business in Boston, Massachusetts, and is an independent licensee of the Blue Cross and Blue Shield Association.  Along with Plaintiff Blue Cross and Blue Shield of Massachusetts HMO Blue, Inc., BCBS of Massachusetts provides a full spectrum of health care plans and services to approximately 2,900,000 members.

20.      Plaintiff **Blue Cross and Blue Shield of Massachusetts HMO Blue, Inc. ("BCBS of Massachusetts HMO Blue")** is a Massachusetts corporation with its principal place of business in Boston, Massachusetts.  BCBS of Massachusetts HMO Blue is an HMO affiliate of Plaintiff BCBS of Massachusetts.  Plaintiffs BCBS of Massachusetts and BCBS of Massachusetts HMO Blue are described herein collectively as "BCBS of Massachusetts Plaintiffs."

21.      Plaintiff **Wellmark, Inc. (d/b/a Wellmark Blue Cross and Blue Shield and d/b/a Wellmark Blue Cross and Blue Shield of Iowa) ("Wellmark")** is an Iowa corporation with its principal place of business in Des Moines, Iowa.  Wellmark is an independent licensee of the Blue Cross and Blue Shield Association.  Together with other Iowa-based Wellmark organizations described in the next paragraph and referred to collectively as "Wellmark of Iowa," Wellmark provides a full spectrum of health care plans and services to approximately 1,222,914 members.

22.      Plaintiffs **Wellmark Health Plan of Iowa, Inc.**; **Wellmark Synergy Health, Inc.**; and **Wellmark Value Health Plan, Inc. (collectively, "Wellmark of Iowa")** are Iowa corporations that each maintain their principal place of business in Des Moines, Iowa.  Each of

these three entities is an affiliate of Plaintiff Wellmark and is an independent licensee of the Blue Cross and Blue Shield Association.

23. Plaintiff **Wellmark of South Dakota, Inc. (d/b/a Wellmark Blue Cross and Blue Shield of South Dakota) ("Wellmark of South Dakota")** is a South Dakota corporation with its principal place of business in Sioux Falls, South Dakota. Wellmark of South Dakota is an independent licensee of the Blue Cross and Blue Shield Association, and it provides a full spectrum of health plans and services to approximately 245,748 members. Plaintiffs Wellmark, Wellmark of Iowa, and Wellmark of South Dakota are described herein collectively as "Wellmark Plaintiffs."

### B. Defendants

24. Defendant Walgreen Co. ("Walgreen Co.") is an Illinois corporation that maintains its corporate headquarters at 200 Wilmot Road in Deerfield, Illinois 60015. Until December 31, 2014, Walgreen Co. had no corporate parent. On December 31, 2014, Walgreen Co. became a wholly-owned subsidiary of Defendant Walgreens Boots Alliance, Inc. pursuant to a merger to effect a reorganization of Walgreen Co. into a holding company structure ("Reorganization"), with Walgreens Boots Alliance, Inc. becoming the parent holding company.[5]

25. Defendant Walgreens Boots Alliance, Inc. ("WBA") is a Delaware corporation with its principal place of business and corporate headquarters at 108 Wilmot Road in Deerfield, Illinois 60015. On December 31, 2014, WBA became the successor of Walgreen Co., pursuant

---

[5] Form 10-K for Fiscal Year ending 08/31/2018, WALGREENS BOOTS ALLIANCE, INC. (Oct. 11, 2018) ("WBA 2018 10-K"), at 1, *available at* https://www.sec.gov/Archives/edgar/data/1618921/000162828018012472/wba-2018831x10k.htm (accessed Mar. 12, 2020).

to the Reorganization, with WBA becoming the direct parent holding company and Walgreen Co. becoming a wholly-owned subsidiary of WBA.[6]

26.     All WBA profits are derived from its wholly-owned operating subsidiaries, including Walgreen Co.  Because of their integrated operations, Walgreen Co. and WBA are referred to herein as "Walgreens."

27.     During the course of the events alleged in this action, Walgreens operated under the trade name Walgreens or through various Walgreens-affiliated store banners across the United States, including but not limited to:  Duane Reade, Kerr Drug, Super D Drug, USA Drug, Happy Harry's, Med-X Drug, May's Drug, and Drug Warehouse (collectively, "Walgreens-affiliated banners").

28.     Walgreens is the largest retail drugstore chain in the United States based on both revenues and number of stores.  Walgreens operates 9,277 retail pharmacies in all fifty states, the District of Columbia, Puerto Rico, and the U.S. Virgin Islands, including 154 drugstores in the state of Alabama, 820 drugstores in the state of Florida, 72 drugstores in the state of Iowa, 71 drugstores in the state of Kansas, 258 drugstores in the commonwealth of Massachusetts, 153 drugstores in the state of Minnesota, 57 drugstores in the state of Nebraska, 362 drugstores in the state of North Carolina, 1 drugstore in the state of North Dakota, 14 drugstores in the state of South Dakota, and 583 drugstores in the state of Illinois.[7]

29.     In September 2017, Walgreens announced that it had secured regulatory clearance to purchase 1,932 Rite Aid pharmacy stores "located primarily in the Northeast and Southern

---

[6] *Id.*

[7] *Id.* at 3; *see also* "Store Count by State," WALGREENS (Aug. 31, 2019), *available at* https://news.walgreens.com/fact-sheets/store-count-by-state.htm (accessed Mar. 8, 2020).

U.S." for approximately $4.2 billion.[8]  By March 27, 2018, Rite Aid completed the transfer of all 1,932 stores to Walgreens,[9] and Walgreens now publicly identifies those locations as "Walgreens-owned Rite Aid stores."[10]

30.    In fiscal year 2019, Walgreens' U.S. retail pharmacies filled 843.7 million prescriptions (including immunizations).  In fiscal year 2019, Walgreens' U.S. retail pharmacy sales revenue exceeded $104.5 billion.[11]

31.    Walgreens refers to itself as "the largest retail pharmacy, health and daily living destination across the United States and Europe."[12]  Approximately 78 percent of the U.S. population lives within five miles of a Walgreens retail pharmacy location.[13]

32.    At all relevant times, Walgreens is and has been a network pharmacy for every Plaintiff, meaning that Plaintiffs' Members can use their prescription drug benefit to fill their prescriptions at Walgreens pharmacy locations at in-network pricing.  When a Walgreens pharmacy dispenses a prescription to a Member, Walgreens causes an electronic claim for

---

[8] WBA 2018 10-K at 72; *see also* "Walgreens Boots Alliance Secures Regulatory Clearance for Purchase of Stores and Related Assets from Rite Aid," WALGREENS BOOTS ALLIANCE, INC. (Sept. 17, 2017), *available at* https://www.walgreensbootsalliance.com/news-media/press-releases/2017/walgreens-boots-alliance-secures-regulatory-clearance-purchase (accessed Mar. 10, 2020).

[9] "Rite Aid Completes Transfer of Stores to Walgreens Boots Alliance and Terminates Tax Benefits Preservation Plan," RITE AID CORP. (Mar. 28, 2018), *available at* https://www.riteaid.com/corporate/news/-/pressreleases/news-room/2018/rite-aid-completes-transfer-of-stores-to-walgreens-boots-alliance-and-terminates-tax-benefits-preservation-plan (accessed Mar. 12, 2020).

[10] *See* "Welcome Rite Aid Pharmacy Patients," WALGREENS, *available at* https://www.walgreens.com/topic/pharmacy/welcome_rite_aid.jsp (accessed Mar. 10, 2020).

[11] Form 10-K for Fiscal Year ending 08/31/2019, WALGREENS BOOTS ALLIANCE, INC. (Oct. 28, 2019) ("WBA 2019 10-K"), at 4, *available at* https://www.sec.gov/Archives/edgar/data/1618921/000161892119000069/wba-2019831x10k.htm (accessed Mar. 12, 2020).

[12] *Id.* at 1.

[13] *Id.* at 4.

reimbursement to be sent to Plaintiffs' PBMs, which then submits a claim for payment to

Plaintiffs. During the relevant time period, Plaintiffs have paid Walgreens through PBMs.

33. Walgreens is a defendant in a related action pending in this Court. On March 23,

2017, a putative nationwide class of third-party payors and insured consumers filed a complaint

in *Forth, et al. v. Walgreen Co. and Walgreens Boots Alliance, Inc.*, Civ. No. 17-cv-02246, ECF

No. 1 (N.D. Ill.) (Lee, J.). The allegations in the *Forth* complaint share a similar factual and

legal nexus to Plaintiffs' allegations here; for example, that Walgreens "used its PSC [Program]

as a mechanism to knowingly and intentionally overcharge consumers and third-party payors . . .

in excess of Walgreens' actual U&C prices" for drugs discounted by Walgreens' retail drug

programs. *Id.* ¶ 6.

## III.   JURISDICTION AND VENUE

### A.   JURISDICTION

34. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1332 and 1367

because Plaintiffs are citizens of Alabama, Florida, Iowa, Kansas, Massachusetts, Minnesota,

Nebraska, North Carolina, North Dakota, and South Dakota; the Defendants are citizens of

Delaware and Illinois; and the amount in controversy exceeds $75,000.

35. This Court has general personal jurisdiction over Defendants because Defendants

maintain their principal places of business at 108 Wilmot Road and 200 Wilmot Road, both in

Deerfield, Illinois, which is located within the Northern District of Illinois.

### B.   VENUE

36. Venue is proper in the United States District Court for the Northern District of

Illinois (Eastern Division) pursuant to 28 U.S.C. §§1391(b-d) because, *inter alia*, both

Defendants reside in, and are subject to personal jurisdiction in, this District at the time Plaintiffs

14

commenced this action and because Defendants' contacts within this District are significant and sufficient to subject it to personal jurisdiction. Further, venue is appropriate in this District because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## IV.  FACTS APPLICABLE TO ALL CLAIMS

### A.  U&C Is The Price Paid By Customers Without Insurance.

37.  U&C is the price customers without insurance pay a given pharmacy for prescription drugs, *i.e.*, the cash or uninsured price. Per the "lesser of" reimbursement formulation, it also serves as a ceiling to how much a pharmacy can charge a health plan (like Plaintiffs) for the drug.

38.  Industry organizations endorse this definition. The Academy of Managed Care Pharmacy ("AMCP")[14] *Guide to Pharmaceutical Payment Methods* (October 2007) defines U&C as "the price for a given drug or service that a pharmacy or other provider would charge a cash-paying customer without the benefit of insurance provided through a payer or intermediary with a contract with the provider." The National Council of Prescription Drug Programs ("NCPDP")[15] standards define the U&C price as the "[a]mount charged cash paying customers for the prescription exclusive of sales tax or other amounts claimed."[16] The U&C price, the

---

[14] AMCP is an industry-wide organization whose membership includes both health systems and PBMs.

[15] NCPDP is an accredited, non-profit organization that maintains the industry standard for electronic transmission and adjudication of pharmacy claims.

[16] *See NCPDP Reference Manual*, Ch. 3 at 72 (rev. Oct. 2005), *available at* https://www.cms.gov/Medicare/Billing/ElectronicBillingEDITrans/downloads/NCPDPflatfile.pdf (accessed Mar. 12, 2020).

NCPDP standards explain, "represents the value that a pharmacist is willing to accept as their total reimbursement for dispensing the product/service to a cash-paying customer."[17]

39. For over a decade, federal health programs have consistently required the cash prices offered by pharmacy discount programs to be reported as a pharmacy's U&C prices. These government rules, regulations, and guidance include:

a. **CMS Guidance to Medicare Part D Sponsors.** CMS published a memo in 2006 that explained: "Wal-Mart recently introduced a program offering a reduced price for certain generics to its customers. The low Wal-Mart price on these specific generic drugs is considered Wal-Mart's 'usual and customary' price, and is not considered a one-time 'lower cash' price. Part D sponsors consider this lower amount to be 'usual and customary' and will reimburse Wal-Mart on the basis of this price."[18]

b. **Medicare Part D Regulations**. U&C price is defined as "the price that an out-of-network pharmacy or a physician's office **charges a customer who does not have any form of prescription drug coverage** for a covered Part D drug."[19]

c. **Medicare Prescription Drug Benefit Manual.** U&C price is defined as "the price that an out-of-network pharmacy or a physician's office **charges a customer who does not have any form of prescription drug coverage** for a covered Part D drug."[20]

_____

[17] _See Telecommunications Version 5_, NCPDP, at 38 (Feb. 2010), _available at_ https://ncpdp.org/members/pdf/Version_5_questions_v35.pdf (accessed Mar. 12, 2020).

