# Exhibit A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CAREFIRST OF MARYLAND, INC., GROUP HOSPITALIZATION AND MEDICAL SERVICES, INC., and CAREFIRST BLUECHOICE, INC., )<br><br>Plaintiffs, )<br><br>v. )<br><br>WALGREEN CO. AND WALGREENS BOOTS ALLIANCE, INC., )<br><br>Defendants. ) | Civil No.:<br><br>Jury Trial Demanded |

**CAREFIRST OF MARYLAND, INC., GROUP HOSPITALIZATION AND MEDICAL
SERVICES, INC., AND CAREFIRST BLUECHOICE, INC.'S
FIRST AMENDED COMPLAINT**

Plaintiffs CareFirst of Maryland, Inc. ("CFMI"), Group Hospitalization and Medical Services, Inc. ("GHMSI"), and CareFirst BlueChoice, Inc. ("CareFirst BlueChoice") hereby amend their Complaint, pursuant to Federal Rule of Civil Procedure 15, while adopting and incorporating the original Complaint and its assertions in their entirety, and bring this First Amended Complaint against Defendants Walgreen Co. and Walgreens Boots Alliance, Inc. (collectively, "Walgreens" or "Defendants"). Plaintiffs seek to recover damages from Defendants for for violations of the federal Racketeer Influenced and Corrupt Organizations ("RICO") Act, fraud, fraudulent nondisclosure, unjust enrichment, and state statutory claims. In support of this action, Plaintiffs state and allege as follows:

## I.  PRELIMINARY STATEMENT

1.      For more than a decade, Walgreens—one of the largest retail drugstore chains in the United States—has knowingly and intentionally engaged in an ongoing fraudulent scheme to overcharge Plaintiffs for prescription drugs by submitting claims for payment at artificially inflated

prices.  To conceal its scheme, Walgreens has made false statements and omitted material facts in connection with its ***true*** usual and customary ("U&C") prices—the payment ceiling generally defined as the cash price to a member of the general public paying for a prescription drug without insurance—for prescription drugs dispensed to individuals covered by Plaintiffs' health plans. Walgreens fraudulently submitted inflated U&C prices on millions of claims reimbursed by Plaintiffs.  Through its fraudulent scheme, Walgreens has overcharged Plaintiffs hundreds of millions of dollars for prescription drugs.

2.     Significantly, on January 15, 2019, Walgreens settled claims brought by the United States, 39 states, and the District of Columbia alleging that, from January 2008 through December 2017, Walgreens violated the False Claims Act, 31 U.S.C. § 3729, *et seq.*, by submitting false U&C prices that were higher than the prices it charged for the same drugs sold through its Prescription Savings Club cash discount program ("PSC Program"), thereby obtaining more money in reimbursements for Medicaid fee-for-service claims than it was entitled to receive.[1] Walgreens has now admitted—for the first time—that "in submitting claims for reimbursement," Walgreens "did not identify its PSC program prices as its U&C prices for drugs on the PSC program formulary," despite being so required.[2]  Walgreens further admitted—for the first time— facts demonstrating that the PSC Program itself was a sham, including that it "offered a savings guarantee pursuant to which PSC program members could recoup (in the form of store credit) the difference between the amount they paid to enroll in the program in a given year and the amount

---

[1] *U.S. ex rel. Baker v. Walgreens, Inc. and Walgreen Co.*, No. 12 Civ. 00300-JPO, Stipulation and Order of Settlement and Dismissal ¶ 2(e) (S.D.N.Y. docket filed Jan. 24, 2019) (ECF No. 53) (hereinafter "Walgreens' DOJ Settlement").

[2] *Id.*

they received in discounted savings under the program in that year."[3]  Plaintiffs similarly have been damaged by the same fraudulent course of conduct, as described and admitted to by Walgreens in the Walgreens' DOJ Settlement.

3.     Plaintiffs are health care plans offering comprehensive health care services and coverage, including prescription drug coverage, to their members.  When plan members fill prescriptions covered by Plaintiffs at a Walgreens pharmacy, Walgreens submits electronic claims to Plaintiffs for reimbursement for those prescriptions (through Plaintiffs' contracted pharmacy benefit managers ("PBMs")).  In submitting electronic claims for payment, Walgreens is required to truthfully and accurately submit its U&C price for each dispensing event, in accordance with, *inter alia*, the National Council for Prescription Drug Program ("NCPDP")[4] requirements.

4.     Plaintiffs calculate the drug price to be paid to the pharmacy based on whether the U&C reported by Walgreens for a particular drug is less than or greater than the price that has been otherwise negotiated for that drug.  The U&C price functions as a reimbursement ceiling, ensuring that health plans do not pay Walgreens more than what Walgreens charges cash-paying customers paying without insurance.  This payment methodology is consistent across government standards, PBM instructions manuals, and decades-long industry practice, which recognize that reimbursements are to be adjudicated under this formula.

5.     In 2006, "big box" retailers like Walmart, Target, and Costco disrupted the retail pharmacy market by offering deeply discounted generic drugs—$4 for 30-day supplies—to their customers while also giving third-party payors, including Plaintiffs, the benefit of that deal by reporting their discount prices as their U&C prices for the same drugs, consistent with NCPDP

---

[3] *Id.*

[4] NCPDP is an accredited, non-profit organization that maintains the industry standard for electronic transmission and adjudication of pharmacy claims.

3

and industry standards. Federal health regulators at the Centers for Medicare and Medicaid Services ("CMS") also made clear that generic discount program prices were to be considered the pharmacy's U&C prices for the purposes of billing government healthcare programs.

6. Walgreens recognized the need to retain and attract new customers, but—unlike the "big box" retailers—decided not to absorb substantially reduced margins in connection with lowering its U&C prices submitted to third-party payors, including Plaintiffs. Concerned with maintaining its massive pharmacy revenue, which historically accounts for a vast majority of Walgreens' total revenue, and at the same time competing with "big box" retailers and other pharmacies for in-store traffic and cash sales, Walgreens developed and carried out a massive fraud that resulted in substantial financial harm to Plaintiffs.

7. In or around 2007, Walgreens created the PSC Program to maintain its margins on brand and generic drugs by systematically overcharging Plaintiffs for prescription drugs dispensed to their members. Walgreens created the PSC Program for two reasons: *first*, to maintain and increase its market share for cash customers by offering deep discounts on prescription drugs, and *second*—and more importantly—to obfuscate its true U&C prices from third-party payors, including Plaintiffs. Walgreens artificially divided its cash business, which formerly consisted solely of customers who pay cash, into two segments: customers who pay the high cash price (which it would include in its U&C price) and customers who pay the low cash price (*i.e.*, the price offered by the PSC Program or other similar programs, which would be excluded from U&C). In short, Walgreens created the PSC Program in a covert attempt to insulate its high U&C prices by artificially dividing its customer base in a way that would undermine the central purpose of any health insurance company's prescription drug benefit—that Plaintiffs do not pay more than what cash customers pay for the same drugs.

8.      But unbeknownst to Plaintiffs, Walgreens submitted U&C prices that were regularly five, ten, or even twenty times higher than what Walgreens actually charged cash customers through its PSC Program (and other programs).  Still, on its claims for reimbursement to Plaintiffs, Walgreens reported those artificially inflated "U&C" prices, which were neither usual nor customary, as its U&C prices.  By submitting false and inflated U&C prices to Plaintiffs, Walgreens knowingly and wrongfully overcharged Plaintiffs on millions of claims.

9.      Walgreens knowingly and intentionally concealed from Plaintiffs the ***actual*** cash prices offered to members of the general public paying without insurance—*i.e.*, Walgreens' ***true*** U&C prices—on both brand and generic prescription drugs.  To conceal its fraudulent scheme, Walgreens knowingly made false statements and omitted material facts in connection with its true U&C prices, including, but not limited to, the scope of PSC Program membership; PSC Program eligibility; the enrollment process; the enrollment "fee"; and frequency, share, number, and other key data points related to Walgreens' cash sales under the PSC Program and other similar discount programs; and other discounts (not associated with a discount program) offered to the individuals paying without insurance for drugs also dispensed to Plaintiffs' Members.

10.     For example, Walgreens also effectuated this fraud by offering a prescription savings club called "JustRx" ("JustRx Program") to customers at more than 1,900 Walgreens-owned Rite Aid-branded pharmacy locations and at Walgreens and Duane Reade pharmacy locations and failing to report these prices as U&C.  Additionally, Walgreens further effectuated this fraud by charging third-party branded discount card prices to individuals who pay without insurance, *e.g.*, RxSaver and GoodRx ("third-party discount card programs") and, similarly, failing to report these prices as U&C.

11.     In addition, Walgreens was able to accomplish this scheme through the knowing participation and facilitation of PBMs, including (as alleged herein) Caremark. These activities, as described herein, constitute to violations of the RICO Act.

12.     As a result of Walgreens' fraudulent and unlawful scheme, Walgreens has substantially overcharged Plaintiffs for prescription drugs purchased by their Members at Walgreens' pharmacies. Plaintiffs reimbursed Walgreens for their Members' brand and generic prescription drugs based on Walgreens' inflated U&C prices and, as a result, Plaintiffs were overcharged millions of dollars.

## II.    THE PARTIES

### A.    Plaintiffs

13.     Plaintiff CFMI is a not for profit corporation organized under the laws of Maryland with its principal place of business in Baltimore, Maryland. CFMI operates as a nonprofit health services plan in Maryland.

14.     Plaintiff GHMSI is a congressionally chartered corporation with its principal place of business in Washington, D.C. GHMSI operates as a not for profit health services plan in two counties of Maryland, Northern Virginia, and the District of Columbia.

15.     Plaintiff CareFirst BlueChoice is a corporation organized under the laws of the District of Columbia with its principal place of business in Washington, D.C. CareFirst BlueChoice operates as a health services plan in Maryland, Northern Virginia, and the District of Columbia.

### B.    Defendants

16.     Defendant Walgreen Co. ("Walgreen Co.") is an Illinois corporation that maintains its corporate headquarters at 200 Wilmot Road in Deerfield, Illinois 60015. Until December 31, 2014, Walgreen Co. had no corporate parent. On December 31, 2014, Walgreen Co. became a

wholly-owned subsidiary of Defendant Walgreens Boots Alliance, Inc. pursuant to a merger to affect a reorganization of Walgreen Co. into a holding company structure ("Reorganization"), with Walgreens Boots Alliance, Inc. becoming the parent holding company.[5]

17.    Defendant Walgreens Boots Alliance, Inc. ("WBA") is a Delaware corporation with its principal place of business and corporate headquarters at 108 Wilmot Road in Deerfield, Illinois 60015.  On December 31, 2014, WBA became the successor of Walgreen Co., pursuant to the Reorganization, with WBA becoming the direct parent holding company and Walgreen Co. becoming a wholly-owned subsidiary of WBA.[6]

18.    All WBA profits are derived from its wholly-owned operating subsidiaries, including Walgreen Co.  Because of their integrated operations, Walgreen Co. and WBA are referred to herein as "Walgreens."

19.    During the course of the events alleged in this action, Walgreens operated under the trade name Walgreens or through various Walgreens-affiliated store banners across the United States, including but not limited to:  Duane Reade, Kerr Drug, Super D Drug, USA Drug, Happy Harry's, Med-X Drug, May's Drug, and Drug Warehouse (collectively, "Walgreens-affiliated banners").

20.    Walgreens is one of the largest retail drugstore chains in the United States based on both revenues and number of stores.  Walgreens operates 9,277 retail pharmacies in all fifty states,

---

[5] Form 10-K for Fiscal Year ending 08/31/2018, WALGREENS BOOTS ALLIANCE, INC. (Oct. 11, 2018) ("WBA 2018 10-K"), at 1, *available at* https://www.sec.gov/Archives/edgar/data/1618921/000162828018012472/wba-2018831x10k.htm (accessed Aug. 10, 2020).

[6] *Id.*

the District of Columbia, Puerto Rico, and the U.S. Virgin Islands, including 154 drugstores in Maryland, 14 drugstores in Washington, D.C., and 204 drugstores in Virginia.[7]

21.     In September 2017, Walgreens announced that it had secured regulatory clearance to purchase 1,932 Rite Aid pharmacy stores "located primarily in the Northeast and Southern U.S." for approximately \$4.2 billion.[8]  By March 27, 2018, Rite Aid completed the transfer of all 1,932 stores to Walgreens,[9] and Walgreens now publicly identifies those locations as "Walgreens-owned Rite Aid stores."[10]

22.     In fiscal year 2019, Walgreens' U.S. retail pharmacies filled 843.7 million prescriptions (including immunizations).  In fiscal year 2019, Walgreens' U.S. retail pharmacy sales revenue exceeded \$104.5 billion.[11]

---

[7] *Id.* at 3; *see also* "Store Count by State," WALGREENS (Aug. 31, 2020), *available at* https://news.walgreens.com/fact-sheets/store-count-by-state.htm (accessed Feb. 2, 2020).

[8] WBA 2018 10-K at 72; *see also* "Walgreens Boots Alliance Secures Regulatory Clearance for Purchase of Stores and Related Assets from Rite Aid," WALGREENS BOOTS ALLIANCE, INC. (Sept. 17, 2017), *available at* https://www.walgreensbootsalliance.com/news-media/press-releases/2017/walgreens-boots-alliance-secures-regulatory-clearance-purchase (accessed Aug. 10, 2020).

[9] "Rite Aid Completes Transfer of Stores to Walgreens Boots Alliance and Terminates Tax Benefits Preservation Plan," RITE AID CORP. (Mar. 28, 2018), *available at* https://www.riteaid.com/corporate/news/-/pressreleases/news-room/2018/rite-aid-completes-transfer-of-stores-to-walgreens-boots-alliance-and-terminates-tax-benefits-preservation-plan (accessed Aug. 10, 2020).

[10] *See* "Welcome Rite Aid Pharmacy Patients," WALGREENS, *available at* https://www.walgreens.com/topic/pharmacy/welcome_rite_aid.jsp (accessed Aug. 10, 2020).

[11] Form 10-K for Fiscal Year ending 08/31/2019, WALGREENS BOOTS ALLIANCE, INC. (Oct. 28, 2019) ("WBA 2019 10-K"), at 4, *available at* https://www.sec.gov/Archives/edgar/data/1618921/000161892119000069/wba-2019831x10k.htm (accessed Aug. 10, 2020).

23.     Walgreens refers to itself as "the largest retail pharmacy, health and daily living destination across the United States and Europe."[12]   Approximately 78 percent of the U.S. population lives within five miles of a Walgreens retail pharmacy location.[13]

24.     At all relevant times, Walgreens is and has been a network pharmacy for Plaintiffs, meaning that Plaintiffs' Members can use their prescription drug benefit to fill their prescriptions at Walgreens pharmacy locations at in-network pricing.  When a Walgreens pharmacy dispenses a prescription to a Member, Walgreens causes an electronic claim for reimbursement to be sent to Plaintiffs' PBM, which then submits a claim for payment to Plaintiffs.  During the relevant time period, Plaintiffs have paid Walgreens through PBMs.

