## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

|  |  |  |
|---|---|---|
| **BCBSM, INC.,** *et al.*, | ) | Case No. 1:20-cv-01853 |
|  | ) |  |
|  | ) | Honorable Virginia M. Kendall |
| *Plaintiffs / Counter-Defendants*, | ) | Honorable Sheila M. Finnegan |
|  | ) |  |
| v. | ) | *Consolidated with*: |
|  | ) | No. 1:20-cv-01929 |
| **WALGREEN CO.,** *et al.*, | ) | No. 1:20-cv-03332 |
|  | ) | No. 1:20-cv-04738 |
| *Defendants / Counterclaimant.* | ) | No. 1:20-cv-04940 |
|  | ) | No. 1:22-cv-01362 |
|  | ) |  |

|  |  |
|---|---|
| **WALGREEN CO. & WALGREENS** | ) |
| **BOOTS ALLIANCE, INC.,** | ) |
|  | ) |
| *Third-Party Plaintiffs*, | ) |
|  | ) |
| v. | ) |
|  | ) |
| **PRIME THERAPEUTICS LLC &** | ) |
| **OMEDARX, INC.,** | ) |
|  | ) |
| *Third-Party Defendants.* | ) |

## MEMORANDUM IN SUPPORT OF
## DEFENDANTS' MOTION TO COMPEL
## <u>PLAINTIFFS' DOCUMENT DISCOVERY AND RELATED METRICS</u>

Jeffrey J. Bushofsky
Laura G. Hoey
Timothy R. Farrell
Charles D. Zagnoli
**ROPES & GRAY LLP**
191 N. Wacker Drive
32nd Floor
Chicago, IL 60606
Telephone: (312) 845-1200
Facsimile: (312) 845-5522
Jeffrey.Bushofsky@ropesgray.com
Laura.Hoey@ropesgray.com
Timothy.Farrell@ropesgray.com
Charles.Zagnoli@ropesgray.com

*Attorneys for Defendant / Counterclaimant /
Third-Party Plaintiff Walgreen Co. &
Defendant / Third-Party Plaintiff Walgreens
Boots Alliance, Inc.*

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ...................................................................................... ii

**FACTUAL BACKGROUND** ................................................................................... **3**

    A.   Insurers Produce Under 18,000 Documents, Declare Substantial Completion.................. 4

    B.   Plaintiffs Refuse to Produce the CVS Materials, then Impose Restrictions...................... 6

    C.   Walgreens Uncovers Alarming Gaps in Plaintiffs' Document Productions. .................... 8

    D.   Plaintiffs Refuse to Provide Critical Details about Their Document Review
          Methodology, as Required by the ESI Protocol. ................................................ 9

**ARGUMENT** ......................................................................................................... **12**

    I.    Plaintiffs Should Be Compelled to Provide Assurances that They Have Corrected Their
         Previous Discovery Errors and Will Produce All Responsive Documents...................... 12

    II.   Documents from 20 Custodians Whom Plaintiffs Identified for the First Time in Their
         October 17, 2022, Interrogatory Responses Should be Produced ................................... 14

**CONCLUSION** ...................................................................................................... **15**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Beef Products, Inc. v. Hesse*,
  2019 WL 6841362 (D.S.D. Dec. 16, 2019) ..........................................................................13

*Cary v. N.E. Ill. Reg'l Commuter R.R. Corp.*,
  2021 WL 678872 (N.D. Ill. Feb. 22, 2021) ..........................................................................15

*Livingston v. Chicago*,
  2020 WL 5253848 (N.D. Ill. Sept. 3, 2020) ........................................................................12

*Moore v. Publicis Groupe*,
  287 F.R.D. 182 (S.D.N.Y. 2012) .....................................................................................12, 14

*Progressive Cas. Ins. Co. v. Delaney*,
  2014 WL 3563467 (D. Nev. July 18, 2014) ....................................................................12, 14

*Rio Tinto PLC v. Vale S.A.*,
  306 F.R.D. 125 (S.D.N.Y. 2015) ..........................................................................................13

*Ruiz-Bueno v. Scott*,
  2013 WL 6055402 (S.D. Ohio Nov. 15, 2013).................................................................13, 14

*Winfield v. City of New York*,
  2017 WL 5664852 (S.D.N.Y. Nov. 27, 2017) .......................................................................13

After two years of discovery, the Plaintiffs (dozens of sophisticated insurers alleging a fifteen-year fraud scheme) produced only 18,000, mostly unremarkable, documents. In meet-and-confer discussions initiated by Defendants,[1] Plaintiffs' counsel claimed to be "just as surprised" as anyone about the small number, but assured Walgreens that a robust, comprehensive, and sophisticated search and review process had yielded the slim production. Plaintiffs declared their production "substantially complete" on August 22, 2022. The reality was much different, however. Walgreens recently discovered that, for reasons that remain opaque, Plaintiffs failed to produce several obviously responsive, case-critical internal documents, even though the materials belong to agreed-upon Plaintiff custodians and contain numerous agreed-upon search terms.

