**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| BCBSM, INC., et al., | ) |
| *Plaintiffs/Counter-Defendants,* | ) |
| v. | ) **No. 20 C 01853** |
| WALGREEN CO. & WALGREENS BOOTS ALLIANCE, INC., | ) **Magistrate Judge Finnegan** |
| *Defendants/Counter-Plaintiffs.* | ) **Related Cases:** |

**No. 20 C 01853**

**Magistrate Judge Finnegan**

**Related Cases:**
**Case No. 1:20-cv-04738**
**Case No. 1:20-cv-03332**
**Case No. 1:20-cv01929**
**Case No. 1:20-cv-04940**
**Case No. 1:20-cv-01362**

|  |  |
|---|---|
| WALGREEN CO. & WALGREENS BOOTS ALLIANCE, INC., | ) |
| *Third-Party Plaintiffs,* | ) |
| v. | ) |
| PRIME THERAPEUTICS, LLC, | ) |
| *Third-Party Defendant.* | ) |

## ORDER

Defendants Walgreen Co. and Walgreens Boots Alliance, Inc. ("Walgreens") filed a motion to compel (Doc. 407) the twenty-eight original health care plan plaintiffs (referred to herein as "Plaintiffs")[1] to respond to certain document requests and interrogatories. For the reasons stated herein, the motion is granted.

---

[1] These include the original plaintiffs but not the so-called "CareFirst" plaintiffs who sued Walgreens in March 2022. (Doc. 407, at 1 & n.1).

## DISCUSSION

### A. Motion to Compel Response to Interrogatory No. 26

#### (1) Background

Plaintiffs are health care plans offering comprehensive health care services and coverage, including prescription drug coverage, to their members ("insureds") in locations across the United States. When a Walgreens pharmacy dispenses a prescription to an insured, Walgreens sends a claim for reimbursement to Plaintiffs' pharmacy benefit managers ("PBMs"), which then submit a claim for payment to Plaintiffs. Plaintiffs reimbursed Walgreens for the usual and customary ("U&C") prices associated with filling prescriptions for their insureds. They claim that they did not know that Walgreens had a Prescription Savings Club ("PSC") program that charged prices lower than U&C prices. (Doc. 145 ¶¶ 8, 100-106 (Second Amended Complaint)). Plaintiffs allege that Walgreens overstated U&C prices by not using its lower PSC pricing, and thus owes them "hundreds of millions" in damages. (*Id.* ¶¶ 1, 81, 127, 137).

Defendants say they served Interrogatory 26 on the "Prime-Affiliated Plaintiffs, a set of Blue Cross-affiliated Plaintiffs that use or have used Prime Therapeutics LLC" ("Prime") as their PBM. (Doc. 407, at 4). It seeks information about the financial relationship between these Plaintiffs and Prime in connection with Walgreens' third-party complaint against Prime for contribution. Prime was the entity responsible for adjudicating Walgreens' reimbursement claims on behalf of the Prime-Affiliated Plaintiffs. (Doc. 270 ¶¶ 5, 39 (Prime's Answer to Walgreens' First Amended Third-Party Complaint)). For this service, Prime charged these plaintiffs a fee, kept the difference between what it received from a plaintiff and the amount it paid to Walgreens (so-called

2

"spread compensation"), or both. (*Id.* ¶ 44). Prime had separate confidential contracts with each Prime-Affiliated Plaintiff and with Walgreens governing these tasks. (*Id.* ¶ 7).

While serving as PBM, Prime allegedly "was always fully aware of Walgreens' U&C price reporting policies and practices, including the fact that Walgreens [did] not report, and never has reported, the exceptional prices available to PSC members as its U&C prices." (*Id.* ¶ 9). "Prime nonetheless adjudicated Walgreens' reimbursement claims using Walgreens' allegedly false U&C prices, thereby proximately harming the [Prime-Affiliated Plaintiffs] and contributing to the loss allegedly suffered" by them. (*Id.* ¶ 10). Indeed, Prime "had an enforceable duty" to these Plaintiffs "to convey accurate U&C prices and other claim-related information to them" and, "unlike Walgreens, at all times had a direct relationship with the [Prime-Affiliated Plaintiffs] and was their corporate affiliate." (*Id.* ¶ 12). If these plaintiffs "were deceived and damaged by Walgreens' U&C reporting, then Prime is a joint tortfeasor that shares responsibility for some material part" of that harm." (*Id.* ¶ 4).

Regarding the affiliation between Prime and these plaintiffs, Walgreens alleges that Prime is owned by Blue Cross-affiliated insurers, including certain of the Prime-Affiliated Plaintiffs. Eleven of Prime's "owner clients" are Plaintiffs, and "Prime's board of directors consists almost entirely of the chief executive officers of Blue Cross Blue Shield-affiliated health plans, including the chief executive officers of seven" Prime-Affiliated Plaintiffs. (*Id.* ¶ 38). Walgreens thus claims that Prime and the Prime-Affiliated Plaintiffs had an "intertwined financial relationship." (Doc. 407, at 5).