[18] _HPMS Q&A – Lower Cash Price Policy_, Memorandum to All Part D Sponsors, Centers for Medicare & Medicaid Services, at 1 (Oct. 11, 2006).

[19] 42 C.F.R. § 423.100 (emphasis added); _see also_ 42 C.F.R. §423.160 (incorporating NCPDP standards into the Medicare Part D program).

[20] _See_ ch. 5, § 10.2, Benefits and Beneficiary Protections (rev. 9/20/2011) (emphasis added).

      d.    **TRICARE Pharmacy Manuals.**  The pharmacy manual for TRICARE, the health care program for uniformed service members, retirees, and their families, defines U&C price to include "'loss leaders, frequent shopper or special customer discounts or programs, competitor's matched price or any and all other discounts, special promotions, and programs causing a reduction in the price offered to that Member . . . Additionally, the Usual and Customary Retail Price must include any applicable discounts offered to attract customers . . . ."[21]

      e.    **Federal Employees Health Benefits Plan Pharmacy Manuals.**  The FEHBP pharmacy manual defines U&C as "**the lowest price Provider would charge a particular patient if such patient were paying cash** for an identical prescription on that particular day at that particular location.  This price must include any applicable discounts offered to attract patients."[22]

      f.    **Walgreens PBM—Walgreens Health Initiative.**  Walgreens Health Initiative ("WHI") was a wholly-owned PBM subsidiary of Walgreen Co. until WHI was acquired by Catalyst Health Solutions in 2011.  WHI's Pharmacy Manual defines U&C as "the cash price including all applicable discounts, coupons or sale price which a cash-paying customer would pay at the pharmacy."[23]  In addition, WHI directed its own network pharmacies to use the standard NCPDP form containing the "usual and customary" field discussed above.

---

[21] *TRICARE Express Scripts Pharmacy Manual* (2013).

[22] *FEHBP CVS/Caremark Manual* (2009) (emphasis added).

[23] Pharmacy Manual, WALGREENS HEALTH INITIATIVES, INC., 25 (Jan. 2011), *available at* http://www.walgreenshealth.com/pdf/forms/Revised_Pharmacy_Manual_2010_Revised_04072010.pdf (accessed Mar. 12, 2020).

40.     State Medicaid programs likewise require cash prices offered by pharmacy discount programs to be reported as a pharmacy's U&C prices. *See, e.g.*, Walgreens' DOJ Settlement.

41.     More specifically, Walgreens knew that the U&C prices for prescription drugs dispensed to Plaintiffs' Members must include prices that Walgreens charged to cash customers paying without insurance, including "discount" prices.

42.     More specifically, Walgreens knew that the U&C prices for prescription drugs dispensed to Plaintiffs' Members must include prices that Walgreens charged to cash customers paying without insurance, including "discount" prices.

43.     At all relevant times, Walgreens knew that Plaintiffs contracted to receive the benefit of the prices that Walgreens charged to its customers who paid without insurance, including "discount" prices, in their reported U&C prices, including, for example, in the following contracts:

### BCBS of Minnesota Plaintiffs

a.     From 2005 until 2014, BCBS of Minnesota Plaintiffs' commercial contracts with Prime defined "usual and customary" prices as "███████████ ████████████████████████████████████████████"[24]

---

[24] Pharmacy Benefit Service Agreement between Prime Therapeutics and BCBS of Minnesota Plaintiffs ("Prime-Minnesota PBSA"), at § 1.31 (Jan. 1, 2005); *see also* Prime-Minnesota PBSA, at § 1.36 (Jan. 1, 2009) (same definition); *see also* Prime-Minnesota PBSA, at § 1.51 (Jan. 1, 2010) (same definition); *see also* Prime-Minnesota PBSA, at § 1.54 (Jan. 1, 2012) (same definition,████████████ ████████); *see also* Amendment to 2012 Prime-Minnesota PBSA, at § 8 (Jan. 1, 2013) (reincorporating same U&C definition); Prime-Minnesota PBSA, at § 1.57 (Jan. 1, 2014) (same definition, █████████████████████████████).

BCBS of Minnesota Plaintiffs' Medicare Part D contracts define "usual and customary" prices in the same way.[25]

b.      Since 2015, BCBS of Minnesota Plaintiffs' commercial contracts with Prime have defined "usual and customary" prices as "



"[26] BCBS of Minnesota Plaintiffs' Medicaid contracts define "usual and customary" prices in the same way.[27]

***Florida Blue Plaintiffs***

c.      In 2006, before Walgreens launched the PSC Program, Florida Blue Plaintiffs' contracts with Prime defined "usual and customary" prices as "

---

[25] Medicare Pharmacy Benefit Services Agreement between Prime Therapeutics and BCBS of Minnesota Plaintiffs ("Prime-Minnesota Medicare PBSA"), Appx. 1, § 109 (Mar. 4, 2009); Third Amendment to Prime-Minnesota Medicare PBSA, at § 3 (Jan. 1, 2011) (reincorporating same U&C definition); Fourth Amendment to Prime-Minnesota Medicare PBSA, at § 7 (Jan. 1, 2012) (same); Fifth Amendment to Prime-Minnesota Medicare PBSA, at § 3 (Jan. 1, 2013) (same); Amended and Restated Prime-Minnesota Medicare PBSA, at Appx. 1, § 5 (Jan. 1, 2014) (same); Prime-Minnesota Medicare PBSA, Appx. 1, § 110 (Jan. 1, 2016) (same); Eleventh Amendment to 2016 Prime-Minnesota Medicare PBSA, at § 5 (Jan. 1, 2018) (reincorporating same U&C definition); Amendment 15 to 2016 Prime-Minnesota Medicare PBSA, at Appx. 1, § 115 (Jan. 1, 2019) (same).

[26] Prime-Minnesota PBSA, at § 1.58 (Jan. 1, 2015); Seventh Amendment to Prime-Minnesota PBSA, at § 3 (Jan. 1, 2017) (reincorporating same U&C definition); Tenth Amendment to Prime-Minnesota PBSA, at § 6 (Jan. 1, 2018) (same); Twelfth Amendment to Prime-Minnesota PBSA, at § 3 (Jan. 1, 2019) (same); Thirteenth Amendment to Prime-Minnesota PBSA, at § 7 (Jan. 1, 2020) (same).

[27] Medicaid PBSA between Prime Therapeutics and BCBS of Minnesota Plaintiffs ("Prime-Minnesota Medicaid PBSA"), § 1.41 (Jan. 1, 2015); Prime-Minnesota Medicaid PBSA, at § 1.42 (Jan. 1, 2016); Third Amendment to 2016 Prime-Minnesota Medicaid PBSA, at § 3 (Jan. 1, 2017) (reincorporating same U&C definition); Fifth Amendment to 2016 Prime-Minnesota Medicaid PBSA, at § 1 (Jan. 1, 2018) (same); Sixth Amendment to 2016 Prime-Minnesota Medicaid PBSA, at § 7 (Jan. 1, 2019) (same); Seventh Amendment to 2016 Prime-Minnesota Medicaid PBSA, at § 5 (Jan. 1, 2020) (same).



"[28]

      d.     In 2009, after Walgreens launched the PSC Program, Florida Blue

Plaintiffs' contracts with Prime amended the definition of "usual and customary" to

explicitly include discounted pricing like those offered through the PSC Program, the

JustRx Program, and third party discount card programs. Since 2009, Florida Blue

Plaintiffs' contracts with Prime have defined "usual and customary" pricing as "

"[29]

### BCBS of North Carolina

      e.     Beginning in 2008, before Walgreens launched the PSC Program

nationwide, BCBS of North Carolina's contracts with its PBM, Medco Health Solutions,

Inc., stated that Medco "

"[30] which are

detailed in paragraphs 51 and 52 below.

      f.     In 2012, BCBS of North Carolina transitioned from using Medco as its

PBM to Prime Therapeutics. Since 2012, BCBS of North Carolina's contracts with

Prime have defined "usual and customary" pricing as "

---

[28] Prime Therapeutics LLC Pharmacy Benefit Service Agreement, § 1.41 (Apr. 26, 2006) ("Prime-Florida Blue PBSA").

[29] Prime-Florida Blue PBSA, § 1.55 (Dec. 15, 2009); *see also* Prime-Florida Blue PBSA, § 1.55 (Dec. 21, 2012) (same definition); Prime-Florida Blue PBSA, § 1.62 (Dec. 29, 2015) (same definition).

[30] *Id.* at § 3.5(d)(4).



,,[31]

### BCBS of Alabama

g.      Before 2010, BCBS of Alabama used Preferred Care Services, Inc. ("PCS"), a wholly-owned subsidiary of BCBS of Alabama, as its PBM.  On information and belief, PCS's contract with Walgreens required Walgreens to report as the pharmacy's U&C price the prices that it offered to its customers who paid without insurance.

h.      In 2010, BCBS of Alabama transitioned from using an internal PBM to Prime Therapeutics.  Since 2010, BCBS of Alabama's contract with Prime has defined "usual and customary" pricing as "

,,[32]

---

[31] BCBSNC Contract # PRI-2011807 at A.17 (Apr. 1, 2012) (emphasis added); BCBSNC Contract # PRI-2011807 at A.150 (Jan. 1, 2015); BCBSNC Medicare Part D Contract # PRI-2020020 at Sched. A, ¶ 251 (Jan. 1, 2019); BCBSNC Contract # PRI-3001474 at A.31 (Jan. 1, 2020).

[32] PBSA between Prime Therapeutics and BCBS of Alabama, at § 1.44 (Dec. 31, 2009).

**BCBS of Kansas**

i.       Since 2010, BCBS of Kansas's contracts with Prime have defined "usual and customary" pricing as "



,"[33]

**BCBS of North Dakota**

j.       Since 2007, BCBS of North Dakota's contracts with Prime have defined "usual and customary" price as "

,"[34] Like other contracts between Plaintiffs and PBMs, those contracts also guaranteed that BCBS of North Dakota and its members would never pay more than Walgreens' U&C price for prescription drugs.[35]

**BCBS of Nebraska**

k.       Since 2010, BCBS of Nebraska's contracts with Prime have defined "usual and customary" price to mean "

---

[33] PBSA between Prime Therapeutics and BCBS of Kansas ("Prime-Kansas PBSA"), at § 1.51 (Jan. 1, 2010); Prime-Kansas PBSA, at § 1.52 (Jan. 1, 2019).

[34] Pharmacy Benefit Service Agreement between Prime Therapeutics LLC and Noridian Mutual Insurance Co. ("Prime-North Dakota PBSA"), § 1.31 (May 4, 2007); Amendment to Prime-North Dakota PBSA, at § 2 (Jan. 1, 2013) (reincorporating same U&C definition); Amendment to Prime-North Dakota PBSA, at § 5 (Jan. 1, 2016) (reincorporating same U&C definition).

[35] *Id.* at § 3.3



,,[36]

### BCBS of Massachusetts Plaintiffs

l.     Since 1999, BCBS of Massachusetts Plaintiffs' contracts with their PBM, Express Scripts, Inc., have defined "usual and customary retail price" as "



,,[37]

### Wellmark Plaintiffs

m.     In 2006, before Walgreens launched the PSC Program, Wellmark Plaintiffs' contracts with their PBM, Catalyst Rx, stated that Wellmark Plaintiffs would reimburse claims "

,,[38] On information and belief, Catalyst Rx's contracts with Walgreens required Walgreens to report as the

---

[36] PBSA between BCBS of Nebraska and Prime Therapeutics ("Prime-Nebraska PBSA"), at § 1.47 (Jan. 1, 2010); Amendment to 2010 Prime-Nebraska PBSA, at § 8 (Jan. 1, 2011) (reincorporating same U&C definition); Amendment to 2010 Prime-Nebraska PBSA, at § 2 (Jan. 1, 2012) (same); Amendment to 2010 Prime-Nebraska PBSA, at § 5 (Jan. 1, 2014) (same); Amendment to 2010 Prime-Nebraska PBSA, at § 4 (Jan. 1, 2016) (same).