25.     Walgreens is a defendant in six related actions pending in this Court.  On March 23, 2017, a putative nationwide class of third-party payors and insured consumers filed a complaint in *Forth, et al. v. Walgreen Co. and Walgreens Boots Alliance, Inc.*, Civ. No. 17-cv-02246, ECF No. 1 (N.D. Ill.) (Lee, J.).  The allegations in the *Forth* complaint share a similar factual and legal nexus to Plaintiffs' allegations here; for example, that Walgreens "used its PSC [Program] as a mechanism to knowingly and intentionally overcharge consumers and third-party payors . . . in excess of Walgreens' actual U&C prices" for drugs discounted by Walgreens' retail drug programs.  *Id.* ¶ 6.  On March 18, 2020, a complaint was filed in *BCBSM, Inc. (d/b/a Blue Cross and Blue Shield of Minnesota), et al. v. Walgreen Co., et al.*, Civ. Case No. 1:20-cv-01853, ECF No. 1 (N.D. Ill.) (Kendall, J.).   On June 5, 2020, a complaint was filed in *Horizon Healthcare Services, Inc. (d/b/a Horizon Blue Cross Blue Shield of New Jersey), et al. v. Walgreen Co., et al.*, Civ. Case No. 1:20-cv-03332, ECF No. 1 (N.D. Ill.), (Kendall, J.).  On June 15, 2020, an amended

---

[12] *Id.* at 1.

[13] *Id.* at 4.

complaint was filed in *HealthNow New York Inc., et al. v. Walgreen Co., et al.*, Civ. Case No. 1:20-cv-1929, ECF No. 33 (N.D. Ill.), (Kendall, J.). On August 12, 2020, a complaint was filed in *Blue Cross and Blue Shield of Arizona, Inc. (d/b/a Blue Cross Blue Shield of Arizona and d/b/a AZBlue) v. Walgreen Co., et al.*, Civ. Case No. 1:20-cv-04738, ECF No. 1 (N.D. Ill.). On August 21, a complaint was filed in *Asuris Northwest Health et al. v. Walgreen Co. et al.*, Civ. Case No. 1:20-cv-04940, ECF No. 1 (N.D. Ill.). On January 28, 2021, the Plaintiffs in the *BCBSM*, *Horizon*, *HealthNow*, *Blue Cross and Blue Shield of Arizona*, and *Asuris Northwest Health et al.* actions filed a consolidated First Amended Complaint. The allegations in the First Amended Complaint shares a similar factual and legal nexus to Plaintiffs' allegations here, including, *inter alia*, Defendants' fraudulent misrepresentation of the usual and customary prices of prescription drugs dispensed by Defendants' pharmacies.

## III.  JURISDICTION AND VENUE

### A.  Jurisdiction

26.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims arise under federal law and under 18 U.S.C. § 1964(c) because this action alleges violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962 *et seq*. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1332 and 1367 because Plaintiffs are citizens of Maryland and Washington, D.C.; the Defendants are citizens of Delaware and Illinois; and the amount in controversy exceeds $75,000.

27.  This Court has general personal jurisdiction over Defendants because Defendants maintain their principal places of business at 108 Wilmot Road and 200 Wilmot Road, both in Deerfield, Illinois, which is located within the Northern District of Illinois.

**B.     Venue**

28.     Venue is proper in the United States District Court for the Northern District of Illinois (Eastern Division) pursuant to 28 U.S.C. §§1391(b-d) because, *inter alia*, both Defendants reside in, and are subject to personal jurisdiction in, this District at the time Plaintiffs commenced this action and because Defendants' contacts within this District are significant and sufficient to subject them to personal jurisdiction.  Further, venue is appropriate in this District because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

**IV.     FACTS APPLICABLE TO ALL CLAIMS**

**A.     U&C Is The Price Paid By Customers Without Insurance.**

29.     U&C is the price customers without insurance pay a given pharmacy for prescription drugs, *i.e.*, the cash or uninsured price.  Per the "lesser of" reimbursement formulation, it also serves as a ceiling to how much a pharmacy can charge a health plan (like Plaintiffs) for the drug.

30.     Industry organizations endorse this definition.  The Academy of Managed Care Pharmacy ("AMCP")[14] *Guide to Pharmaceutical Payment Methods* (October 2007) defines U&C as "the price for a given drug or service that a pharmacy or other provider would charge a cash-paying customer without the benefit of insurance provided through a payer or intermediary with a contract with the provider."  The NCPDP standards define the U&C price as the "[a]mount charged cash paying customers for the prescription exclusive of sales tax or other amounts claimed."[15]  The U&C price, the NCPDP standards explain, "represents the value that a pharmacist is willing to

---

[14] AMCP is an industry-wide organization whose membership includes both health systems and PBMs.

[15] *See NCPDP Reference Manual*, Ch. 3 at 72 (rev. Oct. 2005), *available at* https://www.cms.gov/Medicare/Billing/ElectronicBillingEDITrans/downloads/NCPDPflatfile.pdf (accessed Aug. 10, 2020).

accept as their total reimbursement for dispensing the product/service to a cash-paying customer."[16]

31.    For over a decade, federal health programs have consistently required the cash prices offered by pharmacy discount programs to be reported as a pharmacy's U&C prices. These government rules, regulations, and guidance include:

a.    **CMS Guidance to Medicare Part D Sponsors.** CMS published a memo in 2006 that explained: "Wal-Mart recently introduced a program offering a reduced price for certain generics to its customers. The low Wal-Mart price on these specific generic drugs is considered Wal-Mart's 'usual and customary' price, and is not considered a one-time 'lower cash' price. Part D sponsors consider this lower amount to be 'usual and customary' and will reimburse Wal-Mart on the basis of this price."[17]

b.    **Medicare Part D Regulations**. U&C price is defined as "the price that an out-of-network pharmacy or a physician's office **charges a customer who does not have any form of prescription drug coverage** for a covered Part D drug."[18]

c.    **Medicare Prescription Drug Benefit Manual.** U&C price is defined as "the price that an out-of-network pharmacy or a physician's office **charges a customer who does not have any form of prescription drug coverage** for a covered Part D drug."[19]

---

[16] *See Telecommunications Version 5*, NCPDP, at 38 (Feb. 2010), *available at* https://ncpdp.org/members/pdf/Version_5_questions_v35.pdf (accessed Mar. 12, 2020).

[17] *HPMS Q&A – Lower Cash Price Policy*, Memorandum to All Part D Sponsors, Centers for Medicare & Medicaid Services, at 1 (Oct. 11, 2006).

[18] 42 C.F.R. § 423.100 (emphasis added); *see also* 42 C.F.R. §423.160 (incorporating NCPDP standards into the Medicare Part D program).

[19] *See* ch. 5, § 10.2, Benefits and Beneficiary Protections (rev. 9/20/2011) (emphasis added).

      d.     **TRICARE Pharmacy Manuals.**  The pharmacy manual for TRICARE, the health care program for uniformed service members, retirees, and their families, defines U&C price to include "loss leaders, frequent shopper or special customer discounts or programs, competitor's matched price or any and all other discounts, special promotions, and programs causing a reduction in the price offered to that Member . . . Additionally, the Usual and Customary Retail Price must include any applicable discounts offered to attract customers . . . ."[20]

      e.     **Federal Employees Health Benefits Plan Pharmacy Manuals.**  The FEHBP pharmacy manual defines U&C as "**the lowest price Provider would charge a particular patient if such patient were paying cash** for an identical prescription on that particular day at that particular location.  This price must include any applicable discounts offered to attract patients."[21]

      f.     **Walgreens PBM—Walgreens Health Initiative.**  Walgreens Health Initiative ("WHI") was a wholly-owned PBM subsidiary of Walgreen Co. until WHI was acquired by Catalyst Health Solutions in 2011.  WHI's Pharmacy Manual defines U&C as "the cash price including all applicable discounts, coupons or sale price which a cash-paying customer would pay at the pharmacy."[22]  In addition, WHI directed its own network pharmacies to use the standard NCPDP form containing the "usual and customary" field discussed above.

---

[20] *TRICARE Express Scripts Pharmacy Manual* (2013).

[21] *FEHBP CVS/Caremark Manual* (2009) (emphasis added).

[22] Pharmacy Manual, WALGREENS HEALTH INITIATIVES, INC., 25 (Jan. 2011), *available at* http://www.walgreenshealth.com/pdf/forms/Revised_Pharmacy_Manual_2010_Revised_04072010.pdf (accessed Aug. 10, 2020).

32.     State Medicaid programs likewise require cash prices offered by pharmacy discount programs to be reported as a pharmacy's U&C prices.  *See, e.g.*, Walgreens' DOJ Settlement.

33.     More specifically, Walgreens knew that the U&C prices for prescription drugs dispensed to Plaintiffs' Members must include prices that Walgreens charged to cash customers paying without insurance, including "discount" prices.

34.     At all relevant times, Walgreens knew that Plaintiffs contracted to receive the benefit of the prices that Walgreens charged to its customers who paid without insurance, including "discount" prices, in their reported U&C prices.

35.     Plaintiffs' contracts with their PBMs recognized and implemented the NCPDP requirements and industry standards for reporting U&C prices.

36.     Furthermore, under a Participating Pharmacy Agreement and Amendments thereto, between Prime Therapeutics and Walgreens ("Walgreens Prime PPA"), Walgreens agreed to report its U&C charge on all claims submitted to Prime Therapeutics for payment by Plaintiffs, who contracted with Prime as their PBM.

37.     The Walgreens Prime PPA required Walgreens to accept as payment *the lesser of* the U&C charge or a negotiated rate.

38.     On information and belief, the Walgreens Prime PPA[23] and other contracts between Plaintiffs' PBMs and Walgreens (in place at various times throughout the relevant time period) define U&C using the same or similar definition as the Plaintiffs' PBM agreements, and consistent with NCPDP requirements and industry standards.  The Walgreens Prime PPA and other PBM

---

[23] The Walgreens Prime PPA contains a confidentiality provision preventing disclosure without both parties' consent.  Prime Therapeutics consented to provide the Walgreens Prime PPA, and at Plaintiffs' request, Prime Therapeutics sought Walgreens' consent to provide the Walgreens Prime PPA to Plaintiffs. Walgreens, however, refused to consent.

contracts require Walgreens to submit claims electronically or in writing using the industry standard NCPDP Universal Claims Form.

39.    Additionally, the Prime Therapeutics Pharmacy Provider Manual instructs Walgreens to submit, as its U&C charge, "the lowest price [Walgreens] would charge to a particular customer if such customer were paying cash for the identical Prescription Drug Services on the date dispensed.  This includes any applicable discounts including, but not limited to, senior discounts, frequent shopper discounts and other special discounts offered to attract customers."[24]

40.    The current OptumRx Pharmacy Provider Manual,[25] which "includes the policies and procedures for pharmacies . . . which serve Members pursuant to [OptumRx's] participating pharmacy provider network agreements," contains this U&C guidance:

**Usual and Customary (U&C):**

Price charged by Network Pharmacy Provider to the general public at the time of dispensing for the same Drug Product including all applicable customer discounts, such as advertised or sale prices, special customer, senior citizen, frequent shopper, coupons or other discounts, a cash paying customer pays Network Pharmacy Provider for Drug Products, devices, products and/or supplies. Network Pharmacy Provider must supply proof of a cash Prescription (i.e. without any disclosure of PHI) when necessary to evaluate the appropriate adjudication of the Transaction. Alteration of the U&C price to attempt to increase Claim payment without a true change to the cash price being offered to the general public will be considered non-compliance and a violation of the Agreement. The Network Pharmacy Provider must be able to communicate the U&C price to Administrator upon inquiry, failure to disclose this information may be considered noncompliance.

---

[24] Pharmacy Provider Manual, PRIME THERAPEUTICS LLC, § 6, at 30 (Mar. 1, 2015) (emphasis added), *available at* https://www.primetherapeutics.com/content/dam/corporate/Documents/Resources/Pharmacists/Pharmacy ProviderResources/ProviderManual/March12015PharmacyProviderManualEffectiveMarch12015.pdf.

[25] 2020 Pharmacy Provider Manual, OPTUMRX, *available at* https://learn.optumrx.com/content/dam/orx-rxmicros/pharmacy-manual/OptumRxPharmacyProviderManual2020-Version%203.1.pdf (last accessed July 31, 2020).

41.     The Catamaran Provider Manual published in 2013 told Cataraman's pharmacy providers, including Walgreens, that U&C meant "the usual and customary price charged by the Provider to the general public at the time of dispensing, including any advertised or sale prices, discounts, coupons or other deductions."[26]

42.     Further, at the outset of Walgreens' fraudulent scheme, its own Illinois-based subsidiary created and issued statements confirming – falsely – that discounted pricing would be treated as U&C.  Walgreens' wholly-owned PBM subsidiary until 2011, WHI, defined U&C consistent with NCPDP requirements and industry standards.  WHI's Pharmacy Manual defined U&C as "the cash price including all applicable discounts, coupons or sale price which a cash-paying customer would pay at the pharmacy."[27]   In addition, WHI directed its own network pharmacies to use the standard NCPDP form containing the "usual and customary" field discussed above.  WHI was based in and operated out of Illinois.

43.     These provisions all recognize and implement the NCPDP requirements and industry standards, which required Walgreens to report, as the U&C charge, any discount price offered to cash-paying or "private pay" uninsured customers on all claims submitted to Plaintiffs through their PBMs and to accept payment of that discount price as payment in full.

44.     In short, Walgreens was well aware of both the definition of "usual and customary" and how the "usual and customary" price of a particular prescription drug should be calculated. But Walgreens knowingly and intentionally submitted inflated U&C prices for brand and generic

---

[26] Provider Manual, CATAMARAN (2013), *available at* https://silo.tips/download/provider-manual-2013-4 (last accessed July 31, 2020).

[27] Pharmacy Manual, WALGREENS HEALTH INITIATIVES, INC., 25 (Jan. 2011), *available at* http://www.walgreenshealth.com/pdf/forms/Revised_Pharmacy_Manual_2010_Revised_04072010.pdf (accessed Aug. 10, 2020).

drugs purchased by Plaintiffs' Members in a way that was antithetical to applicable law, requirements, and standards.

45.     At all relevant times, Walgreens knew that Plaintiffs contracted to receive the benefit of the prices that Walgreens charged to its customers who paid without insurance, including "discount" prices, in their reported U&C prices. Since 2014, CFMI, GHMSI, and CareFirst BlueChoice's commercial contracts with CaremarkPCS Health have defined "usual and customary" prices as "the lowest price, including any Dispensing Fee, a pharmacy would charge a particular customer without any insurance coverage if such customer were paying cash for the identical Program Drug on the date Dispensed. This includes any applicable discounts, including but not limited to senior discounts, frequent shopper discounts, and other special discounts offered to customers."[28]

**B.     The Pharmacy Claims Reimbursement Process.**

46.     As a general matter, third-party payors, including private and government payors, reimburse pharmacies for the insured portion of prescription drugs at the ***lesser of*** a negotiated price (as reflected in the pricing terms of a governing agreement) and the subject pharmacy's U&C price for both brand and generic prescription drugs.

47.     NCPDP establishes and maintains the industry standard for electronic transmission and adjudication of pharmacy claims.  The NCPDP's standard form contains a specific data field, designated as field 426-DQ, in which Walgreens represents its U&C charge for that prescription drug.

---

[28] Commercial Pharmacy Benefit Services Agreement between CareFirst and CaremarkPCS Health, LLC, Sch. A ¶ 158 (Jan. 1, 2014); Amended and Restated Commercial Pharmacy Benefit Services Agreement between CareFirst and CaremarkPCS Health, LLC, Sch. A ¶ 167 (Jan. 1, 2017); Pharmacy Benefit Services Agreement between CareFirst and CaremarkPCS Health, LLC, Sch. A ¶ 180 (Jan. 1. 2019).