Those case-critical documents cast doubt on Plaintiffs' entire discovery efforts—and sent Plaintiffs scrambling. Since November 4, Plaintiffs have produced 157,437 documents—compared to the 18,000 documents Plaintiffs produced before declaring their production substantially complete. As a result of Plaintiffs' actions, 20 months into discovery, Walgreens is essentially back at square one. And despite Plaintiffs' recent frantic efforts, as demonstrated below, Walgreens still has no reason to believe that Plaintiffs have met their basic discovery obligations. This Motion seeks clarity and an assurance that Plaintiffs will conduct a proper review and produce responsive documents in their possession, custody, or control.

In just the past few weeks, Walgreens was able to uncover previously withheld, critical defense documents only because a subset of these Plaintiff insurers, earlier this year and through different counsel, produced ten times as much material in a closely related Usual & Customary ("U&C") pricing case. In that action, Blue Cross insurers are suing Walgreens' primary competitor, CVS. Naturally, Walgreens asked Plaintiffs for those productions early and often—

---

[1] Defendants are Walgreen Co. and Walgreens Boots Alliance, Inc. (together "Walgreens").

seeking fairness and symmetry, since Walgreens has always agreed to produce its documents from two similar U&C cases, *Russo v. Walgreen Co.*, No. 17-cv-2246 (N.D. Ill.), and *Humana Health Plan v. Walgreen Co.*, No. 01-19-0002-5131 (Am. Arb. Ass'n).

Plaintiffs long ignored Walgreens' requests, and later purported to impose significant limitations. Rather than simply handing over their CVS productions (subject to the Agreed Confidentiality Order), Plaintiffs reserved the right to pick and choose among custodians and topics. Plaintiffs also claimed that their CVS productions focus on CVS and so (Plaintiffs said) lack information relevant here—despite the CVS materials' obvious bearing on Plaintiffs' core "industry standards" fraud theory. Plaintiffs even suggested that their *other* outside counsel might have "data dumped" irrelevant materials on CVS, claiming that, in this case, Plaintiffs are taking a more targeted approach yielding far more meaningful results without needless bulk. Plaintiffs' equivocations about the CVS production continued.[2]

Walgreens was steadfast, ultimately advising Plaintiffs that it intended to subpoena CVS for the productions. Soon after, Plaintiffs finally turned over some of the CVS materials. What Walgreens found was astonishing: Several of these same Plaintiffs had produced ***to CVS*** obviously responsive, critical internal Blue Cross documents specifically discussing ***Walgreens*** ' ***U&C price reporting*** and establishing that Plaintiffs have long been completely aware that Walgreens never

---

[2] Plaintiffs' primary law firm in the CVS case is Stein Mitchell Beato & Missner LLP—which notably also represents a group of newer plaintiffs in *this case*, the *CareFirst* insurers. Individual Stein Mitchell lawyers who represent the Blue Cross plaintiffs suing CVS have also appeared in this matter and attended key telepresence conferences addressing the subject matter of this Motion. In a cynical "whipsaw" approach, counsel from Crowell & Moring LLP advised Walgreens that Crowell could not speak to what Plaintiffs produced to CVS, while, in the same conference, Stein Mitchell lawyers likewise declined to address the CVS production. Plaintiffs consistently pressed the fiction that their CVS productions are largely irrelevant to discovery in this case—a fiction apparently calculated to support Plaintiffs' highly curated and very incomplete production. Regardless of which lawyers represent Plaintiffs in which litigation, and whether one firm was more fulsome in its productions than the other, the *Plaintiffs* have obligations to the Court and Walgreens. Plaintiffs' enervating gamesmanship should end.

reported pricing from its Prescription Savings Club ("PSC") and similar programs as Walgreens' U&C price. To be clear, these Plaintiffs gave to CVS critical documents about Walgreens that they inexplicably withheld or, at best, carelessly failed to produce, here. The first tranche of CVS documents debunked Plaintiffs' baseless (and now abandoned) claim that materials from the CVS case are irrelevant in this case. But for the CVS productions and Walgreens' persistence, key evidence would have remained buried.