3

In Interrogatory No. 26, Walgreens sought the following information from certain Prime-Affiliated Plaintiffs:[2]

> [i]dentify the projected and actual annual revenues and profits you have received from owning an equity interest, ownership interest, or debt interest in Prime for each calendar or fiscal year during the Time Period [defined as August 1, 2006 to the present].[3]

(Doc. 377-12, at 9, 12; see Doc. 407, at 5). In responding under Fed. R. Civ. P. 33, the plaintiffs objected to this request as "overbroad, unduly burdensome, and seeking information that is irrelevant to any claims or defenses in this matter and is not proportional to the needs of this case." (*E.g.*, Doc. 377-6, at 7). No reasons were given for each such conclusory objection. After fruitless meet and confer discussions led to an impasse, Walgreens filed this motion to compel.

**(2) Analysis**

As Walgreens sees it, "Prime is the intermediary between Walgreens and the Prime-Affiliated Plaintiffs for the U&C price reporting central to this case; thus, the economics of the relationship between Prime and its Plaintiff-owners are directly relevant to both the supposed damages the Prime-Affiliated Plaintiffs claim they suffered and the bias weighing on the Prime-Affiliated Plaintiffs and Prime resulting from those economics." (Doc. 407, at 4). Walgreens further argues that the objections made in response to Interrogatory 26 do not pass muster under Rule 33(b)(4)'s mandate that objections be stated "with specificity." (*Id.* at 5-6). The Court agrees. Because the

---

[2]     Interrogatory 26 was issued to BCBS Alabama, BCBS Kansas, BCBS Minnesota, BCBS North Carolina, BCBS North Dakota, Florida Blue, Cambia, and Horizon. (Doc. 418, at n.3).

[3]     The Second Amended Complaint complains of conduct by Walgreens from approximately 2007 to 2019, when Plaintiffs say they discovered "the bases" for their claims. (See Doc. 145 ¶¶ 7, 115).

4

objections did not provide any underlying explanation, however minimal, they were "tantamount to not making any objection at all." *See Loughnane v. Zukowski, Rogers, Flood and McArdle*, 2019 WL 13073480, at *10 (N.D. Ill. Dec. 2, 2019) (citation omitted). This alone justifies granting the motion to compel.

Even without these deficiencies, however, the Court would overrule these objections because the data sought appears to be relevant. First, Walgreens argues that the information bears on damages. Walgreens' theory is based on its claim that Prime sometimes received spread compensation (the difference between what it received from a plaintiff and the amount it paid to Walgreens) which may have resulted in providing higher profits to Prime, "and, by extension, Prime's Blue Cross-owners," that could be a potential offset to damages and/or an increase in contribution liability. (Doc. 407, at 6). Put another way, Walgreens seeks discovery relating to the claim that the higher prices these plaintiffs allegedly paid flowed through Prime's pockets back into the pockets of the Prime-Affiliated Plaintiffs. Walgreens also argues that if its allegedly inflated U&C prices resulted in higher fees to Prime, that also could have ultimately benefitted these plaintiffs even without the use of spread compensation. (*Id.*).

Plaintiffs deny that Prime received spread compensation, pointing out that *Prime* denied Walgreens' allegations on this issue. (Doc. 418, at 14). But one cannot tell from Prime's answer which facts are denied. (See Doc. 270 ¶ 44). Plaintiffs' reliance on one of Prime's interrogatory answers fares no better. In responding to the question "Describe all ways in which you generate profit, revenue, or other financial gain by serving as an intermediary between Plaintiff-Owners and Walgreens," Prime objected to the time period and number of Plaintiffs covered by the question and gave a response that was equivocal,

general in nature, and insufficiently detailed.[4]  Plaintiffs also argue that they produced their Prime contracts to Walgreens  and that this "ends the inquiry."  (Doc. 418, at 14-15; Doc. 419 ¶ 16).  But Plaintiffs simply attach (under seal) contracts to their brief without any explanation of what they mean.  (See Doc. 419 ¶ 16).

Given the enormous damages being sought against Walgreens, it would be inappropriate to deny discovery of the facts at issue where there is a reasonable theory of relevancy, and especially where this would require resolving a factual dispute in Plaintiffs' favor based on an ambiguous record.  Walgreens has shown the discovery is sufficiently relevant to damages to sustain its request.[5]

Walgreens supports its motion with a second viable theory of relevancy.  It argues that the "intertwined financial relationship" that Walgreens is seeking to prove between Prime and the Prime-Affiliated Plaintiffs, including the extent to which Prime enriched these plaintiffs and the way Prime was paid, is also relevant to these parties' potential

---

[4]    The time period and number of plaintiffs covered by this interrogatory are a function of *Plaintiffs'* allegations, on which Walgreens is entitled to discovery.