[37] Managed Pharmacy Program Agreement between Express Scripts and BCBS of Massachusetts Plaintiffs ("ESI-Massachusetts PBSA"), at § 1 (Jan. 29, 1999); Restated and Amended ESI-Massachusetts PBSA, at § 1 (Jan. 1, 2008); Fourth ESI-Massachusetts PBSA, at § 1 (Jan. 1, 2018) (same definition, but deleting "plus dispensing fee").

[38] Managed Pharmacy Benefit Services Agreement between Wellmark and Catalyst Rx, at Exh. A (July 1, 2006).

pharmacy's U&C price the prices that it offered to its customers who paid without using insurance.

n.      In 2013, Wellmark Plaintiffs transitioned from using Catalyst Rx as their PBM to Catamaran Corp. (formerly SXC Health Solutions), which acquired Catalyst Rx. Wellmark Plaintiffs' contract with Catamaran stated that Wellmark Plaintiffs would reimburse claims "██████████████████████████████████████████████

████████████████████████"[39] While the Wellmark-Catamaran contract does not explicitly define U&C price, Catamaran's 2013 Pharmacy Provider Manual instructed Catamaran's network pharmacies, including Walgreens, that "Usual and Customary (U&C) charge means the usual and customary pricing charged by [Walgreens] to the general public at the time of dispensing, including any advertised or sale prices, discounts, coupons or other deductions."[40]

o.      In 2014, Wellmark Plaintiffs transitioned from using Catamaran Corp. as their PBM to CVS Caremark. Wellmark Plaintiffs' contract with CVS Caremark defines U&C charge as "████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████

---

[39] PBM Services Agreement between Catamaran PBM and Wellmark at SOW No. 4, § 2.1.3 (Jan. 1, 2013); *see also id.* at SOW No. 3, § 2.1.2 ████████████████████████████████████.

[40] "Provider Manual 2013," CATAMARAN CORP., at 13 (2013), *available at* https://docplayer.net/7828098-Provider-manual-2013.html (accessed Mar. 10, 2020).

███████████████████████████████████████

████████████████████,,[41]

44.     Furthermore, under a Participating Pharmacy Agreement and Amendments thereto, between Prime Therapeutics and Walgreens ("Walgreens Prime PPA"), Walgreens agreed to report its U&C charge on all claims submitted to Prime Therapeutics for payment by Plaintiffs who contracted with Prime as their PBM.

45.     The Walgreens Prime PPA required Walgreens to accept as payment *the lesser of* the U&C charge or the post average wholesale price discount and dispensing fees listed in the Agreement.

46.     On information and belief,[42] the Walgreens Prime PPA defines "Usual and Customary" using the same or similar definition as the Plaintiffs' PBM agreements.  The Walgreens Prime PPA requires Walgreens to submit claims electronically or in writing using the industry standard NCPDP Universal Claims Form.

47.     Additionally, the Prime Therapeutics Pharmacy Provider Manual instructs Walgreens to submit, as its U&C charge, "the lowest price [Walgreens] would charge to a particular customer if such customer were paying cash for the identical Prescription Drug Services on the date dispensed.  This includes any applicable discounts including, but not limited

---

[41] PBM Services Agreement between CVS Caremark (CaremarkPCS Health, LLC) and Wellmark at Sched. A § 149 (Nov. 21, 2014).

[42] The Walgreens Prime PPA contains a confidentiality provision preventing disclosure without both parties' consent.  Prime Therapeutics consented to provide the Walgreens Prime PPA, and at Plaintiffs' request, Prime Therapeutics sought Walgreens' consent to provide the Walgreens Prime PPA to Plaintiffs. Walgreens, however, refused to consent.

to, senior discounts, frequent shopper discounts and other special discounts offered to attract customers."[43]

48.     These provisions recognize and implement the NCPDP requirements and industry standards, which required Walgreens to report, as the U&C charge, any discount price offered to cash-paying or "private pay" uninsured customers on all claims submitted to Plaintiffs' PBMs and to accept payment of that discount price as payment in full.

49.     In short, Walgreens was well aware of both the definition of "usual and customary" and how the "usual and customary" price of a particular prescription drug should be calculated.  But Walgreens knowingly and intentionally submitted inflated U&C prices for brand and generic drugs purchased by Plaintiffs' Members in a way that was antithetical to applicable law, requirements, and standards.

**B.      The Pharmacy Claims Reimbursement Process.**

50.     As a general matter, third party payors, including private and government payors, reimburse pharmacies for the insured portion of prescription drugs at the ***lesser of*** a negotiated price (as reflected in the pricing terms of a governing agreement) and the subject pharmacy's U&C price for both brand and generic prescription drugs.

51.     NCPDP establishes and maintains the industry standard for electronic transmission and adjudication of pharmacy claims.  The NCPDP's standard form contains a specific data field, designated as field 426-DQ, in which Walgreens represents its U&C charge for that prescription drug.

---

[43] Pharmacy Provider Manual, PRIME THERAPEUTICS LLC, § 6, at 30 (Mar. 1, 2015) (emphasis added), *available at* https://www.primetherapeutics.com/content/dam/corporate/Documents/Resources/Pharmacists/Pharmacy ProviderResources/ProviderManual/March12015PharmacyProviderManualEffectiveMarch12015.pdf.

52.     NCPDP defines the U&C price transmitted in the 426-DQ data field as the "[a]mount charged cash paying customers for the prescription exclusive of sales tax or other amounts claimed."[44]  The U&C price that Walgreens enters into field 426-DQ on a payment claim, the NCPDP standards explain, must represent "the value that a pharmacist is willing to accept as their total reimbursement for dispensing the product/service to a cash-paying customer."[45]

53.     Congress has adopted the NCPDP standards through federal legislation, including the Health Insurance Portability and Accountability Act ("HIPAA"), the Medicare Modernization Act ("MMA"), and the Health Information Technology for Economic and Clinical Health Act ("HITECH").  HIPAA, for example, requires uniform methods and codes for exchanging electronic information with health insurance plans.  These standards are referred to as the NCPDP Telecommunication Standard.  Pharmacies must report claims using NCPDP standards, *inter alia*, when prescribing drugs under Medicare Part D.[46]

54.     Whenever Walgreens fills a Member's prescription, Walgreens submits its claim for Plaintiffs' reimbursement on a standardized NCPDP electronic claim form.

55.     In the retail pharmacy industry, health plans and other third-party payors often use PBMs to adjudicate and administer prescription benefits with a network of pharmacies on their behalf.  When a health plan employs the services of a PBM, instead of submitting claims directly

---

[44] *See NCPDP Reference Manual*, Ch. 3 at 72 (rev. Oct. 2005), *available at* https://www.cms.gov/Medicare/Billing/ElectronicBillingEDITrans/downloads/NCPDPflatfile.pdf (accessed Mar. 12, 2020).

[45] *See Telecommunications Version 5*, NCPDP, 38 (Feb. 2010), *available at* https://ncpdp.org/members/pdf/Version_5_questions_v35.pdf (accessed Mar. 12, 2020).

[46] 42 C.F.R. § 423.160.

to the health plan, the retail pharmacy submits claims for payment from the health plan to the health plan's chosen PBM. PBMs directly pass on Walgreens' reported U&C prices to Plaintiffs.

56. Walgreens submits its claims seeking Plaintiffs' reimbursement payments to the PBMs that process Plaintiffs' reimbursement claims. Since 2006, Plaintiffs have paid Walgreens through various PBMs, including Medco Health Solutions, Inc.; Catalyst Rx; Catamaran Corp.; CVS Caremark; Express Scripts, Inc.; Preferred Care Services, Inc.; and Prime Therapeutics LLC.

57. The claims-processing and payment mechanics between Plaintiffs, Plaintiffs' various PBMs, and Walgreens work as follows:

a. A Member presents a prescription at a Walgreens pharmacy (or Walgreens-affiliated banner location) and purchases the corresponding prescription drug, less the share of the purchase price covered by the Member's prescription drug benefit.

b. Walgreens then reports to the Plaintiff's PBM the data associated with the sale, including the U&C charge for the drug it dispensed to the Member, which Walgreens reports in NCPDP field 426-DQ.

c. Using Walgreens' reported information, the Plaintiff's PBM adjudicates the claim on Plaintiff's behalf using the "lesser of" logic that incorporates the reported U&C price term.[47] If Walgreens' reported U&C price for the drug at issue is *greater* than the parties' other negotiated prices, Plaintiff pays, through its PBM, the negotiated price to Walgreens. If, on the other hand, Walgreens' reported U&C price for the drug at

---

[47] As described above, third party payors reimburse pharmacies for the insured portion of prescription drugs at the **lesser of** a negotiated price (as reflected in the pricing terms of a governing agreement) or the subject pharmacy's U&C charge for prescription drugs.

28

issue is *less* than the parties' other negotiated prices, then Plaintiff pays, through its PBM, the reported U&C price to Walgreens.

        d.      As part of the claims adjudication process, Plaintiff's PBM transmits to Plaintiffs the numerous fields of claims data in the prescribed NCPDP format, including field 426-DQ, which indicates the U&C charges Walgreens reported for the drug at issue.

58.      At all relevant times, for each and every claim submitted by Walgreens to one of Plaintiffs' PBMs, Walgreens knew that the PBM at issue in turn either transmits Walgreens' reported U&C price (as represented in NCPDP field 426-DQ) to Plaintiffs, uses the reported U&C price when calculating a reimbursement amount per the contractual "lesser of" reimbursement formula, or both.

59.      At all relevant times, Walgreens knew that Plaintiffs directly relied upon Walgreens' reported U&C prices in reimbursing Walgreens through their PBMs, as described above for prescription claims submitted by Walgreens to Plaintiffs via Plaintiffs' PBMs.

60.      At all relevant times, Walgreens knows that the electronic claims adjudication process used the NCPDP field 426-DQ data as a necessary input. Walgreens also knew that Plaintiffs' PBMs and Plaintiffs relied on the NCPDP field 426-DQ data as necessary business information in calculating and paying Members' prescription reimbursements on both brand and generic claims submitted by Walgreens.

      **C.**    **Walgreens Developed its Prescription Savings Club to Compete with "Big Box" Retailers While Maintaining Fraudulently Inflated Reimbursements from Plaintiffs.**

61.      In 2006, "big box" retailers like Walmart began to launch prescription drug programs that offered steeply discounted prices for hundreds of popular prescription drugs to cash customers. For example, in September 2006, Walmart began offering $4 for 30-day

supplies and $10 for 90-day supplies of the most commonly prescribed generic drugs. Walmart's formulary of low-priced generics, which initially included approximately 140 drugs (totaling more than 300 formulations), was matched by Target and partially by Kmart (which offers 90-day supplies at $15). Many non-pharmacy chains, which were able to absorb lower margins on generic drug sales because pharmacy sales represent such a low percentage of total sales, followed suit. Walmart and Target submit their discounted prices as their U&C prices to third party payors, including Plaintiffs.

62. Walgreens executives labeled these competitor programs as "limited promotions" that provided "no significant savings for the vast majority" of cash customers, concluding that programs like Walmart's generics program were "not positive for healthcare."[48]

63. Walgreens was unwilling to price match Walmart and other "big box" retailers on generic drug prices. In response to those competitor programs, however, Walgreens launched its PSC Program in 2007 to target cash customers and other price-sensitive customers. By 2008, Walgreens offered PSC Program prices at all of its U.S. retail pharmacy locations.[49]

64. Initially, Walgreens' PSC Program offered between 300 and 400 generic medications at $12.99 for a 90-day supply. For those medications, Walgreens advertised a discount price list with some basic information about the eligible medications (*e.g.*, the drug name, strength, and quantity).