48.     NCPDP defines the U&C price transmitted in the 426-DQ data field as the "[a]mount charged cash paying customers for the prescription exclusive of sales tax or other amounts claimed."[29]  The U&C price that Walgreens enters into field 426-DQ on a payment claim, the NCPDP standards explain, must represent "the value that a pharmacist is willing to accept as their total reimbursement for dispensing the product/service to a cash-paying customer."[30]

49.     Congress has adopted the NCPDP standards through federal legislation, including the Health Insurance Portability and Accountability Act ("HIPAA"), the Medicare Modernization Act ("MMA"), and the Health Information Technology for Economic and Clinical Health Act ("HITECH").  HIPAA, for example, requires uniform methods and codes for exchanging electronic information with health insurance plans.  These standards are referred to as the NCPDP Telecommunication Standard.  Pharmacies must report claims using NCPDP standards, *inter alia*, when prescribing drugs under Medicare Part D.[31]

50.     Whenever Walgreens fills a Member's prescription, Walgreens submits its claim for Plaintiffs' reimbursement on a standardized NCPDP electronic claim form.

51.     In the retail pharmacy industry, health plans and other third-party payors often use PBMs to adjudicate and administer prescription benefits with a network of pharmacies on their behalf.  When a health plan employs the services of a PBM, instead of submitting claims directly to the health plan, the retail pharmacy submits claims for payment from the health plan to the

---

[29] *See NCPDP Reference Manual*, Ch. 3 at 72 (rev. Oct. 2005), *available at* https://www.cms.gov/Medicare/Billing/ElectronicBillingEDITrans/downloads/NCPDPflatfile.pdf (accessed Aug. 10, 2020).

[30] *See Telecommunications Version 5*, NCPDP, 38 (Feb. 2010), *available at* https://ncpdp.org/members/pdf/Version_5_questions_v35.pdf (accessed Mar. 12, 2020).

[31] 42 C.F.R. § 423.160.

health plan's chosen PBM. PBMs directly pass on Walgreens' reported U&C prices to Plaintiffs as a basis for payment.

52. Walgreens submits its claims seeking Plaintiffs' reimbursement payments to the PBMs that process Plaintiffs' reimbursement claims. Since 2006, Plaintiffs have paid Walgreens through various PBMs, including Express Scripts and CVS/Caremark.

53. The claims-processing and payment mechanics between Plaintiffs, Plaintiffs' various PBMs, and Walgreens work as follows:

a. A Member presents a prescription at a Walgreens pharmacy (or Walgreens-affiliated banner location) and purchases the corresponding prescription drug, less the share of the purchase price covered by the Member's prescription drug benefit.

b. Walgreens then reports to Plaintiff's PBM the data associated with the sale, including the U&C charge for the drug it dispensed to the Member, which Walgreens reports in NCPDP field 426-DQ.

c. Using Walgreens' reported information, Plaintiff's PBM adjudicates the claim on Plaintiff's behalf using the "lesser of" logic that incorporates the reported U&C price term.[32] If Walgreens' reported U&C price for the drug at issue is *greater* than the parties' other negotiated prices, Plaintiff pays, through its PBM, the negotiated price to Walgreens. If, on the other hand, Walgreens' reported U&C price for the drug at issue is *less* than the parties' other negotiated prices, then Plaintiff pays, through its PBM, the reported U&C price to Walgreens.

---

[32] As described above, third-party payors reimburse pharmacies for the insured portion of prescription drugs at the ***lesser of*** a negotiated price (as reflected in the pricing terms of a governing agreement) or the subject pharmacy's U&C charge for prescription drugs.

d.      As part of the claims adjudication process, Plaintiff's PBM transmits to Plaintiffs the numerous fields of claims data in the prescribed NCPDP format, including field 426-DQ, which indicates the U&C charges Walgreens reported for the drug at issue.

54.      At all relevant times, for each and every claim submitted by Walgreens to one of Plaintiffs' PBMs, Walgreens knew that the PBM at issue in turn either transmits Walgreens' reported U&C price (as represented in NCPDP field 426-DQ) to Plaintiffs, uses the reported U&C price when calculating a reimbursement amount per the contractual "lesser of" reimbursement formula, or both.

55.      At all relevant times, Walgreens knew that Plaintiffs directly relied upon Walgreens' reported U&C prices in reimbursing Walgreens through their PBMs, as described above for prescription claims submitted by Walgreens to Plaintiffs via Plaintiffs' PBMs.

56.      At all relevant times, Walgreens knew that the electronic claims adjudication process used the NCPDP field 426-DQ data as a necessary input.  Walgreens also knew that Plaintiffs' PBMs and Plaintiffs relied on the NCPDP field 426-DQ data as necessary business information in calculating and paying Members' prescription reimbursements on both brand and generic claims submitted by Walgreens.

**C.      Walgreens Developed its Prescription Savings Club to Compete with "Big Box" Retailers While Maintaining Fraudulently Inflated Reimbursements from Plaintiffs.**

57.      In 2006, "big box" retailers like Walmart began to launch prescription drug programs that offered steeply discounted prices for hundreds of popular prescription drugs to cash customers.  For example, in September 2006, Walmart began offering $4 for 30-day supplies and $10 for 90-day supplies of the most commonly prescribed generic drugs.  Walmart's formulary of low-priced generics initially included approximately 140 drugs (totaling more than 300

formulations). Walmart's competitors, including Target and Costco, responded with similar prescription discount programs. Many retailers whose primary line of business was not operating a pharmacy, which were able to absorb lower margins on generic drug sales because pharmacy sales represent such a low percentage of total sales, followed suit. Walmart, Target, and Costco submit their discounted prices as their U&C prices to third-party payors, including Plaintiffs.

58.     Walgreens executives labeled these competitor programs as "limited promotions" that provided "no significant savings for the vast majority" of cash customers, concluding that programs like Walmart's generics program were "not positive for healthcare."[33]

59.     Walgreens was unwilling to price match Walmart and other "big box" retailers on generic drug prices. In response to those competitor programs, however, Walgreens launched its PSC Program in 2007 to target cash customers and other price-sensitive customers. By 2008, Walgreens offered PSC Program prices at all of its U.S. retail pharmacy locations.[34]

60.     But unlike the "big box" retailers, Walgreens did not submit its discount prices as U&C. Instead, it submitted prices that were often substantially higher than the discount prices as the U&C.

61.     Initially, Walgreens' PSC Program offered between 300 and 400 generic medications at $12.99 for a 90-day supply. For those medications, Walgreens advertised a discount price list with some basic information about the eligible medications (*e.g.*, the drug name, strength, and quantity).

---

[33] *See* Jeffrey A. Rein, Walgreens President & CEO, "*Letter to Shareholders,*" 2006 Annual Report, WALGREEN CO., at 4.

[34] Walgreens' DOJ Settlement at ¶ 2(a).

62.     Walgreens' price lists provided limited information that was insufficient to identify specific drugs eligible for discounted PSC Program prices.  For example, Walgreens did not provide the National Drug Code ("NDC"), a 10-digit universal product identifier for prescription drugs dispensed in the United States.  As a specific illustration of this, the Walgreens PSC Program price list advertised 90 tabs of Lisinopril 10mg for $12.99.[35]  According to the U.S. Food & Drug Administration's NDC Directory, there are at least 24 different products sold by at least 15 different companies that meet this description.[36]  Nor did Walgreens provide other industry-standard drug identifiers on its PSC Program price list, like the Generic Product Identifier ("GPI"), Generic Sequence Number ("GSN"), or Generic Code Number ("GCN").

63.     The PSC Program was not limited to so-called "value-priced generics" listed on advertised formularies.  In addition to these steeply discounted "value-priced" drugs, the PSC Program offered discounted prices on approximately 5,000 to 8,000 other brand and generic prescription drugs to Walgreens' cash-paying customers.  Walgreens did not advertise lists or pricing information for the "other name brand and generic prescription medications" eligible for PSC Program prices.  Further, Walgreens did not provide lists of the "other name brand and generic prescription medications" eligible for PSC Program prices to Plaintiffs or, on information and belief, to any of the PBMs that processed Plaintiffs' reimbursement claims.

---

[35] "Walgreens Prescription Savings Club" (Dec. 13, 2007) (attached hereto as **Exhibit 1**).

[36] The NDCs include: 53217-303-90, 52427-440-90, 43353-113-60, 50090-1737-5, 71335-0536-4, 70934-200-90, 55700-479-90, 55700-513-90, 49999-182-90, 68180-980-09, 68180-514-09, 63739-349-43, 0006-0106-54, 66267-577-90, 68788-8912-9, 68788-6407-9, 68788-9823-9, 68788-6782-9, 68788-9912-9, 63187-098-90, 63187-821-90, 70518-0530-3, and 50436-0353-3.  The manufacturers include: Aidarex Pharmaceuticals LLC; Almatica Pharma Inc.; Aphena Pharma Solutions - Tennessee, LLC; A-S Medication Solutions; Bryant Ranch Prepack; Denton Pharma, Inc. DBA Northwind Pharmaceuticals; Lake Erie Medical DBA Quality Care Products LLC; Lupin Pharmaceuticals, Inc.; McKesson Corporation; Merck Sharp & Dohme Corp.; NuCare Pharmaceuticals, Inc.; Preferred Pharmaceuticals Inc.; Proficient Rx LP; REMEDYREPACK INC.; and Unit Dose Services.

64.    Walgreens claimed that these discount prices were only available to cash-paying customers who paid an enrollment fee.  But Walgreens' statements to that effect were illusory and intentionally misleading.   Contrary to Walgreens' assertions that the PSC was a fee-based membership program, the "enrollment fee" (which was nominal at best) was a sham.  In its recent settlement with the U.S. Department of Justice, for example, Walgreens admitted that it regularly returned "enrollment fees" to its PSC Program enrollees through, *e.g.*, store credits.[37]

65.    But whether Walgreens charged a nominal enrollment fee in certain instances does not alter the fact that—unbeknownst to Plaintiffs—Walgreens offered the PSC to ***anyone*** who wanted to join and made its discounted drug prices under the PSC widely and consistently available to the general public, and thus they cannot be excluded from Walgreens' U&C price.  Significantly, in *United States ex rel. Garbe v. Kmart Corp.*, the Seventh Circuit stated that "[a]llowing Kmart to insulate high 'usual and customary' prices by artificially dividing its customer base would undermine a central purpose of the statutory and regulatory structure.  The 'usual and customary' price requirement should not be frustrated by so flimsy a device as Kmart's 'discount programs.'  Because Kmart offered the terms of its 'discount programs' to the general public and made them the lowest prices for which its drugs were widely and consistently available, the Kmart 'discount' prices at issue represented the 'usual and customary' charges for the drugs."  824 F.3d 632, 645 (7th Cir. 2016), *cert. denied*, 137 S.Ct. 627 (Jan. 9, 2017).

66.    The drugs discounted by the PSC Program were not static.  Walgreens regularly revised the brand and generic drugs eligible for PSC Program discounts, the price points at which the drugs were eligible, and the quantum of discounts offered on those drugs.  When it revised its

---

[37] Walgreens' DOJ Settlement ¶ 2(b).

PSC Program drug lists, Walgreens did not provide notice to Plaintiffs or, on information and belief, to any of the PBMs that processed Plaintiffs' reimbursement claims.

67.     Walgreens' PSC Program continues today.  In its current form, which was launched on or about May 1, 2012, Walgreens' PSC Program allows cash-paying customers to purchase hundreds of prescription drugs on its formulary list for $5.00, $10.00, or $15.00 for 30-day supplies and $10.00, $20.00, and $30.00 for 90-day supplies.  The discount price depends on Walgreens' "tier" classification of the particular drug.  Many of the drugs discounted on the formulary are among the most widely-prescribed drugs in the United States.  Walgreens has also represented that even for brand and generic drugs not listed on this formulary, Walgreens offers reduced PSC Program pricing in other denominations to cash-paying customers.

68.     Moreover, Walgreens continues to "offer" a similar "Rx savings program"—the JustRx Program—to customers who pay without using insurance at more than 1,900 Walgreens-owned Rite Aid stores,[38] as well as Walgreens- and Duane Reade-branded Walgreens pharmacies.[39]  The JustRx Program is "simple and free; there is no annual or up-front membership fee to participate."[40]  Like the PSC Program, the JustRx Program provides cash-paying customers with discounts on "all" prescription drugs (and not just those listed on program formularies), with

---

[38] *See* "Welcome Rite Aid Pharmacy Patients," ("Walgreens is pleased to offer existing Rite Aid patients a new Rx savings program called 'JustRx.'  JustRx is simple and free; there is no annual or up-front membership fee to participate.  JustRx offers eligible patients cost savings on over 300 commonly prescribed generic medications, prices starting at $9.99 for a 30 day supply.  It also includes an average of 40% savings on value priced brand drugs that were not previously available.").

[39] "Value Priced Generics," JUSTRX ("Value-Priced Generics . . . [a]vailable at Walgreens, Duane Reade and Rite Aid Pharmacies Operated by Walgreens."), *available at* https://justrx.com/generics (accessed Mar. 10, 2020).

[40] *Id.*

significant discounts available on drugs listed on advertised "value-priced medication" formularies.[41]

**D.    Walgreens Reported False U&C Charges.**

69.    Instead of submitting its discounted PSC Program prices, JustRx Program prices, third-party discount card program prices, or other discounted cash prices as U&C, Walgreens inflated the U&C prices that it reported to Plaintiffs and their PBMs by pegging Walgreens' reported U&C prices to higher prices that did not reflect the cash prices offered to PSC Program enrollees, JustRx Program participants, third-party discount program cardholders, or other discounted prices.

70.    There is no dispute that Walgreens did **not** in fact report its PSC Program prices, JustRx Program prices, third-party discount card program prices, or other discounted prices for prescription drugs made available to those paying without insurance as its U&C price.  For example, with respect to PSC Program prices specifically, Walgreens "admit[ted], acknowledge[d], and accept[ed] responsibility for" failing to do so in its January 2019 settlement stipulation with the U.S. Department of Justice, stating that "Walgreens did not identify its PSC program prices as its U&C prices for the drugs on the PSC formulary" on Medicaid fee-for-service claims.[42]

71.    For many millions of transactions, Walgreens caused Plaintiffs to pay Walgreens the negotiated price because the negotiated price was lower than the *reported inflated* U&C price.  For those many millions of transactions, Walgreens should have reported the true U&C price (*i.e.*, the lowest prices for which its drugs were widely and consistently available).  Had it done so, the

---

[41] "Frequently Asked Questions," JUSTRX, *available at* https://justrx.com/faq (accessed Aug. 10, 2020).

[42] Walgreens' DOJ Settlement at ¶ 2.

adjudicated price—ultimately the price paid by Plaintiffs for the claim—would have, in many cases, been lower than what Plaintiffs paid based on Walgreens reporting a false and inflated U&C price.

72.    How Walgreens overcharged Plaintiffs on millions of claims is exemplified by the examples of apparent overcharges detailed in the attached **Exhibit 2** to this Complaint.[43]

73.    Walgreens' false and misleading U&C reporting caused Plaintiffs to significantly overpay Walgreens on many millions of Walgreens claims for brand and generic drugs.