After several fruitless letter exchanges and lawyer conferences, Plaintiffs continue to prevaricate. While Walgreens hoped to bring one consolidated motion to compel on multiple disputed topics, a few of which remain in discussion between the parties, Walgreens cannot wait on this Motion. The Court's intervention is needed to ensure that Plaintiffs adequately search for and produce responsive, relevant materials.

## FACTUAL BACKGROUND

When a health insurer reimburses a pharmacy for a prescription, the insurer typically pays no more than the pharmacy's U&C price. *See* 2d Am. Compl., Dkt. 145 ¶ 68. This case involves a claim by 28 Blue Cross insurers[3] that Walgreens defrauded them into believing that Walgreens was reporting as U&C the pricing available through its members-only PSC, when in fact it did not. Plaintiffs make this claim even though they had full access to the U&C prices Walgreens reported to Plaintiffs' pharmacy benefit managers; that Walgreens' PSC program and prices were widely publicized; that other plaintiffs had been litigating related issues against Walgreens and other pharmacies since at least 2011; and that it was common industry knowledge that pharmacies report

---

[3] The data presented in this Motion excludes documents and custodians produced by a twenty-ninth plaintiff, BCBS of Nebraska, which voluntarily dismissed its claims. *See* Dkt. 292. In March 2022, seven more Blue Cross insurers (the "*CareFirst* Plaintiffs") filed a nearly identical complaint against Walgreens. The *CareFirst* Plaintiffs' case was consolidated with the other Plaintiffs', *see* Dkt. 272, but discovery between Walgreens and the *CareFirst* Plaintiffs is in its early stages. *See, e.g.*, Dkt. 372, at 2-3. This Motion seeks relief only against the initial 28 Plaintiffs, reserving all rights as to the *CareFirst* Plaintiffs.

as U&C their cash retail prices charged to customers paying out-of-pocket without insurance or any other intermediary program—and *not* prices available only to members of programs like PSC.

### A. Insurers Produce Under 18,000 Documents, Declare Substantial Completion.

Before receiving a single discovery request, Plaintiffs claimed they could find, review, and produce relevant documents in only seven months; they criticized Walgreens for suggesting a longer timeline. Feb. 3, 2021 Hr'g Tr., Dkt. 193 at 6:20-7:22. Plaintiffs protested that Walgreens had already "gathered the relevant facts" in other, related litigation, *id.* 7:10-22, but Plaintiffs ignored that the same was not true in reverse. Plaintiffs had never before identified custodians or collected and produced responsive documents in a U&C-related case against Walgreens.

The parties commenced discovery by serving Rule 26 initial disclosures on March 19, 2021. *See* Dkt. 129. Although Plaintiffs' allegations covered "many millions of transactions" across a 15-year period, the 28 Plaintiffs, divided into 13 Plaintiff groups,[4] identified in their initial disclosures just 22 individuals likely to have discoverable and responsive information—*fewer than one knowledgeable individual on average per Plaintiff and fewer than two per Plaintiff group. See* Exhibit 1 to Decl. of Charles D. Zagnoli ("Ex."). Plaintiffs then agreed to provide documents from fewer than two custodians per Plaintiff group.[5] *See* Ex. 4.

Walgreens served its first requests for production on May 14, 2021, Ex. 5, but Plaintiffs failed to make any serious document production for nearly 18 months. By the end of 2021,

---

[4] Plaintiffs divided themselves into 13 groups for discovery and represented that, because of their business structures, the members of each group would have identical responses and productions. Some of those groups include a single Plaintiff (*e.g.*, Blue Cross and Blue Shield of Alabama); other groups include several Plaintiffs (*e.g.*, the "Cambia Plaintiffs," comprising Cambia Health Solutions Inc.; Regence BlueShield of Idaho, Inc.; Regence BlueCross and BlueShield of Oregon; Regence BlueCross and BlueShield of Utah; Regence BlueShield; and Asuris Northwest Health). *See* Ex. 1. Walgreens reserves the right to challenge these groupings and their overlapping nature should discovery contradict Plaintiffs' representations.

[5] Walgreens, by contrast, named in its initial disclosures over 30 former and current employees with knowledge about the suit's underlying facts and initially agreed to produce materials from 13 custodians. Exs. 2, 3.