[5]    None of Plaintiffs' citations suggest otherwise. *Eternity Mart, Inc. v. Nature's Sources, LLC*, 2019 WL 6052366, at *3 (N.D. Ill. Nov. 15, 2019) (Doc. 418, at 13), disallowed speculative discovery into complaints against the plaintiff made before the acts triggering the lawsuit (suspension from Amazon) because they long pre-dated the suspension and because Amazon identified *defendant's* complaint as the reason for the suspension.  *United States v. Ocwen Loan Servicing, LLC.*, 2016 WL 1031157, at *4 n.2 (E.D. Tex. Mar. 15, 2016) (Doc. 418, at 15), is also inapposite.  There the court said it would not rely on unsupported claims about what plaintiff may have received from litigation funders, but nevertheless allowed discovery of the identity of those funders as relevant to the case.  *Lyft, Inc. v. Quartz Auto Techs. LLC*, 2022 WL 17076703, at *2 (N.D. Cal. Nov. 18, 2022) (Doc. 418, at 15), is similarly inapposite because, unlike here, the proponent of discovery simply demanded "more" details with no discussion of relevance. And in *DeLeon-Reyes v. Guevera*, 2020 WL 3050230, at *7-11 (N.D. Ill. June 8, 2020) (Doc. 418, at 15), plaintiffs sought discovery based on "guesswork", namely, a theory (bribes) that bore no relation to their case (wrongful conviction) and events taking place 12 years after those at issue in the case.  In contrast to these cases, Walgreens has information about the interrelationship between Prime and the Prime-Affiliated Plaintiffs.

bias. (Doc. 407, at 5, 7). "Bias in its myriad forms is always relevant and never collateral." *Surgery Ctr. at 900 N. Mich. Ave., LLC v. Am. Phys. Assurance Corp.*, 317 F.R.D. 620, 625-26 (N.D. Ill. 2016) (allowing discovery of potential incentive plans or bonuses as relevant to bias). Plaintiffs say the historical benefits they received from Prime are irrelevant to bias today since they predate their testimony (Doc. 418, at 15-16), but even crediting that argument, such benefits could shed light on contemporaneous statements and documents. In any event, this argument goes to the weight of the evidence in establishing bias and is an insufficient basis to bar discovery of the evidence.[6]

Plaintiffs do not make a viable burden argument in their response to Walgreen's motion, despite their assertion of undue burden in their interrogatory response. They mention the burden of responding only in passing (Doc. 418, at 7), and without developing the argument. "Claims of undue burdensomeness require a specific showing of what is involved." *In re Peregrine Fin. Grp. Customer Litig.*, 2015 WL 1344466, at *4 (N.D. Ill. Mar. 20, 2015). Plaintiffs have not even attempted to make this showing.

Instead, Plaintiffs say that "compiling additional, irrelevant financial information would not be proportional" to the case. (Doc. 418, at 16). The Court has, however, found the requested information to be relevant. They also claim that Walgreens already has that information, but the citations they provide for that assertion (Doc. 418, at 15-16), do not support this claim. Finally, they assert that some of these Plaintiffs have no ownership interests in Prime, making this discovery disproportionate to the case. (Doc. 418, at 13,

---

[6] Plaintiffs' reliance on *West v. Miller*, 2006 WL 2349988 (N.D. Ill. Aug. 11, 2006) (Doc. 418, at 16), in making this argument, is misplaced. *West* concerned how the passage of time could affect market value, not bias.

7

16-17). Discovery responses filed under seal (the redacted exhibits are at Docs. 419-6 and 419-8), in which certain Plaintiffs admitted to having such ownership interests, as well as the right to appoint a Prime board member, through certain named (but undescribed) entities, undermine this argument. And their reliance on *Bilek v. Nat'l Cong. Of Emps., Inc.*, 2022 WL 523108 (N.D. Ill. Feb. 22, 2022) (Doc. 418, at 16-17), for their disproportionality argument is unavailing. There plaintiff sought extensive financial information on whether the defendant could satisfy a judgment, a request deemed premature and overbroad. Here, Walgreens seeks only annual financial data that has not been shown to be too burdensome to produce. The motion to compel is granted.

### B. Motion to Compel Responses to Interrogatories Nos. 13, 14, and 16

These interrogatories ("ROG") seek information about common interest agreements (ROG 13), litigation financing or funding, including contingency fee arrangements (ROG 14), and insurance contracts or policies covering any part of Plaintiffs' costs in this case (ROG 16) between or among Plaintiffs and other persons and third parties, including their counsel. The Court addresses each in turn.