65. Walgreens' price lists provided limited information that was insufficient to identify specific drugs eligible for discounted PSC Program prices. For instance, Walgreens did

---

[48] *See* Jeffrey A. Rein, Walgreens President & CEO, "*Letter to Shareholders*," 2006 Annual Report, WALGREEN CO., at 4.

[49] Walgreens' DOJ Settlement at ¶ 2(a).

not provide the National Drug Code ("NDC"), a 10-digit universal product identifier for prescription drugs dispensed in the United States. For example, the Walgreens PSC Program price list advertised 90 tabs of Lisinopril 10mg for $12.99.[50] According to the U.S. Food & Drug Administration's NDC Directory, there are at least 24 different products sold by at least 15 different companies that meet this description.[51] Nor did Walgreens provide other industry-standard drug identifiers on its PSC Program price list, like the Generic Product Identifier ("GPI"), Generic Sequence Number ("GSN"), or Generic Code Number ("GCN").

66. The PSC Program was not limited to so-called "value-priced generics" listed on advertised formularies. In addition to these steeply discounted "value-priced" drugs, the PSC Program offered discounted prices on approximately 5,000 to 8,000 other brand and generic prescription drugs to Walgreens' cash-paying customers. Walgreens did not advertise lists or pricing information for the "other name brand and generic prescription medications" eligible for PSC Program prices. Further, Walgreens did not provide lists of the "other name brand and generic prescription medications" eligible for PSC Program prices to Plaintiffs or, on information and belief, to any of the PBMs that processed Plaintiffs' reimbursement claims.

67. Walgreens claimed that these discount prices were only available to cash-paying customers who paid an enrollment fee. But Walgreens' statements to that effect were illusory

---

[50] "Walgreens Prescription Savings Club" (Dec. 13, 2007) (attached as **Exhibit 1**).

[51] The NDCs include: 53217-303-90, 52427-440-90, 43353-113-60, 50090-1737-5, 71335-0536-4, 70934-200-90, 55700-479-90, 55700-513-90, 49999-182-90, 68180-980-09, 68180-514-09, 63739-349-43, 0006-0106-54, 66267-577-90, 68788-8912-9, 68788-6407-9, 68788-9823-9, 68788-6782-9, 68788-9912-9, 63187-098-90, 63187-821-90, 70518-0530-3, and 50436-0353-3. The manufacturers include: Aidarex Pharmaceuticals LLC; Almatica Pharma Inc.; Aphena Pharma Solutions - Tennessee, LLC; A-S Medication Solutions; Bryant Ranch Prepack; Denton Pharma, Inc. DBA Northwind Pharmaceuticals; Lake Erie Medical DBA Quality Care Products LLC; Lupin Pharmaceuticals, Inc.; McKesson Corporation; Merck Sharp & Dohme Corp.; NuCare Pharmaceuticals, Inc.; Preferred Pharmaceuticals Inc.; Proficient Rx LP; REMEDYREPACK INC.; and Unit Dose Services.

and intentionally misleading. Contrary to Walgreens' assertions that the PSC was a fee-based membership program, the "enrollment fee" (which was nominal at best) was a sham. In its recent settlement with the U.S. Department of Justice, for example, Walgreens admitted that it regularly returned "enrollment fees" to its PSC Program enrollees through, *e.g.*, store credits.[52]

68.     But whether Walgreens charged a nominal enrollment fee in certain instances does not alter the fact that—unbeknownst to Plaintiffs—Walgreens offered the PSC to ***anyone*** who wanted to join and made its discounted drug prices under the PSC widely and consistently available to the general public, and thus cannot be excluded from Walgreens' U&C price. Significantly, in *United States ex rel. Garbe v. Kmart Corp.*, the Seventh Circuit stated that "[a]llowing Kmart to insulate high 'usual and customary' prices by artificially dividing its customer base would undermine a central purpose of the statutory and regulatory structure. The 'usual and customary' price requirement should not be frustrated by so flimsy a device as Kmart's 'discount programs.' Because Kmart offered the terms of its 'discount programs' to the general public and made them the lowest prices for which its drugs were widely and consistently available, the Kmart 'discount' prices at issue represented the 'usual and customary' charges for the drugs." 824 F.3d 632, 645 (7th Cir. 2016), *cert. denied*, 137 S.Ct. 627 (Jan. 9, 2017).

69.     The drugs discounted by the PSC Program were not static. Walgreens regularly revised the brand and generic drugs eligible for PSC Program discounts, the price points at which the drugs were eligible, and the quantum of discounts offered on those drugs. When it revised its PSC Program drug lists, Walgreens did not provide notice to Plaintiffs or, on information and belief, to any of the PBMs that processed Plaintiffs' reimbursement claims.

---

[52] Walgreens' DOJ Settlement ¶ 2(b).

70.     Walgreens' PSC Program continues today.  In its current form, which was launched on or about May 1, 2012, Walgreens' PSC Program allows cash-paying customers to purchase hundreds of prescription drugs on its formulary list for $5.00, $10.00, or $15.00 for 30-day supplies and $10.00, $20.00, and $30.00 for 90-day supplies.  The discount price depends on Walgreens' "tier" classification of the particular drug.  Many of the drugs discounted on the formulary are among the most widely-prescribed drugs in the United States.  Walgreens has also represented that even for brand and generic drugs not listed on this formulary, Walgreens offers reduced PSC Program pricing in other denominations to cash paying customers.

71.     Moreover, Walgreens continues to "offer" a similar "Rx savings program"—the JustRx Program—to customers who pay without using insurance at more than 1,900 Walgreens-owned Rite Aid stores,[53] as well as Walgreens- and Duane Reade-branded Walgreens pharmacies.[54]   Walgreens advertises that the JustRx Program is "simple and free; there is no annual or up-front membership fee to participate."[55]  Like the PSC Program, the JustRx Program provides cash-paying customers with discounts on "all" prescription drugs (and not just those listed on program formularies), with significant discounts available on drugs listed on advertised "value-priced medication" formularies.[56]

---

[53] *See* "Welcome Rite Aid Pharmacy Patients," *supra* n. 10 ("Walgreens is pleased to offer existing Rite Aid patients a new Rx savings program called 'JustRx.'  JustRx is simple and free; there is no annual or up-front membership fee to participate.  JustRx offers eligible patients cost savings on over 300 commonly prescribed generic medications, prices starting at $9.99 for a 30 day supply.  It also includes an average of 40% savings on value priced brand drugs that were not previously available.").

[54] "Value Priced Generics," JUSTRX ("Value-Priced Generics . . . [a]vailable at Walgreens, Duane Reade and Rite Aid Pharmacies Operated by Walgreens."), *available at* https://justrx.com/generics (accessed Mar. 10, 2020).

[55] *Id.*

[56] "Frequently Asked Questions," JUSTRX, *available at* https://justrx.com/faq (accessed Mar. 10, 2020).

### D. Walgreens Reported False U&C Charges.

72.     Instead of submitting its discounted PSC Program prices, JustRx Program prices, third party discount card program prices, or other discounted cash prices as U&C, Walgreens inflated the U&C prices that it reported to Plaintiffs and their PBMs by pegging Walgreens' reported U&C prices to higher prices that did not reflect the cash prices offered to PSC Program enrollees, JustRx Program participants, or third party discount program cardholders.

73.     There is no dispute that Walgreens did **not** in fact report its PSC Program prices, JustRx Program prices, or third party discount card program prices, or other discounted prices for prescription drugs made available to those paying without insurance as its U&C price.  For example, with respect to PSC Program prices specifically, Walgreens "admit[ted], acknowledge[d], and accept[ed] responsibility for" failing to do so in its January 2019 settlement stipulation with the U.S. Department of Justice, stating that "Walgreens did not identify its PSC program prices as its U&C prices for the drugs on the PSC formulary" on Medicaid fee-for-service claims.[57]

74.     For many millions of transactions, Walgreens caused Plaintiffs to pay Walgreens the negotiated price because the negotiated price was lower than the *reported inflated* U&C price.  For those many millions of transactions, Walgreens should have reported the true U&C price (*e.g.*, the PSC Program price for a given drug).  Had it done so, the adjudicated price—ultimately the price paid by Plaintiffs for the claim—would have, in many cases, been lower than what Plaintiffs paid based on Walgreens reporting a false and inflated U&C price.

---

[57] Walgreens' DOJ Settlement at ¶ 2.

75.     How Walgreens overcharged Plaintiffs on millions of claims is exemplified by the examples of more than eighty apparent overcharges detailed in **Exhibit 2** to this complaint.[58]

76.     Since 2007, when Walgreens first implemented its PSC Program, Walgreens has submitted to Plaintiffs, through Plaintiffs' PBMs, more than **245 million** brand and generic retail pharmacy claims for payment using the standardized NCPDP format.  For those approximately 245 million claims, Plaintiffs have reimbursed Walgreens more than **$17 billion**.

77.     Walgreens' false and misleading U&C reporting caused Plaintiffs to significantly overpay Walgreens on many millions of those brand and generic Walgreens claims.

**E.     Tolling of the Statute of Limitations.**

78.     As alleged herein, Walgreens affirmatively presented claims for reimbursement to Plaintiffs, through Plaintiffs' PBMs, that contained false and inflated U&C prices and further acted to conceal the true U&C prices being charged to its cash customers.

79.     Furthermore, Walgreens used its marketing of the PSC Program to conceal the fraudulent scheme it had implemented.  Walgreens marketed the PSC Program as being a "club" that required "membership" in order to obtain the discount pricing.  Walgreens' marketing effort was meant to present the PSC Program as an "exclusive" program, not available to the general public.  In reality, however, the PSC Program was not exclusive and was available to the general public.  Walgreens used its marketing to conceal the true nature of the PSC Program and the fact

---

[58] These exemplar overcharges are based on assumptions Plaintiffs have made as a result of the limited information available to them regarding Walgreens PSC Program and will be confirmed through review and analysis of Walgreens' cash transaction data.  As described above in, *inter alia*, paragraph 65, the PSC Program's advertised price lists did not provide all of the information that Plaintiffs need to identify specific drugs eligible for discounted PSC Program prices.  Chiefly, the PSC Program price lists omitted NDCs, GPIs, GCNs, GSNs, or other industry-standard drug identifiers, which are necessary to determine whether an overcharge has indeed occurred.

that cash-paying customers were paying U&C prices that were lower than the U&C prices
Walgreens reported to Plaintiffs.

80.     Walgreens does not provide Plaintiffs with records of transactions involving
Walgreens' cash customers, including cash customers paying PSC Program prices, JustRx
Program prices, third party discount card program prices, or other discounted cash prices.

81.     Plaintiffs had no information regarding how many of Walgreens' customers were
in the PSC Program or JustRx Program, or used third party discount card programs.  Plaintiffs
further had no information regarding the actual cash prices charged to customers enrolled in the
PSC Program, JustRx Program, or other third-party discount card programs on a drug-by-drug
basis, or any other information regarding Walgreens' cash transactions for prescription drugs.

82.     Plaintiffs could not have discovered the truth regarding Walgreens' fraudulent
scheme because Walgreens actively concealed information and data from Plaintiffs that was
necessary to understand the facts underlying Walgreens' scheme.

83.     Walgreens knew that Plaintiffs and Plaintiffs' PBMs would ultimately rely upon
the claims data, including the reported U&C charge, that Walgreens submitted to them to pay the
claims, and Plaintiffs relied on Walgreens to report its U&C charges truthfully and consistent
with industry practice, government regulations, and contract definitions.

84.     Walgreens repeatedly has refused requests made by third party payors like
Plaintiffs to produce relevant cash pricing transaction data necessary to validate Walgreens'
reported U&C prices like those submitted to Plaintiffs, *i.e.*, records of transactions involving
Walgreens' cash-paying and uninsured customers.

85.     Walgreens never notified Plaintiffs that it excluded the prices charged on millions
of its steeply discounted PSC Program, JustRx Program, and third party discount card program

36

sales to cash customers from the U&C prices that it reported to Plaintiffs, through Plaintiffs' PBMs, on claims submitted for payment.