74.    Walgreens' fraudulent scheme took place primarily and substantially in Illinois. Walgreens has administered, and continues to administer, its PSC Program from Walgreens' corporate headquarters in Deerfield, Illinois, where Walgreens developed the PSC Program. The PSC Program's Terms & Conditions state that the "PSC is administered by WAGDCO, LLC, a wholly-owned subsidiary of Walgreen Co.," whose offices are located at 104 Wilmot Road in Deerfield, Illinois.  Publicly-available state and federal regulatory and court filings made by Walgreens indicate that WAGDCO has administered the PSC Program since at least 2015, and in so doing has had full responsibility for obtaining and holding the licenses required to operate the PSC in various states, setting and reporting to state regulatory bodies the discount amounts provided through the PSC, negotiating and maintaining PPAs with local pharmacies offering the PSC Program, and securing the discount rates offered through the PSC.  These filings also indicate that WAGDCO's own day-to-day operations are subcontracted to another of Walgreens' wholly-

---

[43] These exemplar overcharges are based on assumptions Plaintiffs have made as a result of the limited information available to them regarding Walgreens PSC Program and will be confirmed through review and analysis of Walgreens' cash transaction data.  As described above in, *inter alia*, paragraph 67, the PSC Program's advertised price lists did not provide all of the information that Plaintiffs need to identify specific drugs eligible for discounted PSC Program prices.  Chiefly, the PSC Program price lists omitted NDCs, GPIs, GCNs, GSNs, and other industry-standard drug identifiers, which are necessary to determine whether an overcharge has indeed occurred.

owned subsidiaries headquartered in Illinois, Walgreens Business Services, LLC, which manages the PSC Program's member enrollment, fee collection, advertising and marketing, discount adjudication process, and maintenance of the PSC Program's participating provider network. Since at least 2008, Walgreen Co.'s Illinois-based investor relations division has recognized the success of these Illinois-based subsidiaries and the PSC Program as its own, reporting in multiple Deerfield, Illinois press releases that Walgreen Co.'s financial well-being was buoyed by the PSC Program. These public statements omitted disclosures that the PSC pricing discounts were not being provided to health plans, including Plaintiffs, as U&C.

75.     Walgreens admitted in a U&C fraud settlement with the Department of Justice that "[i]n submitting claims for reimbursement" Walgreens "did not identify its PSC program prices as its U&C prices for the drugs on the PSC program formulary, which resulted in the States paying more in reimbursement than they would have paid if WALGREENS had identified its PSC program prices." The remedial actions required of Walgreens by the U.S. Government reflect the senior level involvement of Walgreens' Illinois-based management. The Corporate Integrity Agreement that Walgreens was required to execute with the U.S. Department of Health and Human Services requires certifications from "the Senior Vice President, Pharmacy; Senior Vice President, Pharmacy and Retail Operations; Senior Vice President, Operations; Senior Vice President, Chief Financial Officer Retail Pharmacy; and Senior Vice President, Chief Human Resources Officer," (all located in Illinois); the appointment of a Compliance and Ethics Officer (also located in Illinois); and periodic reports to the Audit Committee of the Board of Directors of Walgreens Boots Alliance, Inc. (located in Illinois).

## IV. Defendants' Violations of the RICO Act.

### A. RICO

76.     In 1970, Congress enacted RICO to combat the influence of organized crime on interstate commerce.  "But Congress for cogent reasons chose to enact a more general statute, one which, although it had organized crime as its focus, was not limited in application to organized crime." *H.J. Inc v. Nw. Bell Telephone Co.*, 492 U.S. 229, 248 (1989).  Thus, a plaintiff may allege RICO claims against any defendant businesses and individuals that engage "in a pattern of criminal acts" absent "an allegation and proof of an organized crime nexus." *Id.* at 249.

77.     Congress expressly stated that RICO is to "be liberally construed to effectuate its remedial purposes." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 498 (1985) (quoting Pub. L. No. 91–452, § 904(a), 84 Stat. 947).

78.     Congress included a "civil cause of action" under RICO for a plaintiff to recover damages from a defendant who injured the plaintiff's business or property by violating the statute. *RJR Nabisco Inc. v. European Cmty.*, 579 U.S. 325, 329 (2016) (citing 18 U.S.C. § 1964(c)); *see also* 18 U.S.C. § 1961(a) (defining "racketeering activity").

79.     Plaintiffs successfully have brought civil RICO claims against defendants in a variety of circumstances outside of organized crime and beyond traditional mob-related activities like murder, kidnapping, gambling, arson, robbery, bribery, and extortion.

### B. The Cash Discount Enterprise.

80.     Under 18 U.S.C. § 1961(4), a RICO "enterprise" may be an association-in-fact that, although it has no formal legal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's purpose.

81.     Defendants formed just such an association-in-fact enterprise— sometimes referred to in this complaint as the Cash Discount Enterprise. As it pertains to Plaintiffs, the Cash Discount Enterprise consists of (a) Walgreens Co., including its employees and agents; (b) the Walgreens Boots Alliance, Inc. including its employees and agents; (c) WHI, Walgreen Co.'s wholly-owned subsidiary PBM, including its agents and employees; and (d) the PBM Caremark, L.L.C, including its employees and agents.

82.     The Cash Discount Enterprise is an ongoing and continuing business organization consisting of "persons" within the meaning of 18 U.S.C. § 1961(3) that created and maintained systematic links for a common purpose: to ensure that Walgreens could report inflated U&C prices to Plaintiffs and their members without its fraud being detected.

83.     To accomplish this purpose, the Cash Discount Enterprise periodically and systematically inflated Walgreens' U&C prices and represented—either affirmatively or through half- truths and omissions—to health plans, including Plaintiffs and their members, that Walgreens' U&C prices were "the amount charged cash customers for the prescription exclusive of sales tax or other amounts charged." The Enterprise concealed from health plans, like Plaintiffs, that the cash discount prices were not reported as Walgreens' U&C price. This scheme translated into higher sales (and therefore profits) for Walgreens and larger profits for PBMs, such as WHI, as an administrator of Walgreens' program, and Caremark, the PBM that has administered prescription drug insurance benefits for the CareFirst Plaintifffs since 2014.

84.     The persons engaged in the Cash Discount Enterprise are systematically linked through contractual relationships, financial ties, and continuing coordination of activities, as spearheaded by Walgreens. There is regular communication between Walgreens, Caremark, and other PBMs, in which information is shared. Typically, this communication occurred, and

continues to occur, through the use of the wires and the mail in which Walgreens and Caremark share information regarding various cash discount programs, the structure of those programs, and whether they are reporting those prices as U&C prices. Walgreens and Caremark functioned as a continuing unit for the purposes of implementing the cash discount scheme and, as set forth above, when issues arose during the scheme, each agreed to take actions to hide the scheme and continue its existence.

85. At all relevant times, Caremark was aware of Walgreens' conduct, was a knowing and willing participant in that conduct, and reaped profits from that conduct. Caremark concealed Walgreens' true U&C prices and adopted policies that allowed Walgreens to submit a fraudulent U&C price. Caremark represented to its clients that it was acting to save them (including Plaintiffs and their members) money on their prescription needs. But it knew that Walgreens' conduct was inflating the price its clients were paying for generic prescription drugs, because Walgreens' U&C price was falsely inflated. Caremark was also incentivized to tolerate Walgreens' overpricing, and to misrepresent and conceal this misconduct, because Caremark's related company, CVS Pharmacy, also falsely inflated its own U&C prices through conduct similar to Walgreens'— excluding CVS's own cash discount prices from its submitted U&C prices.

86. Caremark also knew, but did not disclose, that WHI, which was administering the cash discount programs, likewise would not disclose the fraud. But for the Cash Discount Enterprise's unlawful fraud, Caremark would have had the incentive to disclose the deceit by Walgreens. By failing to disclose this information, Caremark perpetuated the Cash Discount Enterprise's scheme, and reaped substantial profits.

87. During the time that it was administering the cash discount programs, WHI was aware of Walgreens' conduct, was a knowing and willing participant in that conduct, and reaped

profits from that conduct. WHI concealed Walgreens' true U&C prices and adopted policies that allowed Walgreens to submit a fraudulent U&C price. WHI knew that Walgreens' conduct was inflating the price health plans were paying for generic prescription prices, because Walgreens' U&C price was falsely inflated. WHI also knew, but did not disclose, that Caremark was also allowing Walgreens to engage in this fraud to the detriment of their health plan customers. But for the Cash Discount Enterprise's unlawful fraud, WHI would have had the incentive to disclose the deceit by Walgreens. By failing to disclose this information, WHI perpetuated the Cash Discount Enterprise's scheme, and reaped substantial profits.

88.     Furthermore, neither Caremark nor WHI challenged Walgreens' reported U&C prices, terminated their role in the Cash Discount Enterprise, nor disclosed publicly that Walgreens' U&C prices were artificially inflated.

89.     Caremark and WHI participated in the conduct of Walgreens in the Cash Discount Enterprise, sharing the common purpose of inflating Walgreens' U&C prices, through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and (5), which includes multiple instances of mail fraud in violation of 18 U.S.C. § 1341, and multiple instances of wire fraud in violation of 18 U.S.C. § 1343. Caremark and WHI knowingly made material misstatements to Plaintiffs in furtherance of the fraudulent scheme regarding:

   a. Walgreens' actual U&C prices;

   b. The extent to which Walgreens was reporting its cash discount prices as its U&C price;

   c. Whether Walgreens' practice of failing to report its cash discount prices as its U&C price caused health plans to pay more money for generic prescription drugs; and

     d.     Whether and how the PBMs benefited from Walgreens' practice of failing to report its cash discount prices as its U&C price.

90.    Walgreens alone could not have accomplished the purpose of the Cash Discount Enterprise without the assistance of Caremark and WHI. For Walgreens to profit from the scheme, Caremark and WHI needed to allow Walgreens to report inflated U&C prices. And Caremark and WHI did so. They then, through misrepresentations and failures to disclose material information, failed to tell Plaintiffs and their members that they were paying higher prices for generic prescription drugs, and that Caremark and WHI were benefitting from those higher prices. Without these misrepresentations, the Cash Discount Enterprise could not have achieved its common purpose.

91.    The Cash Discount Enterprise engaged in and affected interstate commerce because, *inter alia*, it set the price of drugs that were paid for by million of prescription insurance customers, including those of Plaintiffs.

92.    The foregoing evidences that Walgreens and WHI were each willing participants in the Cash Discount Enterprise, had a common purpose and interest in the object of the scheme, and functioned within a structure designed to effectuate the Enterprise's purpose, *i.e.*, through Walgreens' inflation of its U&C prices, coupled with Caremark and WHI's failures to disclose that inflation and misstatements to Plaintiffs regarding that inflation.

**C.    Conduct of the Cash Discount Enterprise.**

93.    From 2007 to date, Walgreens exerted control over the Cash Discount Enterprise and participated in the operation or management of the affairs of the Cash Discount Enterprise, directly or indirectly, in the following ways:

a.      Walgreens published its U&C prices, which did not include its cash discount prices;

b.      Caremark charged their clients U&C prices, which they knew did not include Walgreens' cash discount prices and were therefore inflated;

c.      Caremark and WHI concealed that Walgreens' U&C price was inflated in order to allow themselves to charge health plans that inflated price; and

d.      Walgreens expected and intended that Caremark and WHI would (and did) distribute through the U.S. Mail and interstate wire facilities, communications that failed to disclose that Walgreens' U&C prices were artificially inflated.

94.     The scheme had a hierarchical decision-making structure that was headed by Walgreens. Walgreens controlled the publication of its U&C price, and stood silent as Caremark charged its clients inflated prices for generic prescription prices based on the publication of that price and WHI administered the cash discount program such that those inflated prices would be submitted to Plaintiffs.

95.     Caremark and WHI also participated in the conduct of the affairs of the Cash Discount Enterprise, directly or indirectly, in the following ways:

a.    Caremark and WHI promised to, and did, keep secret that Walgreens was not reporting its cash discount prices as its U&C;

b.    Caremark and WHI distributed through the U.S. Mail and interstate wire facilities communications which concealed the existence of the Cash Discount Enterprise; and

c.    Caremark and WHI concealed the existence of Walgreens' inflated U&C prices to further the fraudulent pricing scheme.

33

96.     The scheme devised and implemented by Walgreens, as well as other members of the Cash Discount Enterprise, amounted to a common course of conduct intended to (a) allow Walgreens to charge inflated prices for generic prescription drugs; (b) allow Caremark to charge inflated prices for generic prescription drugs; and thereby (c) secure from health plans, such as Plaintiffs, payment for generic prescription drugs at inflated prices.

**D.      Walgreens' Pattern of Racketeering Activity.**

97.     Walgreens conducted and participated in the conduct of the affairs of the Cash Discount Enterprise through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud. The pattern of racketeering activity by the Cash Discount Enterprise likely involved millions of separate instances of use of the U.S. Mail or interstate wire facilities in furtherance of the unlawful cash discount pricing scheme. Each of these fraudulent mailings and interstate wire transmissions constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), through which Walgreens intended to defraud Plaintiffs, their members, and other intended victims.

98.     Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs and their members. Walgreens and Caremark calculated and intentionally crafted the cash discount scheme to ensure their own profits remained high, without regard to the effect such pricing behavior had on Plaintiffs and their members who would be over-billed for generic prescription drugs. In designing and implementing the scheme,

at all times Walgreens was cognizant of the fact that those to whom it reports U&C prices rely on the integrity of those reporting those prices consistent with NDPDP standards.

99. By intentionally and artificially inflating its U&C prices, and then subsequently failing to disclose such practices to the health plans, Walgreens, Caremark, and WHI engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

100. Walgreens', Caremark's, and WHI's racketeering activities amounted to a common course of conduct, with a similar pattern and purpose, intended to deceive Plaintiffs and their members. Each separate use of the U.S. Mail and/or interstate wire facilities employed by Walgreens was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including Plaintiffs and their members. Walgreens has engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of its Cash Discount Enterprise.

101. The pattern of racketeering activity alleged herein and the Cash Discount Enterprise are separate and distinct from each other. Likewise, Walgreens is distinct from the Cash Discount Enterprise.

102. The pattern of racketeering activity alleged herein continues to date.

**E. Walgreens' Use of the U.S. Mail and Interstate Wire Facilities**

103. Cash Discount Enterprise engaged in and affected interstate commerce because it engaged in the following activities across state boundaries: the transmission and publication of false and misleading information concerning Walgreens' U&C prices; the benefits Caremark received from Walgreens' inflated U&C prices; and transmission of false or incomplete statements intended to mislead health plans like Plaintiffs regarding the publication of Walgreens' inflated U&C prices.

104.     Since its inception on or about 2007, the Cash Discount Enterprise's unlawful conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents, information, products, and funds by the U.S. Mail and interstate wire facilities.

105.     The nature and pervasiveness of the cash discount fraud scheme, which was orchestrated out of the corporate headquarters of Walgreens, Caremark, and WHI, necessarily required those headquarters to communicate directly and frequently by U.S. Mail and interstate wire facilities.

106.     Many of the precise dates of the Cash Discount Enterprise's uses of the U.S. Mail and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to Walgreens' or Caremark's or WHI's books and records. Indeed, an essential part of the successful operation of the Enterprise alleged herein depended upon secrecy. However, Plaintiffs can generally describe the occasions on which the RICO predicate acts of mail fraud and wire fraud occurred, and how those acts were in furtherance of the scheme; Plaintiffs describe this below.