Plaintiffs collectively had produced just 81 documents (and no internal emails) compared to Walgreens' 44,361. Ex. 8. In 2022, Plaintiffs' productions continued to lag. Having produced no additional documents in January and February 2022, Plaintiffs promised on March 16, 2022, to produce "thousands of additional pages" in March and April 2022, "followed by additional rolling productions . . . on a consistent basis." Ex. 9. Yet, between March 22 and August 2, 2022, Plaintiffs made just 5 productions totaling 3,685 documents, which included just over 1,200 emails. *See* Ex. 8. In contrast, by August 2, 2022, Walgreens had produced 149,949 documents and 840,461 pages. *Id.* Walgreens questioned the growing disparity, Ex. 10 at 2, but Plaintiffs dismissed Walgreens' concerns. Plaintiffs implied that their self-described discerning review weeded out irrelevant documents: "It is simply not our practice to 'data-dump' or serve massive amounts of nonresponsive documents for mere appearances." Ex. 11 at 1.

Plaintiffs made their largest production (before their recent frantic production of CVS documents in November and December 2022) on August 2, 2022. *See* Ex. 8. But even that production included only 13,551 documents. Plaintiffs produced 78 more documents on August 10, 2022, bringing their grand total to 17,395—*621 documents, on average, per Plaintiff and 1,338 documents per Plaintiff group*. *See id.* With that, Plaintiffs reported to Walgreens and the Court on August 22, 2022, that their production was "substantially complete." Dkt. 317 at 2.

The paucity of Plaintiffs' production was suspicious: 28 leading health insurers, each with major contractual relationships (including with intermediary pharmacy benefit managers and other pharmacies), are alleging widespread fraud affecting millions of prescription reimbursements over a 15-year period. Yet, a purportedly fulsome review resulted in just 17,395 responsive documents. As concerning to Walgreens was Plaintiffs' disclosure that the materials were culled from around *3 million* documents, using agreed search terms and technology aided review ("TAR"). Dkt. 317

at 2-3. Plaintiffs dismissed the troubling statistics as smoke, not fire—waiving off Walgreens'
questions in a report to the Court as mere "'concerns' . . . based solely on the number of documents
and pages produced." *Id.* There was nothing more to it, Plaintiffs assured the Court: "Defendants
have not—because they cannot—point to a single deficiency in [Plaintiffs'] document production
beyond just general 'concerns.'" Dkt. 334 at 4. At the same time, Plaintiffs urged the Court to
hurry the case along, seeking to close fact discovery no later than December 27, 2022. In Plaintiffs'
words: "Defendants' 'concerns' with . . . Plaintiffs' document productions . . . do not provide
support for additional delay of the case schedule." Dkt. 334 at 4. The Court recognized, however,
that "it [was] not at all realistic to think that [fact] discovery would be completed by December
27," and it granted a six-month extension. Sept. 15 Hr'g, Dkt. 353 at 21:10-22.

## B.    Plaintiffs Refuse to Produce the CVS Materials, then Impose Restrictions.

In contrast to their purportedly "substantially complete" production of just 17,395
documents in this case, a subset of the same Plaintiffs had produced *ten times* as many documents
to CVS in nearly identical litigation (the "CVS Production" and the "CVS Litigation").[6]

Refusing to defend against Plaintiffs' fraud claims with an obviously deficient discovery
record, Walgreens continued to insist that Plaintiffs comply with their obligations under the
Federal Rules. First, just eight days after Plaintiffs' August 2 production, Walgreens issued an
interrogatory to test whether Plaintiffs had contributed to their *de minimis* production by omitting
knowledgeable individuals from their initial disclosures and custodian list. *See* Ex. 12 at 9. After
asking for a month-long extension to respond, Plaintiffs identified on October 17, 2022, *49 new,*

---

[6] Eight of the 13 Plaintiff groups are Plaintiffs both in this case and the CVS Litigation, Case No. 1:20-cv-
00236-WES-PAS (D.R.I.): Blue Cross and Blue Shield of Alabama; Florida Blue (which includes 2
Plaintiffs); Horizon Healthcare (2 Plaintiffs); HealthNow (3 Plaintiffs); Blue Cross and Blue Shield of
Kansas City; Blue Cross and Blue Shield of Minnesota (2 Plaintiffs); Blue Cross and Blue Shield of North
Carolina; and Blue Cross Blue Shield of North Dakota.

*never-before disclosed individuals* with past or present managerial or leadership responsibility for Plaintiffs' pharmacy- or pharmacy benefit management–related functions. *See* Ex. 13 at Exhibit A (comparing Plaintiffs' October 17, 2022, interrogatory responses to initial disclosures and custodians). On October 25, 2022, Walgreens requested documents from those newly disclosed individuals (an average of fewer than four new custodians per Plaintiff group), *see id.*, but Plaintiffs initially agreed to produce documents from just 8 of the 49, along with 5 more custodians who Plaintiffs, without explanation, had only "themselves identified . . . recently." *See* Ex. 14 at 1-2.