**Interrogatory No. 13.** In this interrogatory, Walgreens seeks information about joint defense and related agreements.

> Identify and describe any common interest agreement, joint defense agreement, or other agreement or arrangement under which you assert a joint attorney-client privilege with any other person (including any other Plaintiffs in this lawsuit) in which the privileged communications relate to U&C Prices, Discount Programs (including PSC), or any other matter at issue in this Action, identifying any and all other members of or parties to such agreements, arrangements, or groups.

(Doc. 408-2, at 13-14). Plaintiffs objected to each interrogatory as "overly broad, unduly burdensome, seek[ing] information that is irrelevant to any claims or defenses in this

matter, and not proportional to the needs of the case" and because it seeks "information protected by the attorney-client privilege, the work product doctrine, the joint prosecution or common interest privilege, as trial preparation materials, or under any other privilege or immunity recognized by law." (*Id.* at 14). Such conclusory objections carry no weight and could be stricken, but the objections Plaintiffs ultimately advanced in opposing this motion to compel are untenable in any event.

Written or oral joint defense or common interest agreements are potentially relevant. Depending on their contents, including their recitals of interests and objectives in common, such agreements bear on witness bias. *Harris Corp. v. Federal Express Corp.*, 2010 WL 11474447, at *2 (M.D. Fla. July 19, 2010) (common interest in voiding patent between two companies relevant to witness bias regarding patent).[7] Here, for example, Walgreens argues that it is entitled to know if any party or non-party witness— including Prime's former employee Bretta Grinsteinner, who has provided testimony in this matter—has entered into a joint-defense agreement. (Doc. 408-1; 407 at 11). The Court agrees, and so the information sought by this interrogatory must be provided.

Walgreens also argues that the timing of the agreements is relevant to its statute of limitations and related defenses. (Doc. 407, at 10). For example, it alleges that the claims are untimely because Plaintiffs and their PBMs (such as Prime) were aware of

---

[7]    *Biovail Labs. Int'l SRL v. Watson Pharm., Inc.*, 2010 WL 3447187, at *1 (S.D. Fla. Aug. 30, 2010), on which Plaintiffs rely (Doc. 418, at 11), is not to the contrary.  That court recognized that information about the parties to a joint defense agreement *is* relevant to bias and did not hold that joint defense agreements are never relevant.  (*Id.*).  Rather, the party in that case seeking production of the agreement said that the agreement would *not* be relevant if it contained only "boilerplate terms," which the Court found was the case after an *in camera* review.  Here, Walgreens makes no such concession, nor have Plaintiffs argued their agreements contain only boilerplate terms.

Walgreens' PSC program for years because of "related litigation against Walgreens and other pharmacies in this District and other Courts nationwide." (*Id.*) The contents of the agreements are thus relevant for this second reason.

Finally, Plaintiffs provide no basis for asserting that the information sought in Interrogatory No. 13 is privileged. Indeed, after Walgreens filed the instant motion, Plaintiffs belatedly conceded that certain facts relating to "common-interest agreements, engagement letters, and contracts—such as their existence, their effective dates, and the parties to them"—are not privileged and agreed to produce such information in "short order." (Doc. 418, at 10). While Plaintiffs continue to assert privilege as to other information in the agreements, they fail to offer any supporting argument, much less proof, that a privilege applies to such information. It was Plaintiffs' burden to show that a privilege attached to the information sought. *Shaffer v. American Med. Ass'n.*, 662 F.3d 439, 446 (7th Cir. 2011) (attorney-client privilege); *Baxter Int'l, Inc. v. AXA Versicherung*, 320 F.R.D. 158, 163 (N.D. Ill. 2017) (work product). The interrogatory should be answered. *E.g.*, *Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 2007 WL 1302765, at *2 (N.D. Ill. May 1, 2007) (ordering production of joint defense agreement).

**Interrogatory No. 14.** This interrogatory seeks information about various agreements relating to attorneys' fees and litigation financing.

> Identify and describe any litigation financing or funding arrangement or agreement, contingent attorneys' fee arrangement or agreement, or other arrangement or agreement under which any part of the attorneys' fees or other costs arising from or relating to this Action will be paid or advanced by any third party, or under which any third party (including your counsel) has an interest in any proceeds from this litigation, contingent or otherwise, describing the terms of such agreements and identifying the parties thereto.

(Doc. 408-2, at 14). Walgreens claims that the information sought about these agreements is also relevant to its statute-of-limitations defense. (Doc. 407, at 10). Walgreens believes the timing of the agreements will show that Plaintiffs and their attorneys had actual or constructive knowledge of the factual bases for the claims asserted here for years, rendering the claims untimely. The Court agrees that, depending on the timing and content of these agreements, they could support that defense. *See Doe v. Soc. of Missionaries of the Sacred Heart*, 2014 WL 1715376, at *3 (N.D. Ill. May 1, 2014) (litigation financing agreements may bear on limitations defenses).