86.     Instead, Walgreens established a two-track U&C pricing system: one price *reported* as U&C on claims for those customers that used an insurance benefit provided by Plaintiffs; and a different—and almost universally lower—price *actually charged* to customers that did not use an insurance benefit (*i.e.*, cash-paying customers).

87.     Under this two-track U&C pricing system, Walgreens knowingly and intentionally submitted inflated prices to Plaintiffs, through Plaintiffs' PBMs, as U&C.

88.     By knowingly and intentionally reporting inaccurate U&C charges to Plaintiffs, through Plaintiffs' PBMs, in order to obtain inflated reimbursements for millions of brand and generic prescriptions filled for and sold to Members at Walgreens pharmacies across the country, knowing at all times that Plaintiffs and Plaintiffs' PBMs would rely upon the NCPDP field 426-DQ data in making payment decisions, Walgreens misled Plaintiffs and caused Plaintiffs to overpay many millions of dollars.

89.     Walgreens submitted millions of claims for payment to Plaintiffs, through Plaintiffs' PBMs—almost all of which included inflated (false) U&C charges.

90.     Walgreens took other active steps to hide its scheme from Plaintiffs.  For example, Walgreens frequently, and without providing any notice to Plaintiffs, changed its PSC Program's scope and prices.  Walgreens also used its marketing terminology as subterfuge to make it look like the PSC Program provided exclusive, limited "club" prices instead of discount cash prices available to the general public.

91.     Walgreens' systematic reporting of inflated U&C charges and its deliberate obfuscation of the cash pricing information for most of the drugs eligible for PSC Program

discounts, *inter alia*, prevented Plaintiffs from recognizing Walgreens' misleading and fraudulent pricing scheme.

92.     Walgreens knowingly and fraudulently concealed its true U&C prices every time it reported prices higher than its PSC Program, JustRx Program, and third party discount card program prices to Plaintiffs, through Plaintiffs' PBMs, in the NCPDP 426-DQ data field—for many millions of prescriptions that it submitted for payment to Plaintiffs.

93.     As a result of Walgreens' fraudulent concealment, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs have as a result of the unlawful conduct alleged in this complaint.[59]

94.     Plaintiffs discovered the bases for the causes of action set forth in this complaint not earlier than January 2019.

95.     Since Plaintiffs were unable to know the truth regarding Walgreens' fraudulent conduct until, at the earliest, January 2019, the discovery rule applies to delay the commencement of any statute of limitations that may be applicable to Plaintiffs' claims resulting from the unlawful conduct alleged in this complaint.

96.     As of the date of filing of this complaint, Walgreens continues to submit inflated U&C prices for payment by Plaintiffs, via Plaintiffs' PBMs, on claims for generic and brand-name prescription drugs.  Walgreens' inflated U&C prices are in excess of the prices that it charges millions of cash-paying customers enrolled in the PSC Program, JustRx Program, or other third-party discount card programs for the very same drugs.  On millions of payment

---

[59] For example, in Illinois, "[i]f a person liable to an action fraudulently conceals the cause of action from the knowledge of the person entitled thereto, the action may be commenced at any time within 5 years after the person entitled to bring the same discovers that he or she has such cause of action, and not afterwards."  735 ILCS 5/13-215.

claims, Walgreens continues to collect higher payment amounts from Plaintiffs than that to which it is entitled.

97. Moreover, to the extent that any statute of limitations applies to any of Plaintiffs' claims, the running of that limitations period has been tolled by the class action tolling doctrine pursuant to the United States Supreme Court's decision in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and subsequent decisions. *See supra* paragraph 33.

## FIRST CLAIM FOR RELIEF (COUNT I)
### FRAUD

98. Plaintiffs incorporate and repeat the allegations set forth in Paragraphs 1 through 97 above.

99. On millions of claims for payment, Walgreens deliberately submitted to Plaintiffs, through Plaintiffs' PBMs, inflated U&C prices in the NCPDP field 426-DQ that were significantly higher than the prices available to individuals who paid without insurance for prescription drugs. Walgreens made misrepresentations to Plaintiffs' PBMs and Plaintiffs each time it reported prices higher than the prices available to individuals who paid without insurance as its U&C charges in the 426-DQ data field on the standardized NCPDP price form.

100. Walgreens' misrepresentations to Plaintiffs' PBMs and Plaintiffs began in 2007 and are ongoing. Walgreens made its misrepresentations to Plaintiffs via Plaintiffs' PBMs, knowing that the fraudulently inflated U&C charges it submitted in field 426-DQ of the NCPDP form would materially impact the adjudication process and be communicated to Plaintiffs as the ultimate payor.

101. Because the U&C price was a payment term necessary for determining Plaintiffs' payment price, the U&C prices Walgreens reported to Plaintiffs' PBMs and Plaintiffs were material.

102.    Walgreens knew that the cash prices that it charged PSC Program customers, JustRx Program customers, and third party discount card customers for prescriptions were lower than the inflated U&C charges that Walgreens reported electronically to Plaintiffs' PBMs and Plaintiffs on the NCPDP form for the same drugs.  Walgreens thus knew that the U&C charges it represented were false and misleading.

103.    Walgreens submitted inflated U&C prices on claims for payment by Plaintiffs with the knowledge and intent that those false U&C prices would be relied upon to adjudicate Plaintiffs' payments, to the benefit of Walgreens.  Specifically, through this fraudulent scheme, Walgreens intended to gain reimbursement payments in amounts far greater than it was entitled.

104.    Plaintiffs lacked the ability to discover Walgreens' fraud.  Plaintiffs had no means to identify how many Walgreens customers were actually paying PSC Program prices, JustRx Program prices, or third party discount card program prices, or to identify the precise list of drugs discounted by those programs, or to identify the prices at which all of those discounted drugs were offered to Walgreens' cash customers.

105.    Plaintiffs justifiably relied on the accuracy of the pricing information that Walgreens reported in NCPDP field 426-DQ.

106.    As a result of Walgreens' fraudulent conduct and Plaintiffs' justifiable reliance, Plaintiffs have sustained immense damage.  Plaintiffs have overpaid hundreds of millions of dollars to Walgreens—if not more.  In addition, Walgreens' fraudulent conduct has prevented Plaintiffs from obtaining more favorable prescription drug prices for their Members.

107.    Walgreens' false and misleading conduct is ongoing:  Walgreens continues to report inflated U&C prices in NCPDP field 426-DQ for claims submitted for payment by Plaintiffs.

40

108.    Plaintiffs are entitled to recover damages against Walgreens based on fraud in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF (COUNT II)
### FRAUDULENT NONDISCLOSURE

109.    Plaintiffs incorporate and repeat the allegations set forth in Paragraphs 1 through 108 above.

110.    Walgreens had special knowledge of material facts, *i.e.*, the accurate, non-inflated U&C prices, which the Plaintiffs did not have.

111.    Walgreens concealed material facts, *i.e.*, the accurate, non-inflated U&C prices, from Plaintiffs' PBMs and Plaintiffs.

112.    Walgreens knew what the accurate, non-inflated U&C prices were for the prescription drugs for which it submitted claims for reimbursement from Plaintiffs' PBMs and Plaintiffs.  These prices were the same prices Walgreens was charging its customers using the PSC Program, JustRx Program, or third party discount programs to purchase the same prescription drugs.

113.    Walgreens knew or should have known that Plaintiffs' PBMs and Plaintiffs would rely upon Walgreens' concealment of the accurate, non-inflated U&C prices to adjudicate Walgreens' claims for reimbursement.

114.    Walgreens had a duty to disclose the accurate, non-inflated U&C prices. Walgreens had special knowledge of the accurate, non-inflated U&C prices that Plaintiffs could not have because the prescription drugs covered under Walgreens' PSC Program, JustRx Program, and third party discount card programs—and the prices for those covered drugs— varied, and none of that relevant information was available to Plaintiffs.

115.    As a result of Walgreens' fraudulent nondisclosure, Plaintiffs have sustained immense damage in the form of overpayments to Walgreens totaling hundreds of millions of dollars.  In addition, Walgreens' fraudulent conduct has prevented Plaintiffs from obtaining more favorable prescription drug prices for its members.

116.    Walgreens' fraudulent conduct is ongoing: Walgreens continues to report inflated U&C prices in NCPDP field 426-DQ for claims submitted for payment by Plaintiffs.

117.    Plaintiffs are entitled to recover damages against Walgreens based on its fraudulent nondisclosures in an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF (COUNT III)
### NEGLIGENT MISREPRESENTATION

118.    Plaintiffs incorporate and repeat the allegations set forth in Paragraphs 1 through 117 above.

119.    Walgreens made false statements of material fact each time it failed to report its PSC Program, JustRx Program, or third party discount card program pricing as its U&C price on a claim it submitted to Plaintiffs' PBMs for reimbursement by Plaintiffs.

120.    Walgreens knew or should have known that the prices it reported in field 426-DQ on claims submitted for Plaintiffs' reimbursement were false.

121.    At the very least, Walgreens exercised both carelessness and negligence in ascertaining the truth of the U&C prices it reported in field 426-DQ on claims submitted for Plaintiffs' reimbursement.

122.    Walgreens controls the mechanism by which it calculates and reports its U&C prices.  At all relevant times, Walgreens knew that Plaintiffs and their PBMs would rely upon the information that Walgreens calculated and supplied as its U&C price in field 426-DQ to calculate payment amounts in millions of reimbursement transactions.  Because Walgreens

42

calculates and reports the U&C prices that its pharmacies report on claims for reimbursement by Plaintiffs and their PBMs, Walgreens is in the business of supplying information for the guidance of others in their business transactions. Walgreens consequently owed Plaintiffs a duty to communicate accurate information to Plaintiffs.

123. Walgreens intended for Plaintiffs' PBMs and Plaintiffs to use the U&C prices it reported in field 426-DQ on claims submitted for Plaintiffs' reimbursement to reimburse claims in accordance with the "lesser of" calculation contained in the Walgreens-Prime PPA (and similar agreements between Walgreens and Plaintiffs' PBMs) and the contracts between Plaintiffs and Plaintiffs' PBMs.

124. Plaintiffs acted in reliance on Walgreens' false statements of fact by reimbursing millions of claims according to the prices submitted by Walgreens, including U&C prices reported in field 426-DQ.

125. As a result of Walgreens' misrepresentations, Plaintiffs have sustained immense damage in the form of overpayments to Walgreens totaling hundreds of millions of dollars. In addition, Walgreens' negligent conduct has prevented Plaintiffs from obtaining more favorable prescription drug prices for its members.

126. Walgreens' negligent conduct is ongoing: Walgreens continues to report inflated U&C prices in NCPDP field 426-DQ for claims submitted for payment by Plaintiffs.

127. Plaintiffs are entitled to recover damages against Walgreens based on its negligent misrepresentations in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF (COUNT IV)
## VIOLATION OF THE ILLINOIS UNIFORM
## DECEPTIVE TRADE PRACTICES ACT (815 ILCS 510, *et seq.*)

128.     Plaintiffs incorporate and repeat the allegations set forth in Paragraphs 1 through 127 above.

129.     Walgreens' business acts and practices alleged herein constitute deceptive trade practices under the Illinois Uniform Deceptive Trade Practices Act ("IUDTPA").

130.     Each Plaintiff and each Defendant is, and at all relevant or material times was, a "person" as defined in IUDTPA.[60]

131.     Walgreens' deceptive trade practices included, but were not limited to: (i) making false and misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions; and (ii) engaging in conduct which similarly created a likelihood of confusion or misunderstanding.

132.     At all material and relevant times, Walgreens' wrongful acts occurred in the course of its "business, vocation, or occupation" as described in IUDTPA.[61]

133.     Walgreens represented that the prices it reported in NCPDP field 426-DQ were Walgreens' true and accurate U&C prices.  Walgreens' representations were false, and Walgreens' true and accurate U&C prices for the prescription drugs for which it sought reimbursement from Plaintiffs' PBMs and Plaintiffs were lower than the prices quoted by Walgreens.