107.     Walgreens' use of the U.S. Mail and interstate wire facilities to perpetrate the cash discount fraud scheme involved millions of communications since its inception on or about 2007 through to today, including, *inter alia*:

      a.     Communications of Walgreens' U&C price to health plans, which occurred on a regular basis as health plans' members purchased generic prescription drugs;

      b.     Written representations and telephone calls between Walgreens and Caremark regarding the cash discount program and Walgreens' inflated U&C prices;

c.      Written representations and telephone calls between Walgreens and WHI regarding the cash discount program and Walgreens' inflated U&C prices;

d.      Written and oral communications directed to health plans that fraudulently misrepresented Walgreens' U&C price that were designed to conceal the scheme and deter investigations into Walgreens' U&C pricing; and

e.      Receipts of increased profits sent through the U.S. Mail and interstate wire facilities—the wrongful proceeds of the scheme.

108.    In addition to the above-referenced RICO predicate acts, it was foreseeable to Walgreens that Caremark and WHI would distribute publications through the U.S. Mail and by interstate wire facilities, and in those publications, conceal that Walgreens' U&C price was fraudulently inflated.

**F.      Motive and Common Purpose.**

109.    Walgreens' motive and purpose in creating and conducting the scheme and the Enterprise was to compete in the cash payor business while not damaging its substantial health plan business by using a lower U&C price that could cost Walgreens billions. Caremark joined in that common purpose because it made more money the higher the drug cost to health plans, either in the form of rebates from the manufacturers or from the difference between the spread, the amount charged the health plan and the cost to Caremark. Although PBMs typically agree to share rebates in some form with clients, they link the rebates to formulary savings in such a manner that the PBM often is able to secretly retain all of the rebates. Furthermore, PBMs refuse to disclose specific rebate amounts to clients in any fashion other than in the aggregate compared to performance standards, thereby preventing the client from learning the true amount of rebates that the PBM has received in connection with the health plan client.

## G. Damages Caused by Walgreens' Cash Discount Fraud.

110. Walgreens' violations of federal law and its pattern of racketeering activity have directly and proximately caused Plaintiffs and their members to be injured in their business or property because Plaintiffs and their members have paid inflated out-of-pocket expenses for generic prescription drugs.

111. As described above, when a health plan pays for prescription drugs, its payment is based on the lower of AWP, MAC or U&C. When U&C is artificially inflated, the health plan overpays due to a fraudulent price.

112. Plaintiffs' injuries, and those of their members, were proximately caused by Walgreens' racketeering activity. But for the misstatements made by Walgreens, Caremark, and WHI, and the pricing scheme employed by the Cash Discount Enterprise, Plaintiffs would have paid less for generic prescription drugs for their members.

113. Plaintiffs' injuries were directly caused by Walgreens' racketeering activity. Walgreens' racketeering activity inflated the U&C price, the price upon which Plaintiffs' payments for generic prescription drugs were based.

114. And, although the Cash Discount Enterprise was effectuated to give Walgreens a wrongfully-obtained advantage over certain its competitors, the harm this suit seeks to remedy was not suffered by Walgreens' competitors. Indeed, Walgreens' competitors such as CVS and Rite Aid have engaged in similar misconduct. The United States District Court for the District of Rhode Island granted leave to amend to add, and rejected dismissal-like futility arguments against, substantially similar RICO allegations targeting CVS Pharmacy and PBMs including Caremark. *See Sheet Metal Workers Local No. 20 v. CVS Pharmacy, Inc.*, 305 F. Supp. 3d 337 (D.R.I. 2018).

38

V. **Tolling of the Statute of Limitations.**

115.    As alleged herein, Walgreens affirmatively presented claims for reimbursement to Plaintiffs, through Plaintiffs' PBMs, that contained false and inflated U&C prices and further acted to conceal the true U&C prices being charged to its cash customers.

116.    Furthermore, Walgreens used its marketing of the PSC Program to conceal the fraudulent scheme it had implemented.  Walgreens marketed the PSC Program as being a "club" that required "membership" in order to obtain the discount pricing.  Walgreens' marketing effort was meant to present the PSC Program as an "exclusive" program, not available to the general public.  In reality, however, the PSC Program was not exclusive and was available to the general public.  Walgreens used its marketing to conceal the true nature of the PSC Program and the fact that cash-paying customers were paying U&C prices that were lower than the U&C prices Walgreens reported to Plaintiffs.

117.    Walgreens does not provide Plaintiffs with records of transactions involving Walgreens' cash customers, including cash customers paying PSC Program prices, JustRx Program prices, third-party discount card program prices, or other discounted cash prices.

118.    Plaintiffs had no information regarding how many of Walgreens' customers were in the PSC Program or JustRx Program, used third-party discount card programs, or received other discounts.  Plaintiffs further had no information regarding the actual cash prices charged to customers, or any other information regarding Walgreens' cash transactions for prescription drugs.

119.    Plaintiffs could not have discovered the truth regarding Walgreens' fraudulent scheme because Walgreens actively concealed information and data from Plaintiffs that was necessary to understand the facts underlying Walgreens' scheme.

39

120.     Walgreens knew that Plaintiffs would ultimately rely upon the claims data, including the reported U&C charge, that Walgreens submitted to them to pay the claims, and Plaintiffs relied on Walgreens to report its U&C charges truthfully and consistent with industry practice, government regulations, and contract definitions.

121.     Walgreens repeatedly has refused requests made by third-party payors like Plaintiffs to produce relevant cash pricing transaction data necessary to validate Walgreens' reported U&C prices like those submitted to Plaintiffs, *i.e.*, records of transactions involving Walgreens' cash-paying and uninsured customers.

122.     Walgreens never notified Plaintiffs that it excluded the prices charged on millions of its steeply discounted PSC Program, JustRx Program, third-party discount card programs, and other discount sales to cash customers from the U&C prices that it reported to Plaintiffs, through Plaintiffs' PBMs, on claims submitted for payment.

123.     Instead, Walgreens established a covert two-track U&C pricing system: one price *reported* as U&C on claims for those customers that used an insurance benefit provided by Plaintiffs; and a different—and almost universally lower—price *actually charged* to customers who did not use an insurance benefit (*i.e.*, cash-paying customers).

124.     Under this two-track U&C pricing system, Walgreens knowingly and intentionally submitted inflated prices to Plaintiffs, through Plaintiffs' PBMs, as U&C.

125.     By knowingly and intentionally reporting inaccurate U&C charges to Plaintiffs, through Plaintiffs' PBMs, in order to obtain inflated reimbursements for millions of brand and generic prescriptions filled for and sold to Members at Walgreens pharmacies across the country, knowing at all times that Plaintiffs would rely upon the NCPDP field 426-DQ data in making

payment decisions, Walgreens misled Plaintiffs and caused Plaintiffs to overpay many millions of dollars.

126. Walgreens submitted millions of claims for payment to Plaintiffs, through Plaintiffs' PBMs—almost all of which included inflated (false) U&C charges.

127. Walgreens took other active steps to hide its scheme from Plaintiffs. For example, Walgreens frequently, and without providing any notice to Plaintiffs, changed its PSC Program's scope and prices. Walgreens also used its marketing terminology as subterfuge to make it look like the PSC Program provided exclusive, limited "club" prices instead of discount cash prices available to the general public.

128. Walgreens' systematic reporting of inflated U&C charges and its deliberate obfuscation of the cash pricing information for most of the drugs eligible for PSC Program discounts, *inter alia*, prevented Plaintiffs from recognizing Walgreens' misleading and fraudulent pricing scheme.

129. Walgreens knowingly and fraudulently concealed its true U&C prices every time it reported prices higher than its PSC Program, JustRx Program, third-party discount card program prices, and other discounted cash prices to Plaintiffs, through Plaintiffs' PBMs, in the NCPDP 426-DQ data field—for many millions of prescriptions that it submitted for payment to Plaintiffs.

130. As a result of Walgreens' fraudulent concealment, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs have as a result of the unlawful conduct alleged in this Complaint.

131. Plaintiffs discovered the bases for the causes of action set forth in this Complaint not earlier than January 2019.

132.     Since Plaintiffs were unable to know the truth regarding Walgreens' fraudulent conduct until, at the earliest, January 2019, the discovery rule applies to delay the commencement of any statute of limitations that may be applicable to Plaintiffs' claims resulting from the unlawful conduct alleged in this Complaint.

133.     As of the date of the filing of this Complaint, Walgreens continues to submit inflated U&C prices for payment by Plaintiffs, via Plaintiffs' PBMs, on claims for generic and brand-name prescription drugs.  Walgreens' inflated U&C prices are in excess of the prices that it charges millions of cash-paying customers enrolled in the PSC Program, JustRx Program, or other third-party discount card programs, and other discounted prices for the very same drugs.  On millions of payment claims, Walgreens continues to collect higher payment amounts from Plaintiffs than that to which it is entitled.

134.     Moreover, to the extent that any statute of limitations applies to any of Plaintiffs' claims, the running of that limitations period has been tolled by the class action tolling doctrine pursuant to the United States Supreme Court's decision in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and subsequent decisions.

## FIRST CLAIM FOR RELIEF (COUNT I)
## VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO), 18 U.S.C. § 1962(c)
## (BROUGHT BY CFMI, GHMSI AND CAREFIRST BLUECHOICE)

135.     Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

136.     Under RICO, it is unlawful for (1) any culpable person to (2) conduct an "enterprise" (3) affecting interstate commerce (4) through a "pattern" (5) of "racketeering activity."  18 U.S.C. § 1962(c).

137.    RICO defines a culpable "person" as an "individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3). Defendants satisfy this statutory definition as each defendant already has, or can hold, legal interests in property.

138.    The statutory term "'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1861(4). Defendant Walgreen Co. (a legal entity company), and Defendant Walgreens Boots Alliance, Inc. (another legal entity corporation) associated together with Caremark and WHI, formed a Cash Discount Enterprise wherein they worked together for a common purpose of engaging in a cash discount fraud scheme. *United States v. Turkette*, 452 U.S. 576, 583 (1981).

139.    The Cash Discount Enterprise engages in and affects interstate commerce. A RICO enterprise is involved in "interstate commerce" when it is itself "directly engaged in the production, distribution, or acquisition of goods and services in interstate commerce." *United States v. Robertson*, 514 U.S. 669, 672 (1995). Defendants' pattern of racketeering affected interstate commerce because they engaged in the following activities across state boundaries: the transmission and publication of false and misleading information concerning Walgreens' U&C prices; the benefits PBMs received from Walgreens' inflated U&C prices; and transmission of false or incomplete statements intended to mislead health plans like Plaintiffs regarding the publication of Walgreens' inflated U&C prices.

140.    Defendants' Cash Discount Enterprise perpetrated, and continues to perpetrate, its cash discount scheme through widespread and daily wire and mail fraud, which constitutes a pattern of racketeering pursuant to 18 U.S.C. § 1961(5). RICO defines a "pattern of racketeering activity" as "at least two acts of racketeering activity." 18 U.S.C. § 1961(5). The "heart of any

43

RICO complaint is the allegation of a *pattern* of racketeering." *Agency Holding Corp. v. Malley-Duff & Associates, Inc.*, 483 U.S. 143, 154 (1987) (Court's emphasis). Rather than "a sporadic or isolated event," a pattern of racketeering under RICO is continuous such that "a factfinder could find that these practices occurred over a period a several years, involved separate transactions, and injured a great number of individuals, thus posing a threat of continued criminal activity." *Bermudez v. First of Am. Bank Champion, N.A.*, 860 F. Supp. 580, 597 (N.D. Ill. 1994), withdrawn pursuant to settlement, 886 F. Supp. 643 (N.D. Ill. 1995).

141.    Defendants' Cash Discount Enterprise engaged in a continuous series of fraud that has operated in some form from 2007 to the present. To perpetrate this fraud, Defendants communicated directly and frequently with Caremark and WHI by U.S. Mail and interstate wire facilities, in writing, telephonically, and by e-mail, committing the predicate RICO acts of mail and wire fraud. RICO defines "racketeering activity" to include any act that is indictable under the provisions of title 18 of the United States Code.  18 U.S.C. § 1961(1)(B).  That includes any act in violation of "section 1956 (relating to the laundering of monetary instruments)" and "section 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity)." *Id.*

142.    Defendants also received of increased profits sent through the U.S. Mail and interstate wire facilities—the wrongful proceeds of the scheme.

143.    In addition to the above-referenced RICO predicate acts, it was foreseeable to Walgreens that Caremark and WHI would distribute publications through the U.S. Mail and by interstate wire facilities, and in those publications, conceal that Walgreens' U&C price was fraudulently inflated.

44

144.    Defendants are employed by or otherwise associated with this Enterprise. Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity, namely mail and wire fraud, and for the unlawful purpose of intentionally defrauding Plaintiffs, in violation of 18 U.S.C. § 1962(c).

145.    Pursuant to and in furtherance of their fraudulent cash discount scheme, Defendants committed multiple related acts of wire and mail fraud. In fact, every health insurance claim submitted to Plaintiffs which did not reflect the cash discount price as the U&C price, all of which were and are submitted by Defendants through mail or wire, constitutes an independent act of mail or wire fraud, which Defendants have engaged in millions of times since 2007.

146.    Many of the precise dates of the Cash Discount Enterprise's uses of the U.S. Mail and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to Walgreens' or Caremark's or WHI's books and records. Indeed, an essential part of the successful operation of the Enterprise alleged herein depended upon secrecy. However, Plaintiffs have generally described herein the occasions on which the RICO predicate acts of mail fraud and wire fraud occurred, and how those acts were in furtherance of the scheme.

147.    As a direct and proximate result of Defendants' racketeering activities and violations of 18 U.S.C. § 1962(b), Plaintiffs have been injured in their business and property. Defendants' scheme has generated hundreds of millions of dollars in illicit cash proceeds, and continues to generate more daily. But for the misstatements made by Walgreens and Caremark and the pricing scheme employed by the Cash Discount Enterprise, Plaintiffs would have paid less for generic prescription drugs for their members.

148.    By virtue of these violations of 18 U.S.C. § 1962(c), Walgreens is liable to Plaintiffs for three times the damages they have sustained, plus the cost of this suit, including reasonable attorneys' fees.

**SECOND CLAIM FOR RELIEF (COUNT II)**
**VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT**
**ORGANIZATIONS ACT (RICO), 18 U.S.C. § 1962(d), *ET SEQ.***
**(BROUGHT BY CFMI, GHMSI AND CAREFIRST BLUECHOICE)**

149.    Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

150.    Defendants have intentionally conspired and agreed to, along with Caremark and WHI, violate 18 U.S.C. § 1962 (c), as described in Count I, which Plaintiffs adopt and incorporate by reference as if fully set forth herein.

151.    Defendants have intentionally conspired and agreed to, along with Caremark and WHI, conduct, facilitate, and otherwise participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity. Defendants knew that their predicate acts of mail and wire fraud were part of a pattern of racketeering activity and agreed to the commission of those acts to facilitate their cash discount fraud scheme. That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962 (c), in violation of 18 U.S.C. § 1962 (d),

152.    As a direct and proximate result of Defendants' agreement to facilitate the conspiracy, the contemplated racketeering acts in furtherance of that conspiracy, and  violations of 18 U.S.C. § 1962 (d), Plaintiffs have been injured in their business and property. Defendants' scheme has generated hundreds of millions of dollars in illicit cash proceeds, and continues to generate more daily. But for the misstatements made by Walgreens, Caremark, WHI, and the pricing scheme facilitated by the Cash Discount Enterprise, Plaintiffs would have paid less for generic prescription drugs for their members.

153.     By virtue of these violations of 18 U.S.C. § 1962(d), Walgreens is liable to Plaintiffs for three times the damages they have sustained, plus the cost of this suit, including reasonable attorneys' fees.