Second, Walgreens urgently reiterated its request for the CVS Production—a request Walgreens first issued on May 2021, but that Plaintiffs had repeatedly ignored. *See* Ex. 5 at 28 (requesting "All Documents related to the U&C Litigation"); *see also* Ex. 10 at 2-3. Finally, on August 29, 2022, Plaintiffs agreed to respond—but only in part. *See* Ex. 15. Rather than provide the entire CVS Production, Plaintiffs *refused* to produce documents from any non-"overlapping" CVS Litigation custodians whom Plaintiffs had not also designated in this case. *See id.* The reason for their refusal, Plaintiffs asserted, was to avoid flooding Walgreens with irrelevant and nonresponsive documents from custodians who "*presumably* [ ] have knowledge that [is] specific to CVS issues." Sept. 15, 2022 Hr'g, Dkt. 353 at 9:19-24 (emphasis added); *see also* Ex. 16 at 4.

But Plaintiffs also refused to give Walgreens the basic information that it needed to test that assertion. In fact, when Plaintiffs finally provided the names of the non-overlapping custodians whose documents they intended to withhold, Plaintiffs dismissively suggested that Walgreens review the custodians' "public LinkedIn profiles" to find out more about their roles. Ex. 16 at 3-4. Those profiles included only the high-level, generalized descriptions that some (but not all, *see id.* at 3) of the non-overlapping custodians chose to provide on social media about their own roles and responsibilities; they lacked the detailed information that Plaintiffs themselves were required to

provide. *See* Ex. 17 at 2-3. Yet even those public LinkedIn profiles revealed two key facts: (1) most of the custodians served in roles broadly relevant to Walgreens and other pharmacies, not CVS alone, *see* Ex. 13 at 4; and (2) Walgreens had not requested some of the non-overlapping custodians in this case because Plaintiffs disclosed them *for the first time* in their October 17, 2022, interrogatory responses. *Compare id.* at Exhibit A (listing Carol Motamed, Brian Edwards, and Brian Stalder), *with* Ex. 16 at 3-4 (same). Plaintiffs eventually agreed to produce documents from some of the non-overlapping custodians, but they inexplicably remained unwilling to fully re-produce all the documents that they had already given to CVS. *See* Ex. 14 at 2.

      **C.**    **Walgreens Uncovers Alarming Gaps in Plaintiffs' Document Productions.**

      Plaintiffs finally began delivering certain documents from the CVS Production on November 4, 2022—nearly 18 months after Walgreens' document request; two months after Plaintiffs finally committed to produce them; and seven weeks after Plaintiffs advised the Court that responsive CVS documents would be available for production in a matter of days. *See* Ex. 13 at 4 (summarizing history); Ex. 18 at 1 (same).

      Walgreens' serious concerns were borne out by Plaintiffs' initial production of CVS case materials. Defendants quickly identified issue-dispositive documents (i) from the parties' agreed list of custodians (ii) that hit on the parties' agreed search terms, but that (iii) Plaintiffs had somehow failed to produce to Walgreens in their own purportedly "substantially complete" search and production. As the sample excerpts below reflect, Plaintiffs knew or should have known for years that Walgreens does not report its PSC prices as its U&C prices:

- From Blue KC custodian John Gardynik, ██████████████████████████

██████████████████████████████████████

8

███████████████████████████████████████████████████

Ex. 19 at 5, 12 (emphasis added).

- From Blue Cross and Blue Shield of North Carolina ("BCBSNC") custodian Estay Greene,

███████████████████████████████████████████████████

███████████████████████████████████ Ex. 20

at 1 (emphasis added).

- From Florida Blue custodian Scott McClelland,

███████████████████████████████████████████████████

███████████████████████ Ex. 21 at 4.

- From BCBSNC custodian Estay Greene,

███████████████████████████████████████████████████

███████████████████████ Ex. 22 at 2.

Again, these critical documents came from the parties' agreed custodians, and they contain agreed search terms. Yet, Plaintiffs failed to produce them in this case. Walgreens received them only via the CVS Production, long after Plaintiffs declared their production "substantially complete."

### D. Plaintiffs Refuse to Provide Critical Details about Their Document Review Methodology, as Required by the ESI Protocol.

As reflected by the remarkable production gaps, Plaintiffs have failed to do one or more of the following: (i) collect documents from enough custodians per Plaintiff to reasonably ensure the recovery of responsive documents, (ii) adequately search for and identify responsive documents from among those collected, and (iii) produce documents properly identified as responsive.