Plaintiffs contend that the discovery should not be allowed since they already answered interrogatories about when they first communicated with a law firm about the substance of these claims, and first came upon "publicly-available information" suggesting Walgreens' prices excluded discount pricing from it U&C prices. (Doc. 418, at 11, citing ROGs 3 and 4). But admittedly half of the Plaintiffs have not yet responded to this discovery (Doc. 418, at 11, n.8), despite Walgreens' demand for a response in December 2021 (Doc. 408-5, at 4). Even if all Plaintiffs had responded, however, the Court agrees with Walgreens that the discovery sought here is not irrelevant, cumulative, or disproportionately burdensome.

This discovery seeks information beyond what was sought in these other interrogatories and is also relevant to damages given that Plaintiffs seek recovery of their attorneys' fees and costs from Walgreens. (Doc. 145, at 85). Plaintiffs argue that it is premature to order production of materials relating to payment of attorneys' fees and costs, since these are recoverable "only if Plaintiffs prevail." (Doc. 418, at 12.) Plaintiffs waived this objection by not making it in response to the interrogatory. Fed. R. Civ. P.

33(b)(4); see Doc. 408-2, at 14.  In any event, Plaintiffs present no argument, much less proof, that producing information about fee arrangements now is unduly burdensome or disproportionate.   In a case of this magnitude, Walgreens is entitled to understand the scope of its fee exposure, at least as memorialized in agreements.  *See Emerus Hosp. Partners, LLC v. Health Care Serv. Corp.*, 2015 WL 13950105, at *3 (N.D. Ill. Nov. 19, 2015) (ordering production of fee information before conclusion of case).

Finally, Plaintiffs argue that Walgreens' request in ROG 14 goes further than in ROG 13 since it seeks "detailed, potentially privileged information and communications between Plaintiffs and their lawyers with respect to financing, funding, and contingent (or not) fee structures." (Doc. 418, at 10).   But fee information is typically not privileged. *United States v. Leonard-Allen*, 739 F.3d 948, 953 (7th Cir. 2013) (fee arrangements fall "outside the scope of the privilege because fees are incidental to the substance of representation"); *Dunn v. Schlumberger Tech. Corp.*, 2010 WL 11646536, at *2 (S.D. Tex. July 20, 2010) (contingency fee agreement discoverable and not privileged where prevailing party may recover attorneys' fees).  Plaintiffs' reliance on *Kratzer v. Scott Hotel Group, LLC*, 2019 WL 8326691, at *5 (S.D. Ind. Apr. 23, 2019) (Doc. 418, at 10), does not help them because there, the producing party was allowed to redact portions of his fee agreement with counsel that "memorialize[d] advice from lawyer to client about the nature of the claims and Mr. Kratzer's role as a class representative."   Plaintiffs make no claim that their agreements contain legal advice.  The motion to compel is granted as to Interrogatory No. 14.

**Interrogatory No. 16.** In this interrogatory, Walgreens seeks certain insurance or indemnification policies that might cover Plaintiffs' costs.

> Identify and describe any insurance contract or policy, indemnification agreement or obligation (including agreements with or obligations owed by any PBM), or any other contract or arrangement that will or may cover any part of your costs related to this Action, including costs for the defense of any counterclaims or third-party claims asserted against you.

(Doc. 408-2, at 15.) In opposing Walgreens' motion as to this interrogatory, Plaintiffs state that because this information was required under the initial disclosure rules, they had already responded that they have no such agreements. (Doc. 418, at 11-12 & n.7). Providing sworn responses to that effect is appropriate and not burdensome per this admission, and the motion is thus granted.

### C. Motion to Compel Responses to Interrogatory No. 10 and Requests for Production No. 38-39

Interrogatory No. 10 asks Plaintiffs to:

> Describe the method or process that you used to create Exhibit 2 to the Complaint, including identification of all Documents and sources reviewed, relied upon, consulted, drawn upon, or otherwise referenced in the course of creating such Exhibit 2, and identification of all persons who were consulted on or contributed information to the creation of Exhibit 2.

(Doc. 408-2, at 11-12). Exhibit 2 is a chart of sample overcharges that are part of the allegations of the complaint. (Doc. 145-2; Doc. 145 ¶ 94 ("How Walgreens overcharged Plaintiffs on millions of claims is exemplified by the examples of apparent overcharges detailed in the attached Exhibit 2 to this Complaint.")). Document Request No. 38 seeks "All Documents supporting or forming the basis for the Complaint's exhibits" (Doc 377-5, at 27), while Document Request No. 39 seeks "Documents sufficient to support the data in exhibit 2 to the Complaint" (Doc. 377-5, at 28). Exhibit 1 is the only other attachment to the complaint, a Walgreens' advertisement for the PSC program. (Doc. 145-1). These exhibits have been part of the case since the complaint was filed on March 19, 2020.