---

[60] *See* 815 ILCS 510/1(2) ("'[P]erson' means an individual, corporation, government or governmental subdivision or agency, business trust, estate, trust, partnership, unincorporated association, 2 or more of any of the foregoing having a joint or common interest or any other legal or commercial entity.").

[61] 815 ILCS 510/2.

134.    The true and accurate U&C prices for the prescription drugs for which Walgreens sought reimbursement were the actual prices at which the prescription drugs were regularly and customarily sold at retail by Walgreens, inclusive of any prices offered to customers paying without insurance who participated in the PSC Program, JustRx Program, or third party discount card program.

135.    Walgreens actions are ongoing: Walgreens continues to report inflated U&C prices in NCPDP field 426-DQ for claims submitted for payment by Plaintiffs.  As a result, Plaintiffs face the threat of future harm.

136.    Walgreens' deceptive practices regarding its true U&C prices of drugs discounted by the PSC Program (and other similar programs) were directed at and impacted the market generally and/or otherwise implicate consumer protection concerns, and remedying Walgreens' wrongdoing through the relief requested herein would serve the interests of consumers.

137.    Because Walgreens continues its U&C overcharging conduct described in this complaint, Plaintiffs are likely to be damaged by Walgreens' continued deceptive trade practices. Consequently, Plaintiffs seek injunctive relief, pursuant to 815 ILCS 510/3, to enjoin Walgreens from excluding PSC Program prices, JustRx Program prices, or third party discount card program prices from the U&C prices it reports on claims for Plaintiffs' reimbursement.

138.    Because Walgreens has willfully engaged in the deceptive trade practices described in this complaint, Plaintiffs are entitled to recover attorneys' fees and costs of suit.

## FIFTH CLAIM FOR RELIEF (COUNT V)
## VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND
## DECEPTIVE BUSINESS PRACTICES ACT (815 ILCS 505, *et seq.*)

139.    Plaintiffs incorporate and repeat the allegations set forth in Paragraphs 1 through 138 above.

140.    Walgreens' business acts and practices alleged herein constitute unfair, unconscionable, deceptive, and fraudulent acts or practices under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA").

141.    Each Plaintiff and each Defendant is, and at all relevant or material times was, a "person" as defined in ICFA.[62]

142.    Because Plaintiffs suffered actual damage as a result of Walgreens' ICFA violations, Plaintiffs are statutorily authorized to bring a private action to recover actual economic damages, reasonable attorney's fees, and litigation costs, and to secure injunctive relief against Defendants.

143.    Defendants engaged in unfair, deceptive, and unlawful acts and practices, including the employment of deception, fraud, false pretenses, misrepresentations to Plaintiffs, and the concealment, suppression and omission of material facts from Plaintiffs, with the specific intent that the Plaintiffs would rely upon those deceptive acts and practices to reimburse claims to Walgreens.

144.    At all material and relevant times, Walgreens' wrongful acts occurred in the course of its business and in the conduct of trade and commerce, as defined by ICFA.[63]

---

[62] *See* 815 ILCS 505/1(c) ("The term 'person' includes[, *inter alia*,] any natural person or his legal representative, partnership, corporation (domestic and foreign), company, trust, business entity or association.").

[63] 815 ILCS 505/2.

Walgreens' unfair, unlawful, and deceptive acts and practices alleged herein regarding its true U&C prices occurred during and related directly to the routine purchase, sale, and reimbursement of prescription drugs at Walgreens pharmacies.

145.   Further, Walgreens marketed, promoted, advertised, and distributed the PSC Program cards, JustRx Program cards, other third party discount program cards, and marketing materials in conjunction with PSC Program, JustRx Program, and third party discount program cards, that "purport[ed] to offer discounts or access to discounts from health care providers in health related purchases," but the "the discounts or access to discounts offered or the range of discounts or access to the range of discounts offered," and Walgreens' intent for offering those discounts, were misleading, deceptive, and fraudulent.[64]

146.   Walgreens displayed price quotations through submission of claims for reimbursement for prescription drugs to Plaintiffs' PBMs and Plaintiffs. Walgreens' price quotations were included in NCPDP field 426-DQ of its claims for reimbursement.

147.   Walgreens represented that its price quotations included in NCPDP field 426-DQ were U&C prices. Walgreens' representations were false, and Walgreens' true and accurate U&C prices for the prescription drugs for which it sought reimbursement from Plaintiffs' PBMs and Plaintiffs were lower than the prices quoted by Walgreens.

148.   The true and accurate U&C prices for the prescription drugs for which Walgreens sought reimbursement were the actual prices at which the prescription drugs were regularly and customarily sold at retail by Walgreens, inclusive of any prices offered to customers paying without insurance who participated in the PSC Program, JustRx Program, or third party discount card program.

---

[64] 815 ILCS 505/2B.3.

149. Walgreens actions are ongoing: Walgreens continues to report inflated U&C prices in NCPDP field 426-DQ for claims submitted for payment by Plaintiffs. As a result, Plaintiffs face the threat of future harm.

150. Walgreens' unfair and deceptive acts and practices regarding its true U&C prices of drugs discounted by the PSC Program (and other similar programs) were directed at and impacted the market generally and/or otherwise implicate consumer protection concerns, and remedying Walgreens' wrongdoing through the relief requested herein would serve the interests of consumers.

151. Walgreens' acts, omissions, and practices, as described herein, proximately caused Plaintiffs to suffer actual damages in the form of, *inter alia*, overpaying reimbursements on at least millions of prescription claims. Pursuant to 815 ILCS 505/10a, Plaintiffs are entitled to the amount of the actual economic damages resulting from Walgreens' unlawful trade practices.

152. Plaintiffs also seek injunctive relief, pursuant to 815 ILCS 505/10a(c), to enjoin Walgreens from excluding PSC Program prices, JustRx Program prices, or third party discount card program prices from the U&C prices it reports on claims for Plaintiffs' reimbursement.

## SIXTH CLAIM FOR RELIEF (COUNT VI)
### VIOLATION OF THE MINNESOTA UNLAWFUL
### TRADE PRACTICES ACT (MINN. STAT. §§ 8.31, 325D.09-.16)

153. Plaintiffs incorporate and repeat the allegations set forth in Paragraphs 1 through 152 above.

154. Walgreens' business acts and practices alleged herein constitute unfair, unconscionable, deceptive, and fraudulent acts or practices under the Minnesota Unlawful Trade Practices Act ("MUTPA").

155.    Walgreens is a seller of merchandise at retail, including generic and brand prescription drugs.

156.    Each Plaintiff and Defendant is, and at all relevant and material times was, a "person" as defined in the MUTPA.[65]

157.    Walgreens displayed price quotations through submission of claims for reimbursement for prescription drugs to Plaintiffs' PBMs and Plaintiffs. Walgreens' price quotations were included in NCPDP field 426-DQ of its claims for reimbursement.

158.    Walgreens represented that its price quotations included in NCPDP field 426-DQ were U&C prices. Walgreens' representation was false, and Walgreens' true and accurate U&C prices for the prescription drugs for which it sought reimbursement from Plaintiffs' PBM and Plaintiffs were lower than the prices quoted by Walgreens.

159.    The true and accurate U&C prices for the prescription drugs for which Walgreens sought reimbursement were the actual prices at which the prescription drugs were regularly and customarily sold at retail by Walgreens.

160.    Walgreens actions are ongoing: Walgreens continues to report inflated U&C prices in NCPDP field 426-DQ for claims submitted for payment by Plaintiffs. As a result, Plaintiffs face the threat of future harm.

161.    Walgreens' acts, omissions, and practices, as described herein, proximately caused Plaintiffs to suffer actual damages in the form of, inter alia, overpaying reimbursements on millions of prescription claims. Pursuant to Minn. Stat. § 325D.15, Plaintiffs are entitled to the amount of the actual damages resulting from Walgreens' unlawful trade practices.

---

[65] *See* Minn. Stat. Ann. § 325D.10(a) ("The term 'person' includes any individual, firm, partnership, corporation or other organization, whether organized for profit or not.").

49

162. Plaintiffs also seek injunctive relief, pursuant to Minn. Stat. § 325D.15, to enjoin Walgreens from excluding PSC Program prices, JustRx Program prices, or third party discount card program prices from the U&C prices it reports on claims for Plaintiffs' reimbursement.

163. Walgreens' unlawful conduct is not individualized, and relief will serve the public benefit.

**SEVENTH CLAIM FOR RELIEF (COUNT VII)**
**VIOLATION OF THE MINNESOTA UNIFORM**
**DECEPTIVE TRADE PRACTICES ACT (MINN. STAT. §§ 8.31, 325D.43-.48)**

164. Plaintiffs incorporate and repeat the allegations set forth in Paragraphs 1 through 163 above.

165. Walgreens' business acts and practices alleged herein constitute unfair, unconscionable, deceptive, and fraudulent acts or practices under the Minnesota Uniform Deceptive Trade Practices Act ("MUDTPA").

166. Each Plaintiff and Defendant is, and at all relevant and material times was, a "person" for purposes of the MUDTPA.

167. Walgreens' business acts and practices, as alleged herein, violate MUDTPA for the following reasons:

a. Walgreens engaged in unconscionable commercial practices in failing to reveal material facts and information about Walgreens' true U&C prices, which misled Plaintiffs about facts that could not reasonably be known by Plaintiffs;

b. Walgreens failed to reveal facts that were material to the transactions at issue in light of representations of fact made in a positive manner;

c. Walgreens failed to reveal material facts about Walgreens' true U&C prices to Plaintiffs with the intent that Plaintiffs would rely upon those omissions; and

50

   d.  Walgreens made material representations and statements of fact to Plaintiffs that resulted in Plaintiffs reasonably believing the represented or suggested state of affairs to be other than what they actually were.

168. Walgreens intended that Plaintiffs rely on their misrepresentations and omissions, so that Plaintiffs would reimburse millions of claims at inflated rates.

169. Had Plaintiffs known Walgreens' true U&C prices, Plaintiffs would have paid millions of dollars less for the reimbursement of claims submitted by Walgreens.

170. Walgreens' actions caused a likelihood of confusion or misunderstanding regarding the true and accurate U&C prices for the prescription drugs dispensed to Plaintiffs' Members.

171. Walgreens' actions are ongoing: Walgreens continues to report inflated U&C prices in NCPDP field 426-DQ for claims submitted for payment by Plaintiffs.

172. Walgreens' acts, omissions, and practices, as described herein, proximately caused Plaintiffs to suffer actual damages in the form of, inter alia, overpaying reimbursements on millions of prescription claims.  Pursuant to Minn. Stat. § 325D.45, Plaintiffs are entitled to recover attorneys' fees and costs of suit.

173. Plaintiffs seek injunctive relief, pursuant to Minn. Stat. § 325D.45, to enjoin Walgreens from excluding PSC Program prices, JustRx Program prices, or third party discount card program prices from the U&C prices it reports on claims for Plaintiffs' reimbursement.

174. Walgreens' unlawful conduct is not individualized, and relief will serve the public benefit.

**EIGHTH CLAIM FOR RELIEF (COUNT VIII)**
**VIOLATION OF THE MASSACHUSETTS CONSUMER**
**PROTECTION LAW (MASS. GEN. LAWS CH. 93A, §§ 1-11)**

175.    Plaintiffs incorporate and repeat the allegations set forth in Paragraphs 1 through 174 above.

176.    Walgreens' business acts and practices alleged herein constitute unfair, unconscionable, deceptive, and fraudulent acts or practices under the Massachusetts Consumer Protection Law ("MCPL").

177.    Each Plaintiff and Defendant is, and at relevant and material times was, a "person" as defined in the MCPL.[66]

178.    Walgreens' business acts and practices, as alleged herein, violate the MCPL for the following reasons:

      a.    Walgreens engaged in unfair and deceptive commercial practices in failing to reveal material facts and information about Walgreens' true U&C prices, which misled Plaintiffs about facts that could not reasonably be known by Plaintiffs;

      b.    Walgreens failed to reveal facts that were material to the transactions at issue in light of representations of fact made in a positive manner;

      c.    Walgreens failed to reveal material facts about Walgreens' true U&C prices to Plaintiffs with the intent that Plaintiffs would rely upon those omissions; and

      d.    Walgreens made material representations and statements of fact to Plaintiffs that resulted in Plaintiffs reasonably believing the represented or suggested state of affairs to be other than what they actually were.