**THIRD CLAIM FOR RELIEF (COUNT III)**
**FRAUD**

154.     Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

155.     On millions of claims for payment, Walgreens deliberately submitted to Plaintiffs, through Plaintiffs' PBMs, inflated U&C prices in the NCPDP field 426-DQ that were significantly higher than the prices available to individuals who paid without insurance for prescription drugs. Walgreens made misrepresentations to Plaintiffs' PBMs and Plaintiffs each time it reported prices higher than the prices available to individuals who paid without insurance as its U&C charges in the 426-DQ data field on the standardized NCPDP price form.

156.     Walgreens' misrepresentations to Plaintiffs' PBMs and Plaintiffs began in 2007 and are ongoing.  Walgreens made misrepresentations to Plaintiffs via Plaintiffs' PBMs, knowing that the fraudulently inflated U&C charges it submitted in field 426-DQ of the NCPDP form would materially impact the adjudication process and be communicated to Plaintiffs as the ultimate payor.

157.     Because the U&C price was a payment term necessary for determining Plaintiffs' payment price, the U&C prices Walgreens reported to Plaintiffs' PBMs and Plaintiffs were material.

158.     Walgreens knew that the cash prices that it charged PSC Program customers, JustRx Program customers, and third-party discount card customers, and other discounted prices for prescriptions were lower than the inflated U&C charges that Walgreens reported electronically

to Plaintiffs' PBMs and Plaintiffs on the NCPDP form for the same drugs. Walgreens thus knew that the U&C charges it represented were false and misleading.

159. Walgreens submitted inflated U&C prices on claims for payment by Plaintiffs with the knowledge and intent that those false U&C prices would be relied upon to adjudicate Plaintiffs' payments, to the benefit of Walgreens. Specifically, through this fraudulent scheme, Walgreens intended to gain reimbursement payments in amounts far greater than it was entitled.

160. Plaintiffs lacked the ability to discover Walgreens' fraud. Plaintiffs had no means to identify how many Walgreens customers were actually paying PSC Program prices, JustRx Program prices, third-party discount card program prices, or other discount prices; or to identify the precise list of drugs discounted by those programs; or to identify the prices at which all of those discounted drugs were offered to Walgreens' cash customers.

161. Plaintiffs justifiably relied on the accuracy of the pricing information that Walgreens reported in NCPDP field 426-DQ.

162. As a result of Walgreens' fraudulent conduct and Plaintiffs' justifiable reliance, Plaintiffs have sustained immense damage. Plaintiffs have overpaid millions of dollars to Walgreens. In addition, Walgreens' fraudulent conduct has prevented Plaintiffs from obtaining more favorable prescription drug prices for their Members.

163. Walgreens' false and misleading conduct is ongoing: Walgreens continues to report inflated U&C prices in NCPDP field 426-DQ for claims submitted for payment by Plaintiffs.

164. Plaintiffs are entitled to recover damages against Walgreens based on fraud in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF (COUNT IV)
### FRAUDULENT NONDISCLOSURE

165.    Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

166.    Walgreens had special knowledge of material facts, *i.e.*, the accurate, non-inflated U&C prices, which the Plaintiffs do not have.

167.    Walgreens concealed material facts, *i.e.*, the accurate, non-inflated U&C prices, from Plaintiffs' PBMs and Plaintiffs.

168.    Walgreens knew what the accurate, non-inflated U&C prices were for the prescription drugs for which it submitted claims for reimbursement from Plaintiffs' PBMs and Plaintiffs.  These prices were the same or similar prices Walgreens was charging its customers using the PSC Program, JustRx Program, third-party discount programs, or through other discounts to purchase the same prescription drugs.

169.    Walgreens knew that it was not submitting the accurate, non-inflated U&C prices for reimbursement from Plaintiffs' PBMs and Plaintiffs.

170.    Walgreens knew or should have known that Plaintiffs' PBMs and Plaintiffs would rely upon Walgreens' concealment of the accurate, non-inflated U&C prices to adjudicate Walgreens' claims for reimbursement.

171.    Walgreens had a duty to disclose the accurate, non-inflated, true U&C prices. Walgreens had special knowledge of the complete list of drugs, drug prices, discounts, and cash transaction data necessary to determine the accurate, non-inflated, true U&C prices.  Plaintiffs could not determine the true U&C price because this information was hidden by Walgreens and not available to Plaintiffs.

172.     As a result of Walgreens' fraudulent nondisclosure, Plaintiffs have sustained immense damage in the form of overpayments to Walgreens totaling millions of dollars.  In addition, Walgreens' fraudulent conduct has prevented Plaintiffs from obtaining more favorable prescription drug prices for their members.

173.     Walgreens' fraudulent conduct is ongoing: Walgreens continues to report inflated U&C prices in NCPDP field 426-DQ for claims submitted for payment by Plaintiffs.

174.     Plaintiffs are entitled to recover damages against Walgreens based on its fraudulent nondisclosures in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF (COUNT V)
## UNJUST ENRICHMENT

175.     Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein

176.     Under the circumstances described herein, Walgreens has owed—and continues to owe—a duty to Plaintiffs to provide Plaintiffs with accurate U&C prices on reimbursement claims.

177.     Because Walgreens fraudulently inflated the U&C prices it reported on millions of claims submitted for Plaintiffs' reimbursement, Plaintiffs were overcharged, and thus overpaid millions of dollars to Walgreens.

178.     Walgreens knowingly and voluntarily accepted these millions of dollars in overpayments from Plaintiffs.

179.     Plaintiffs' overpayments should not have been paid to Walgreens.  Those millions of dollars in overpayments should have been retained by Plaintiffs.

180.     Walgreens' retention of these overpayment amounts violates fundamental principles of justice, equity, and good conscience.

181.    Under the circumstances described herein, it would be inequitable for Walgreens to retain these overpayments.

182.    As a result of Walgreens' wrongful conduct as described herein, Walgreens has been unjustly enriched at the expense of, and to the detriment of, Plaintiffs.

183.    Walgreens is therefore liable to Plaintiffs for restitution in the amount of Walgreens' wrongfully obtained monies.

**SIXTH CLAIM FOR RELIEF (COUNT VI)**
**VIOLATION OF THE ILLINOIS UNIFORM**
**DECEPTIVE TRADE PRACTICES ACT (815 ILCS 510, *et seq.*)**

184.    Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

185.    Walgreens' business acts and practices alleged herein constitute deceptive trade practices under the Illinois Uniform Deceptive Trade Practices Act ("IUDTPA").

186.    Each Plaintiff and each Defendant is, and at all relevant or material times was, a "person" as defined in IUDTPA.[44]

187.    Walgreens' deceptive trade practices included, but were not limited to: (i) making false and misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions; and (ii) engaging in conduct which similarly created a likelihood of confusion or misunderstanding.

188.    At all material and relevant times, Walgreens' wrongful acts occurred in the course of its "business, vocation, or occupation" as described in IUDTPA.[45]

---

[44] *See* 815 ILCS 510/1(2) ("'[P]erson' means an individual, corporation, government or governmental subdivision or agency, business trust, estate, trust, partnership, unincorporated association, 2 or more of any of the foregoing having a joint or common interest or any other legal or commercial entity.").

[45] 815 ILCS 510/2.

189.    At all material and relevant times, the circumstances related to Walgreens' wrongful acts occurred primarily and substantially in Illinois. Walgreens has administered, and continues to administer, its PSC Program from Walgreens' corporate headquarters in Deerfield, Illinois. The decisions to not report its discounted prices as U&C to Plaintiffs and to conceal that decision from Plaintiffs were made by Walgreens' senior management in and implemented out of Illinois. Walgreens has also issued statements from senior officials and made other representations about the PSC Program from and in the course of its Illinois operation which contributed to the fraud, concealment, and deception. Further, WHI, which was Walgreen Co.'s wholly-owned subsidiary PBM during the initial years of Walgreens' fraudulent scheme, was at that time based in and operated out of Illinois. In Illinois, WHI created and published a false policy regarding Walgreens' reporting of discounted prices through its Pharmacy Manual, which contained a U&C definition consistent with the NCPDP requirements and industry standards, and disseminated that false policy from Illinois. Through its scheme, Walgreens secured hundreds of millions of dollars in payments from Plaintiffs, and these payments were sent to Walgreens' headquarters in Illinois. Walgreens' PBM agreements were negotiated by Walgreens in Illinois. And members of each of Plaintiffs' health plans have purchased prescription drugs from Walgreens in Illinois.

190.    Walgreens represented that the prices it reported in NCPDP field 426-DQ were Walgreens' true and accurate U&C prices. Walgreens' representations were false, and Walgreens' true and accurate U&C prices for the prescription drugs for which it sought reimbursement from Plaintiffs' PBMs and Plaintiffs were lower than the prices quoted by Walgreens.

191.    The true and accurate U&C prices for the prescription drugs for which Walgreens sought reimbursement were the actual prices at which the prescription drugs were regularly and customarily sold at retail by Walgreens, inclusive of any prices offered to customers paying

without insurance who participated in the PSC Program, JustRx Program, third-party discount card programs, or received other discounts.

192.     Walgreens actions are ongoing: Walgreens continues to report inflated U&C prices in NCPDP field 426-DQ for claims submitted for payment by Plaintiffs.  As a result, Plaintiffs face the threat of future harm.

193.     Walgreens' deceptive practices regarding its true U&C prices of drugs discounted by the PSC Program (and other similar programs) injured both Plaintiffs and their Members, including those based in Illinois.  Walgreens' misconduct was and continues to be directed at and impacts the market generally and otherwise implicates consumer protection concerns, and remedying Walgreens' wrongdoing through the relief requested herein would serve the interests of consumers.

194.     Because Walgreens continues its U&C overcharging conduct described in this Complaint, Plaintiffs are likely to be damaged by Walgreens' continued deceptive trade practices. Consequently, Plaintiffs seek injunctive relief, pursuant to 815 ILCS 510/3, to enjoin Walgreens from excluding PSC Program prices, JustRx Program prices, third-party discount card program prices, and other discounts from the U&C prices it reports on claims for Plaintiffs' reimbursement.

195.     Because Walgreens has willfully engaged in the deceptive trade practices described in this complaint, Plaintiffs are entitled to recover attorneys' fees and costs of suit.

### SEVENTH CLAIM FOR RELIEF (COUNT VII)
### VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND
### DECEPTIVE BUSINESS PRACTICES ACT (815 ILCS 505, *et seq.*)

196.     Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

197.   Walgreens' business acts and practices alleged herein constitute unfair, unconscionable, deceptive, and fraudulent acts or practices under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA").

198.   Each Plaintiff and each Defendant is, and at all relevant or material times was, a "person" as defined in ICFA.[46]

199.   At all material and relevant times, the circumstances related to Walgreens' wrongful acts occurred primarily and substantially in Illinois.  Walgreens has administered, and continues to administer, its PSC Program from Walgreens' corporate headquarters in Deerfield, Illinois.  The decisions to not report its discounted prices as U&C to Plaintiffs and to conceal that decision from Plaintiffs were made by Walgreens' senior management in and implemented out of Illinois.  Walgreens has also issued statements from senior officials and made other representations about the PSC Program from and in the course of its Illinois operation which contributed to the fraud, concealment, and deception.  Further, WHI, which was Walgreen Co.'s wholly-owned subsidiary PBM during the initial years of Walgreens' fraudulent scheme, was at that time based in and operated out of Illinois.  In Illinois, WHI created and published a false policy regarding Walgreens' reporting of discounted prices through its Pharmacy Manual, which contained a U&C definition consistent with the NCPDP requirements and industry standards, and disseminated that false policy from Illinois.  Through its scheme, Walgreens secured hundreds of millions of dollars in payments from Plaintiffs, and these payments were sent to Walgreens' headquarters in Illinois.  Walgreens' PBM agreements were negotiated by Walgreens in Illinois.  And members of each of Plaintiffs' health plans have purchased prescription drugs from Walgreens in Illinois.

---

[46] *See* 815 ILCS 505/1(c) ("The term 'person' includes[, *inter alia*,] any natural person or his legal representative, partnership, corporation (domestic and foreign), company, trust, business entity or association.").

200.    Because Plaintiffs suffered actual damage as a result of Walgreens' ICFA violations, Plaintiffs are statutorily authorized to bring a private action to recover actual economic damages, reasonable attorney's fees, and litigation costs, and to secure injunctive relief against Defendants.

201.    Defendants engaged in unfair, deceptive, and unlawful acts and practices, including the employment of deception, fraud, false pretenses, misrepresentations to Plaintiffs, and the concealment, suppression and omission of material facts from Plaintiffs, with the specific intent that the Plaintiffs would rely upon those deceptive acts and practices to reimburse claims to Walgreens.

202.    At all material and relevant times, Walgreens' wrongful acts occurred in the course of its business and in the conduct of trade and commerce, as defined by ICFA.[47] Walgreens' unfair, unlawful, and deceptive acts and practices alleged herein regarding its true U&C prices occurred during and related directly to the routine purchase, sale, and reimbursement of prescription drugs at Walgreens pharmacies.

203.    Further, Walgreens marketed, promoted, advertised, and distributed the PSC Program cards, JustRx Program cards, other third-party discount program cards, and marketing materials in conjunction with PSC Program, JustRx Program, and third-party discount program cards, that "purport[ed] to offer discounts or access to discounts from health care providers in health related purchases," but the "the discounts or access to discounts offered or the range of discounts or access to the range of discounts offered," and Walgreens' intent for offering those discounts, were misleading, deceptive, and fraudulent.[48]

---

[47] 815 ILCS 505/2.

[48] 815 ILCS 505/2B.3.

55

204.    Walgreens displayed price quotations through submission of claims for reimbursement for prescription drugs to Plaintiffs' PBMs and Plaintiffs.  Walgreens' price quotations were included in NCPDP field 426-DQ of its claims for reimbursement.

205.    Walgreens represented that its price quotations included in NCPDP field 426-DQ were U&C prices.  Walgreens' representations were false, and Walgreens' true and accurate U&C prices for the prescription drugs for which it sought reimbursement from Plaintiffs' PBMs and Plaintiffs were lower than the prices quoted by Walgreens.

206.    The true and accurate U&C prices for the prescription drugs for which Walgreens sought reimbursement were the actual prices at which the prescription drugs were regularly and customarily sold at retail by Walgreens, inclusive of any prices offered to customers paying without insurance who participated in the PSC Program, JustRx Program, third-party discount card programs, or received other discounts.

207.    In addition to Plaintiffs, Walgreens' fraudulent conduct impacted consumers purchasing prescription drugs from Walgreens pharmacies using insurance through increased copay, coinsurance, and deductible obligations, as well as increased premiums resulting from increased costs to Plaintiffs.  The requested relief will also serve the interests of these consumers.

208.    Walgreens actions are ongoing: Walgreens continues to report inflated U&C prices in NCPDP field 426-DQ for claims submitted for payment by Plaintiffs.  As a result, Plaintiffs face the threat of future harm.

209.    Walgreens' deceptive practices regarding its true U&C prices of drugs discounted by the PSC Program (and other similar programs) injured both Plaintiffs and their Members, including those based in Illinois.  Walgreens' misconduct was and continues to be directed at and impacts the market generally and otherwise implicates consumer protection concerns, and

remedying Walgreens' wrongdoing through the relief requested herein would serve the interests of consumers.

210.    Walgreens' acts, omissions, and practices, as described herein, proximately caused Plaintiffs to suffer actual damages in the form of, *inter alia*, overpaying reimbursements on at least millions of prescription claims.  Pursuant to 815 ILCS 505/10a, Plaintiffs are entitled to the amount of the actual economic damages resulting from Walgreens' unlawful trade practices.