Walgreens promptly sent Plaintiffs a letter on November 17, 2022, explaining the urgency of the situation and requesting that Plaintiffs take reasonable steps to explain and mitigate their discovery lapses. *See* Ex. 18. Walgreens asked Plaintiffs to (1) transmit the remainder of the CVS Production, including documents from non-overlapping custodians; (2) produce responsive documents from the dozens of custodians whom Plaintiffs disclosed for the first time in their

October 17, 2022, interrogatory responses; (3) certify that Plaintiffs produced all known responsive or otherwise relevant documents, regardless of whether they fell within the parties' agreed set of custodians, search parameters, and terms; and (4) provide a log of non-privileged documents collected from agreed custodians that hit on key Walgreens- and PSC-related terms but Plaintiffs withheld. *See id.* The parties met at Walgreens' urging on November 23. *See* Ex. 23.

During that conference and in a follow-up December 1, 2022, letter, Plaintiffs admitted to somehow missing each of the sample "hot documents" provided by Walgreens. Although the documents apparently existed within the full 3-million-document data set from which Plaintiffs pulled their 18,000-document production, Plaintiffs had not *reviewed the hot documents at all*. Plaintiffs' explanation left much to be desired: the TAR model that Plaintiffs employed to aid human review in scoring and prioritizing documents for responsiveness inexplicably assigned multiple case-critical documents such a low score (per Plaintiffs' own chosen standard) that no attorney ever saw them. *See* Ex. 24. Plaintiffs flatly refused to provide meaningful details—initially asserting that their entire TAR process, including metrics and methodology, was protected attorney work product—or to agree to Walgreens' requests for other assurances. *See id.*

Giving Plaintiffs every opportunity to address their failures, Walgreens requested yet another follow-up meeting—now involving the parties' e-discovery experts, including Walgreens' counsel's Global Head of E-Discovery, Discovery Strategies & Data Analytics. Ex. 25 at 1. Plaintiffs again refused (on work-product grounds) to provide crucial data about their TAR model's performance as of the date Plaintiffs declared substantial completion, including the cutoff score, the responsiveness rate for the highest score band just below the cutoff, and the validation sample results. Nor would Plaintiffs reveal how they adjusted their model going forward, stating only that the example hot documents now clear the bar—as if backing into a set of criteria

sufficient to identify a few blatantly relevant documents can satisfy Plaintiffs' obligations.

Plaintiffs' December 16, 2022, follow-up letter also raised more questions than it answered. Plaintiffs conceded that, after Walgreens exposed their discovery failures, Plaintiffs reduced their TAR cutoff score from ███ "out of an abundance of caution." Ex. 26 at 1. Critically, however, Plaintiffs did not explain why or how their model initially scored case-critical and clearly relevant documents so low. *See id.* Plaintiffs not only failed to explain how they built their model, failed to provide data on the responsiveness rate for the score bands just below the cutoff, and failed to provide relevant validation sample results, they also failed to answer Walgreens' request for the number of times the model had been refreshed before they declared substantial completion.[7] *See id.* Nor would Plaintiffs explain what steps they are taking to "recalibrate" and "stabilize" their model. *Id.* Instead, Plaintiffs merely assured Walgreens that the two example key documents "are now well above the initial relevancy cut-off score." *Id.* And although Plaintiffs agreed to provide the remainder of the CVS Production, add two new custodians, and produce more responsive documents, Plaintiffs did not estimate how much longer Walgreens must wait for a production Plaintiffs declared substantially complete on August 22, 2022. *See id.*; Ex. 24.

Plaintiffs' production from the CVS case and their recalibration of search criteria to hit on a few obviously responsive key documents is insufficient—even if it is more responsive than what Plaintiffs did before. That is particularly true for the five Plaintiff groups that are not parties to the CVS Litigation and produced nothing there. Walgreens needs meaningful, reasonably complete discovery in *this* case, and it needs Plaintiffs' documents immediately to prepare for oral discovery.

---

[7] Plaintiffs disclosed that they are using a Continuous Active Learning ("CAL") TAR model. As human reviewers code documents as relevant or non-relevant, CAL models should continually refresh and update. But CAL models sometimes stall and do not refresh, whether by way of the review platform or human error. Walgreens asked how often Plaintiffs' CAL model had actually refreshed. Plaintiffs refused to respond.

**ARGUMENT**

Walgreens respectfully requests that the Court (1) order Plaintiffs to make reasonable disclosures and representations ensuring that Plaintiffs have met or will soon meet their document discovery obligations, including by providing details about their TAR process, and (2) order Plaintiffs to produce responsive materials from 20 custodians whom Plaintiffs identified for the first time on October 17, 2022, as likely to possess relevant information.