Plaintiffs' Rule 33 and 34 responses to all three discovery requests said Walgreens already had this information, the request is "premature" because (a) it sought "an extensive volume of evidence in support of [Plaintiffs'] case, even though discovery is in its early stages, no document productions have occurred, no depositions have occurred, and expert discovery has yet to begin"; and (b) "to the extent it seeks information that will be the subject of expert reports." (*E.g.*, Doc. 408-2, at 11-12; Doc. 377-5, at 27-28). They also asserted attorney-client privilege, the work product doctrine, the joint prosecution or common interest privilege, trial preparation privilege, and any other privilege or immunity recognized by law. (Doc. 408-2, at 12).

In opposing this motion, however, Plaintiffs abandon most of these objections. They now contend that the motion seeks to compel "the production of protected work product underlying certain claims examples and a publicly-accessible Walgreens Prescription Savings Club pricing formulary" (*i.e.*, Exhibits 1 and 2 to their complaint). (Doc. 418, at 7). They further state that Exhibit 2 was prepared "by non-testifying consulting experts working in conjunction with Plaintiffs' counsel in this litigation" and that answering the discovery would "reveal not just the mental impressions of counsel, but also the identities and opinions of Plaintiffs' non-testifying consulting experts." (Doc. 418, at 8; see also Doc. 419 ¶ 18 (lawyer's affidavit); Fed. R. Civ. P. 26(b)(4)(D)).

As an initial matter, "any opinions or records developed or acquired by [Plaintiffs] prior to consultation" with the consulting expert "fall outside the protection of Rule 26(b)(4)(B)." *Spearman Indus., Inc. v. St. Paul Fire & Marine Inc. Co.*, 128 F. Supp. 2d 1148, 1152 (N.D. Ill. 2001) (relied upon by Plaintiffs at Doc. 418, at 8). Therefore, such documents and information must be produced promptly.

14

In addition, Plaintiffs' assertion of the consulting expert objection to Exhibit 2 is wholly conclusory; they discuss no documents (individually or by category), much less produce a privilege log. This is especially troubling since, as Walgreens rightly points out, the *consulting* expert claim here varies from Plaintiffs' written response to Interrogatory No. 10 asserting that the process used to create Exhibit 2 will be answered by "the forthcoming expert report(s)," clearly a reference to a *testifying* expert.[8]

In any event, to make a viable claim of work product protection, Plaintiffs "bear[ ] the burden of establishing that the doctrine applies to each document as to which it is asserted." *Baxter Int'l, Inc.*, 320 F.R.D. at 163. Here, Plaintiffs submitted an affidavit asserting merely that their counsel "engaged with non-testifying consulting experts to compile information used to create Exhibit 2 to the Complaint." (Doc. 419 ¶ 18). Such a blanket privilege claim is insufficient to establish that documents are privileged, *United States v. First State Bank*, 691 F.2d 332, 335 (7th Cir. 1982); *McCutcheon v. Colgate-Palmolive, Co.*, 2017 WL 4776984, at *4 (S.D.N.Y. Oct. 5, 2017), much less to allow the opposing party or the Court to analyze the claim.

Moreover, Plaintiffs' reliance on an alleged consulting expert's work product in their complaint waived any work product protection that might otherwise have existed. *U.S. Gypsum Co. v. Ectek Int'l, Inc.*, 2022 WL 1155155, at *9 (N.D. Ill. Apr. 19, 2022) (holding that any protection under Rule 26(b)(4)(D) for a report was waived when defendant

---

[8]     See also Doc. 408-7, at 5, a letter in which Plaintiffs' counsel states, as to Document Requests Nos. 38-39: "With respect to Exhibit 2, a chart depicting apparent over charge examples, Plaintiffs object to Request Nos. 38 and 39 as premature, as they seek information that is subject to forthcoming expert testimony and which will be disclosed according to the stipulated case management order entered in this case." (Cited by Plaintiffs at Doc. 418, at 8-9).

15

produced the report to plaintiff); see *Appleton Papers, Inc. v. E.P.A.*, 702 F.3d 1018, 1024 (7th Cir. 2012) (concept of waiver applies to Rule 26(b)(4)(D)).[9] And because Plaintiffs' complaint freely discloses how the report was prepared, alleging that "[t]hese exemplar overcharges are based on assumptions Plaintiffs have made as a result of the limited information available to them regarding Walgreens PSC Program and will be confirmed" through discovery (Doc. 145 ¶ 94, n. 35), such "assumptions," the "information available" to Plaintiffs, and the chart preparation are also fair game for discovery.