---

[66] *See* Mass. Gen. Laws ch. 93A, § 1(a) ("'Person' shall include, where applicable, natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entity.").

179.     Walgreens intended that Plaintiffs rely on their misrepresentations and omissions, so that Plaintiffs would reimburse millions of claims at inflated rates.

180.     Walgreens committed the acts, omissions, and practices giving rise to Plaintiffs' claims primarily and substantially within the commonwealth.

181.     Had Plaintiffs known Walgreens' true U&C prices, Plaintiffs would have paid millions of dollars less for the reimbursement of claims submitted by Walgreens.

182.     Walgreens' actions caused a likelihood of confusion or misunderstanding regarding the true and accurate U&C prices for the prescription drugs dispensed to Plaintiffs' Members.

183.     Walgreens' actions are ongoing: Walgreens continues to report inflated U&C prices in NCPDP field 426-DQ for claims submitted for payment by Plaintiffs.

184.     Walgreens' acts, omissions, and practices, as described herein, proximately caused Plaintiffs to suffer actual damages in the form of, *inter alia*, overpaying reimbursements on millions of prescription claims.  Pursuant to Mass. Gen. Laws ch. 93A § 11, Plaintiffs are entitled to recover attorneys' fees and costs of suit.

185.     Walgreens' acts, omissions, and practices, as described herein, were committed willfully and knowingly.  As such, Plaintiffs are entitled to three times the actual damages suffered, pursuant to Mass. Gen. Laws ch. 93A § 11.

186.     Plaintiffs seek injunctive relief, pursuant to Mass. Gen. Laws ch. 93A § 11, to enjoin Walgreens from excluding PSC Program prices, JustRx Program prices, or third party discount card program prices from the U&C prices it reports on claims for Plaintiffs' reimbursement.

**NINTH CLAIM FOR RELIEF (COUNT IX)**
**VIOLATION OF THE SOUTH DAKOTA DECEPTIVE**
**TRADE PRACTICES AND CONSUMER PROTECTION LAW**
**(S.D. CODIFIED LAWS § 37-24-1, *et seq.*)**

187. Plaintiffs incorporate and repeat the allegations set forth in Paragraphs 1 through 186 above.

188. Walgreens' business acts and practices alleged herein constitute unfair, deceptive, and fraudulent acts or practices under the South Dakota Deceptive Trade Practices and Consumer Protection Law ("DTPCPL").

189. Each Plaintiff and Defendant is, and at relevant and material times was, a "person" as defined in the DTPCPL.[67]

190. Walgreens' business acts and practices, as alleged herein, violate DTPCPL for the following reasons:

a. Walgreens knowingly engaged in deceptive and fraudulent commercial practices in failing to reveal material facts and information about Walgreens' true U&C prices, which misled Plaintiffs about facts that could not reasonably be known by Plaintiffs;

b. Walgreens failed to reveal facts that were material to the transactions at issue in light of representations of fact made in a positive manner;

c. Walgreens failed to reveal material facts about Walgreens' true U&C prices to Plaintiffs with the intent that Plaintiffs would rely upon those omissions; and

---

[67] *See* S.D. Codified Laws § 37-24-1(8) ("Person" means "a natural person or his legal representative, a partnership, a limited liability company (domestic or foreign), a corporation (domestic or foreign), a trust, an incorporated or unincorporated association, and any other legal entity").

d.  Walgreens made material representations and statements of fact to Plaintiffs that resulted in Plaintiffs reasonably believing the represented or suggested state of affairs to be other than what they actually were.

191.  Walgreens intended that Plaintiffs rely on their misrepresentations and omissions, so that Plaintiffs would reimburse millions of claims at inflated rates.

192.  Had Plaintiffs known Walgreens' true U&C prices, Plaintiffs would have paid millions of dollars less for the reimbursement of claims submitted by Walgreens.

193.  Plaintiffs have been adversely affected by Walgreens' acts, omissions, and practices, as described herein.

194.  Walgreens' actions caused a likelihood of confusion or misunderstanding regarding the true and accurate U&C prices for the prescription drugs dispensed to Plaintiffs' Members.

195.  Walgreens' actions are ongoing: Walgreens continues to report inflated U&C prices in NCPDP field 426-DQ for claims submitted for payment by Plaintiffs.

196.  Walgreens' acts, omissions, and practices, as described herein, proximately caused Plaintiffs to suffer actual damages in the form of, inter alia, overpaying reimbursements on millions of prescription claims.  Consequently, Plaintiffs seek actual damages pursuant to S.D. Codified Laws § 37-24-31.

## TENTH CLAIM FOR RELIEF (COUNT X)
## VIOLATION OF THE NEBRASKA UNIFORM DECEPTIVE
## TRADE PRACTICES ACT (NEB. REV. STAT. § 87-301, *et seq.*)

197.    Plaintiffs incorporate and repeat the allegations set forth in Paragraphs 1 through 196 above.

198.    Walgreens' business acts and practices alleged herein constitute unconscionable and deceptive trade practices under the Nebraska Uniform Deceptive Trade Practices Act ("UDTPA"), Neb. Rev. Stat. § 87-302.

199.    Each Plaintiff is, and at relevant and material times was, a "person" as defined in the UDTPA.[68]

200.    Walgreens' business acts and practices, as alleged herein, violate the UDTPA for the following reasons:

a.    Walgreens engaged in unconscionable commercial practices in failing to reveal material facts and information about Walgreens' true U&C prices, which misled Plaintiffs about facts that could not reasonably be known by Plaintiffs;

b.    Walgreens failed to reveal facts that were material to the transactions at issue in light of representations of fact made in a positive manner;

c.    Walgreens failed to reveal material facts about Walgreens' true U&C prices to Plaintiffs with the intent that Plaintiffs would rely upon those omissions; and

d.    Walgreens made material representations and statements of fact to Plaintiffs that resulted in Plaintiffs reasonably believing the represented or suggested state of affairs to be other than what they actually were.

---

[68] *See* Neb. Rev. Stat. Ann. § 87-301(19) ("Person means a natural person, a corporation, a government, a governmental subdivision or agency, a business trust, an estate, a trust, a partnership, a joint venture, a limited liability company, an unincorporated association, a sole proprietorship, or two or more of any of such persons having a joint or common interest or any other legal or commercial entity.").

201.     Walgreens intended that Plaintiffs rely on their misrepresentations and omissions, so that Plaintiffs would reimburse millions of claims at inflated rates.

202.     Had Plaintiffs known Walgreens' true U&C prices, Plaintiffs would have paid millions of dollars less for the reimbursement of claims submitted by Walgreens.

203.     Walgreens' actions caused a likelihood of confusion or misunderstanding regarding the true and accurate U&C prices for the prescription drugs dispensed to Plaintiffs' Members.

204.     Walgreens' actions are ongoing: Walgreens continues to report inflated U&C prices in NCPDP field 426-DQ for claims submitted for payment by Plaintiffs.

205.     Plaintiffs seek injunctive relief, pursuant to Neb. Rev. Stat. § 87-303, to enjoin Walgreens from excluding PSC Program prices, JustRx Program prices, or third party discount card program prices from the U&C prices it reports on claims for Plaintiffs' reimbursement.

206.     Walgreens' acts, omissions, and practices, as described herein, demonstrate that it has willfully engaged in trade practices that it knows to be deceptive.  Pursuant to Neb. Rev. Stat. § 87-303, Plaintiffs are entitled to recover attorneys' fees and costs of suit.

### ELEVENTH CLAIM FOR RELIEF (COUNT XI)
### VIOLATION OF THE NEBRASKA CONSUMER PROTECTION ACT
### (NEB. REV. STAT. § 59-1601, *et seq.*)

207.     Plaintiffs incorporate and repeat the allegations set forth in Paragraphs 1 through 206 above.

208.     Walgreens' business acts and practices alleged herein constitute unfair and deceptive acts or practices under the Nebraska Consumer Protection Act ("NCPA"), Neb. Rev. Stat. § 59-1601, *et seq.*

209.    Each Plaintiff and Defendant is, and at all relevant and material times was, a "person" as defined in the NCPA.[69]

210.    Walgreens' business acts and practices, as alleged herein, violate the NCPA for the following reasons:

a.    Walgreens knowingly engaged in deceptive and fraudulent commercial practices in failing to reveal material facts and information about Walgreens' true U&C prices, which misled Plaintiffs about facts that could not reasonably be known by Plaintiffs;

b.    Walgreens failed to reveal facts that were material to the transactions at issue in light of representations of fact made in a positive manner;

c.    Walgreens failed to reveal material facts about Walgreens' true U&C prices to Plaintiffs with the intent that Plaintiffs would rely upon those omissions; and

d.    Walgreens made material representations and statements of fact to Plaintiffs that resulted in Plaintiffs reasonably believing the represented or suggested state of affairs to be other than what they actually were.

211.    Walgreens intended that Plaintiffs rely on their misrepresentations and omissions, so that Plaintiffs would reimburse millions of claims at inflated rates.

212.    Had Plaintiffs known Walgreens' true U&C prices, Plaintiffs would have paid millions of dollars less for the reimbursement of claims submitted by Walgreens.

213.    Plaintiffs have been adversely affected by Walgreens' acts, omissions, and practices, as described herein.

---

[69] *See* Neb. Rev. Stat. § 59-1601(1) ("Person shall mean natural persons, corporations, trusts, unincorporated associations, partnerships, and limited liability companies.").

214.    Walgreens' actions caused a likelihood of confusion or misunderstanding regarding the true and accurate U&C prices for the prescription drugs dispensed to Plaintiffs' Members.

215.    Walgreens' actions are ongoing: Walgreens continues to report inflated U&C prices in NCPDP field 426-DQ for claims submitted for payment by Plaintiffs.

216.    Walgreens' acts, omissions, and practices, as described herein, proximately caused Plaintiffs to suffer actual damages in the form of, inter alia, overpaying reimbursements on millions of prescription claims.  Consequently, Plaintiffs seek actual damages, as well as enhanced damages bearing a reasonable relation to actual damages, pursuant to Neb. Rev. Stat. § 59-1609.

217.    In additional to actual and enhanced damages, pursuant to Neb. Rev. Stat. § 59-1609, Plaintiffs are entitled to recover attorneys' fees and costs of suit.

## TWELFTH CLAIM FOR RELIEF (COUNT XII)
### VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT (FLA. STAT. § 501.201, *et seq.*)

218.    Plaintiffs incorporate and repeat the allegations set forth in Paragraphs 1 through 217 above.

219.    Walgreens' business acts and practices alleged herein constitute unfair, unconscionable, and deceptive acts and practices under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201, *et seq.*

220.    Each Plaintiff is, and at all relevant times was, a "consumer" for purposes of the FDUTPA.[70]

---

[70] *See* Fla. Stat. Ann. § 501.203(7) ("'Consumer' means an individual; child, by and through its parent or legal guardian; business; firm; association; joint venture; partnership; estate; trust; business trust; (Continued...)

221.    Walgreens' business acts and practices, as alleged herein, were done while engaging in trade or commerce in the State of Florida.

222.    Walgreens' business acts and practices, as alleged herein, violate the FDUTPA for the following reasons:

a.    Walgreens engaged in unfair, unconscionable, and deceptive commercial practices in failing to reveal material facts and information about Walgreens' true U&C prices, which misled Plaintiffs about facts that could not reasonably be known by Plaintiffs;

b.    Walgreens failed to reveal facts that were material to the transactions at issue in light of representations of fact made in a positive manner;

c.    Walgreens failed to reveal material facts about Walgreens' true U&C prices to Plaintiffs with the intent that Plaintiffs would rely upon those omissions; and

d.    Walgreens made material representations and statements of fact to Plaintiffs that resulted in Plaintiffs reasonably believing the represented or suggested state of affairs to be other than what they actually were.