211.    Plaintiffs also seek injunctive relief, pursuant to 815 ILCS 505/10a(c), to enjoin Walgreens from excluding PSC Program prices, JustRx Program prices, third-party discount card program prices, and other discounted prices from the U&C prices it reports on claims for Plaintiffs' reimbursement.

## EIGHTH CLAIM FOR RELIEF (COUNT VIII)
### VIOLATION OF MARYLAND CONSUMER PROTECTION ACT, MD. COM. LAW CODE § 13-101 *et seq.* (BROUGHT BY CFMI, GHMSI AND CAREFIRST BLUECHOICE)

212.    Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

213.    CFMI, GHMSI and CareFirst BlueChoice are consumers within the meaning of the Maryland Consumer Protection Act, Md. Code Ann., Com. Law § 13-101 et seq. ("MCPA") who transacted with Walgreens through CFMI's, GHMSI's and CareFirst BlueChoice's insured members' purchase of generic prescription drugs.

214.    Defendants are persons and merchants within the meaning of MCPA § 13-101(g), (h).

215.    The MCPA was "intended to provide minimum standards for the protection of consumers in the State." § 13-101.

216.     Among other things, the MCPA prohibits unfair and deceptive trade practices "in the sale, lease, rental, loan, or bailment of any consumer goods, consumer realty, consumer services... ."  MCPA § 13-303(1).

217.     Deceptive trade practices include "[d]eception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that the consumer relies on the same in connection with… the promotion or sale of any consumer goods… or consumer service[.]"  MCPA § 13-301.

218.     Walgreens has engaged in unfair, abusive or deceptive trade practices against CFMI, GHMSI and CareFirst BlueChoice within the meaning of, and in violation of, the MCPA by engaging in deception, fraud, false pretense, false premise, misrepresentation, knowing concealment, suppression, and omission regarding the true U&C price for prescription drugs.

219.     Defendants violated MCPA § 13-301(3) by failing to state a material fact, a failure which deceives to tends to deceive.  As alleged herein, Walgreens' conduct and nondisclosures were false, misleading and likely to deceive CFMI, GHMSI and CareFirst BlueChoice in violation of the MCPA.

220.     Walgreens engaged in these unfair and deceptive trade practices in connection with the offering for sale of consumer goods in violation of MCPA § 13-303.

221.     Walgreens' representations or omissions were material because they were likely to, and in fact did, deceive CFMI. GHMSI and CareFirst BlueChoice.

222.     Walgreens intended to mislead CFMI, GHMSI and CareFirst BlueChoice and induce CFMI, GHMSI and CareFirst BlueChoice to rely on Walgreens' representations and omissions.

58

223. CFMI, GHMSI and CareFirst BlueChoice would not have paid Walgreens' inflated prices for prescription drugs if nor for Walgreens' deception, fraud, false premise, misrepresentation, knowing concealment, suppression, and/or omission regarding the true U&C price.

224. As a direct and proximate result of Walgreens' unlawful, unfair, deceptive and fraudulent conduct in violation of the MCPA, CFMI, GHMSI and CareFirst BlueChoice suffered injury in fact in the form of paying Walgreens' inflated prices.

225. CFMI, GHMSI and CareFirst BlueChoice seek all monetary and non-monetary relief allowed by law, including damages, disgorgement, and attorneys' fees and costs.

**NINTH CLAIM FOR RELIEF (COUNT IX)**
**VIOLATION OF VIRGINIA CONSUMER PROTECTION ACT,**
**VA. CODE §§ 59.1-200**
**(BROUGHT BY GHMSI AND CAREFIRST BLUECHOICE)**

226. Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

227. The transactions for prescription drugs made by GHMSI and CareFirst BlueChoice on behalf of their Members were "consumer transactions" within the meaning of the Virginia Consumer Protection Act ("VCPA"), Va. Code § 59.1-198.

228. Defendants are "suppliers" within the meaning of VCPA § 59.1-198.

229. GHMSI and CareFirst BlueChoice are each a "person" within the meaning of VCPA § 59.1-198.

230. Walgreens used deception, fraud, false pretense, false promise, and misrepresentation in connection with consumer transactions by, in the course of selling generic prescription drugs, misrepresenting the true prices paid by cash customers and inflating the U&C price for those prescription drugs, in violation of VCPA § 59.1-200.

59

231. Walgreens' deceptions and misrepresentations were material because they were intended to, and in fact did, deceive GHMSI and CareFirst BlueChoice in connection with consumer transactions.

232. Walgreens intended to deceive GHMSI and CareFirst BlueChoice, and to misrepresent the true U&C prices for prescription drugs.

233. Walgreens knew, or should have known, that GHMSI and CareFirst BlueChoice would rely on these misrepresentations and, as a result, would pay inflated reimbursements above Walgreens' true U&C prices.

234. As a result of Walgreens' deception and misrepresentations, GHMSI and CareFirst BlueChoice did pay the artificially inflated reimbursements to Defendants.

235. Each of Walgreens' violations of the VCPA were done willfully, entitling GHMSI and CareFirst BlueChoice to their actual damages, statutory damages, and exemplary damages under VCPA § 59.1-204.

## NOTICE TO STATE ATTORNEY GENERAL

Pursuant to applicable statutory provisions, a copy of this Complaint has been mailed to the Offices of the Attorney General of Illinois with the filing of this Complaint. Upon entry or judgment or order in this action, a copy of such judgment or order will also be mailed to the Office of the Attorney General of Illinois.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs seek judgment in an amount to be determined at trial, as follows:

a) That Plaintiffs are owed at least the amount that Plaintiffs were overcharged on reimbursement claims where Plaintiffs paid Walgreens based on Walgreens' reported U&C prices

that were higher than the true U&C price offered to Walgreens' customers who paid without using insurance;

b)      That the Court grant permanent injunctive relief to prohibit Walgreens from continuing to engage in the unlawful practices, acts, and omissions described herein;

c)      That the Court award compensatory, consequential, and general damages in an amount to be determined at trial;

d)      That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Walgreens as a result of its unlawful practices, acts, and omissions;

e)      That the Court award statutory double or treble damages, and other exemplary or punitive damages, to the extent the relevant law permits;

f)      That the Court adjudge and decree that the unlawful acts and omissions alleged in this Complaint are unfair and deceptive business acts and practices in violation of the consumer protection statutes alleged herein;

g)      That the Court award to Plaintiffs the costs and disbursements of the action, along with reasonable attorneys' fees;

h)      That the Court award pre- and post-judgment interest at the maximum rate permitted by applicable laws;

i)      That the Court grant all such other relief as it deems just and proper.

## **JURY DEMAND**

Plaintiffs hereby demand a jury trial on all claims so triable.

Dated: June 9, 2022                    Respectfully submitted,

*/ss/ Samera Syeda Ludwig*
Samera Syeda Ludwig

61

Samera Syeda Ludwig
L&G LAW GROUP LLP
175 West Jackson Blvd, Suite 950
Chicago, Illinois 60604
Tel: (312) 364-2500
Fax: (312) 364-1003
sludwig@lgcounsel.com


Robert B. Gilmore (admitted *pro hac vice*)
Michael A. Petrino (admitted *pro hac vice*)
Kevin J. Attridge (*pro hac vice* forthcoming)
Susie Kim (admitted *pro hac vice*)
Megan Benevento (*pro hac vice* forthcoming)
STEIN MITCHELL BEATO & MISSNER LLP
901 15th Street, N.W., Suite 700
Washington, D.C. 20005
Tel: (202) 737-7777
Fax: (202) 296-8312
rgilmore@steinmitchell.com
mpetrino@steinmitchell.com
kattridge@steinmitchell.com
susie.kim@steinmitchell.com
mbenevento@steinmitchell.com

*Attorneys for Plaintiffs*

# EXHIBIT 1

# Walgreens

# Prescription Savings Club*

## Over 300 generic medications value priced at $12.99 for a 90-day supply! *(That's just over $4 a month)*

## Plus, savings on over 5,000 name brand and generic medications

### Antifungal

| Drug Name | Qty. |
|---|---|
| FLUCONAZOLE 150MG TABS | 3 |
| TERBINAFINE 250MG TABS | 90 |

### Antiviral Treatments

| Drug Name | Qty. |
|---|---|
| ACYCLOVIR 200MG CAPSULES | 180 |

### Arthritis or Pain

| Drug Name | Qty. |
|---|---|
| A/B OTIC DROPS 15ML | 45 |
| ALLOPURINOL 100MG, 300MG TABLETS | 180 |
| BACLOFEN 10MG TABS | 270 |
| CHLORZOXAZONE 500MG TABS | 90 |
| COLCHICINE 0.6MG TABS | 180 |
| CYCLOBENZAPRINE 5MG, 10MG TABS | 90 |
| DICLOFENAC POTASSIUM 50MG TABS | 180 |
| DICLOFENAC SODIUM 50MG TABS | 180 |
| DICLOFENAC SODIUM 75MG EC TABS | 180 |
| IBUPROFEN 100MG/5ML ORAL SUSP | 360 |
| IBUPROFEN 400MG TABS | 270 |
| IBUPROFEN 600MG, 800MG TABS | 180 |
| LIDOCAINE VISCOUS 2% ORAL SOL 100ML | 300 |
| MELOXICAM 7.5MG, 15MG TABS | 90 |
| NAPROXEN 250MG, 375MG, 500MG TABS | 180 |
| NAPROXEN SODIUM 275MG TABS | 90 |
| PIROXICAM 20MG CAPS | 90 |
| SALSALATE 500MG, 750MG TABS | 270 |
| TIZANIDINE 2MG TABS | 90 |

### Asthma

| Drug Name | Qty. |
|---|---|
| ALBUTEROL 0.083% INH SOLN 25X3ML | 225 |
| ALBUTEROL 0.5% INH SOL 20ML | 60 |
| ALBUTEROL SULFATE 2MG TABS | 270 |
| ALBUTEROL SULFATE 4MG TABS | 180 |
| ALBUTEROL SULFATE SYRUP (2MG/5ML) | 360 |

### Blood Pressure and Heart Health

| Drug Name | Qty. |
|---|---|
| AMILORIDE 5MG / HCTZ 50MG TABS | 90 |
| ATENOLOL 25MG, 50MG TABS | 180 |
| ATENOLOL 100MG TABS | 90 |
| ATENOLOL 100MG/CHLORTHAL 25MG TABS | 90 |
| ATENOLOL/CHLORTHALIDONE 50/25 TABS | 90 |
| BENAZEPRIL 5MG, 10MG, 20MG, 40MG TABS | 90 |
| BENAZEPRIL HCT 10/12.5, 20/12.5 TABS | 90 |
| BISOPROLOL/HCTZ 2.5MG/6.25MG TABS | 90 |
| BISOPROLOL/HCTZ 5MG/6.25MG TABS | 90 |

### Blood Pressure and Heart Health (Cont.)

| Drug Name | Qty. |
|---|---|
| BISOPROLOL/HCTZ 10MG/6.25MG TABS | 90 |
| BUMETANIDE 0.5MG, 1MG, 2MG TABS | 90 |
| CAPTOPRIL 12.5MG, 25MG TABS | 180 |
| CAPTOPRIL 50MG, 100MG TABS | 180 |
| CAPTOPRIL/HCTZ 25/15 TABS | 180 |
| CARVEDILOL 3.125MG, 6.25MG TABS | 180 |
| CARVEDILOL 12.5MG, 25MG TABS | 180 |
| CLONIDINE 0.1MG, 0.2MG TABS | 90 |
| DIGOXIN 0.125MG, 0.25MG TABS | 90 |
| DILTIAZEM 30MG, 60MG, 90MG TABS | 180 |
| DILTIAZEM 120MG TABS | 90 |
| DOXAZOSIN 1MG, 2MG, 4MG, 8MG TABS | 90 |
| ENALAPRIL 2.5MG, 5MG, 10MG, 20MG TABS | 180 |
| ENALAPRIL-HCTZ 10-25MG TABS | 90 |
| ENALAPRIL-HCTZ 5-12.5MG TABS | 180 |
| FUROSEMIDE 80MG TABS | 90 |
| GUANFACINE 1MG TABS | 90 |
| HYDRALAZINE 10MG, 25MG TABS | 180 |
| HYDROCHLOROTHIAZIDE 12.5MG CAPS | 90 |
| HYDROCHLOROTHIAZIDE 25MG, 50MG TABS | 90 |
| INDAPAMIDE 1.25MG, 2.5MG TABS | 90 |
| ISOSORBIDE DINITRATE 5MG ORAL TABS | 270 |
| ISOSORBIDE DINITRATE 10MG ORAL TABS | 270 |
| ISOSORBIDE DINITRATE 20MG ORAL TABS | 270 |
| ISOSORBIDE MONONITRATE 30MG ER TABS | 180 |
| ISOSORBIDE MONONITRATE 60MG ER TABS | 90 |
| ISOSORBIDE MONONITRATE 120MG ER TABS | 90 |
| LABETALOL 100MG TABS | 180 |
| LISINOPRIL 2.5MG TABS | 90 |
| LISINOPRIL 5MG TABS | 90 |
| LISINOPRIL 10MG TABS | 90 |
| LISINOPRIL 20MG TABS | 90 |
| LISINOPRIL 30MG TABS | 90 |
| LISINOPRIL 40MG TABS | 90 |
| LISINOPRIL-HCTZ 10/12.5MG TABS | 90 |
| LISINOPRIL-HCTZ 20/12.5MG TABS | 90 |
| LISINOPRIL-HCTZ 20/25MG TABS | 90 |
| METOPROLOL (TARTRATE) 25MG TABS | 180 |
| METOPROLOL (TARTRATE) 50MG TABS | 180 |
| METOPROLOL (TARTRATE) 100MG TABS | 180 |
| NADOLOL 20MG, 40MG TABS | 90 |
| NITROQUICK 0.3MG SUBLINGUAL TABS | 300 |
| NITROQUICK 0.4MG SUBL TABS 25'S | 300 |
| PINDOLOL 5MG, 10MG TABS | 90 |
| PRAZOSIN 1MG CAPS | 90 |
| PRAZOSIN 2MG, 5MG CAPS | 180 |
| PROPRANOLOL 10MG TABS | 180 |
| PROPRANOLOL 20MG TABS | 180 |
| PROPRANOLOL 40MG TABS | 180 |
| PROPRANOLOL 80MG TABS | 180 |
| QUINAPRIL 20MG, 40MG TABS | 90 |

### Blood Pressure and Heart Health (Cont.)

| Drug Name | Qty. |
|---|---|
| SOTALOL 80MG TABS | 180 |
| SPIRONOLACTONE 25MG TABS | 90 |
| TERAZOSIN 1MG, 2MG, 5MG, 10MG CAPS | 90 |
| TORSEMIDE 10MG TABS | 90 |
| TRIAMTERENE 37.5MG CAPS OR TABS | 90 |
| TRIAMTERENE HCTZ 25MG CAPS OR TABS | 90 |
| TRIAMTERENE 75MG/ HCTZ 50MG TABS | 90 |
| VERAPAMIL 80MG, 120MG TABS | 90 |
| VERAPAMIL ER 180MG TABS | 90 |
| WARFARIN SOD 1MG, 2MG, 2.5MG TABS | 90 |
| WARFARIN SOD 3MG, 4MG TABS | 90 |
| WARFARIN SOD 6MG, 7.5MG, 10MG TABS | 90 |

### Cholesterol

| Drug Name | Qty. |
|---|---|
| LOVASTATIN 10MG, 20MG, 40MG TABS | 90 |
| PRAVASTATIN 10MG, 20MG, 40MG TABS | 90 |

### Cough/Cold/Allergy

| Drug Name | Qty. |
|---|---|
| AMIBID DM 30MG/600MG TABS | 180 |
| BENZONATATE 100MG CAPS | 90 |
| BROMETANE DX SYRUP | 360 |
| CERON DM SYRUP | 360 |
| CYPROHEPTADINE 4MG TABS | 180 |
| PROMETHAZINE 25MG TABS | 36 |
| PROMETHAZINE SYRUP PLAIN | 360 |

### Diabetes

| Drug Name | Qty. |
|---|---|
| CHLORPROPAMIDE 100MG TABS | 180 |
| GLIMEPIRIDE 1MG, 2MG, 4MG TABS | 90 |
| GLIPIZIDE 5MG TABS | 90 |
| GLIPIZIDE 10MG TABS | 180 |
| GLYBURIDE 1.25MG, 2.5MG, 5MG TABS | 90 |
| GLYBURIDE MICRO 1.5MG, 3MG, 6MG TABS | 90 |
| METFORMIN 500MG, 850MG, 1000MG TABS | 270 |
| METFORMIN ER 500MG 24HR TABS | 180 |

### Eye Care

| Drug Name | Qty. |
|---|---|
| BACITRACIN OPHTH OINTMENT 3.5GM | 10.5 |
| ERYTHROMYCIN OPHTH OINT 3.5GM | 10.5 |
| GENTAMICIN 0.3% OPHTH SOLN 5ML | 15 |
| LEVOBUNOLOL 0.5% OPTH SOLN 5ML | 15 |
| NEO/POLY/DEX OPHTH SUSP 5ML | 15 |
| NEO/POLY/DEXAMETH OPHTH OINT. 3.5GM | 10.5 |

As of 12/13/07.