**I.      Plaintiffs Should Be Compelled to Provide Assurances that They Have Corrected Their Previous Discovery Errors and Will Produce All Responsive Documents**

Since November 4, Plaintiffs have purported to remedy their discovery mistakes by producing 157,437 new documents. *See* Ex. 8. While Plaintiffs' productions come far too late for Walgreens to complete depositions before fact discovery closes, they also fail to address Plaintiffs' errors. Supplying more documents, standing alone, offers no proof that Plaintiffs have fixed the glaring inadequacies of their approach to identifying and producing written discovery.

Courts recognize TAR methodology as sound and more efficient than a linear review of search-terms hits, *see, e.g.*, *Progressive Cas. Ins. Co. v. Delaney*, 2014 WL 3563467, at *8 (D. Nev. July 18, 2014) (collecting citations); *Moore v. Publicis Groupe*, 287 F.R.D. 182, 190-91 (S.D.N.Y. 2012) (same), *but only when* the TAR user properly trains and applies the model. Thus, when parties use TAR, transparency is crucial to "allow[] the opposing counsel (and the Court) to be more comfortable with computer-assisted review." *Moore*, 287 F.R.D. at 192 & n.14; *see also Progressive*, 2014 WL 3563467, at *10 (TAR requires "an unprecedented degree of transparency and cooperation among counsel"); *Livingston v. Chicago*, 2020 WL 5253848, at *3 (N.D. Ill. Sept. 3, 2020) (approving TAR methodology because of "sufficient information to make the production transparent"). When document productions suggest that a party has *not* properly trained and applied its model, courts direct parties to provide "discovery about discovery," just as they would

if a party using keyword searches and linear review made an obviously deficient production. *See, e.g.*, *Beef Products, Inc. v. Hesse*, 2019 WL 6841362, at *8-9 (D.S.D. Dec. 16, 2019) (producing party's files ordered forensically examined because of anomalous, unreliable, and incomplete production); *Ruiz-Bueno v. Scott*, 2013 WL 6055402, at *1-4 (S.D. Ohio Nov. 15, 2013) (collecting cases); *see also Winfield v. City of New York*, 2017 WL 5664852, at *9-11 (S.D.N.Y. Nov. 27, 2017) (requiring *in camera* inspection of documents addressing predictive coding, training, and validation processes; finding "human error in categorizing a small subset of documents," not anything "inherently defective" in TAR process itself).

Mindful of the foregoing considerations, the parties agreed in their ESI Protocol that, if one party alleges a discovery violation, the responding party must share details about its TAR methodology. *See* Dkt. 140 at 3. Walgreens has asked Plaintiffs to follow this provision, but Plaintiffs have refused—instead providing only elementary information that raises more questions. *See* Part D, *supra*. Walgreens now respectfully asks the Court to compel Plaintiffs to provide, in three ways, the transparency the ESI Protocol and case law demands.

*First*, the Court should compel Plaintiffs to supply data on their TAR model's performance now and on August 22, 2022, the date that Plaintiffs declared substantial completion—including the responsiveness rate for the highest score band just below the cutoff, validation sample results (a QC review of a sample of low-scoring, unreviewed documents), and the number of times the model had been refreshed, as well as how those metrics changed after November 4.

Plaintiffs inaccurately assert that those metrics are protected work product and are unnecessary now that Walgreens knows the TAR model's cutoff score. Responsiveness rates and the results of a validation sample, however, are discoverable, *see, e.g.*, *Rio Tinto PLC v. Vale S.A.*, 306 F.R.D. 125, 128-29 (S.D.N.Y. 2015) (statistics to validate TAR process discoverable), just as

13

they would be if the parties had not used TAR. *See Ruiz-Bueno*, 2013 WL 6055402, at *1-4. That data (and not just the cutoff threshold Plaintiffs eventually disclosed) is also crucial to ensuring Plaintiffs meet (and have met) their discovery obligations. For example, a producing party can artificially limit its production while maintaining a facially acceptable cutoff score by coding for responsiveness too narrowly. The producing party might then conceal its too-narrow coding by disclosing QC and statistical metrics (typical TAR disclosures) that make the producing party's model seem appropriately trained. Responsiveness rates and validation sample results would reveal the producing party's misguided approach and would explain how and why very clearly key documents fell below a unilaterally determined threshold and avoided human review entirely.