Plaintiffs' reliance on *nCap Licensing, LLC. V. Apple, Inc.*, 2018 WL 10509455, at *2-3 (D. Utah Dec. 17, 2018) (cited at Doc. 418, at n.6), is misplaced. In that patent case, the court found only that relying on work product to file a case does not constitute waiver; the party must expressly rely on that evidence to support its claims to cause a waiver. Plaintiffs did that here when they alleged that "[h]ow Walgreens overcharged Plaintiffs on millions of claims is exemplified by the examples of apparent overcharges detailed in the attached Exhibit 2" (Doc. 145 ¶ 94). The motion is thus granted, but the responses may be limited to the facts and documents existing at the time the initial complaint was filed.

The motion to compel is also granted as to Exhibit 1, which is a Walgreens' advertisement of drugs available for $12.99 (90 day supply) through the PSC program as of "12/13/07". (Doc. 145-1). It is unclear what documents Plaintiffs would have

---

[9]     Rule 26(b)(4)(D) states in full:

(D) Expert Employed Only for Trial Preparation. Ordinarily, a party may not, by interrogatories or deposition, discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial. But a party may do so only:
            (i) as provided in Rule 35(b); or
            (ii) on showing exceptional circumstances under which it is impracticable for the party to obtain facts or opinions on the same subject by other means.

"supporting or forming the basis for" Exhibit 1 (Request No. 38) since Walgreens presumably created that public document. It is cited in the complaint as an "illustration" of how Walgreens' price lists provided limited information about discounted drugs. (Doc. 145 ¶ 84). But Plaintiffs do not discuss any specific objections to production of responsive documents. The motion to compel is also granted as to facts and documents existing at the time the initial complaint was filed.

### D. Requests for Admission Nos. 148-160

#### (1) Background

Requests for admission ("RFA") Nos. 148-160 relate to Plaintiffs' Consumer Fraud Act claims against Walgreens. (See Doc. 408-8, at 6-10). They are designed to determine if these claims are based on intentional or other (such as reckless or negligent) alleged misconduct by Walgreens. Thus, for example, RFAs 148, 150, 153, and 156 seek admissions that "for purposes of your consumer fraud and consumer protection claims ... you contend that Walgreen Co. submitted a U&C Price to you":

- (RFA 148) "knowing the price was false or misleading"

- (RFA 150) "with reckless disregard as to whether the price was false or misleading"

- (RFA 153) "without exercising reasonable care to determine that the price was false or misleading"

- (RFA 156) "not knowing that the U&C Price was false or misleading"

(*Id.* at 6-9). RFAs Nos. 149, 151, 154, and 157 seek admissions about Plaintiffs' intent to prove these varying degrees of Walgreens' mental state under their consumer fraud and protection claims. RFAs Nos. 152, 155, and 158 seek similar admissions regarding Plaintiffs' ability to recover damages under those claims. Finally, RFAs Nos. 159-160

seek admissions on whether Plaintiffs are asserting non-*scienter* theories under these consumer fraud and protection claims.  Plaintiffs objected to responding.  (*Id.*).

Walgreens moves to compel responses to these RFAs because denial of its motion to amend its contribution claims against Prime was based on *Prime's* argument that *Plaintiffs'* claims were based *only* on intentional torts as to which claims for contribution are barred in seven states.  (Doc. 407, at 13-14; Doc. 253, at 4 (denial of motion to amend because Plaintiffs "purport to prove Walgreens' fraudulent intent")).  According to Walgreens, "Plaintiffs sat by passively while Prime characterized Plaintiffs' consumer claims as being limited to intentional misconduct for which contribution is unavailable in certain states . . . [and] then said nothing to the contrary when the Court expressly agreed with Prime." (Doc. 407, at 13; *see also* Doc. 237, at 11-12 (Prime's argument)).  Walgreens now seeks "confirmation from Plaintiffs that they agree with Prime's characterization." (Doc. 407, at 13).

**(2) Analysis**

Requests for admission may be directed to facts, the application of law to fact, and opinions about either.  Fed. R. Civ. P. 36(a)(1)(A).  They are used to "determine which elements of each claim are still in dispute"; in such cases, a "response to the requests will serve to narrow and define the issues for trial."  *Intertech Res., Inc. v. Vital Signs, Inc.*, 1996 WL 637860, at *2 (N.D. Ill. Nov. 1996).  Here, the requests fall into a category sometimes described as "contention" requests for admission.  See generally *Think Products, Inc. v. ACCO Brands Corp.*, 2023 WL 2539669, at *6 (N.D. Ill. Mar. 16 2023) (finding contention requests for admission to be proper).