223.    Walgreens intended that Plaintiffs rely on their misrepresentations and omissions, so that Plaintiffs would reimburse millions of claims at inflated rates.

224.    Had Plaintiffs known Walgreens' true U&C prices, Plaintiffs would have paid millions of dollars less for the reimbursement of claims submitted by Walgreens.

---

syndicate; fiduciary; corporation; any commercial entity, however denominated; or any other group or combination.").

225.     Walgreens' actions caused a likelihood of confusion or misunderstanding regarding the true and accurate U&C prices for the prescription drugs dispensed to Plaintiffs' Members.

226.     Walgreens' actions are ongoing: Walgreens continues to report inflated U&C prices in NCPDP field 426-DQ for claims submitted for payment by Plaintiffs.

227.     Walgreens' acts, omissions, and practices, as described herein, proximately caused Plaintiffs to suffer actual damages in the form of, *inter alia*, overcharges on reimbursements for millions of prescription claims.  Pursuant to Fla. Stat. § 501.2105, Plaintiffs are entitled to recover attorneys' fees and costs of suit, in addition to actual damages.

228.     Plaintiffs seek a declaratory judgment, pursuant to Fla. Stat. § 501.2105, declaring that Walgreens' acts and practices are unfair and deceptive and in violation of FDUTPA.

229.     Plaintiffs seek injunctive relief, pursuant to Fla. Stat. § 501.2105, to enjoin Walgreens from excluding PSC Program prices, JustRx Program prices, or third party discount card program prices from the U&C prices it reports on claims for Plaintiffs' reimbursement.

**THIRTEENTH CLAIM FOR RELIEF (COUNT XIII)**
**VIOLATION OF THE NORTH CAROLINA UNFAIR AND**
**DECEPTIVE TRADE PRACTICES ACT (N.C. GEN. STAT. § 75-1, *et seq.*)**

230.     Plaintiffs incorporate and repeat the allegations set forth in Paragraphs 1 through 229 above.

231.     Walgreens' business acts and practices alleged herein constitute unfair, and deceptive acts and practices under the North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA"), N.C. Gen. Stat. § 75-1, *et seq.*

232.     Each Plaintiff and Defendant is, and at all relevant and material times was, a "person, firm, or corporation" for purposes of the UDTPA.

233. Walgreens' business acts and practices, as alleged herein, violate the NCUDTPA for the following reasons:

    a. Walgreens engaged in unfair, unconscionable, and deceptive commercial practices in failing to reveal material facts and information about Walgreens' true U&C prices, which misled Plaintiffs about facts that could not reasonably be known by Plaintiffs;

    b. Walgreens failed to reveal facts that were material to the transactions at issue in light of representations of fact made in a positive manner;

    c. Walgreens failed to reveal material facts about Walgreens' true U&C prices to Plaintiffs with the intent that Plaintiffs would rely upon those omissions; and

    d. Walgreens made material representations and statements of fact to Plaintiffs that resulted in Plaintiffs reasonably believing the represented or suggested state of affairs to be other than what they actually were.

234. Walgreens intended that Plaintiffs rely on their misrepresentations and omissions, so that Plaintiffs would reimburse millions of claims at inflated rates.

235. Had Plaintiffs known Walgreens' true U&C prices, Plaintiffs would have paid millions of dollars less for the reimbursement of claims submitted by Walgreens.

236. Walgreens' actions caused a likelihood of confusion or misunderstanding regarding the true and accurate U&C prices for the prescription drugs dispensed to Plaintiffs' Members.

237. Walgreens' acts, omissions, and practices, as described herein, constitute unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, as understood by N.C. Gen. Stat. § 75-1.1.

238.     Walgreens' actions are ongoing: Walgreens continues to report inflated U&C prices in NCPDP field 426-DQ for claims submitted for payment by Plaintiffs.

239.     Walgreens' acts, omissions, and practices, as described herein, proximately caused Plaintiffs to suffer actual damages in the form of, inter alia, overcharges on reimbursements for millions of prescription claims.  Pursuant to N.C. Gen. Stat. § 75-16, Plaintiffs are entitled to three times their actual damages.

240.     Pursuant to N.C. Gen. Stat. § 75-16-1, Plaintiffs are entitled to recover attorneys' fees and costs of suit.

### FOURTEENTH CLAIM FOR RELIEF (COUNT XIV)
### VIOLATION OF THE NORTH DAKOTA UNLAWFUL SALES
### OR ADVERTISING PRACTICES ACT (N.D. CENT. CODE § 51-15, *et seq.*)

241.     Plaintiffs incorporate and repeat the allegations set forth in Paragraphs 1 through 240 above.

242.     Walgreens' business acts and practices alleged herein constitute unfair, deceptive, unconscionable, and fraudulent acts or practices under the North Dakota Unlawful Sales or Advertising Practices Act ("USAPA").

243.     Each Plaintiff and Defendant is, and at all relevant and material times was, a "person" as defined in the USAPA.[71]

244.     Walgreens' business acts and practices, as alleged herein, violate the USAPA for the following reasons:

   a.     Walgreens knowingly engaged in unconscionable, deceptive, and fraudulent commercial practices in failing to reveal material facts and information about

---

[71] *See* N.D. Cent. Code Ann. § 51-15-01(4) ("'Person' means any natural person or the person's legal representative, partnership, corporation, limited liability company, company, trust, business entity, or association, and any agent, employee, salesman, partner, officer, director, member, stockholder, associate, trustee, or cestui que trust thereof.").

Walgreens' true U&C prices, which misled Plaintiffs about facts that could not reasonably be known by Plaintiffs;

     b.    Walgreens failed to reveal facts that were material to the transactions at issue in light of representations of fact made in a positive manner;

     c.    Walgreens failed to reveal material facts about Walgreens' true U&C prices to Plaintiffs with the intent that Plaintiffs would rely upon those omissions; and

     d.    Walgreens made material representations and statements of fact to Plaintiffs that resulted in Plaintiffs reasonably believing the represented or suggested state of affairs to be other than what they actually were.

245.    Walgreens intended that Plaintiffs rely on their misrepresentations and omissions, so that Plaintiffs would reimburse millions of claims at inflated rates.

246.    Had Plaintiffs known Walgreens' true U&C prices, Plaintiffs would have paid millions of dollars less for the reimbursement of claims submitted by Walgreens.

247.    Plaintiffs have been adversely affected by Walgreens' acts, omissions, and practices, as described herein.

248.    Walgreens' actions caused a likelihood of confusion or misunderstanding regarding the true and accurate U&C prices for the prescription drugs dispensed to Plaintiffs' Members.

249.    Walgreens' actions are ongoing: Walgreens continues to report inflated U&C prices in NCPDP field 426-DQ for claims submitted for payment by Plaintiffs.

250.    Walgreens' acts, omissions, and practices, as described herein, proximately caused Plaintiffs to suffer actual damages in the form of, inter alia, overpaying reimbursements

on millions of prescription claims.  Consequently, Plaintiffs seek actual damages pursuant to N.D. Cent. Code § 51-15-09.

251.    Walgreens knowingly performed these acts, omissions, and practices, as described herein.  Pursuant to N.D. Cent. Code § 51-15-09, Plaintiffs are entitled to three times the actual damages, as well as costs and attorney's fees.

## FIFTEENTH CLAIM FOR RELIEF (XV)
### UNJUST ENRICHMENT

252.    Plaintiffs incorporate and repeat the allegations set forth in Paragraphs 1 through 251 above.

253.    Under the circumstances described herein, Walgreens has owed—and continues to owe—a duty to Plaintiffs to provide Plaintiffs with accurate U&C prices on reimbursement claims.

254.    Because Walgreens fraudulently inflated the U&C prices it reported on millions of claims submitted for Plaintiffs' reimbursement, Plaintiffs overpaid hundreds of millions of dollars to Walgreens.

255.    Walgreens knowingly and voluntarily accepted these hundreds of millions of dollars in overcharges to Plaintiffs.

256.    Plaintiffs' overpayments should not have been paid to Walgreens.  Those millions of overpayments should have been retained by Plaintiffs.

257.    Walgreens' retention of these overpayment amounts violates fundamental principles of justice, equity, and good conscience.

258.    Under the circumstances described herein, it would be inequitable for Walgreens to retain these overpayments.

259. As a result of Walgreens' wrongful conduct as described herein, Walgreens has been unjustly enriched at the expense of, and to the detriment of, Plaintiffs.

260. Walgreens is therefore liable to Plaintiffs for restitution in the amount of Walgreens' wrongfully obtained monies.

## NOTICE TO STATE ATTORNEYS GENERAL

Pursuant to applicable statutory provisions, a copy of this complaint has been mailed to the Offices of the Attorneys General of Illinois and Nebraska with the filing of this complaint. *See* 815 Ill. Comp. Stat. Ann. 505/10a(d); Neb. Rev. Stat. § 87-301.12. Upon entry or judgment or order in this action, a copy of such judgment or order will also be mailed to the Office of the Attorney General of Illinois. *Id.* Upon entry of final judgment in this action, a copy of the judgment will be mailed to the Office of the Attorney General of Nebraska. *Id.*

Plaintiffs respectfully request that the Clerk of this Court mail a copy of this complaint to the Office of the Attorney General of the Commonwealth of Massachusetts pursuant to Mass. Gen. Laws Ch. 93A, § 10. As required by that same statute, upon entry of any judgment or decree in this action, Plaintiffs respectfully request that that Clerk of this Court mail a copy of such judgment or decree to the Office of the Attorney General of the Commonwealth of Massachusetts.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs seek judgment in an amount to be determined at trial, as follows:

a) That Plaintiffs are owed at least the amount that Plaintiffs were overcharged on reimbursement claims where Walgreens' reported U&C prices were higher than the true U&C price offered to Walgreens' customers who paid without using insurance for all drugs discounted

66

by the PSC Program (including both drugs listed on advertised formularies and drugs not listed on advertised formularies), JustRx Program, or other third party discount card programs;

b)       That the Court grant permanent injunctive relief to prohibit Walgreens from continuing to engage in the unlawful practices, acts, and omissions described herein;

c)       That the Court award compensatory, consequential, and general damages in an amount to be determined at trial;

d)       That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Walgreens as a result of its unlawful practices, acts, and omissions;

e)       That the Court award statutory double or treble damages, and other exemplary or punitive damages, to the extent the relevant law permits;

f)       That the Court adjudge and decree that the unlawful acts and omissions alleged in this Complaint are unfair and deceptive business acts and practices in violation of the consumer protection statutes alleged herein;

g)       That the Court award to Plaintiffs the costs and disbursements of the action, along with reasonable attorneys' fees;

h)       That the Court award pre- and post-judgment interest at the maximum rate permitted by applicable laws;

i)       That the Court grant all such other relief as it deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a jury trial on all claims so triable.

Dated: March 18, 2020        Respectfully submitted,

*/s/ Justin D. Kingsolver*

Stephen J. McBrady (D.C. Bar No. 978847)*
Kent A. Gardiner (D.C. Bar No. 432081)*
Jacinta L. Alves (D.C. Bar No. 992132)*
Kelly H. Hibbert (D.C. Bar No. 1006010)*
Justin D. Kingsolver (N.D. Ill. General Bar No. 6320926)
**CROWELL & MORING LLP**
1001 Pennsylvania Ave. NW
Washington, D.C. 20004
Telephone: (202) 624-2500
Facsimile: (202) 628-5116
SMcBrady@crowell.com
KGardiner@crowell.com
JAlves@crowell.com
KHibbert@crowell.com
JKingsolver@crowell.com

David L. Applegate (IL Bar No. 3122573)
Matthew A. Blumenreich (IL Bar No. 6329458)
**WILLIAMS MONTGOMERY & JOHN LTD.**
Suite 6800 Willis Tower
233 South Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 443-3200
Facsimile: (312) 855-4851
dla@willmont.com
mab@willmont.com

*Attorneys for Plaintiffs*

*\*Motion for leave to appear pro hac vice forthcoming.*