*Membership fee required. This program does not constitute insurance.

## Eye Care (Cont.)

| Drug Name | Qty. |
|---|---|
| PILOCARPINE 1%, 2% OPHTH SOLN 15ML | 45 |
| POLYMYXIN-B/TRIMETHOPRIMOPHTH SOLN | 30 |
| SULFACETAMIDE NA 10% OPH SOLN 15ML | 45 |
| TIMOLOL MALEATE .25% OPHTH SOLN 5ML | 15 |
| TIMOLOL MALEATE .5% OPHTH SOLN 5ML | 15 |
| TOBRAMYCIN 0.3% OPH SOL 5ML | 15 |

## Gastrointestinal Health

| Drug Name | Qty. |
|---|---|
| BELLADONNA ALKALOIDS W/PB TABS | 180 |
| CIMETIDINE 300MG, 400MG, 800MG TABS | 180 |
| DICYCLOMINE 10MG CAPS | 270 |
| DICYCLOMINE 20MG TABS | 180 |
| ENULOSE SYRUP (10GM/15ML) | 711 |
| FAMOTIDINE 20MG TABS | 180 |
| FAMOTIDINE 40MG TABS | 90 |
| HYOSCYAMINE 0.125MG ORAL DIS TABS | 180 |
| HYOSCYAMINE 0.125MG SUBLINGUAL TABS | 180 |
| HYOSCYAMINE 0.375MG ER CAPS | 180 |
| HYOSCYAMINE SULFATE 0.125MG TABS | 180 |
| HYOSCYAMINE SULFATE 0.375MG TABS | 180 |
| HYOSCYAMINE SULFATE ORAL DROP 15ML | 45 |
| METOCLOPRAMIDE 10MG TABS | 180 |
| METOCLOPRAMIDE HCL 5MG/5ML SYRUP | 180 |
| RANITIDINE 150MG TABS | 180 |
| RANITIDINE 300MG TABS | 90 |

## Infectious Treatments

| Drug Name | Qty. |
|---|---|
| AMOXICILLIN 125MG/5ML SUSP 150ML | 450 |
| AMOXICILLIN 200MG/5ML SUSP 100ML | 150 |
| AMOXICILLIN 250MG, 500MG CAPS | 90 |
| AMOXICILLIN 250MG/5ML SUSP 150ML | 450 |
| AMOXICILLIN 400MG/5ML SUSP 100ML | 300 |
| AMOXICILLIN 400MG/5ML SUSP 50ML | 150 |
| CEPHALEXIN 250MG CAPS | 84 |
| CEPHALEXIN 250MG/5ML SUSP 100ML | 300 |
| CEPHALEXIN 500MG CAPS | 90 |
| CIPROFLOXACIN 250MG TABS | 42 |
| CIPROFLOXACIN 500MG TABS | 60 |
| DOXYCYCLINE HYCLATE 50MG CAPS | 90 |
| DOXYCYCLINE HYCLATE 100MG CAPS | 60 |
| DOXYCYCLINE HYCLATE 100MG TABS | 60 |
| ERYTHROMYCIN 250MG TABS | 84 |
| METRONIDAZOLE 250MG TABS | 84 |
| METRONIDAZOLE 500MG TABS | 60 |
| PENICILLIN VK 125MG/5ML SOLN 200ML | 600 |
| PENICILLIN VK 250MG TABS | 90 |
| PENICILLIN VK 250MG/5ML SOLN 100ML | 300 |
| PENICILLIN VK 500MG TABS | 60 |
| SMZ/TMP REGULAR STRENGTH TABS | 84 |
| SULFAMETH/TRIMETHOPRIM 800/160 TABS | 60 |
| SULFAMETH-TRIMETH SUSP(GRAPE) | 450 |
| TETRACYCLINE 250MG, 500MG CAPS | 180 |

## Mental Health

| Drug Name | Qty. |
|---|---|
| AMITRIPTYLINE 10MG, 25MG TABS | 90 |
| AMITRIPTYLINE 50MG, 75MG TABS | 90 |
| AMITRIPTYLINE 100MG, 150MG TABS | 90 |
| BENZTROPINE 0.5MG TABS | 90 |
| BENZTROPINE 1MG TABS | 180 |
| BENZTROPINE 2MG TABS | 180 |
| BUSPIRONE 5MG, 10MG, 15MG TABS | 180 |
| CARBAMAZEPINE 100MG CHEWABLE TABS | 360 |
| CARBAMAZEPINE 200MG TABS | 300 |
| CITALOPRAM 10MG, 20MG, 40MG TABS | 90 |
| CLOMIPRAMINE 25MG CAPS | 180 |
| DOXEPIN 10MG, 25MG CAPS | 90 |
| DOXEPIN 50MG, 75MG, 100MG CAPS | 90 |
| FLUOXETINE 10MG, 20MG CAPS OR TABS | 90 |
| FLUOXETINE 40MG CAPS OR TABS | 90 |
| FLUPHENAZINE 1MG TABS | 180 |
| HALOPERIDOL 0.5MG TABS | 180 |
| HALOPERIDOL 1MG, 2MG, 5MG TABS | 90 |
| HYDROXYZINE 10MG/5ML SYRUP | 540 |
| HYDROXYZINE HCL 10MG, 25MG TABS | 90 |
| HYDROXYZINE PAMOATE 25MG, 50MG CAPS | 270 |
| IMIPRAMINE 10MG, 25MG, 50MG TABS | 90 |
| LITHIUM CARBONATE 300MG CAPS | 270 |
| NORTRIPTYLINE 10MG, 25MG CAPS | 90 |
| NORTRIPTYLINE 50MG CAPS | 180 |
| PAROXETINE 10MG, 20MG TABS | 90 |
| PRIMIDONE 50MG TABS | 180 |
| PROCHLORPERAZINE 10MG TABS | 90 |
| SERTRALINE 25MG TABS | 90 |
| THIORIDAZINE 10MG TABS | 180 |
| THIORIDAZINE 25MG TABS | 180 |
| THIOTHIXENE 2MG CAPS | 180 |
| TRAZODONE 50MG, 100MG, 150MG TABS | 90 |
| TRIHEXYPHENIDYL 2MG TABS | 180 |

## Skin Conditions

| Drug Name | Qty. |
|---|---|
| BETAMETHASONE DIP 0.05%, 0.1% CRM | 45 |
| BETAMETHASONE VAL. 0.1% OINT | 135 |
| ERYTHROMYCIN 2% TOPICAL SOLN | 180 |
| FLUOCINOLONE ACET 0.01% SOLN | 180 |
| FLUOCINONIDE 0.05% CREAM | 90 |
| GENTAMICIN 0.1% CREAM OR OINT | 45 |
| HYDROCORTISONE 1%, 2.5% CREAM | 90 |
| NYSTATIN CREAM OR OINT | 90 |
| NYSTATIN/TRIAMCINOLONE CREAM | 45 |
| NYSTATIN/TRIAMCINOLONE CREAM | 90 |
| SELENIUM SULFIDE 2.5% SHAMPOO | 354 |
| TRIAMCINOLONE 0.025% CREAM | 45 |
| TRIAMCINOLONE 0.025% CREAM | 240 |
| TRIAMCINOLONE 0.1% CREAM OR OINT | 270 |
| TRIAMCINOLONE 0.5% CREAM | 45 |

## Thyroid Conditions

| Drug Name | Qty. |
|---|---|
| LEVOTHYROXINE TABS ALL STRENGTH | 90 |
| METHIMAZOLE 5MG TABS | 90 |

## Vitamins and Nutritional Health

| Drug Name | Qty. |
|---|---|
| ETHEDENT 0.25MG CHEW TABS | 360 |
| ETHEDENT 0.5MG CHEW TABS | 90 |
| KLOR-CON 10MEQ TABS | 90 |
| KLOR-CON 8MEQ SUST-RELEASE TABS | 180 |
| KLOR-CON M10 ER TABS | 90 |
| MULTI-VITA-F 0.25MG CHEW TABS | 90 |
| MULTI-VITA-F 0.5MG , 1MG CHEW TABS | 90 |
| MULTIVITS W/FL 1MG & IRON CHEW TAB | 90 |
| NATALCARE GT TABS | 90 |
| NATALCARE PLUS TAB(1MG FOLIC ACID) | 90 |
| NATATAB FA TABS | 90 |
| POTASSIUM CHLORIDE 10% LIQ | 1,419 |
| PRENATAL RX TABS | 90 |
| VITAMIN D 50000IU CAPS | 12 |

## Women's Health

| Drug Name | Qty. |
|---|---|
| CLOMIPHENE CITRATE 50MG TABS | 15 |
| ESTRADIOL 0.5MG, 1MG, 2MG TABS | 90 |
| ESTROPIPATE 0.625MG (0.75MG) TABS | 90 |
| ESTROPIPATE 1.5MG (1.25MG) TABS | 90 |
| MEDROXYPROGESTERONE 2.5MG, 5MG TABS | 90 |
| MEDROXYPROGESTERONE 10MG TABS | 30 |

## Other

| Drug Name | Qty. |
|---|---|
| ANUCORT-HC 25MG RECTAL SUPPOS. 12'S | 36 |
| CHLORHEXIDINE ORAL RINSE 473ML | 1,419 |
| CYTRA-2 SOLN | 540 |
| DEXAMETHASONE 0.5MG TABS | 180 |
| DEXAMETHASONE 0.75MG TABS | 36 |
| MEGESTROL ACETATE 20MG TABS | 90 |
| METHYLPREDNISOLONE 4MG DOSPAK 21'S | 63 |
| METHYLPREDNISOLONE 4MG TABS | 63 |
| OXYBUTYNIN 5MG TABS | 180 |
| PHENAZOPYRIDINE 200MG TABS | 90 |
| PREDNISOLONE SOD PHOS 15MG/5ML SOL | 90 |
| PREDNISONE 10 MG, 20MG, 50MG TABS | 90 |
| PREDNISONE 5MG TABS PACK 21'S | 63 |
| PREDNISONE 10MG TABS PACK 48'S | 144 |

---

*Persons receiving prescription benefits from a publicly funded health care program are ineligible. Membership may be cancelled within 30 days of issue date. For complete terms and conditions, call 1-866-WCARD-12 (1-866-922-7312) or visit www.walgreens.com/wcard. Walgreen Co., 200 Wilmot Rd., Deerfield, IL 60015. $12.99 prescriptions are for a 90-day supply of a covered drug at a commonly prescribed dosage. The list of covered drugs is subject to change. Not all prescription drugs are covered by this program. State law may prohibit the advertising of controlled substances. If you have a prescription for a controlled substance, please talk to your local pharmacist to see if your medication is included in the Prescription Savings Club Formulary. Only prescriptions initially filled in person at a participating pharmacy are eligible for the $12.99 rate; refills must also be picked up in-store, but may be ordered in person, online or by phone. This program is not available for prescriptions filled by mail order. See your Walgreens pharmacist for more information.*

# **EXHIBIT 2**

**Sample Walgreens Overcharges**

CareFirst BCBS

| Fill Date | Drug Name | Quantity | Days Supply | Reported U&C | Total Amount Due | PSC List Price | Overcharge |
|---|---|---|---|---|---|---|---|
| 4/12/11 | LEVOTHYROXIN TAB 50MCG | 90 | 90 | $26.89 | $16.56 | $12.00 | $4.56 |
| 10/3/13 | HYDROCHLOROT TAB 12.5MG | 90 | 90 | $49.99 | $49.99 | $15.00 | $34.99 |
| 1/2/14 | HYDROCHLOROT TAB 12.5MG | 90 | 90 | $51.99 | $51.99 | $30.00 | $21.99 |
| 1/2/14 | LISINOPRIL  TAB 30MG | 90 | 90 | $72.29 | $11.93 | $10.00 | $1.93 |
| 1/3/14 | METFORMIN  TAB 500MG | 270 | 90 | $91.46 | $13.32 | $10.00 | $3.32 |
| 1/5/14 | METFORMIN  TAB 850MG | 270 | 90 | $95.79 | $40.28 | $10.00 | $30.28 |
| 8/2/14 | ATENOL/CHLOR TAB 50-25MG | 90 | 90 | $36.99 | $36.99 | $20.00 | $16.99 |
| 1/5/15 | LEVOTHYROXIN TAB 75MCG | 90 | 90 | $38.89 | $38.89 | $20.00 | $18.89 |
| 9/22/15 | ESTRADIOL  TAB 0.5MG | 90 | 90 | $31.99 | $12.23 | $10.00 | $2.23 |
| 1/27/16 | ATENOL/CHLOR TAB 50-25MG | 30 | 30 | $18.39 | $11.93 | $10.00 | $1.93 |
| 7/24/17 | ATENOL/CHLOR TAB 50-25MG | 90 | 90 | $43.99 | $33.20 | $20.00 | $13.20 |
| 2/19/18 | ATENOL/CHLOR TAB 50-25MG | 90 | 90 | $42.99 | $34.33 | $20.00 | $14.33 |
| 8/2/18 | ESTRADIOL  TAB 0.5MG | 90 | 90 | $27.99 | $18.85 | $10.00 | $8.85 |
| 1/9/19 | LISINOP/HCTZ TAB 20-12.5 | 90 | 90 | $53.89 | $53.89 | $20.00 | $33.89 |
| 1/14/19 | LISINOP/HCTZ TAB 20-12.5 | 30 | 30 | $22.99 | $22.99 | $10.00 | $12.99 |
| 5/16/19 | ESTRADIOL  TAB 0.5MG | 90 | 90 | $27.99 | $14.79 | $10.00 | $4.79 |
| 8/24/20 | ATENOL/CHLOR TAB 50-25MG | 90 | 90 | $42.99 | $36.40 | $20.00 | $16.40 |