*Second*, the Court should compel Plaintiffs to certify that they are not knowingly withholding responsive documents merely because those documents fall outside the parties' collection parameters. Plaintiffs' refusal to provide such a certification is troubling, particularly given their refusal to provide the transparency Walgreens needs to check their work.

*Third*, the Court should compel Plaintiffs to supply a log of documents that hit on the key terms specifically identified in Walgreens' Motion, but that Plaintiffs have withheld from production. Courts have ordered similar relief in analogous cases, *see Progressive*, 2014 WL 3563467, at *11-12 (party that refused to use TAR cooperatively and transparently required to produce all non-privileged search-term hits), and it is necessary here because Plaintiffs' model has "deemed irrelevant . . . 'hot,' 'smoking gun' documents." *Moore*, 287 F.R.D. at 189.

## II.     Documents from 20 Custodians Whom *Plaintiffs* Identified for the First Time in Their October 17, 2022, Interrogatory Responses Should be Produced

Given Plaintiffs' meager production, Walgreens asked Plaintiffs on August 10, 2022, to identify the names, job responsibilities, and dates of employment of other individuals with potentially relevant information. In their October 17, 2022, Interrogatory Responses, Plaintiffs

disclosed 49 entirely new potential custodians, but provided no information about the custodians' roles. *See, e.g.*, Exs. 6, 7. After conducting its own LinkedIn research, Walgreens offered to de-prioritize some custodians (while continuing to request custodians who covered temporal and subject-matter gaps), and Plaintiffs conceded to the production of documents from others. Plaintiffs have adamantly refused to produce documents from the remaining 20.[8]

These individuals almost certainly possess additional relevant documents. Their titles include "Contract Administrator"; others hold executive-level positions at OmedaRx, a Plaintiff-owned third-party defendant, in addition to their employment with the Plaintiff insurers; and *Plaintiffs themselves* named each of the custodians in response to Walgreens' interrogatory, which asked for information about current and former Blue Cross employees in relevant roles. Plaintiffs bore the burden of explaining why the employees Plaintiffs themselves identified as knowledgeable should not be added as custodians. *See Cary v. N.E. Ill. Reg'l Commuter R.R. Corp.*, 2021 WL 678872, at *2, *4 (N.D. Ill. Feb. 22, 2021) (respondent must "provide sufficient information" about custodians so adversary "will be able to negotiate intelligently"). Plaintiffs have articulated no basis other than "duplication," which is not supported based on Plaintiffs' previous productions. *See* Ex. 27. Given the extreme discovery deficiencies documented above, fewer custodians and documents is not the answer here. Plaintiffs should not be permitted to limit discovery based on a bare assertion that additional effort would be duplicative.

## CONCLUSION

For the reasons above, Defendants respectfully request that the Court grant their Motion.

---

[8] Of the 25 disputed custodians in the prioritized list Walgreens sent on December 5, 2022, *see* Ex. 25 at Exhibit B, Plaintiffs agreed to produce documents from 2 custodians and purport to have already agreed to produce documents from 2 others (despite no documentation of that supposed agreement). Based on Plaintiffs' representations, Walgreens agrees that Plaintiffs need not produce documents from Young Fried.

Dated: December 21, 2022

Respectfully submitted,


By: ___ /s/ *Jeffrey J. Bushofsky* ___

Jeffrey J. Bushofsky
Laura G. Hoey
Timothy R. Farrell
Charles D. Zagnoli
ROPES & GRAY LLP
191 N. Wacker Drive
32nd Floor
Chicago, IL 60606
Telephone: (312) 845-1200
Facsimile: (312) 845-5522
Jeffrey.Bushofsky@ropesgray.com
Laura.Hoey@ropesgray.com
Timothy.Farrell@ropesgray.com
Charles.Zagnoli@ropesgray.com

*Attorneys for Defendant / Counterclaimant /
Third-Party Plaintiff Walgreen Co. &
Defendant / Third-Party Plaintiff Walgreens
Boots Alliance, Inc.*

**Certificate of Service**

I, Charles D. Zagnoli, hereby certify that the foregoing document was electronically filed on December 21, 2022, and will be served electronically via the Court's ECF Notice system upon all registered counsel of record.

    /s/ *Charles D. Zagnoli*
Charles D. Zagnoli
ROPES & GRAY LLP
191 N. Wacker Dr.
32nd Floor
Chicago, IL 60606
Telephone: (312) 845-1200
Facsimile: (312) 845-5522
Charles.Zagnoli@ropesgray.com

*Attorney for Defendant / Counterclaimant / Third-Party Plaintiff Walgreen Co. & Defendant / Third-Party Plaintiff Walgreens Boots Alliance, Inc.*