18

The Court rejects Plaintiffs' argument that the requests here seek legal conclusions. On their face, they do not, and none of Plaintiffs' cases for this argument (Doc. 418, at 17) is apposite. "[R]equests on mixed matters of law and fact or other legal conclusions that directly relate to the facts of the case are authorized" under Rule 36(a)(1)(A). *Hart v. Dow Chem.*, 1997 WL 627645, at *8 (N.D. Ill. Sept. 30, 1997). This includes, for example, "RFAs which call upon [a party] to admit its understanding and opinion as to how the specified statutes would apply." *Breuder v. Bd. of Trs. of Cmty. Coll. Dist. No. 502*, 2021 WL 1165089, at *4–5 (N.D. Ill. Mar. 25, 2021). In contrast, an RFA asking a pure legal question is improper. *E.g.*, *Stanek v. St. Charles Comm. Unit School Dist. #303*, 2020 WL 9348257, at *3 (N.D. Ill. Oct. 9, 2020) (request for admission on meaning of statute improper as concerned pure matter of law). None of Walgreens' RFAs poses a pure question of law. Plaintiffs argue that the RFAs ask them "to describe legal rights under different legal scenarios." (Doc. 418, at 17). This is incorrect; the RFAs ask questions based on different *factual* scenarios, which falls squarely within Rule 36's allowance of requests for admission about "the application of law to fact."

Nor do the requests, by trying to delineate the scope of Plaintiffs' claims, seek attorney work product, as Plaintiffs argue. (*Id.* at 18). Plaintiffs, who have the burden of showing that the work product privilege applies here, never explain why responding to this discovery would invade attorney work product, and none of Plaintiffs' cases is on point. All Plaintiffs say in this regard is that the RFAs ask them to "admit or deny their intended legal theories [and so] necessarily require[ ] divulging Plaintiffs' legal strategy," relying on *Itex, Inc. v. Workrite Unif. Co. Inc.*, 2011 WL 1224920, at *1 (N.D. Ill. Mar. 31, 2011). In that case, plaintiffs objected to answering a request for admission about

19

whether they conducted pre-suit testing, arguing that it would reveal their counsel's strategy in preparing the lawsuit. While the court agreed that work product protections may extend to responses to requests for admission, it explained that the doctrine should not be used to shield any item that could reveal some hint of a lawyer's mental impressions. *Id.* at *1. The court then held that responding to the request for admission would not implicate work product since it would not reveal whether the pre-suit testing was done at the direction of counsel but only that it was done at all. *Id.* at *1-2. The same is true here. Attempting to understand what claims Plaintiffs are asserting in this case is crucial information; responding to the RFAs does not reveal anything about counsel's opinions, impressions, or directions about those issues.

Finally, Plaintiffs' argument that the requests are premature because they were served before discovery closed is also unsupported. (Doc. 418, at 19). Plaintiffs rely on *Ziemack v. Centel Corp.,* 1995 WL 729295, at *2 (N.D. Ill. Dec. 7, 1995), in making this argument, but that court did not hold that contention interrogatories were always premature before the close of discovery. It held that each interrogatory had to be analyzed individually, compelling responses to certain contention interrogatories before the close of discovery.

Here, Walgreens has shown a reasonable need at this advanced stage of the case to know the scope of Plaintiffs' claims for discovery and pleading purposes. (Doc. 407, at 14 (arguing that the responses "will critically define and narrow the issues for various matters and tasks—depositions, expert reports and testimony, summary judgment briefing, jury instructions, trial evidence, and opening statements")). In addition, the answers may affect whether Walgreens has a basis to revisit third party contribution

claims that were precluded based on *Prime's* representation that *Plaintiffs'* consumer claims were limited to intentional misconduct. Thus these requests do not seek an "illusory" narrowing of any claims, as Plaintiffs argue (Doc. 418, at 19-20), citing *U.S. ex rel. Tyson v. Amerigroup Illinois, Inc.*, 230 F.R.D. 538, 542 (N.D. Ill. 2005) (denying motion to compel where discovery responses would have served no purpose). Instead Walgreens seeks to understand Plaintiffs' claims so it can defend the case.

It is worth noting that Plaintiffs themselves signal that they *are* in fact asserting consumer fraud claims based on conduct short of intentional deceit by confirming that such claims are viable and stating that they have not been abandoned. (Doc. 418, at 20). The requests for admission are a proper way to understand what Plaintiffs are alleging. The motion to compel is granted.[10]

## CONCLUSION

For the reasons stated above, Walgreen's Motion to Compel Plaintiff's Discovery [Doc. 407] is granted.

ENTER:


Dated: May 31, 2023

*Sheila Finnegan*

SHEILA FINNEGAN
United States Magistrate Judge

---

[10] Plaintiffs' argument that the requests seek discovery about dismissed third party contribution claims (Doc. 418, at 19) is wrong. The requests seek discovery about Plaintiffs' pending consumer fraud act claims.