**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **BCBSM, INC.,** *et al.*, | ) | Case No. 1:20-cv-01853 |
| | ) | |
| *Plaintiffs / Counter-Defendants*, | ) | Honorable Virginia M. Kendall |
| | ) | Honorable Sheila M. Finnegan |
| v. | ) | |
| | ) | *Consolidated with*: |
| **WALGREEN CO. & WALGREENS** | ) | No. 1:20-cv-01929 |
| **BOOTS ALLIANCE, INC.,** | ) | No. 1:20-cv-03332 |
| | ) | No. 1:20-cv-04738 |
| *Defendants / Counterclaimant.* | ) | No. 1:20-cv-04940 |
| | ) | No. 1:22-cv-01362 |
| | ) | |
| | ) | |

| | |
|---|---|
| **WALGREEN CO. & WALGREENS** | ) |
| **BOOTS ALLIANCE, INC.,** | ) |
| | ) |
| *Third-Party Plaintiffs*, | ) |
| | ) |
| v. | ) |
| | ) |
| **PRIME THERAPEUTICS LLC &** | ) |
| **OMEDARX, INC.,** | ) |
| | ) |
| *Third-Party Defendant*. | ) |

**DECLARATION OF TIMOTHY R. FARRELL IN SUPPORT OF**
**DEFENDANTS' OPPOSITION TO PLAINTIFFS'**
**MOTION TO COMPEL CLAWED BACK DOCUMENTS**

I, Timothy R. Farrell, hereby declare, pursuant to 28 U.S.C. § 1746, that the following facts

are true and accurate to the best of my knowledge and belief.

1

1.      I am an attorney at Ropes & Gray LLP and counsel to Walgreen Co. and Walgreens Boots Alliance, Inc. (together with Walgreen Co., "Defendants"). I am a member of the Illinois bar, and I am admitted to practice before the United States District Court for the Northern District of Illinois.

2.      I submit this declaration with and in support of Defendants' Opposition to Plaintiffs' Motion to Compel Clawed Back Documents.

3.      On June 6, 2023, Plaintiffs deposed former Walgreens employee Joseph Kristie in connection with this case. I represented Mr. Kristie at the deposition. Plaintiffs attached a transcript of this deposition testimony to the declaration of Justin D. Kingsolver ("Kingsolver Decl.") as Exhibit 3. Attached hereto as **Exhibit 1** is a true and accurate copy of the document introduced as Exhibit 129 at Mr. Kristie's deposition ("Kristie Ex. 129").

4.      Attached hereto as **Exhibit 2** is a true an accurate copy of a document produced by Walgreens bearing Bates number WAG_BCBS00586765 through WAG_BCBS00586767. This document is one of three near-duplicate versions of the same email chain represented in Kristie Ex. 129 that had the privileged information redacted and was available to Plaintiffs' counsel in advance of the Kristie deposition. Walgreens had previously produced two other versions of this same email chain with the privileged material redacted.

5.      In July 2023, Walgreens' counsel in this action discovered an email from Walgreens senior attorney Daniel Fitzgerald to Megan Butterfield in which Mr. Fitzgerald expressly directed Ms. Butterfield and others █████████████████████████████ ███████████████████████████████ (the "Email Directive"). Counsel at my firm then searched for and reviewed all PSC-related communications stemming from the Email

Directive, including any such communications with other executives and specialists that counsel identified as involved in the counsel-directed project, such as Blake Slansky and Andy Fox.

6.      In consultation with Walgreens' in-house counsel and based on my firm's review of the record, we confirmed that Nabeel Ahmed's ████████████████████████ ███████████████████ ordered by Walgreens in-house counsel in the Email Directive. Counsel's review also confirmed that Paul Vroman created a ██████████████ as directed in the Email Directive.

7.      Documents produced by Walgreens reflect Mr. Ahmed's work alongside senior Walgreens executives with respect to ██████████████████████████████ ██████████, such as **<u>Exhibit 3</u>**, which is a true an accurate copy of a document produced by Walgreens bearing Bates number WAG_BCBS01612209 through WAG_BCSB01612214.

8.      Documents produced by Walgreens reflect Walgreens' leadership involving ███ ████████████████████████████████, such as **<u>Exhibit 4</u>**, which is a true an accurate copy of a document produced by Walgreens bearing Bates number WAG_BCBS00612483 through WAG_BCBS00612488.

9.      Attached hereto as **<u>Exhibit 5</u>** is a true and accurate copy of transcript excerpts from the 30(b)(6) deposition of Walgreens through representative Scott Schuler in *Russo v. Walgreen Co.,* No. 1:17-cv-2246 (N.D. Ill.), dated October 5, 2018. Walgreens' testimony through representative Mr. Schuler in the Rule 30(b)(6) deposition taken in *Russo v. Walgreen Co.,* No. 1:17-cv-2246 (N.D. Ill.) describes Mr. Hohmeier's role in assisting leadership's pricing decisions. *See* Ex. 5, at Tr. 93:11–18.

10.     Documents produced by Walgreens reflect Dustin Thomas's involvement and provision of opinions on drug pricing to Walgreens leadership, including Megan Butterfield and

Rick Gates, Vice President – Pharmacy Operations, such as **Exhibit 6**, which is a true an accurate copy of a document produced by Walgreens bearing Bates number WAG_BCBS00029808 through WAG_BCBS00029822.

11.     Documents produced by Walgreens reflect Grace Noboa-Hidalgo's work with Walgreens leadership in planning related to the consumer-paid markets, such as **Exhibit 7**, a true an accurate copy of a document produced by Walgreens bearing Bates number WAG_BCBS01343209.

12.     On September 1, 2023, Walgreens issued a Notice of Inadvertent Disclosure of Privileged Material (the "Notice") to Plaintiffs, a copy of which is attached as Exhibit 4 to the Kingsolver Declaration.

13.     On September 11, 2023, Plaintiffs issued a letter to Walgreens responding to the Notice, a copy of which is attached as Exhibit 5 to the Kingsolver Declaration. In the letter, Plaintiffs challenged Walgreens' clawing back of one document included in the notice—specifically, Kristie Ex. 129. Plaintiffs' letter did not challenge any other documents that Walgreens clawed back. Plaintiffs' letter also never argued that Walgreens waived any privilege over any other documents.

14.     On September 14, 2023, Walgreens sent a response letter to Plaintiffs, a copy of which is attached as Exhibit 6 to the Kingsolver Declaration. In this letter, Walgreens corrected misstatements in Plaintiffs' September 11 letter and explained the privileged nature of Kristie Ex. 129. Walgreens also reiterated its concerns regarding Mr. Kingsolver's questions during the Kristie deposition about Kristie Ex. 129.

15.     On September 21, 2023, Walgreens' counsel (I with my colleagues Jeffrey Bushofsky, Nicholas Smith, and Tyler Paladino of Ropes & Gray LLP), and Plaintiffs' counsel

4

(Justin Kingsolver and Michael Pine of Crowell & Moring LLP), conferred by videoconference in an attempt to resolve issues related to the clawed back documents. During the discussion, Plaintiffs' counsel expressly withdrew any dispute regarding Walgreens' privilege claim over Kristie Ex. 129, advising Walgreens' counsel that Plaintiffs were not contesting that clawback. Plaintiffs challenged Walgreens' withholding of documents related to the Email Directive, to which Walgreens' counsel reiterated the argument made in the Notice that these documents were created expressly at the direction of counsel. Plaintiffs' counsel argued that the production of these documents in prior litigation waived privilege in this case, and that Walgreens waived any chance at further redacting previously redacted documents produced in the prior litigations. I explained that Walgreens was still entitled to claw back and redact these documents based on the parties' Agreed Amended Confidentiality Order ("AACO") and the Rule 502(d) order.

16.     On October 2, 2023, Walgreens' counsel (I and my colleagues Nicholas Smith and Tyler Paladino) and Plaintiffs' counsel (Justin Kingsolver and Michael Pine) again conferred by video-conference in another good faith attempt to resolve issues related to the clawed back documents. During this discussion, I disagreed with Plaintiffs' purported reliance on certain case law, explaining that those cases did not involve Rule 502(d) orders, and thus were entirely distinguishable here where any Walgreens productions—whether in this case or in prior litigations—were made pursuant to applicable Rule 502(d) orders. I stated that the documents were in the process of being clawed back in the other litigations, and described how it had not been clear in those cases that the documents being clawed back flowed from the Email Directive. Plaintiffs' counsel disputed this claim and reiterated their previous arguments about waiver, as argued on the September 21 meet and confer. At the end of the call, Plaintiffs' counsel asked whether Walgreens would stipulate to the application of Illinois choice of law principles for purposes of motion

practice. However, when discussing this issue, Plaintiffs did not raise any waiver argument or theory based on the application of Illinois law's control group test, nor did they mention the control group test whatsoever. Plaintiffs also did not raise an argument regarding application of the "control group" test in response to Walgreens' previous notices of inadvertent disclosure or in their motion to compel filed October 11, 2022. Finally, Plaintiffs promised to follow up with a list of redactions that they specifically challenged.

17.     On October 2, 2023, Walgreens clawed back most of the documents identified in the Notice in two prior cases: *Russo v. Walgreen Co.*, No. 1:17-cv-2246 (N.D. Ill.) and *Humana Health Plan, Inc. v. Walgreen Co.*, AAA Case No. 01-19-0002-5131. Walgreens clawed back these documents pursuant to the protective orders, both invoking Rule 502(d), entered in those litigations.

18.     On October 9, 2023, Plaintiffs emailed Walgreens identifying only two documents for which it challenged the proposed redactions. One of which was Kristie Ex. 129, for which they had already agreed to withdraw their challenge to Walgreens' privilege claim. The next day, Walgreens responded that the redacted information was privileged because it either detailed the contents of legal advice, stemmed from the Email Directive, or described the rationale on which Walgreens' counsel provided legal advice. A true and accurate copy of excerpts of this meet and confer email correspondence is included in the email chain attached hereto as **Exhibit 8**.

19.     During the meet-and-confer process, Plaintiffs' counsel did not raise any waiver argument based on Illinois' control group test.

20.     The parties have not yet exchanged privilege logs in this matter, except for limited logs of certain documents subject to inadvertent-disclosure notices.

21. Attached hereto as **<u>Exhibit 9</u>** is a true and accurate copy of the *qui tam* Complaint filed under seal on January 13, 2012 in *United States ex rel. Baker v. Walgreen, Co.*, No. 1:12-cv-300 (S.D.N.Y) in the Southern District of New York.

22. Attached hereto as **<u>Exhibit 10</u>** is a true and accurate copy of the first of multiple Civil Investigative Demands the Department of Justice issued to Walgreens relating to PSC, issued on July 5, 2012.

23. Attached hereto as **<u>Exhibit 11</u>** is a true and accurate copy of a settlement reached on January 18, 2017, Stipulation & Order of Settlement & Release, *Baker*, No. 1:12-cv-300 (S.D.N.Y.), Dkt. Nos. 23, resolving certain claims brought against Walgreens in the *Baker* litigation.

24. Attached hereto as **<u>Exhibit 12</u>** is a true and accurate copy of a settlement reached on January 15, 2019, Stipulation & Order of Settlement & Release, *Baker*, No. 1:12-cv-300 (S.D.N.Y.), Dkt. Nos. 53, resolving the remaining claims brought against Walgreens in the *Baker* litigation.

25. Attached hereto as **<u>Exhibit 13</u>** is a true and accurate copy of excerpts of the transcript of the deposition of Megan Butterfield in *Russo v. Walgreen Co.,* No. 1:17-cv-2246 (N.D. Ill.), dated December 5, 2019.

26. Attached hereto as **<u>Exhibit 14</u>** is a true and accurate copy of excerpts of the transcript of the deposition of Blake Slansky in *Russo v. Walgreen Co.,* No. 1:17-cv-2246 (N.D. Ill.), dated November 22, 2019.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 1st day of November, 2023.

_____ */s/ Timothy R. Farrell* _____

Timothy R. Farrell
**ROPES & GRAY LLP**
191 North Wacker Drive, 32nd Floor
Chicago, Illinois 60606
Tel: (312) 845-1209
Fax: (312) 845-5569
Timothy.Farrell@ropesgray.com

*Attorney for Defendant / Counterclaimant / Third-Party Plaintiff Walgreen Co. & Defendant / Third-Party Plaintiff Walgreens Boots Alliance, Inc.*

## CERTIFICATE OF SERVICE

I, Charles D. Zagnoli, hereby certify that the forgoing document was electronically filed on November 1, 2023, and will be served electronically via the Court's ECF Notice system upon all registered counsel of record.

_/s/ Charles D. Zagnoli_

Charles D. Zagnoli
**ROPES & GRAY LLP**
191 North Wacker Drive, 32nd Floor
Chicago, Illinois 60606
Tel: (312) 845-1209
Fax: (312) 845-5569
Charles.Zagnoli@ropesgray.com

*Attorney for Defendant / Counterclaimant / Third-Party Plaintiff Walgreen Co. & Defendant / Third-Party Plaintiff Walgreens Boots Alliance, Inc.*

# Farrell Decl. Exhibit 1

# Filed Under Seal

# Farrell Decl. Exhibit 2

# Filed Under Seal

# Farrell Decl. Exhibit 3

# Filed Under Seal

# Farrell Decl. Exhibit 4

# Filed Under Seal

# Farrell Decl. Exhibit 5

# Filed Under Seal

# Farrell Decl. Exhibit 6

# Filed Under Seal

# Farrell Decl. Exhibit 7

# Filed Under Seal

# Farrell Decl. Exhibit 8

| | |
|---|---|
| **From:** | Smith, Nicholas |
| **To:** | JKingsolver@crowell.com; Farrell, Timothy |
| **Cc:** | Mpine@crowell.com; Zagnoli, Charles; Bushofsky, Jeffrey J.; KHibbert@crowell.com; Lewis, Matthew |
| **Subject:** | RE: BCBS v. Walgreens - Walgreens Fourth Notice of Inadvertent Disclosure |
| **Date:** | Tuesday, October 10, 2023 7:32:06 PM |

Justin,

Thank you for providing a list of the as-applied redactions with which you take issue with respect to two documents only. We understand this means you are not challenging the redactions applied to other documents in the relevant clawback population. We have reviewed the redactions you challenge, and will not be withdrawing the associated privilege claims as to the redactions in those two documents.

With regard to WAG_BCSB00159631, all the information contained in both challenged slides is privileged. 

Next, we appreciate your willingness to continue to meet and confer regarding the documents you contend were previously introduced as exhibits in other cases. We do not believe, based on the case law and other information you've provided in challenging these privilege assertions, that your challenges are supported. Instead, we believe your clients' challenges purport to avoid the terms regarding inadvertent disclosures to which they agreed in the protective order. Walgreens accordingly stands by its privilege assertions as to those documents.

To the extent you do intend to file a motion, we trust that you will file said motion under seal in compliance with your obligations set forth in the inadvertent disclosure provisions of this case's relevant orders.

Best,
Nick

---

**From:** Kingsolver, Justin <JKingsolver@crowell.com>
**Sent:** Monday, October 09, 2023 3:48 PM
**To:** Smith, Nicholas <Nicholas.Smith@ropesgray.com>; Farrell, Timothy <Timothy.Farrell@ropesgray.com>
**Cc:** Mpine@crowell.com; Zagnoli, Charles <Charles.Zagnoli@ropesgray.com>; Bushofsky, Jeffrey J. <Jeffrey.Bushofsky@ropesgray.com>; KHibbert@crowell.com; Lewis, Matthew <MLewis@crowell.com>
**Subject:** RE: BCBS v. Walgreens - Walgreens Fourth Notice of Inadvertent Disclosure

**[EXTERNAL]**

Counsel:

Following up on our meet and confer, we have concerns with respect to the following redactions.

1. **WAG_BCBS00159631**
   - Slide 26 redacts out the entirety of the information besides the title. ████████████ ████████████ does not make clear that everything in the slide is a privileged communication. For example, what is the basis for redacting out a ████████████ ████████████████████████████████████████ ████████████████████████████████
   - Slide 48 is entirely redacted. It is not possible to tell from this redaction the basis of any of the redaction. Is Walgreens taking the position that the ████████████ ████████████████████████ in this deck is itself privileged?

2. **WAG_BCBS00649215**
   - While we understand your position that anything from "legal" is to be redacted as legal communication, we do not believe the redaction of the ████████████ ████████████████████ is appropriate.

Finally, ahead of our planned motion filing deadline on Wednesday, we wanted to make one more good faith attempt to resolve issues short of motions practice. To that end, will Walgreens agree to withdraw its clawback claims on the documents previously used as exhibits in *Forth* or *Humana*?

Thanks,
Justin

**Justin D. Kingsolver**

Crowell & Moring LLP
jkingsolver@crowell.com
+1.202.624.2927 direct

---

**From:** Kingsolver, Justin
**Sent:** Sunday, October 1, 2023 7:51 PM
**To:** 'Smith, Nicholas' <Nicholas.Smith@ropesgray.com>; Farrell, Timothy <Timothy.Farrell@ropesgray.com>
**Cc:** Pine, Michael <Mpine@crowell.com>; Zagnoli, Charles <Charles.Zagnoli@ropesgray.com>; Bushofsky, Jeffrey J. <Jeffrey.Bushofsky@ropesgray.com>; Hibbert, Kelly <KHibbert@crowell.com>; Lewis, Matthew <MLewis@crowell.com>
**Subject:** RE: BCBS v. Walgreens - Walgreens Fourth Notice of Inadvertent Disclosure

Counsel:

As noted in my earlier email, Plaintiffs are continuing to investigate the documents that are subject to Defendants' clawback.  Resulting from this narrowing review, attached is an updated list of the documents which we believe appeared as exhibits in previous cases.

Thanks,
Justin


**Justin D. Kingsolver**

Crowell & Moring LLP
jkingsolver@crowell.com
+1.202.624.2927 direct

---

**From:** Smith, Nicholas <Nicholas.Smith@ropesgray.com>
**Sent:** Friday, September 29, 2023 1:34 PM
**To:** Kingsolver, Justin <JKingsolver@crowell.com>; Farrell, Timothy <Timothy.Farrell@ropesgray.com>
**Cc:** Pine, Michael <Mpine@crowell.com>; Zagnoli, Charles <Charles.Zagnoli@ropesgray.com>; Bushofsky, Jeffrey J. <Jeffrey.Bushofsky@ropesgray.com>; Hibbert, Kelly <KHibbert@crowell.com>
**Subject:** RE: BCBS v. Walgreens - Walgreens Fourth Notice of Inadvertent Disclosure

External Email

Justin,

I will circulate an invite for 2:30 ET / 1:30 CT, which appears to work for everyone on our end.

Best,
Nick


**Nicholas W. Smith**
**ROPES & GRAY LLP**
T +1 312 845 1384
191 North Wacker Drive, 32nd Floor
Chicago, IL 60606
Nicholas.Smith@ropesgray.com
www.ropesgray.com

This message (including attachments) is privileged and confidential. If you are not the intended recipient, please delete it without further distribution and reply to the sender that you have received the message in error.

---

**From:** Kingsolver, Justin <JKingsolver@crowell.com>
**Sent:** Friday, September 29, 2023 3:30 PM
**To:** Smith, Nicholas <Nicholas.Smith@ropesgray.com>; Farrell, Timothy <Timothy.Farrell@ropesgray.com>
**Cc:** Mpine@crowell.com; Zagnoli, Charles <Charles.Zagnoli@ropesgray.com>; Bushofsky, Jeffrey J.

<Jeffrey.Bushofsky@ropesgray.com>; KHibbert@crowell.com
**Subject:** RE: BCBS v. Walgreens - Walgreens Fourth Notice of Inadvertent Disclosure

Hi Nick:

My apologies for the delay.  I now need to be on a flight on Monday until 1:45pm ET.  To be safe, could we schedule our M&C for 2:15pm ET?  I will be joining via phone.

Thanks,
Justin

**Justin D. Kingsolver**

Crowell & Moring LLP
jkingsolver@crowell.com
+1.202.624.2927 direct

---

**From:** Smith, Nicholas <Nicholas.Smith@ropesgray.com>
**Sent:** Wednesday, September 27, 2023 2:18 PM
**To:** Kingsolver, Justin <JKingsolver@crowell.com>; Farrell, Timothy <Timothy.Farrell@ropesgray.com>
**Cc:** Pine, Michael <Mpine@crowell.com>; Zagnoli, Charles <Charles.Zagnoli@ropesgray.com>; Bushofsky, Jeffrey J. <Jeffrey.Bushofsky@ropesgray.com>; Hibbert, Kelly <KHibbert@crowell.com>
**Subject:** RE: BCBS v. Walgreens - Walgreens Fourth Notice of Inadvertent Disclosure

External Email

Justin,

Thank you for sending this list.

We agree with your proposal to reschedule the meet and confer to Monday, October 2. Would 2 ET / 1 CT work on your end? If so, we are happy to send a calendar invite.

Best,
Nick

**Nicholas W. Smith**
**ROPES & GRAY LLP**
T +1 312 845 1384
191 North Wacker Drive, 32nd Floor
Chicago, IL 60606
Nicholas.Smith@ropesgray.com
www.ropesgray.com

This message (including attachments) is privileged and confidential. If you are not the intended recipient, please delete it without further distribution and reply to the sender that you have received the message in

error.

---

**From:** Kingsolver, Justin <JKingsolver@crowell.com>
**Sent:** Wednesday, September 27, 2023 2:19 PM
**To:** Farrell, Timothy <Timothy.Farrell@ropesgray.com>; Smith, Nicholas <Nicholas.Smith@ropesgray.com>
**Cc:** Mpine@crowell.com; Zagnoli, Charles <Charles.Zagnoli@ropesgray.com>; Bushofsky, Jeffrey J. <Jeffrey.Bushofsky@ropesgray.com>; KHibbert@crowell.com
**Subject:** RE: BCBS v. Walgreens - Walgreens Fourth Notice of Inadvertent Disclosure


Tim,

My apologies, but the holiday schedule got the best of me.  Attached, recognizing that it has taken more time than anticipated, is a list of clawed-back documents that we believe have previously appeared in substantially-similar form as exhibits in the other cases.  We reserve rights to supplement this list, as our investigation is still ongoing.

Given the timing, I propose that we move the contemplated M&C to Monday, Oct. 2, on which I am currently flexible from 1pm to 5:30pm CT.  Thanks, and I look forward to continuing our conversation.
Justin


**Justin D. Kingsolver**

Crowell & Moring LLP
jkingsolver@crowell.com
+1.202.624.2927 direct

---

**From:** Kingsolver, Justin
**Sent:** Sunday, September 24, 2023 9:18 PM
**To:** 'Farrell, Timothy' <Timothy.Farrell@ropesgray.com>; Smith, Nicholas <Nicholas.Smith@ropesgray.com>
**Cc:** Pine, Michael <Mpine@crowell.com>; Zagnoli, Charles <Charles.Zagnoli@ropesgray.com>; Bushofsky, Jeffrey J. <Jeffrey.Bushofsky@ropesgray.com>; Hibbert, Kelly <KHibbert@crowell.com>
**Subject:** RE: BCBS v. Walgreens - Walgreens Fourth Notice of Inadvertent Disclosure

Hi Tim,

Yes, we are in agreement.  Those are the rights which my email intended to reserve, so thank you for the clarifying question.  Regarding the meet-and-confer later this week, I could do Thursday at 4:00 or 4:30pm CT, but if your team needs any more time to review the list we send over, we can call an audible on Thursday morning and move the M&C to Monday, Oct. 2 (when I am currently flexible after 1pm CT).

Thanks,
Justin

**Justin D. Kingsolver**

Crowell & Moring LLP
jkingsolver@crowell.com
+1.202.624.2927 direct

---

**From:** Farrell, Timothy <Timothy.Farrell@ropesgray.com>
**Sent:** Friday, September 22, 2023 1:53 PM
**To:** Kingsolver, Justin <JKingsolver@crowell.com>; Smith, Nicholas
<Nicholas.Smith@ropesgray.com>
**Cc:** Pine, Michael <Mpine@crowell.com>; Zagnoli, Charles <Charles.Zagnoli@ropesgray.com>;
Bushofsky, Jeffrey J. <Jeffrey.Bushofsky@ropesgray.com>; Hibbert, Kelly <KHibbert@crowell.com>
**Subject:** RE: BCBS v. Walgreens - Walgreens Fourth Notice of Inadvertent Disclosure

External Email

Justin,

Thank you for sending over this authority, which we'll review in advance of a meet and confer next
week.  We will need to some to evaluate your list of which documents have been introduced at
deposition or hearing; however Thursday and Friday are challenging as I have a deposition and
mediation respectively.  Could you do late Thursday (4CT) or early Friday (8 or 9 CT)?

As to your proposed extension, we believe the parties are likely in agreement. However, we are not
quite sure what would be implicated by our agreement that your clients "would not waive any
rights." To be clear, we would agree that this extension to October 11 would not impact your clients'
ability to file a Motion to Compel related to the documents in Walgreens' September 1 Inadvertent
Disclosure Notice based on the privilege objections you've articulated, and that the parties would
each retain the same rights or arguments as if you had filed the motion by the original deadline of
September 25. Walgreens would raise no timeliness objection if your motion was filed by October
11. If this matches your understanding, then we agree to the proposed October 11 deadline.

Thanks,

Tim

**Timothy R. Farrell**
**ROPES & GRAY LLP**
T +1 312 845 1209 | M +1 646 337 9376
191 North Wacker Drive, 32nd Floor
Chicago, IL 60606
Timothy.Farrell@ropesgray.com
www.ropesgray.com
pronouns: he/him/his

This message (including attachments) is privileged and confidential. If you are not the intended recipient, please delete it without further distribution and reply to the sender that you have received the message in error.

**From:** Kingsolver, Justin <JKingsolver@crowell.com>
**Sent:** Thursday, September 21, 2023 7:23 PM
**To:** Smith, Nicholas <Nicholas.Smith@ropesgray.com>; Farrell, Timothy <Timothy.Farrell@ropesgray.com>
**Cc:** Mpine@crowell.com; Zagnoli, Charles <Charles.Zagnoli@ropesgray.com>; Bushofsky, Jeffrey J. <Jeffrey.Bushofsky@ropesgray.com>; KHibbert@crowell.com
**Subject:** RE: BCBS v. Walgreens - Walgreens Fourth Notice of Inadvertent Disclosure


Counsel:

Thanks for your note.  We conferred and agreed to hold off on filing our motion to permit the parties a bit more time to engage in a meet-and-confer.  We propose an additional 10 business days, meaning if any motion still needs to be filed at the conclusion of the M&C process, it would be filed **Wednesday, October 11**.  (We would exclude Yom Kippur and Indigenous People's/Columbus Day from the business-day count.)  We agree to this timeline contingent on your agreement, as you expressed during today's meet-and-confer, that our filing a motion by October 11 would not waive any rights nor would it be deemed a withdrawal or waiver of any of Plaintiffs' objections to Walgreens' assertion of privilege.  Please let us know by 5pm ET tomorrow if you agree.

Regarding authority, I believe we discussed sending precedent related to waiver (as a result of Walgreens' production of the same documents in prior litigation).  But we are happy to provide some authority on the selective redaction issue, too.  A few of those authorities are below.

- On "selective redaction" (and, given our discussion, by this we mean document for which Walgreens' counsel has already applied redactions that you now appear to be seeking to redact in new and additional places):
    - *Hubert v. Oswego Junction Enters. LLC*, No. 21 C 3360, 2022 WL 17986707, at *2 (N.D. Ill. Dec. 29, 2022).
    - *Baxter Travenol Labs., Inc. v. Abbott Labs.*, 117 F.R.D. 119, 121 (N.D. Ill. 1987).
    - *Golden Valley Microwave Foods, Inc. v. Weaver Popcorn Co., Inc.*, 132 F.R.D. 204, 207 (N.D. Ind. 1990).

- On waiver:
    - *Ctr. Partners, Ltd. v. Growth Head GP, LLC*, 981 N.E.2d 345, 345, 365-66 (Ill. 2012).
    - *Patrick v. City of Chicago*, 154 F. Supp. 3d 705, 715 (N.D. Ill. 2015).
    - *Harmony Gold U.S.A., Inc. v. FASA Corp.*, 169 F.R.D. 113, 117 (N.D. Ill. 1996) (2-week delay constituted waiver).
    - *Cent. Die Casting & Mfg. Co. v. Tokheim Corp.*, No. 93 C 7692, 1994 WL 444796, at *5 (N.D. Ill. Aug. 15, 1994) (3-month delay constituted waiver).
    - *Carmody v. Bd. of Trustees of Univ. of Illinois*, 893 F.3d 397, 406 (7th Cir. 2018) (1-week

delay did not constitute waiver).
- As we agree to your proposal to extend this deadline, we also must reiterate what we said during the M&C: should your team instruct – directly or indirectly – Walgreens' counsel in other litigation to claw back these documents, as has occurred before in similar situations, that will have no impact on our argument that Walgreens has long ago waived the privilege over these documents produced in *Russo/Forth* and *Humana*, as they have been in the possession of third-parties (and litigation opponents, to boot) *for years*.

We will follow up by Wednesday (but hopefully sooner) with a list of clawed-back documents introduced in depositions or arbitral hearings. (Michael and I will both be away on Monday for the holiday.) We should be in a position to further M&C on Thursday or Friday, so if you want to propose a few times, that would be helpful.

Thanks,
Justin

**Justin D. Kingsolver**
Crowell & Moring LLP
jkingsolver@crowell.com
+1.202.624.2927 direct

---

**From:** Smith, Nicholas <Nicholas.Smith@ropesgray.com>
**Sent:** Thursday, September 21, 2023 2:09 PM
**To:** Kingsolver, Justin <JKingsolver@crowell.com>; Farrell, Timothy <Timothy.Farrell@ropesgray.com>
**Cc:** Pine, Michael <Mpine@crowell.com>; Zagnoli, Charles <Charles.Zagnoli@ropesgray.com>; Bushofsky, Jeffrey J. <Jeffrey.Bushofsky@ropesgray.com>; Hibbert, Kelly <KHibbert@crowell.com>
**Subject:** RE: BCBS v. Walgreens - Walgreens Fourth Notice of Inadvertent Disclosure

External Email

Justin, Michael,

Thank you for your time on the meet and confer this afternoon. We believe it was a productive start to the meet and confer process, which we hope continues next week once your team has had a chance to review the redacted documents produced earlier today.

We look forward to seeing your promised list of clawed back documents that you argue were introduced at prior evidentiary hearings or depositions. This information will certainly help us evaluate our response to your positions in advance of your filing of any motion to compel.

Additionally, we appreciate your offer to send authority that supports your position with regards to what you've termed Walgreens' alleged "selective redaction."

As discussed, please let us know when next week your team can be available for the continued meet and confer discussion.

Best,
Nick

**Nicholas W. Smith**
**ROPES & GRAY LLP**
T +1 312 845 1384
191 North Wacker Drive, 32nd Floor
Chicago, IL 60606
Nicholas.Smith@ropesgray.com
www.ropesgray.com

This message (including attachments) is privileged and confidential. If you are not the intended recipient, please delete it without further distribution and reply to the sender that you have received the message in error.

---

**From:** "Kingsolver, Justin" <JKingsolver@crowell.com>
**Date:** September 21, 2023 at 12:42:10 AM CDT
**To:** "Farrell, Timothy" <Timothy.Farrell@ropesgray.com>
**Cc:** mpine@crowell.com, "Zagnoli, Charles" <Charles.Zagnoli@ropesgray.com>, "Bushofsky, Jeffrey J." <Jeffrey.Bushofsky@ropesgray.com>, KHibbert@crowell.com
**Subject: RE: BCBS v. Walgreens - Walgreens Fourth Notice of Inadvertent Disclosure**


We can discuss during the M&C tomorrow whether there is a reasonable prospect that further time would help the parties come to any agreement. But as I explained below, we do not believe that more time would be productive, since it appears the parties have a true disagreement on privilege law. While I do hope to hear tomorrow that Walgreens plans to reverse course and withdraw its clawbacks as to each one of these 127 documents, I think that is unlikely and, without such a proposal, that disagreement will persist and will need to be resolved by the Court.

Justin D. Kingsolver
Crowell & Moring LLP
jkingsolver@crowell.com
+1.202.624.2927 direct


-----Original Message-----
From: Farrell, Timothy <Timothy.Farrell@ropesgray.com>
Sent: Wednesday, September 20, 2023 8:36 PM
To: Kingsolver, Justin <JKingsolver@crowell.com>

# Farrell Decl. Exhibit 9

JUDGE OETKEN

# 12 CIV 0300

U. S. DISTRICT COURT
FILED
JAN 13 2012
S. D. OF N. Y.

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                      :

**THE UNITED STATES OF AMERICA**
*ex rel.* **(UNDER SEAL),**     :

              **Plaintiff,**     :

                      :        **Civil Action No.**

         v.          :

**(UNDER SEAL)**         :

           **Defendant.**     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**COMPLAINT FILED *IN CAMERA* AND UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)**

**DO NOT ENTER IN ECF/PACER**

**DO NOT PUT IN PRESS BOX**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                                               :

THE UNITED STATES OF AMERICA       :
*ex rel.* MARC D. BAKER             :
       7120 St. James Court       :     **Civil Action No.**
       North Port, Florida 34287    :
                                         :

            **Plaintiff,**            :
                                         :

        v.                          :     **COMPLAINT FILED**
                                         :     **IN CAMERA AND**
WALGREENS, INC.                :     **UNDER SEAL**
200 Wilmot Road              :     **31 U.S.C. § 3730(b)(2)**
Deerfield, Illinois 60015      :
                                         :     **DO NOT ENTER IN**
    **SERVE ON REGISTERED AGENT:**  :     **ECF/PACER**
       Illinois Corporation Service Company  :
       801 Adlai Stevenson Drive    :     **DO NOT PUT IN**
       Springfield, Illinois 62703     :     **PRESS BOX**
                                         :

           **Defendant.**           :
                                         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

# TABLE OF CONTENTS

I.  NATURE OF THE ACTION ............................................................................1

II.  JURISDICTION AND VENUE ....................................................................11

III.  PARTIES ......................................................................................................12

IV.  THE LAW......................................................................................................15

V.  MEDICARE PART D AND OTHER FEDERAL PAYER PROGRAMS ...........19

VI.  DEFENDANT'S WRONGFUL CONDUCT ........................................................30

    A.  Defendant's PSC Program. ..............................................................31

    B.  Defendant Used Illegal Marketing and Promotional Tactics to Enroll
        Ineligible Federal Beneficiaries in the PSC Program ......................36

    C.  The Enrollment Process for Federal Beneficiaries Wrongfully Induced to
        Join the PSC Program ......................................................................43

    D.  Defendant Has Mandatory Enrollment Minimums and
        Awards Bonuses for Enrolling PSC Program Members,
        Including Federal Beneficiaries ........................................................44

    E.  Defendant Failed to Use Patient Screening Programs Available on its
        Nationwide Computer Network to Block Federal Beneficiaries ....................47

    F.  Defendant Knowingly Violated the Anti-Kickback Statute by
        Steering Federal Beneficiaries Exclusively to its
        Pharmacies and Ignored Relator's Concerns ....................................48

    G.  Information from Defendant's Computer System Shows that the
        Majority of PSC Program Members are Federal Beneficiaries ......................51

    H.  Defendant Directed its Employees Not to Promote and to Destroy
        Free Discount Drug Cards to Maximize PSC Program Enrollments..............51

    I.  Defendant's Unlawful Scheme Resulted in Billions of
        Medicare Part D Overcharges for Covered Drugs in Clear
        Violation of CMS Requirements ......................................................52

    J.  Defendant's Fraudulent Scheme Also Resulted in False Claims for
        Payment for Overbilled Influenza Vaccines ....................................60

i

VII.    DEFENDANT MADE, AND CAUSED TO BE MADE, FALSE CLAIMS
        AND STATEMENTS IN REIMBURSEMENT CLAIMS AND FALSE
        CERTIFICATIONS OF PAYMENT DATA ........................................................62

VIII.   DEFENDANT'S VIOLATIONS UNDERMINE THE PROGRAM
        INTEGRITY OF PART D AND THREATEN THE FEDERAL
        BENEFICIARY STATUS OF PATIENTS ........................................................66

IX.     DAMAGES ...........................................................................................................69

COUNTS ........................................................................................................................................323

        FIRST CAUSE OF ACTION  ..............................................................................69

        SECOND CAUSE OF ACTION ...........................................................................71

        THIRD CAUSE OF ACTION ...............................................................................72

        PRAYER AS TO COUNTS I-III ...........................................................................73

        FOURTH CAUSE OF ACTION ...........................................................................74

        PRAYER AS TO COUNT IV ................................................................................76

        FIFTH CAUSE OF ACTION .................................................................................77

        PRAYER AS TO COUNT V ..................................................................................78

DEMAND FOR JURY TRIAL ....................................................................................................79

*THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK*

## ORIGINAL COMPLAINT

**COMES NOW**, through the undersigned counsel, Relator Marc D. Baker, on behalf of himself and the United States of America ("United States"), and brings this *qui tam* action under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (the "FCA"), the Medicare and Medicaid Patient Protection Act of 1987, 42 U.S.C. § 1320a-7b (the "Anti-Kickback Statute"); the Medicare Prescription Drug, Improvement and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066, 42 U.S.C. § 1395w-101-52, and the Medicare Prescription Drug Benefit, 70 Fed. Reg. 4193 (Jan. 28, 2005) (codified at 42 C.F.R. § 423.1 et seq. ("Medicare Part D"), to recover monetary damages, civil penalties, and other remedies for violations of the Federal healthcare programs, including Medicare and the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS/TRICARE"), the Veterans Administration, and the Federal Employees Health Benefits Program (collectively, "Federal Payer Programs"), and hereby alleges as follows:

### I.  NATURE OF THE ACTION.

1.  This is a *qui tam* action under the federal False Claims Act and the Anti-Kickback Statute. The False Claims Act was enacted in 1863 in response to "widespread corruption and fraud in the sales of supplies and provisions to the union government during the Civil War." 132 CONG. REC. H9382-03 (daily ed. Oct. 7, 1986) (statement of Rep. Glickman). The law allows a private person with knowledge of a fraud to bring an action in federal district court for himself and for the United States and States and to share in any recovery. The party is known as a Relator, and the action that a Relator brings is called a *qui tam*.

1

2.      In this *qui tam*, Relator alleges that Defendant knowingly made and caused to be made false statements and claims that were material to the government's decision to reimburse payment of claims for Medicare Part D covered drugs. Defendant's fraudulent course of conduct centers on an illegal scheme to induce or steer Federal Beneficiaries to self-refer their Federal payer business exclusively to Defendant's pharmacies and to overbill Medicare and other Federal Payer Programs for covered Part D drugs. Two categories of violations arise out of this unlawful scheme. First, Defendant induced (and continues to induce) millions of Federal Beneficiaries to fill Federal payer prescriptions exclusively at its retail pharmacies in exchange for illegal kickbacks in the form of substantial cash discounts and lower drug prices in violation of the Anti-Kickback Statute. Second, having induced Federal Beneficiaries to fill Federal payer prescriptions exclusively at its retail pharmacies, Defendant overbilled the Federal government for covered Part D drugs by submitting claims for payment at higher prices than permitted by law. Defendant's false statements and claims were material to the government's decision to pay the artificially inflated drug prices in violation of the False Claims Act.

3.      Defendant is a nationwide pharmacy chain with over 7,500 retail pharmacy locations in 50 states, the District of Columbia, Puerto Rico, and Guam. Defendant provides pharmaceuticals for millions of disabled, elderly, and military personnel and their families paid for by the United States each year. It receives hundreds of millions of dollars annually in reimbursements for prescription drugs under Medicare Part D and other Federal payer programs.

2

4.     **Defendant's Anti-Kickback Violations**.   The Anti-Kickback Statute prohibits pharmacies from offering anything of value, *i.e.*, remuneration, to Medicare Beneficiaries ("Federal Beneficiaries") with the intent of inducing the referral of prescription business paid for by the Federal government.   For more than five years, Defendant has knowingly and intentionally offered and provided illegal kickbacks through its Prescription Savings Club ("PSC Program") to Federal Beneficiaries to induce them to self-refer their Federal payer business exclusively to Defendant's pharmacies.  The PSC Program is a non-networked discount drug program, exclusive to Defendant's stores, that provides Federal Beneficiaries with cash discounts (*i.e.*, 10-percent discount on all purchases of Walgreens-branded products, including over-the-counter medications, baby care and household items, consumables, and photo-finishing) **and** deeply discounted covered and non-covered Part D drugs. Defendants designed and implemented the PSC Program to steer Federal Beneficiaries exclusively to their retail pharmacies by providing them with substantial financial incentives.  Knowing that the PSC Program violates the Anti-Kickback Statute when marketed to Federal Beneficiaries, Defendant falsely stated that Federal Beneficiaries are excluded from the program, while concealing from the Centers for Medicare & Medicaid Services ("CMS" or "Medicare") and Part D Plan Sponsors the systemic solicitation and enrollment of Federal Beneficiaries.

5.     A number of significant events triggered the launch of Defendant's fraudulent scheme under the PSC Program.  On January 1, 2006, Medicare's Part D Voluntary Prescription Drug Benefit went into effect.  More than 20 million Federal Beneficiaries became eligible for voluntary coverage under Part D.   A significant

percentage of these Federal Beneficiaries were customers of Defendant, which sought to retain its Federal Beneficiary business as a contracted network pharmacy chain accepting Part D plans. CMS imposed a Part D reimbursement ceiling to limit a pharmacy's reimbursement for covered Part D drugs to the lesser of (a) the Part D Plan Sponsor's negotiated price and (b) the pharmacy's usual and customary price offered to Federal Beneficiaries at the point of sale. The reimbursement ceiling is a basic protection against overbilling Medicare for covered Part D drugs and ensures that Medicare receives the benefit of lower pricing at the point of sale. It also allows Federal Beneficiaries to gain the benefit of lower pricing and lower copayments.

6.     Soon after Part D became effective, Defendant's chief competitors, including Wal-Mart and other pharmacies, implemented deeply discounted prescription drug programs that threatened Defendant's Part D business. Wal-Mart, in particular, offered to Federal payers and Federal Beneficiaries $4 pricing for 30-day supplies of Part D covered generic drugs. Wal-Mart's prices were substantially less than the prices offered at Defendant's stores for the same Part D covered drugs with identical strengths, quantities, and dosages. Wal-Mart's plan also substantially reduced copayments and lessened the impact of the coverage gap for Federal Beneficiaries. Wal-Mart marketed the lower drug prices and copayments available to Federal Beneficiaries, as well as the savings to Medicare Part D and other Federal payer programs by limiting pharmacy reimbursement to "usual and customary" pricing as opposed to the higher negotiated prices of Plan Sponsors.

7.     The risk of losing prescription and Federal payer business, which accounts for 65-percent of Defendant's annual sales, prompted Defendant to develop the PSC

Program.    To conceal its scheme, Defendant adopted a sham policy that Federal Beneficiaries were excluded from the PSC Program.  In reality, however, Defendant has knowingly, intentionally, and systemically marketed the PSC Program to Federal Beneficiaries since its inception by, for example, the following conduct throughout the United States:

       a.     Pressuring pharmacists and pharmacy technicians to market aggressively the PSC Program to customers, including Federal Beneficiaries, at the point of sale.

       b.     Directing its pharmacies to enroll a minimum number of individuals in the PSC Program on a daily and weekly basis.  Defendant required each pharmacy to enroll at least one new member per day.

       c.     Tracking PSC Program enrollments and bonuses paid (on store, district, market, operation, and chain levels), and sending daily emails to pharmacy managers at each store reporting enrollment and bonus data.   The emails exhorted staff to market the PSC Program and single out specific pharmacies that failed to meet the mandatory minimums for PSC Program enrollments.

       d.     Marketing and promoting substantial monetary savings offered under the PSC Program directly to Federal Beneficiaries at the point of sale. Defendant's computer system automatically generates standard marketing messages in the form of written solicitations and "leaflets" that offer Federal Beneficiaries substantial discounts to enroll in the PSC Program to fill prescriptions.  Defendant staples these leaflets to the front of the prescription drug

packaging that is provided to each Federal Beneficiary who fills a prescription at Defendant's pharmacies.

e.      Offering and providing illegal cash discounts to Federal Beneficiaries in the form of $50 coupon books. Defendant provided the coupons to Federal Beneficiaries as a financial inducement to enroll them in the PSC Program with either no out-of-pocket cost or a net monetary gain to a beneficiary. Defendant offered the coupons to any Federal Beneficiary who inquired about the PSC Program at the pharmacy and enrolled. The booklet contained coupons in various monetary denominations to be used as a cash discount toward purchases at Defendant's stores.

f.      Paying bonuses to employees for every customer enrolled in the PSC Program, including Federal Beneficiaries.

g.      Failing to impose disciplinary action or sanction on employees who unlawfully enroll Federal Beneficiaries, and criticizing employees for either not satisfying enrollment mandatory minimums or raising concerns about the PSC Program.

h.      Electing not to use CAP Blocks, computer blocking programs commonly used by Defendant to identify and block specific categories of patients, to block Federal Beneficiaries from joining the PSC Program at the time of enrollment or when filling prescriptions.

i.      Failing to remove from the PSC Program customers who are known by Defendant to be Federal Beneficiaries based on the company's payer/insurance profile and prescription history for the customers.

6

j.      Instructing pharmacy staff not to promote and to destroy free prescription drug discount cards from State and private sector issuers that provide Federal Beneficiaries with deeply discounted drugs, in order to maximize PSC Program enrollments.

8.      Through its fraudulent scheme, Defendant has knowingly and intentionally enrolled more than *5 million* Federal Beneficiaries in the PSC Program throughout the United States, which has resulted in billions of dollars of Federal payer prescriptions steered exclusively to Defendant at artificially higher prices.  A sample of Defendant's computer database for the PSC Program evidences that 58-percent of PSC Program members nationwide are Federal Beneficiaries.  Significantly, Defendant enrolled them knowing in advance that they were Federal Beneficiaries based on historic payer/insurance information, patient data, and prescription histories on file at Defendant's stores and accessed by pharmacy staff at the time of enrollment.

9.      **Defendant's Overbilling Scheme.**  In addition to causing systemic violations of the Anti-Kickback Statute, Defendant's fraudulent scheme resulted in billions of dollars in Medicare Part D overcharges.  Part D limits a pharmacy's reimbursement for a covered drug to the lower of (a) the Plan Sponsor's negotiated price or (b) the pharmacy's usual and customary price offered to Federal Beneficiaries at the point of sale.  CMS considers a lower point of sale price offered to Federal Beneficiaries to be the pharmacy's "usual and customary" price for purposes of Federal reimbursement.  The pharmacy's reimbursement for covered Part D drugs cannot exceed the lower usual and customary price.

10. Defendant knew in December 2005 that reimbursement for covered Part D drugs is limited to the lower of the negotiated price or the pharmacy's usual and customary price. In fact, Defendant's wholly owned pharmacy benefit management company, Walgreens Health Initiatives, Inc. ("WHI"), expressly recognized and contractually required WHI network pharmacies, including Defendant's pharmacies, to limit reimbursement for covered Part D drugs to the lower of the negotiated/contract price or usual and customary pricing at the point of sale. This requirement applied to all contracted pharmacies, although it was not enforced against Defendant's pharmacies.

11. By enrolling Federal Beneficiaries in the PSC Program, Defendant established a new "usual and customary" price for covered Part D drugs – one that is lower than its negotiated price for the same drugs, dose, and quantity. Unlike Wal-Mart, Defendant was unwilling to forego the higher negotiated price reimbursement under Part D plans, as required when a pharmacy offers lower point-of-sale pricing to Federal Beneficiaries. Defendant knowingly and routinely charged Part D Plan Sponsors the *higher* negotiated price, instead of the *lower* usual and customary price for its covered Part D drugs, including the Overbilled Drugs challenged herein.

12. Defendant knowingly and intentionally submitted, and caused to be submitted, false prescription reimbursement claims for covered Part D drugs in violation of Part D regulations. The PSC Program's formulary includes long-term maintenance medications that are covered by Part D plans, including, by way of example, the following drugs: Lisinopril, Simvastatin,[1] Metformin HCL, Metoprolol Tartrate, Warfarin Sodium, Lovastatin, Carvedilol, Citalopram Hydrobromide, Pravastatin Sodium, and

---

[1] Simvastatin is included among many deeply discounted generic drugs offered to PSC Program members, but at this time, it is not listed on the formulary.

Spironolactone (collectively, "Overbilled Drugs"). Based on specific prescription and claims reimbursement data for Federal Beneficiaries enrolled in the PSC Program obtained by Relator, the Part D negotiated prices for the Overbilled Drugs substantially exceeded Defendant's usual and customary price offered to Federal Beneficiaries throughout the benefit year. Relator's evidence documents the amount Defendant overbilled the Federal Payer Programs for specific Part D covered drugs. By way of example, in 2008 alone, Defendant overbilled the Federal Payer Programs in excess of $546,000,000 for the Overbilled Drugs:

| RANK BY FILL | BRAND NAME | TOTAL FILLS | TOTAL GROSS DRUG COST | Walgreens Scripts | Average Overbill per Transaction | $ Overbilled |
|---|---|---|---|---|---|---|
| 26 | CARVEDILOL | 6,931,551 | $168,492,704.51 | 1,316,994.69 | $18.67 | $24,588,290.86 |
| 35 | CITALOPRAM HYDROBROMIDE | 5,979,371 | $81,198,577.93 | 1,136,080.49 | $7.93 | $9,009,118.29 |
| 1 | LISINOPRIL | 28,462,990 | $345,049,130.75 | 5,407,968.10 | $8.60 | $46,508,525.66 |
| 18 | LOVASTATIN | 8,260,656 | $249,199,586.68 | 1,569,524.64 | $12.95 | $20,325,344.09 |
| 11 | METFORMIN HCL | 15,751,296 | $248,314,732.91 | 2,992,746.24 | $15.79 | $47,255,463.13 |
| 12 | METOPROLOL TARTRATE | 15,468,402 | $108,583,184.19 | 2,938,996.38 | $3.86 | $11,344,526.03 |
| 47 | PRAVASTATIN SODIUM | 4,883,776 | $152,255,209.47 | 927,917.44 | $17.25 | $16,006,575.84 |
| 2 | SIMVASTATIN | 27,434,149 | $694,125,350.30 | 5,212,488.31 | $63.63 | $331,670,631.17 |
| 72 | SPIRONOLACTONE | 3,745,669 | $55,473,533.58 | 711,677.11 | $15.42 | $10,974,061.04 |
| 15 | WARFARIN SODIUM | 13,822,768 | $194,910,416.94 | 2,626,325.92 | $11.08 | $29,099,691.19 |
| | Total | 130740628 | $2,297,602,427.26 | 24,840,719.32 | | $546,782,227.29 |

13. Defendant knowingly and intentionally concealed from Plan Sponsors the lower usual and customary prices for Part D covered drugs. As documented by claims data for more than 3,000 prescriptions for 475 patients throughout the country, Defendant falsely processed claims at the Plan Sponsor's *higher* negotiated prices when the same covered drugs were available to the Federal Beneficiaries enrolled in the PSC Program at substantially lower usual and customary prices. Defendant's conduct violated Medicare Part D requirements that a pharmacy only charge Plan Sponsors the lower usual and customary price for a covered drug when offered at the point of sale.

14.     As part of its fraudulent scheme, Defendant made and caused to be made false statements and claims for payment for covered Part D drugs in violation of the False Claims Act.  In submitting electronic claims for payment to Plan Sponsors and CMS, Defendant was required to report its "usual and customary" price for each covered Part D drug, in accordance with the National Council for Prescription Drug Programs ("NCPDP") requirements.  As an express condition of payment, CMS requires Plan Sponsors and contract pharmacies to provide accurate, complete, and truthful information and data necessary for CMS to meet the requirements under Part D.  For each Part D prescription, Plan Sponsor must submit data to CMS in the form of a prescription drug event ("PDE") record, which must contain prescription drug cost and payment data to enable CMS to make accurate payments to plans and otherwise administer the Part D benefit.  For each electronic claim for reimbursement submitted by Defendant for a covered Part D drug, Defendant knowingly and intentionally made false statements that its usual and customary price was the full cash price of the drug, instead of the lower PSC Program price offered to Federal Beneficiaries.  Defendant also knowingly and intentionally failed to disclose the lower prices for covered Part D drugs available to Federal Beneficiaries through the PSC Program.  Defendant's false statements and omissions were material to the government's decision to pay false claims for reimbursement at artificially inflated prices.

15.     The United States has been and continues to be substantially damaged by Defendant's fraud.  Excluding damages caused by Defendant's widespread Anti-Kickback violations, actual (single) damages for overcharges to the United States for the Overbilled Drugs alone exceed $3 billion.

16.     In addition to monetary damages to the United States, Defendant's fraud has caused systemic Part D program violations, while injuring Federal Beneficiaries and their coverage status.  The Part D program violations include, for example, widespread TrOOP (true out-of-pocket costs) manipulation; undermining the negotiated prices of Plan Sponsors under Part D; prolonging the length of time beneficiaries remain in the coverage gap, which is often referred to as the doughnut hole, prior to reaching catastrophic coverage; artificially inflating the co-payments paid by Federal Beneficiaries for covered drugs;  disrupting the coordination of benefits and secondary payer determinations for Federal Beneficiaries by not reporting covered drug transactions to Plan Sponsors and CMS;  pushing Federal Beneficiaries into the coverage gap sooner and prolonging the period of time before they reach catastrophic coverage due to the unreported prescriptions; circumventing Plan Sponsors' drug utilization review and safety of drug interaction edits; and imperiling beneficiaries' Part D eligibility status because of undisclosed coverage.

17.     This Complaint has been filed *in camera* and under seal pursuant to 31 U.S.C. § 3730(b)(2).  It will not be served on Defendant until the Court so orders.  A disclosure of substantially all material evidence and information Relator possesses has been served on the Attorney General of the United States and the United States Attorney for the Southern District of New York pursuant to 31 U.S.C. § 3730(b)(2) and Fed. R. Civ. P. 4.

## II.     JURISDICTION AND VENUE.

18.     This Court possesses subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. §§ 3730 and 3732 because Relator seeks

remedies on behalf of the United States for Defendant's violations of 31 U.S.C. § 3729, some of which occurred in the Southern District of New York, and the Defendant transacts substantial business within the Southern District of New York.

19.     This Court may exercise personal jurisdiction over Defendant under N.Y. C.P.L.R. § 302(a).

20.     This Complaint has been timely filed within the period prescribed by 31 U.S.C. § 3731(b).  The allegations and transactions set forth in this Complaint have not been publicly disclosed prior to filing, in accordance with 31 U.S.C. § 3730(e).

21.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and (c) because the Defendant resides, transacts business, and/or is qualified to do business in this District.  In addition, during the period challenged by this action, Defendant committed the acts proscribed by the False Claims Act in this judicial District.

### III.     PARTIES.

#### A. Plaintiff.

22.     Plaintiff United States of America brings this action by and through its administrative agency, the United States Department of Health and Human Services, Centers for Medicare & Medicaid Services ("CMS"), which is responsible for the administration of all Federal health care programs.  At all times relevant to this Complaint, the United States funded the provision of prescription pharmaceuticals to beneficiaries of the Medicare Part D program administered by CMS.

### B. Relator.

23.     Relator Marc D. Baker graduated from St. John's University, College of Pharmacy, with a Bachelor of Science degree in 1992, and St. John's University, School of Law, with a Juris Doctorate in 1998.  Mr. Baker is a licensed pharmacist in Florida. He worked for Walgreens Pharmacy as a Pharmacy Manager beginning in April 2001 until December 2011.   Throughout his employment with Walgreens, Mr. Baker performed all responsibilities of a Staff Pharmacist, while also overseeing the operations of the Pharmacy department.

24.     By virtue of his position and responsibilities as a Walgreens Pharmacy Manager for more than ten years, and his routine interaction with other Walgreens pharmacies and pharmacists throughout the country, Relator has become aware of Defendant's fraudulent conduct, as alleged herein.   Pursuant to 31 U.S.C. § 3730(e)(4)(B), Mr. Baker is the "original source" of the information given to the United States regarding Defendant's illegal conduct in violation of Federal and State laws.  He has direct and independent knowledge of the allegations set forth herein and states that the information concerning Defendant's misconduct was not disclosed publicly prior to his disclosure to the United States.

### C. Defendant.

25.     Defendant Walgreens, Inc. ("Walgreens") is a nationwide retail pharmacy chain with more than 7,500 retail pharmacy locations in 50 states, the District of Columbia, Puerto Rico, and Guam.  Defendant provides pharmaceuticals for millions of disabled, elderly, and military personnel and their families paid by the United States government.  It receives hundreds of millions of dollars annually in reimbursement for

13

prescriptions under Medicare Part D, Medicaid, Tricare/Champus, and state-based prescription reimbursement programs. Prescription drug sales accounted for more than 65-percent of its sales in 2010.

26.     Defendant has operated under a Corporate Integrity Agreement ("CIA") with the Department of Health and Human Services since 2008 following the settlement of a drug pricing case. The CIA primarily applies to therapeutic interchange programs, but it additionally requires Defendant to have implemented policies and procedures to address the following, among other aspects: (a) "the proper and accurate reimbursement of drugs by the Federal health care programs, including the Maximum Allowable Cost (MAC) programs maintained by states in which Walgreens does business, and the Federal Upper Limit (FUL) program maintained by CMS"; and (b) "engaging an independent review organization to assess and evaluate Walgreens' reimbursement from and compliance with the requirements of the Federal health care program requirements (Government Reimbursement Review)."

27.     Defendant operates as a contracted network pharmacy for numerous Part D Plan Sponsors to provide covered Part D drugs to Part D enrollees. 42 C.F.R. § 423.100. Upon filling a prescription for a Federal Beneficiary, Defendant bills Medicare or the third-party payer. For prescriptions reimbursed by Medicare, either in whole or in part, Defendant collects any required co-payment from the Federal Beneficiary and seeks reimbursement for the remaining cost from the government.

28.     Defendant is organized and existing under the laws of Illinois with its principal place of business located at 200 Wilmot Road, Deerfield, Illinois 60015. It may

14

be served through its registered agent, Illinois Corporation Service Company, at 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

    **IV.**    **THE LAW.**

      **A. The False Claims Act.**

    29.    The False Claims Act, 31 U.S.C. §§ 3729-3733, provides, *inter alia*, that any person who (1) knowingly presents, or causes to be presented, to the United States a false or fraudulent claim for payment or approval; (2) knowing makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim made to the United States; or (3) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States for a civil money penalty plus treble damages. 31 U.S.C. § 3729(a)(1)(A)-(B), (G).

    30.    The False Claims Act also provides that any person who conspires to violate any provision of the Act is liable to the United States for a civil money penalty plus treble damages. 31 U.S.C. § 3729(a)(1)(C).

    31.    The terms "knowing" and "knowingly" are defined to mean "that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A)(i)-(iii). These terms "require no proof of specific intent to defraud." 31 U.S.C. § 3729(b)(1)(B).

32.    The term "claim" is defined to mean "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (1) is presented to an officer, employee, or agent of the United States; or (2) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (a) provides or has provided any portion of the money or property requested or demanded; or (b) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . ." 31 U.S.C. § 3729(b)(2)(A)(i)-(ii).

33.    The term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.   31 U.S.C. § 3729(b)(4).

### B. Anti-Kickback Statute.

34.    Defendant has offered and provided unlawful remuneration to Federal Beneficiaries with the intention of steering or inducing self-referrals of the Federal Beneficiaries' Federal payer business exclusively to its stores.   Relator alleges that Defendant knowingly solicited and provided "remuneration" (*i.e.*, 10-percent cash discounts and discounted drug prices) to a "person" (Federal Beneficiaries) to induce them to "refer" their covered Part D prescriptions exclusively to its stores.

16

35.     The Social Security Act, 42 U.S.C. § 1320a-7a(a)(5) prohibits pharmacies from offering remuneration[2] to a Federal Beneficiary with the intention of inducing the referral of business that is paid for by a Federal healthcare program in whole or in part.

36.     The Medicare and Medicaid Patient Protection Act of 1987, 42 U.S.C. § 1320a-7b(b) ("Anti-Kickback Statute"), provides criminal penalties of no more than $25,000 or five years in jail or both for the following:

> (1) whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind—
>
>> (A)     in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program. . . .
>>
>> (B)     in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program
>
> * * *
>
> (2) whoever knowingly and willfully offers and pays any remuneration (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—
>
>> (A)     to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

---

[2]     The Social Security Act, 42 U.S.C. § 1320a-7a(a)(5), prohibits the offering or transfer of "remuneration", which has been interpreted to mean "anything of value." Office of Inspector General, Special Advisory Bulletin, "Offering Gifts and Other Inducements to Beneficiaries," 67 Fed. Reg. 55,855 (Aug. 30, 2002) (hereinafter "OIG Special Advisory").

> (B)      to purchase, lease, order, or arrange for or recommend purchasing purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program.

42 U.S.C. § 1320a-7b(b).

37.     A "federal health care program" is defined at 42 U.S.C. § 1320a-7b(f) as any plan or program providing health benefits funded, whether directly or indirectly, by the United States Government.  Under Federal case law, the Anti-Kickback Statute is violated if even "one purpose" of a discount is in exchange for or to induce the referral of patients or to order or purchase items or services.

38.     The Anti-Kickback Statute applies to the sale of covered Medicare Part D prescription drugs to Federal Beneficiaries.  The statute, as interpreted by OIG, bars the offering of remuneration to Federal Beneficiaries where the person offering the remuneration knows or should know that the remuneration is likely to influence the beneficiary to order or receive items or services from a particular provider.  The "should know" standard is met when a provider acts with deliberate ignorance or reckless disregard, and there is no need to provide specific intent.   42 C.F.R. § 1003.101. According to OIG's Special Advisory:

> The "inducement" element of the offense is met by any offer of valuable (i.e., not inexpensive) goods and services as part of a marketing or promotional activity, regardless of whether the marketing or promotional activity is active or passive. For example, even if a provider does not directly advertise or promote the availability of a benefit to beneficiaries, there may be indirect marketing or promotional efforts or informal channels of information dissemination, such as "word of mouth" promotion by practitioners or patient support groups. In addition, the OIG considers the provision of free goods or services to existing customers who have an ongoing relationship with a provider likely to influence those customers' future purchases.

18

39.     Federal regulations identify narrow "safe harbors" from Anti-Kickback Statute liability. There are 10 statutory safe harbor provisions, 42 U.S.C. § 1320a-7b(b)(3)(A)-(J), and 25 regulatory safe harbors, 42 C.F.R. § 1001.952(a)-(y).  No safe harbor applies to the conduct alleged herein.

40.     A kickback in violation of the Anti-Kickback Statute violates the FCA. The Patient Protection and Affordability Care Act ("PPACA"), Pub. L. No. 111-148, 124 Stat. 119 (H.R. 3590), which was signed into law on March 23, 2010, specifically makes a violation of the Anti-Kickback Statute actionable under the FCA.  PPACA amended the Anti-Kickback Statute to provide that a "claim that includes items or services resulting from a violation [of the Anti-Kickback Statute] constitutes a false or fraudulent claim" under FCA.  H.R. 3590, § 6402(f)(1).  Moreover, it also clarified that actual knowledge of the Anti-Kickback Statute or specific intent to commit an Anti-Kickback Statute violation is not required for liability.  H.R. 3590, § 6402(f)(2).

## V.     MEDICARE PART D AND OTHER FEDERAL PAYER PROGRAMS.

### A.  Medicare Part D Requirements.

41.     Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.* established Health Insurance for the Aged and Disabled Program ("Medicare").  The Secretary of the United States Department of Health and Human Services ("HHS") administers Medicare through CMS.

42.     The Medicare Program is composed of several parts.  Medicare Part A provides basic insurance for the costs of hospitalization and post-hospitalization care.  42 U.S.C. § 1395c.  Medicare Part B is a federally subsidized, voluntary insurance program

that covers certain non-hospital medical services and products.  42 U.S.C. §§ 1395(k), 1395(I), and 1395(s).  Medicare Part D was added to the Medicare laws with the Medicare Prescription Drug, Improvement and Modernization Act of 2003.  42 U.S.C. §1395w (effective 2006).  Part D provides voluntary prescription drug benefits for qualified seniors and disabled persons.  On January 28, 2005, CMS published a final rule to implement the Part D program.  Medicare Program, Medicare Prescription Drug Benefit, 70 Fed. Reg. 4193 (Jan. 28, 2005) ("Final Rule").

43.  Prior to the implementation of Part D, Medicare permitted Federal Beneficiaries to enroll in a Medicare-approved discount card program from May 2004 through December 2005.  Effective January 1, 2006, Part D provided all Federal Beneficiaries with subsidized drug coverage and reimbursement for prescription drugs dispensed on an outpatient basis.  Any individual entitled to coverage under Part A or enrolled in Part B are eligible to obtain Part D coverage.  42 U.S.C. § 1395w-101.  In 2007 alone, CMS spent over $49 billion in Part D expenditures.  By January 2008, over 25 million Federal Beneficiaries had enrolled in the Part D program.

44.  Part D coverage is voluntary.  Part D coverage includes all covered Part D drugs, which are defined as "(A) a drug that may be dispensed only upon a prescription and that is described in subparagraph (A)(i), (A)(ii), or (A)(iii) of section 1927(k)(2); or (B) a biological product described in clauses (i) through (iii) of subparagraph (B) of such section or insulin described in subparagraph (C) of such section and medical supplies associated with the injection of insulin (as defined in regulations of the Secretary), and such term includes a vaccine licensed under section 351 of the Public Health Service Act (and, for vaccinations administered on or after January 1, 2008, its administration) and

20

any use of a covered part D drug for a medically accepted indication (as defined in paragraph (4))." 42 U.S.C. § 1395w-102(e).

45.     Federal Beneficiaries who elect Part D coverage must enroll in a qualified prescription drug plan ("PDP") or an existing Medicare Advantage ("MA") plan with prescription drug coverage ("MA-PD"). Part D coverage is administered through the plans, and each plan must enter into a contract with CMS to provide Part D covered drugs. Under Part D, CMS contracts for and subsidizes insurance plans offered by PDP sponsors and MA organizations (collectively, "Plan Sponsors"). To qualify for CMS payments under Medicare Part D, CMS requires Plan Sponsors to go through an application process, certify compliance with laws and regulations governing Part D in its contracts and bids, and meet stated reporting requirements. 42 C.F.R. §§ 423.504.

46.     Part D Plan Sponsors must certify compliance with "Federal laws and regulations designed to prevent fraud, waste, and abuse, including, but not limited to applicable provisions of criminal law, the False Claims Act (31 U.S.C. § 3729 *et seq.*), and the anti-kickback statute (section 1128B(b) of the Act)." 42 C.F.R. § 423.505(h).

47.     CMS also requires downstream entities and providers, including contract pharmacies, that provide healthcare goods and services to Federal Beneficiaries under Part D to certify that "any services or other activity performed . . . in accordance with a contract or written agreement are consistent and comply with the Part D sponsor's contractual obligations," and that they have complied with "all applicable Federal laws, regulations, and CMS instructions." 42 C.F.R. § 423.505(i)(3)(iii) and (v).

48.     CMS pays Plan Sponsors in the form of advance monthly payments (consisting of the Plan Sponsor's standardized bid, risk adjusted for health status, minus

21

the beneficiary monthly premium), estimated reinsurance subsidies, estimated low-income subsidies (low-income cost sharing and premiums), and estimated gap discount payments. After the end of the payment year, CMS reconciles the actual amounts of low-income cost sharing subsidies, reinsurance amounts, and gap discount amounts reported against the amount paid as a part of the prospective monthly payments. Risk sharing amounts (if applicable) are determined after all other reconciliations have been completed.

49. Plan Sponsors negotiate prices directly with drug manufacturers, wholesalers, and pharmacies for covered Part D drugs. Federal Beneficiaries enrolled in Part D typically obtain prescription drugs from pharmacies, such as those operated by Defendant. Pharmacy reimbursement under Part D is based on the lower of (a) the negotiated price for a covered drug agreed upon by the Plan Sponsor and the pharmacy, or (b) the pharmacy's usual and customary price for the drug.

50. The Final Rule published on January 28, 2005 defined negotiated prices as "prices for covered Part D drugs that – (1) Are available to beneficiaries at the point of sale at network pharmacies; (2) Are reduced by those discounts, direct and indirect subsidies, rebates, other price concessions, and direct or indirect remunerations that the Part D sponsor has elected to pass through to Part D enrollees at the point of sale; and (3) Includes any dispensing fees." 70 Fed. Reg. 4194, 4534 (Jan. 28, 2005) (codified at 42 C.F.R. 423.100 (Oct. 1, 2005)).

51. On October 1, 2009, CMS revised the definition of "negotiated prices" to "prices for covered Part D drugs that (1) The Part D sponsor . . . and the network dispensing pharmacy . . . have negotiated as the amount such network entity will receive,

in total, for a particular drug; (2) Are reduced by those discounts, direct or indirect subsidies, rebates, and other price concessions, and direct or indirect remuneration that the Part D sponsor has elected to pass through to Part D enrollees at the point of sale; and (3) Includes any dispensing fees." 42 C.F.R. § 423.100 (Oct. 1, 2009). The reason for the change was "to ensure that negotiated prices are based upon the actual drug price paid at the point-of-sale and do not include any of the administrative fees paid by Part D sponsors to their intermediary contracting organizations because higher negotiated prices advance beneficiaries through the phases of the Part D benefit more quickly such that a greater number of beneficiaries reach the coverage gap phase of the benefit." 74 Fed. Reg. 1494, 1505 (Jan. 12, 2009). The definition of "negotiated prices" has not changed since October 1, 2009. *See* 42 C.F.R. 423.100 (Oct. 1, 2010).

52.    CMS requires Plan Sponsors to make available uniform negotiated prices to all beneficiaries "for a particular covered Part D drug when purchased from the same pharmacy. In other words, the negotiated price for a particular covered Part D drug purchased at a particular pharmacy must always be the same regardless of what phase of the Part D benefit an enrollee is in." Prescription Drug Benefit Manual, Ch. 5: Benefits and Beneficiary Protections, at 20.6.

> **1. CMS Limits Pharmacy Reimbursement for Covered Part D Drugs to the Lower of the Negotiated Price or the Usual and Customary Price at the Point of Sale.**

53.    Under Part D, Plan Sponsors are required to reimburse network retail pharmacies at the *lower* of (a) the negotiated price or (b) the contracting pharmacy's usual and customary price for the Part D covered drug at the point of sale. Since 2005, CMS repeatedly emphasized this requirement as it relates to retail pharmacies.

54.     CMS's Final Rule implementing the Medicare Prescription Drug Benefit states that "we anticipate posting the maximum negotiated prices for prescription drugs on the website with the understanding that beneficiaries will pay the lower of the negotiated or usual and customary price at the point of sale." 70 Fed. Reg. 4194, 4219 (Jan. 28, 2005).

55.     On October 11, 2006, CMS issued written instructions to all Part D Plan Sponsors concerning Medicare's policy with respect to one-time lower cash prices offered to Federal Beneficiaries during a coverage gap where the beneficiary is responsible for 100 percent cost-sharing. It stated that:

> Although we expect it to happen rarely, an individual may be able to obtain a lower price at a network pharmacy than that which his or her plan charges (the plan's negotiated price) in any applicable coverage gap or deductible. This may be possible if the pharmacy is offering a "special" price or other discount for all customers, or if the beneficiary is using a discount card, and the beneficiary is in any applicable coverage gap or deductible phase of his or her Part D benefit and is able to receive a better cash price for a covered Part D drug at a network pharmacy than the plan offers via its negotiated price. In this situation, he or she may purchase that covered Part D drug without using his or her Part D benefit or a supplemental card. The enrollee's purchase price for the discounted drug will count toward total drug spend under his or her Part D benefit and TrOOP balance provided the Part D plan finds out about it.

CMS Lower Cash Price Policy, at 1 (Oct. 11, 2006).

56.     The CMS instruction makes clear that the lower cash price policy does not apply where a pharmacy offers a lower price throughout a benefit year. A pharmacy that offers Federal Beneficiaries a lower price throughout the benefit year establishes a "usual and customary" price that automatically takes the place of the higher negotiated price, and Plan Sponsors will reimburse claims based on the lower "usual and customary" price.

CMS specifically applied the reimbursement instruction to Wal-Mart's $4 Prescription Program:

> We note that in cases where a pharmacy offers a lower price to its customers throughout a benefit year, this would not constitute a "lower cash price" situation that is the subject of this guidance. For example, Wal-Mart recently introduced a program offering a reduced price for certain generics to its customers. The low Wal-Mart price on these specific generic drugs is considered Wal-Mart's "usual and customary" price, and is not considered a one-time "lower cash" price. Part D sponsors consider this lower amount to be "usual and customary" and will reimburse Wal-Mart on the basis of this price. To illustrate, suppose a Plan's usual negotiated price for a specific drug is $10 with a beneficiary copay of 25% for a generic drug. Suppose Wal-Mart offers the same generic drug throughout the benefit for $4. The Plan considers the $4 to take the place of the $10 negotiated price. The $4 is not considered a lower cash price, because it is not a one-time special price. The Plan will adjudicate Wal-Mart's claim for $4 and the beneficiary will pay only a $1 copay, rather than a $2.50 copay. This means that both the Plan and the beneficiary are benefiting from the Wal-Mart "usual and customary" price, and the discounted Wal-Mart price of the drug is actually offered within the Plan's Part D benefit design. Therefore, the beneficiary can access this discount at any point in the benefit year, the claim will be adjudicated through the Plan's systems, and the beneficiary will not need to send documentation to the plan to have the lower cash price count toward TrOOP.

CMS Lower Cash Price Policy, n.1 (Oct. 11, 2006).

57. On or about December 15, 2006, CMS released the final chapter for the Prescription Drug Benefit Manual on the Coordination of Benefits, which incorporated verbatim the CMS reimbursement instruction set forth above. In it, CMS cautioned entities offering discount card or other discounted drug pricing arrangements, as alleged herein against Defendant, to comply with all relevant fraud and abuse laws, including, when applicable, the Federal anti-kickback statute and the civil monetary penalty law prohibiting inducements to beneficiaries. Medicare Prescription Drug Benefit Manual,

25

Ch. 14, at 50.4.2 n.2 (published 2006). CMS's reimbursement instruction for Part D has been in effect since 2006 and is unchanged. Medicare Prescription Drug Benefit Manual, Ch. 14, at 50.4.2 n.2 (Rev. 12, Mar. 19, 2010).

58.     In a related context, the final rule for the Discount Drug Card and Transitional Assistance Program requires "network . . . pharmacies [to] provide *the lower of the negotiated price or usual and customary price* when a covered discount card drug for a negotiated price is available at the point of sale." 42 C.F.R. § 403.806(d)(7) (emphasis added). *See* 42 C.F.R. § 403.802 (defining a "covered discount drug card drug" as, among other things, "a drug that may be dispensed only upon a prescription . . .").

59.     These and other CMS authorities establish that, since 2005, Part D implementing regulations and CMS's reimbursement instructions permit a contracted pharmacy to sell covered Part D drugs to Federal Beneficiaries at prices lower than the negotiated prices of Plan Sponsors. The pharmacy establishes a "usual and customary" price for the covered drug if offered throughout the benefit year, and the pharmacy's reimbursement cannot exceed the lower usual and customary price.

### 2. Defendant Required Pharmacies Enrolled in Its Pharmacy Benefit Management Company to Adhere to CMS's Part D Reimbursement Policy.

60.     Defendant's wholly-owned pharmacy benefit management company, Walgreens Health Initiatives, Inc. ("WHI"), expressly recognized and required contracted network pharmacies to limit reimbursement for covered Part D drugs to the lower of the negotiated/contract price or usual and customary pricing at the point of sale. This requirement purportedly applied to all contracted pharmacies, including Defendant's

retail locations. Based on Relator's experience, Defendant's pharmacies never complied with this requirement.

61.     As documented by the WHI Pharmacy Manual, Defendant knew in December 2006 that reimbursement for covered Part D drugs was limited to the lower of the negotiated price or the pharmacy's usual and customary price available to Federal Beneficiaries.  The WHI Pharmacy Manual, dated December 8, 2005, identifies as a program specification of participating pharmacies:

   **C.     Reimbursement**

   *     *     *

   **4.     Network Participating in Medicare Programs**

   *     *     *

   (b)     During the term of WHI Medicare Part D Plans, effective January 1, 2006 or the date that any WHI Part D Plan begins operation, Network pharmacies will dispense Covered Part D Drugs (as defined in 42 C.F.R. §423.100) to Medicare Enrollees in accord with the terms and conditions of this Manual and Pharmacy Network Agreement and will be monitored by WHI and the applicable WHI Part D Plan Sponsor on an ongoing basis.

62.     Under the heading "General Claim Submission Information," the WHI Pharmacy manual states:

   **A.     Submission of Prescription Claims**

   *     *     *

   6.     Medicare Discount Drug Card.   For each Prescription Order for Covered Discount Card Drugs dispensed to Medicare Enrollees, participating pharmacies will charge Medicare

Enrollees the prescription charge specified through the POS System (the "Medicare Prescription Charge"). The Medicare Prescription Charge will be one hundred percent (100%) of the negotiated rate agreed upon in writing by the parties, reduced by any applicable manufacturer rebates and any applicable Transitional Assistance Funds. **The Medicare Prescription Charge will be the lower of the negotiated rate or usual and customary price when a Covered Discount Card Drug subject to a negotiated rate is available at the point of sale. For Products and Services Inside the Scope of Endorsement, participating pharmacies will not charge Medicare Enrollees any fees in addition to the applicable Prescription Charge.**

7. Medicare Part D. For each Prescription Order for Covered Part D Drugs dispensed to Medicare Enrollees pursuant to this Agreement, Pharmacy will charge Medicare Enrollees, including Medicare Subsidy Eligible Individuals, the correct Cost Sharing Amount specified through the POS. As specified through the POS, the Cost Sharing Amount will be one hundred percent (100%) of the Prescription Charge, reduced by any applicable Part D Plan Payment. Claims submitted by Pharmacy for reimbursement of Part D Plan Payments and any rebates the applicable WHI Part D Plan elects to pass to the beneficiary at the point of sale, if any, will be paid by WHI in accordance with the payment terms set forth in the Pharmacy Network Agreement. **As specified through the POS, at the point of sale both the Cost Sharing Amount and the Part D Plan Payment will be calculated using the lower of the negotiated rate and Pharmacy's usual and customary price and the terms and conditions set forth in the Pharmacy Network Agreement.** At the point of sale, Pharmacy will inform Medicare Enrollees of any differential between the price of a prescribed Covered Part D Drug and the price of the lowest priced generic Covered Part D Drug that is therapeutically equivalent and bioequivalent and available at the Pharmacy location. Pharmacy will comply with

28

standards for pharmacy practice as established by the State in which each Pharmacy is located.

8. In no event shall Pharmacy bill, charge, collect a deposit from, have any recourse against, or otherwise seek payment from any Medicare Enrollee for any Prescription Charge, other than the Cost Sharing Amount, returned checks and collections costs, and any similar fees in accordance with applicable laws, including as required under 42 CRF 423.505(g)(i).

63. Under the heading "Pricing," the WHI Pharmacy Manual states:

2. Medicare. As specified through the POS System,[3] at the point of sale: (i) the Medicare Prescription Charge will be the lower of the negotiated rate and Pharmacy's usual and customary price;

64. An earlier version of the WHI Pharmacy Manual, effective 2003, did not include these reimbursement limitations for Part D. Later versions of the WHI Pharmacy Manual, including the 2011 version, excludes this language, but requires participating network pharmacies to report their usual and customary price for covered Part D drugs in NCPDP Standard Universal Claim Forms submitted to WHI, the claims processor for the drugs.

**B. Other Federal Payers Programs.**

65. The Federal government also provides reimbursement for medical care under other health care programs.

66. The Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS") (presently entitled "TRICARE"), 10 U.S.C. §§ 1071-1106, is a federally-

---

[3] The WHI Manual defines "POS System" as "the on-line or real time point-of-sale telecommunication system used to communicate information regarding Covered Drugs, Eligible Members, claims, drug utilization, Copayments, or other amounts to be collected from an Eligible Member by Pharmacy and the amounts payable to Pharmacy."

29

funded program administered by the Department of Defense. TRICARE/CHAMPUS provides medical benefits to certain active duty service members and their spouses and unmarried children, certain retired service members and their spouses and unmarried children, and reservists called to duty and their spouses and unmarried children. 32 C.F.R. § 199 *et seq.* TRICARE pays for its beneficiaries' medical procedures alleged herein.

67. CHAMPVA is a healthcare program administered by the United States Department of Veterans Affairs for families of veterans with 100-percent service-connected disabilities. CHAMPVA pays for its beneficiaries' medical procedures alleged herein.

68. The Federal Employees Health Benefits Program ("FEHBP") provides health care coverage for qualified federal employees and their dependants. FEHBP pays for its beneficiaries' medical procedures alleged herein.

## VI. DEFENDANT'S WRONGFUL CONDUCT.

69. Relator Marc D. Baker is a licensed pharmacist in the State of Florida. He worked for Defendant as a Pharmacy Manager from April 2001 until December 2011. Throughout his employment with Defendant, Mr. Baker performed the responsibilities of a Staff Pharmacist, such as processing and verifying prescriptions, managing patient information, and patient consultations.

70. By virtue of his position and responsibilities with Defendant as a Pharmacy Manager for more than ten years, Relator was ideally situated to investigate and uncover the fraudulent conduct alleged in the Complaint. As a Pharmacy Manager, he routinely interacted with staff pharmacists and managers in the Walgreens community.

and has personal knowledge of the way in which defendant's pharmacies operate. Based on his experience, Relator has personal knowledge that Defendant has uniform operating procedures for its retail pharmacies nationwide. Defendant's pharmacies also use the same computer systems (StoreNet and Intercom Plus) to process transactions. This has conferred upon Relator direct and independent knowledge of Defendant's fraudulent conduct as to specific patients and has enabled him to discover and investigate the systemic and illegal practices of Defendant, as alleged herein.

### A. Defendant's PSC Program.

71.     On January 1, 2006, Medicare Part D coverage went into effect, making tens of millions of Federal Beneficiaries eligible for prescription drug coverage under Part D. A significant percentage of these Federal Beneficiaries were existing customers of Defendant's stores, and Defendant sought to retain their business as a network pharmacy chain accepting Part D plans.

72.     In September 2006, Wal-Mart, a key competitor of Defendant, launched a $4 Prescription Program, a deeply discounted generic drug program offered directly to Federal Beneficiaries for Part D covered drugs at prices substantially lower than the negotiated prices available at Defendant's stores. Wal-Mart's $4 Prescription Program was launched in Tampa, Florida and, within months, expanded to 49 states. Wal-Mart's formulary of low-priced generics, which initially included approximately 140 drugs (totaling more than 300 formulations), was matched by Target and partially by Kmart (which offers 90-day supplies at $15). Many non-pharmacy chains, which were able to absorb lower generic margins because pharmacy sales represent a low percentage of their total sales and gross profits, followed suit.

31

73.     Wal-Mart's $4 Prescription Program offers all pharmacy customers, including those with private insurance, Federal payer insurance, and the uninsured, a 30-day supply of commonly prescribed generic drugs for $4, and a 90-day supply for $10. According to Wal-Mart, all insurance plans, including Federal payers, are accepted and customers need not fill out any additional paperwork.  Wal-Mart's Fact Sheet states:

            a.      "Especially important to the Medicare recipients, the $4 generic prescription program will help alleviate a major challenge for those who have fallen into the coverage gap in their Medicare Part D prescription drug plans, also known as the 'doughnut hole.'  These seniors now find themselves responsible for paying 100 percent of prescription drug costs between $2,250 and $5,100."

            b.      "We estimate that the program will save state Medicaid programs hundreds of thousands of dollars annually."

            c.      "Medicaid patients will see no change with this program.   Their co-pays will remain the same, and there will be savings to the state and taxpayers."

74.     Unwilling to absorb reduced margins on its generic drugs, Defendant initially refused to price match Wal-Mart.  Defendant issued a "Statement on Wal-Mart's Promotion Drug Pricing" in October 2006, declaring that it would not match Wal-Mart's promotion.  Defendant's Statement professed that "Seniors covered under Medicare Part D prescription insurance on average will pay more at Wal-Mart for these medications than they would at Walgreens."  Following the issuance of the Statement, Defendant's stock dropped 11-percent.

32

75.     Concerned with the loss of pharmacy business, which historically accounts for 65-percent of Defendant's annual sales, as well as in-store traffic, Defendant developed the Prescription Savings Club Program ("PSC Program"), which it test-marketed in late-2006 and launched in the fall of 2007.

76.     The PSC Program is a non-networked discount prescription buying program with discounts on more than 8,000 brand-name and generic medications. Enrollment is on an annual basis in the amount of $20 for an individual, or $35 for a family.  To obtain the benefits of the Program, *e.g.*, discounts on cash prices and low cost prescription drugs, customers must use the card at Defendant's stores.[4]

77.     PSC Program members receive discounts and rebates on formulary drugs, seasonal flu vaccinations, and nebulizer devices and related supplies.  PSC members receive 90-day supplies of more than 400 generic drugs for $12, discounts on prescriptions drugs, discounts on pet medications, and 10-percent cash discounts on all purchases of Walgreens-branded products, such as over-the-counter medications, baby care, household items, consumables, and photofinishing.  The drug savings depend on the number of prescriptions, the days supply (for example, 30 day supply versus 90 day supply), and whether the drug is brand or generic.  Defendant corporate documents state that the average savings on a purchase of a 90-day supply of a generic drug purchased at $12 is $44.71, and the average savings for commonly prescribed quantities of branded drugs is $22.71.  Defendant states that the overall savings for a 30-day supply is 5.3-

---

[4]     Eligible pharmacies include Duane Reade, a pharmacy chain in metropolitan New York owned by Defendant with more than 253 stores in commercial and residential neighborhoods throughout New York.

percent for generic drugs and 16.8-percent for generics; and the overall average savings for a 90-day supply is 5.3-percent for brand name drugs and 26-percent for generics.

78. Defendant's internal documents acknowledge that enrolling Federal Beneficiaries in the PSC Program would (a) violate CMS guidelines prohibiting pharmacies from offering a non-networked discount program to Federal Beneficiaries as an incentive to purchase covered Part D drugs at its stores and (b) require Defendant to reduce the Part D reimbursement prices negotiated with Part D Plan Sponsors to the lower usual and customary prices established by its PSC Program. For example, a May 19, 2011 e-mail from Rebecca Sieracki, Defendant's Customer Service Representative for Card Programs, stated:

> ***CMS (Centers for Medicare/Medicaid Services) has strict guidelines that prohibit their members from receiving discounts from a non-networked discount/rebate program. Since our program is valid only at Walgreen's pharmacies, we would be violating those guidelines.*** Therefore, we as a retailer must be careful without programs to prevent potential legal issues with CMS. When a person receives a public benefit (such as Medicare Part A, B, or D) she falls into a different category of patient, one where we may not offer her incentives to shop in our store.

79. From the inception of the Program, Defendant has knowingly, intentionally, and aggressively marketed the PSC Program to Federal Beneficiaries, millions of whom have been wrongfully enrolled. By targeting and enrolling Federal Beneficiaries in the PSC Program, Defendant has steered their Federal payer prescription business exclusively to its pharmacies.

80.     There are 2.5 million active PSC Program memberships.  This number excludes former and canceled memberships,[5] Defendant's employees (approximately 244,000), and individuals enrolled under a family membership.  Based on Relator's direct and independent knowledge, including patient information on file at Defendant's stores at the time of enrollment, substantially more than half of the current PSC Program enrollees are Federal Beneficiaries.  A random sample of 100 current PSC Program members evidenced that 58% of enrollees are Federal Beneficiaries.  Since the inception of the PSC Program in 2006, Defendant has knowingly and intentionally enrolled more than 5 million Federal Beneficiaries in the program -- even though the payer/insurance and prescription information on file in Defendant's computer system at time of enrollment confirmed the applicants' status as Federal Beneficiaries.

81.     As a result, Defendant has illegally steered Federal Beneficiaries to its pharmacies to obtain their federal payer program business for prescription drugs paid for exclusively by the United States.  Relator has documented substantial Federal payer prescription sales under the PSC Program tracing to the Federal Beneficiaries.

82.     The Federal Beneficiaries wrongfully enrolled in the PSC Program by Defendant received illegal discounts on prescriptions drug purchases, pet medications, and 10-percent cash discounts on all purchases of Walgreens-branded products (such as over-the-counter medications, baby care, household items, consumables, and photofinishing).  Defendant electronically tracks the discounts for each member enrolled in the PSC Program.  Based on Defendant's marketing representation that the average savings on a purchase of a 90-day supply of a generic drug purchased at $12 is $44.71,

---

[5]     Based on Defendant's data, an average of 35,000 patients enroll in the PSC Program per week (1,800,000 annually) chain-wide.

35

and the average savings for commonly prescribed quantities of branded drugs is $22.71, the average cash discount to individual Federal Beneficiaries attributed just to drug pricing substantially exceeds $50 during the course of a given benefit year. According to CMS, "Medicare beneficiaries have an average of 28 prescriptions in a year, while those beneficiaries who describe themselves to be in poor health have 45 prescriptions in a year. . . .". CMS, Fact Sheet-Final Medicare Part D Data Regulation (CMS-4119-F), n. 1 (May 22, 2008).

**B. Defendant Used Illegal Marketing and Promotional Tactics to Enroll Ineligible Federal Beneficiaries in the PSC Program.**

83.     Defendant trains its employees to market and promote the PSC Program aggressively to patients, including to Federal Beneficiaries, at the point of sale, through promotional events and in advertising. By way of example, Defendant instructs its employees to make the following representations to patients about the PSC Program:

a.      "Good for people of all ages."

b.      "Includes over 7,000 name brand and generic medications in ALL major drug categories and covers health conditions like allergy, antibiotics, antifungal, antiviral treatments, arthritis and pain, asthma and COPD blood pressure and heart health, cholesterol, cough and cold, diabetes, eye care, gastrointestinal health, infectious treatments, mental health, skin conditions, thyroid conditions, vitamins & nutritional health, women's health and more!"

c.      "All generics are included on the PSC formulary."

d.      "Over 400 generics priced at $12 for a 90-day supply. That's less than $1 a week ($12 ÷ 90 [days] x 7 [days in a week] = $.93 a week)."

36

e.      "10% reward on purchases of Walgreens brand products that can be used on future purchases.  Rewards can even be managed online."

f.      "Insulin and diabetes care supplies covered with a prescription."

g.      "Can be used for pets that need prescription medications."

h.      "No medical exams, no exclusions for pre-conditions, no prior authorizations required."

i.      "Can be used at any Walgreens retail pharmacy nationwide."

84.     Defendant also provides its employees with "talking points directed toward patients," including, for example, that if "your insurance does not cover the medications you are currently taking, our new Rx Savings Club may be for you;" that employees should "give your customer the Prescription Savings Price before charging customer cash price.  By giving the lower price first, the customer will have instant interest in the possibility of saving money;" that "[o]ver 400 generic medications are priced at Less than $1 per week for a 3 month supply;" that "[i]n addition to rx savings, this program also allows you to earn a 10% reward on Walgreens brand products – from toothpaste to OTC medications and on some of our photo finishing services;" and that Defendant "can provide you with the savings associated with the medications you are currently taking."

85.     Defendant, by and through its employees, directly solicits Federal Beneficiaries to enroll in the PSC Program in the store when its employees are filling prescriptions under Part D.  When a Federal Beneficiary fills a prescription at one of Defendant's pharmacies, Defendant provides the beneficiary with a leaflet that solicits enrollment in the PSC Program by promoting substantial monetary savings by enrolling

in the program. The following examples illustrate Defendant's direct solicitation of Federal Beneficiaries for enrollment in the PSC Program:

a. On October 18, 2011, Patient 497[6] filled a covered Part D drug (Gabapentin 800 mg Tablets) with prescription number 0102116-09170 at Defendant's retail pharmacy located at 12600 Tamiami Trail, North Port, Florida 34286. Patient 497 paid $342.92 for the prescription, which is Defendant's cash price for the drug. Defendant's patient records for Patient 497 at the time establish that she was a Federal Beneficiary of PDP Sponsor SIMP Medicare Part D. Defendant's computer system generated a code that the refill on the prescription was too soon under the Federal Beneficiary's Part D coverage plan and notifying Patient 497 that the "Prescription Savings Club could save you $144.27" on the prescription if she enrolled.

b. On November 3, 2011, Patient 516 filled a covered Part D drug (Metroprolol ER Succinate 50 mg Tablets) with prescription number 0103473-09170 at the Defendant's retail pharmacy located at 12600 Tamiami Trail, North Port, Florida 34286. Patient 516 paid $104.37 for the prescription, which is Defendant's cash price for the drug. Defendant's patient records for Patient 516 at the time establish that she was a Federal Beneficiary of PDP Sponsor AARP Medicare Part D. Defendant's computer system generated a drug utilization review error code under the Federal Beneficiary's Part D coverage plan and notified Patient 516 that the "Prescription Savings Club could save you $22.40" on the prescription if she enrolled.

---

[6] Patient names, dates of birth, and addresses have been omitted from the patient exemplars included herein.

c.     On October 7, 2011, Patient 483 filled a covered Part D drug (Anagrelide 0.5 mg capsules) with prescription number 0101281-09170 at the Defendant's retail pharmacy located at 12600 Tamiami Trail, North Port, Florida 34286. Patient 483 paid $455.79 for the prescription, which is Defendant's cash price for the drug.  Defendant's patient records for Patient 483 at the time establish that she was a Federal Beneficiary of PDP Sponsor AARP Medicare Part D.  Defendant's computer system generated a drug utilization review error code under the Federal Beneficiary's Part D coverage plan and notified Patient 483 that the "Prescription Savings Club could save you $243.53" on the prescription if she enrolled.

d.     On November 3, 2011, Patient 514 filled a covered Part D drug (Trazodone 100 mg Tablets) with prescription number 0103496-09170 at the Defendant's retail pharmacy located at 12600 Tamiami Trail, North Port, Florida 34286. Patient 514 paid $55.41 for the prescription, which is Defendant's cash price for the drug.  Defendant's patient records for Patient 514 at the time establish that she was a Federal Beneficiary of PDP Sponsor RXAM Medicare Part D.  Defendant's computer system generated a refill too soon code under the Federal Beneficiary's Part D coverage plan and notified Patient 514 that she could "Pay just $12 for a 90-day supply as a Prescription Savings Club member" if she enrolled, and to "Talk to your pharmacist NOW and learn how much you'll SAVE."

e.     On November 3, 2011, Patient 514 filled a covered Part D drug (Bupropion XL 300 mg Tablets) with prescription number 0103494-09170 at the

Defendant's retail pharmacy located at 12600 Tamiami Trail, North Port, Florida 34286. Patient 514 paid $370.77 for the prescription, which is Defendant's cash price for the drug.  Defendant's patient records for Patient 514 at the time establish that she was a Federal Beneficiary of PDP Sponsor RXAM Medicare Part D.  Defendant's computer system generated a refill too soon code under the Federal Beneficiary's Part D coverage plan and notified Patient 514 that the "Prescription Savings Club could save you $12.80!" if she enrolled in the program.

      f.     On November 4, 2011, Patient 509 filled a covered Part D drug (Cialis 20 mg tablets) with prescription number 0103550-09170 at the Defendant's Pharmacy located at 12600 Tamiami Trail, North Port, Florida 34286. Patient 509 paid $97.04 for the prescription, which is Defendant's cash price for the drug.  Defendant's patient records for Patient 509 at the time establish that he was a Federal Beneficiary of Tricare.  Defendant's computer system generated a refill too soon code under the Federal Beneficiary's Tricare coverage plan and notified Patient 509 that the "Prescription Savings Club could save you $5.05!" if he enrolled in the program.

      g.     On May 31, 2011, Patient 526 filled a prescription for Lorazepam 0.5 mg tablets with prescription number 0087180-09170 at the Defendant's retail pharmacy located at 12600 Tamiami Trail, North Port, Florida 34286. Patient 526 paid $16.69 for the prescription, which is Defendant's cash price for the drug. Defendant's patient records at the time establish that Patient 526 was a Federal Beneficiary of PRSB Medicare Part D.  Defendant's computer system generated a

drug not covered code under the Federal Beneficiary's coverage plan and notified Patient 526 that the "Prescription Savings Club could save you $6.72!" if he enrolled in the program.

      h.    On May 31, 2011, Patient 554 filled a prescription for Fluocinonide 0.05% Cream 30GM with prescription number 0093098-09170 at the Defendant's retail pharmacy located at 12600 Tamiami Trail, North Port, Florida 34286. Patient 554 paid $17.99, which is Defendant's cash price for the drug. Defendant's patient records at the time establish that Patient 554 was a Federal Beneficiary of OPTFL Medicare Part D. Defendant's computer system generated a drug not covered code under the Federal Beneficiary's coverage plan and notified Patient 554 that she could "pay just $12 for a 90-day supply as a Prescription Savings Club member."

      i.    On March 18, 2011, Patient 537 filled his prescription for Promethazine DM Syrup with prescription number 0087098-09710 at the Defendant's retail pharmacy located at 12600 Tamiami Trail, North Port, Florida 34286. Patient 537 paid $11.99, which is Defendant's cash price for the drug. Defendant's patient records at the time establish that Patient 537 was a Federal Beneficiary of AARP Medicare Part D. Defendant's computer system generated a drug not covered code under the Federal Beneficiary's coverage plan and notified Patient 537 that the "Prescription Savings Club could save you $2.02!"

      j.    On March 11, 2011, Patient 539 filled her prescription for Lorazepam 1MG Tablets at the Defendant's retail pharmacy for Fluocinonide 0.05% Cream 30GM with prescription number 0085408-09170 at the Defendant's

retail pharmacy located at 12600 Tamiami Trail, North Port, Florida 34286. Patient 539 paid $47.99, which is Defendant's cash price for the drug. Defendant's patient records at the time establish that Patient 539 was a Federal Beneficiary of AARP Medicare Part D. Defendant's computer system generated a drug not covered code under the Federal Beneficiary's coverage plan and notified Patient 539 that the "Prescription Savings Club could save you $30.00!"

      k.     On December 2, 2010, Patient 351 filled his prescription for Clonidine 0.1 MG/24H TS Patches with prescription number 0077284-09170 at the Defendant's retail pharmacy located at 12600 Tamiami Trail, North Port, Florida 34286. Patient 351 paid $86.99, which is Defendant's cash price for the drug. Defendant's patient records at the time establish that Patient 351 was a Federal Beneficiary of WELLC Medicare Part D. Defendant's computer system generated a drug not covered code under the Federal Beneficiary's coverage plan and notified Patient 351 that the "Prescription Savings Club could save you $17.00!"

      l.     On February 10, 2011, Patient 518 filled her prescription for Clonazepam 1MG Tablets with prescription number 0083482-09170 at the Defendant's retail pharmacy located at 12600 Tamiami Trail, North Port, Florida 34286. Patient 518 paid $38.99, which is Defendant's cash price for the drug. Defendant's patient records at the time establish that Patient 518 was a Federal Beneficiary of AARP Medicare Part D. Defendant's computer system generated a drug not covered code under the Federal Beneficiary's coverage plan and notified Patient 518 that the "Prescription Savings Club could save you $16.25!"

### C. The Enrollment Process for Federal Beneficiaries Wrongfully Induced to Join the PSC Program.

86.     PSC Program enrollment is completed by Defendant's pharmacists in person through its two company-wide network computer systems, StoreNet and Intercom Plus. Both computer systems are controlled and maintained by Defendant's corporate division, and provide all of Defendant's pharmacies with access to a nationwide database of patient specific information, including biographical data, prescription histories, and whether the patient is eligible for coverage under a Federal or State government health care program.

87.     Defendant instructs pharmacists to fill out the enrollment application, which asks for customer information, as well as the employee identification number of the employee who encouraged the patient to enroll in the program, and to print out the temporary membership card for the new member. For patients with a prescription, the membership fee is added to the transaction when the pharmacist scans the bar code of the prescription. This prompts the system to ask members to confirm that they do not belong to a "publicly funded program;" confirm whether they would like to receive promotional materials; and to sign the PIN pad. Pharmacists also can locate and update members' information, along with renewing and cancelling memberships.

88.     Patients also can enroll in the PSC program by logging onto Defendant's website at Walgreens.com, which advertises the PSC Program under the heading "Popular Pharmacy Services." Defendant invites patients to "[s]ave on more than 9,000 brand names medications and see available generic equivalents." Upon selecting the PSC Program, patients are directed to membership homepage, which enables users to check

drug prices under the PSC Program and permits members and nonmembers to join or renew a membership.

89.     By clicking the "join now" button, Defendant provides the patient with the option of purchasing an individual membership for $20, a family membership for $35, or to renew a membership at the same prices.  The patient is then required to create an account with Defendant, providing first and last name, date of birth, email address, and password.  After creating an account, the patient is required to provide an address, phone number, gender, and date of birth.  The purpose of requiring a date of birth is to "keep your records complete and provide you with accurate health info."  Defendant provides members with temporary PSC cards, pending receipt of the permanent card through the mail.

### D. Defendant Has Mandatory Enrollment Minimums and Awards Bonuses for Enrolling PSC Program Members, Including Federal Beneficiaries.

90.     Defendant pressures its pharmacists and pharmacist technicians to aggressively promote the PSC Program to ineligible Federal Beneficiaries by, for example, imposing mandatory minimums on each pharmacy location for the number of daily (at least one per day) and weekly enrollments that are expected.  Defendant circulates e-mails to its pharmacies tracking enrollment data for every store within each company-defined District, praising employees and stores that have enrolled the most members, and identifying underperforming locations that fail to meet expected goals.  Examples of such e-mails include the following statements:

      a.     "Just like the vitamin . . . One A Day!!!"

      b.     "Remember 1 a day is all you need!!!"

c. "Remember all you need is one a day to stay in the GREEN!!!!"

91. Defendant keeps a running tally of the number of PSC Program enrollments – by store, district, operation, and chain – on a daily and weekly basis, and circulates e-mails to each of its pharmacies. For example, on September 7, 2011, the email recounting the daily tally in District 53 (Relator's former district) stated: "Thank you to our top 4 stores and the 8 that made goal. The rest of us (and I'm one of us) need to have a chat with the pharmacy staff." The e-mails exhort staff to market the PSC Program and single out specific pharmacies that fail to meet the mandatory minimums for enrollment. For example, one such e-mail stated that "[t]his is a really hard month, I hope you are all trying new ways to sell. . . . Check with your pharmacy staff to make sure they are promoting the card."

92. Defendant targets store and pharmacy managers who fail to meet PSC Program mandatory enrollment minimums. Defendant requires pharmacy managers at these stores to attend a District wide conference call to explain the reasons why the mandatory minimum was not met. Relator's store, Store Number 9170, was routinely identified in company e-mails as failing to meet mandatory enrollment minimums because the store has a high level of Federal Beneficiaries due to its location, and Relator refused to promote the PSC Program to them. Relator was required to participate in the conference calls.

93. As the daily and weekly tallies show, Defendant routinely enrolls more than 5,000 new members each day and over 30,000 new members each week. For example, Defendant reportedly enrolled 5,031 new members on April 19, 2011; 5,062 new members on April 20, 2011; 5,073 new members on April 25, 2011; 5,035 new

members on May 2, 2011; 5,142 new members on May 3, 2011; 5,004 new members on May 4, 2011; 5,087 new members on May 9, 2011; 5,087 new members on May 9, 2011; 5,071 new members on May 10, 2011; and 5,036 new members on May 11, 2011. Examples of Walgreens weekly totals include, 31,301 new members for the week ending April 23, 2011; 31,306 new members for the week ending May 7, 2011; 31,381 new members for the week ending May 14, 2011; and 31,417 new members for the week ending May 28, 2011. Aggregate store, district, and chain data on PSC Program enrollments was circulated via email to each pharmacy.

94. In addition to daily and weekly mandatory enrollment minimums, Defendant pays bonuses to its employees based on the number of patients, including Federal Beneficiaries, enrolled in the PSC Program. For pharmacists, Defendant focuses on PSC program enrollments as one of the key factors in determining a pharmacist's annual compensation (bonus). For technicians, Defendant awards bonuses (referred to as "PM Dollars") in the amount of $1 per each new enrollment. Technician bonuses are tallied and circulated on a weekly basis by email to each pharmacy. Defendant has paid an average of $17,000 to its employees in weekly bonuses, and over $1,000,000 annually in bonuses for PSC Program enrollments. Examples of weekly technician bonuses include the following:

        a. For the week ending April 23, 2011, Defendant awarded its technicians $17,235 in bonuses for PSC program enrollments.

        b. For the week ending May 7, 2011, Defendant awarded its technicians $17,242 in bonuses for PSC program enrollments.

c.      For the week ending May 14, 2011, Defendant awarded its technicians $17,332 in bonuses for PSC program enrollments.

d.      For the week ending May 21, 2011, Defendant awarded its technicians $17,260 in bonuses for PSC program enrollments.

e.      For the week ending May 28, 2011, Defendant awarded its technicians $16,966 in bonuses for PSC program enrollments.

f.      For the week ending August 20, 2011, Defendant awarded its technicians $17,537 in bonuses for PSC program enrollments.

**E. Defendant Failed to Use Patient Screening Programs Available on its Nationwide Computer Network to Block Federal Beneficiaries.**

95.      Defendant's nationwide computer network system has patient screening programs in place and available to all retail pharmacy locations to identify and prevent duplicative coverage for Federal Beneficiaries, as required by Part D.  Defendant's screening programs are operationally capable of identifying and preventing Federal Beneficiaries from enrolling in the PSC Program.  The computer programs are also capable of preventing Defendant from submitting false claims to Plan Sponsors for payment of covered Part D drugs purchased by Federal Beneficiaries at the high negotiated prices, instead of Defendant's lower usual and customary prices.  In order to facilitate enrollment by Federal Beneficiaries in the PSC Program, Defendant failed to use these computer screening programs.

96.      Intercom Plus is a computer system that networks each of Defendant's pharmacies throughout the United States with its central servers.  Defendant regularly uses Intercom Plus to impose patient chart consultation blocks (also referred to as "CAP Blocks"), which Defendant creates at a network server level.  Defendant has the ability to

search patient files in Intercom Plus for specific information, including primary insurance or age, and impose a CAP Block on patients that satisfy the given criteria. The CAP Block prevents Defendant's pharmacists from completing the sale of covered Part D drugs, absent a manual override.

97.     Defendant routinely utilizes CAP Blocks to target patients for specific actions by pharmacists, including, for example, the imposition of CAP Blocks on patient files to identify patients that are turning 65-years-old to solicit them for Medicare Part D enrollment. Defendant has stated that:

> All patients who are 64.9 years old will receive a CAP block to offer a Medicare Part D session. These patients have the opportunity to choose their first MPD plan (rather than choose to "switch") and with our help, can choose a plan that includes Walgreens in the network.
>
> **Hello Mr./Mrs.---I'm ____ your pharmacist X. I see that you have a birthday coming up and will be eligible for Medicare Part D. We are conducting Medicare Part D review sessions after October 15th, would you like me to schedule a session? The sessions take about 20 minutes.**

98.     Defendant's computer system is readily capable of preventing pharmacists from selling Federal Beneficiaries covered Part D drugs under the PSC Program by using CAP Blocking. Defendant knowingly and intentionally enrolled and sold covered Part D drugs to Federal Beneficiaries in the PSC Program, but has refused to use these computer screening tools to prevent the illegal enrollments.

**F. Defendant Knowingly Violated the Anti-Kickback Statute by Steering Federal Beneficiaries Exclusively to Its Pharmacies and Ignored Relator's Concerns.**

99.     Relator participated in internal meetings and conversations that illustrate Defendant's knowledge and willful ignorance of its unlawful conduct in promoting the

PSC program to Federal Beneficiaries and enrolling them in it. The conversations between Relator and Defendant's management are representative of Defendant's approach to the problem of enrolling Federal Beneficiaries; namely, Defendant pressured its pharmacists to meet mandatory enrollment minimums by marketing the PSC Program to Federal Beneficiaries, but was recklessly and deliberately indifferent to the fact that Federal Beneficiaries were receiving unlawful remuneration under the program.

100.    Hugh R. Morrow, District Pharmacy Supervisor, Sarasota District Number 53, praised stores that met the mandatory enrollment minimums by enrolling Federal Beneficiaries, and instructed the pharmacy managers of underperforming stores that they needed to satisfy the mandatory minimums. During a meeting of Defendant pharmacy managers approximately two years ago, Relator twice asked Mr. Morrow to address the fact that pharmacy managers in some stores refused to market or sell the PSC Program to Federal Beneficiaries, but pharmacy managers at other stores routinely enrolled beneficiaries knowing at the time that it violated the law. Relator twice addressed this question to Mr. Morrow directly, but Mr. Morrow ignored the question and Relator's concerns. A pharmacy manager sitting next to Relator commented that "I guess we won't get an answer."

101.    Within the past year, Mr. Morrow e-mailed the store manager at Relator's store, Ms. Albright, to chastise her for the low sales of the PSC Program at the store. Ms. Albright informed Relator of the e-mail. She told Relator that Mr. Morrow argued in the e-mail that Defendant's other stores in the District with similar volume to Relator's store met mandatory sales minimums for the PSC Program. At the request of Relator, Ms. Albright replied to the e-mail to Mr. Morrow, asking him to investigate whether PSC

49

Program enrollments at the other stores he identified included Federal Beneficiaries into the program and, if so, to take corrective action. Relator discussed with Ms. Albright on numerous occasions thereafter to confirm whether Mr. Morrow responded to the reply e-mail requesting an investigation. He did not. The e-mail was ignored, and Relator was never informed of any investigation by Defendant to verify the illegal enrollments of Federal Beneficiaries.

102. Defendant's corporate level knowledge that enrolling Federal Beneficiaries in the PSC Program violated the Anti-Kickback Statute is illustrated by a sequence of internal emails initiated by Relator. Defendant told Relator that enrolling Federal Beneficiaries in the PSC Program is illegal because the program gives the beneficiaries discounts and it steers Federal payer business exclusively to Walgreens due to the non-networked feature. On May 19, 2011, Relator e-mailed Mr. Morrow to ask for an explanation as to why Federal Beneficiaries cannot be enrolled in the PSC Program. Mr. Morrow did not reply to the e-mail. Instead, he forwarded the e-mail to Jay Bernstein, Defendant's Manager, Wellness Card Programs, and Manager, Product Development. Mr. Bernstein did not respond to the request. He forwarded the request Rebecca Sieracki, Defendant's Customer Service Representative for Card Programs, who replied via email on May 19, 2011 stating:

> CMS (Centers for Medicare/Medicaid Services) has strict guidelines that prohibit their members from receiving discounts from a non-networked discount/rebate program. Since our program is valid only at Walgreen's pharmacies, we would be violating those guidelines. Therefore, we as a retailer must be careful with our programs to prevent potential legal issues with CMS. When a person receives a public benefit (such as Medicare Part A, B, or D) she falls into a different category of patient, one where we may not offer her incentives to shop in our store.

103.     Even with this clear statement from Defendant's corporate representative with responsibility for the PSC Program, Relator continued to receive criticism for expressing concerns about Defendant's widespread enrollment of Federal Beneficiaries. For example, during his annual performance review on August 15, 2011, Mr. Morrow told Relator that he needed to stop criticizing company decisions and communicating negative comments.   Relator interpreted this to be a reference by Mr. Morrow that Relator's criticism of Defendant's enrollment of Federal Beneficiaries into the PSC Program would not be viewed positively by the company.

### G. Information from Defendant's Computer System Shows That the Majority of PSC Program Members are Federal Beneficiaries.

104.     Defendant has knowingly and intentionally enrolled more than 5,000,000 Federal Beneficiaries since 2006.   Approximately 2,500,000 patients enroll in the PSC Program annually.    Based on Relator's direct and independent knowledge and investigation, substantially more than 50-percent of PSC Program members in his district in Florida are Federal Beneficiaries.   Moreover, a random sample of 100 PSC Program members shows that 58-percent of PSC Program members nationwide are Federal Beneficiaries.    Significantly, based on the prescription history and payer/insurance information *on file* at Defendant's stores at the time of enrollment, Walgreens knew at the time of enrollment that the individuals were Federal Beneficiaries.

### H. Defendant Directed its Employees Not to Promote and to Destroy Free Discount Drug Cards to Maximize PSC Program Enrollments.

105.     As a way to further increase PSC Program enrollments, Defendant instructed employees not to promote and to destroy patient assistance drug cards that give needy patients access to deeply discounted drugs.   One such instruction came on October

20, 2011, when a pharmacy manager e-mailed Mr. Morrow to report that a representative from a patient assistance program offered a discount card to a customer "who cannot afford our WCARD. I told [sic] that we cannot offer customers discount cards." Mr. Morrow forwarded the e-mail to all store managers and pharmacy managers in District 53 stating that "under no circumstances should we be promoting this discount card!" In a follow-up email, Mr. Morrow recommended that the store and pharmacy managers look for the patient assistance discount cards and throw them out.

### I. Defendant's Unlawful Scheme Resulted in Billions of Medicare Part D Overcharges for Covered Drugs in Clear Violation of CMS Requirements.

106. As designed and intended by Defendant, concealing widespread Federal Beneficiary enrollments in the PSC Program from Plan Sponsors and CMS allowed it not only to steer the Federal payer business of Federal Beneficiaries exclusively to its pharmacies, but it also bypassed the Part D requirement that participating pharmacies' reimbursement be limited to the lower of (a) the Plan Sponsor's negotiated price and (b) the pharmacy's usual and customary price for covered Part D drugs. An internal (non-public) blog hosted by Mark A. Wagner, President – Community Management for Walgreens (available only on Walgreens' StoreNet computer system), describes the company's knowledge of CMS's requirements and motivation to conceal from CMS and PDP sponsors the enrollment of Federal Beneficiaries in the PSC Program (a.k.a., the "W Card"):

> The reason we went with the WCARD instead of matching Walmart's $4 generics is because *if you lower your Cash price you also have to lower what you charge insurance companies, workers comp, and the government to the same price.*

107.     Through its enrollment of millions of Federal Beneficiaries in the PSC Program, Defendant's offering covered Part D drugs at prices lower than Plan Sponsor's negotiated prices to Federal Beneficiaries has the consequence of establishing these low prices as the usual and customary charge for those drugs.  Defendant was therefore required to limit its reimbursement to the lower price not only for the covered drug prescriptions of Part D beneficiaries enrolled in the PSC Program, but also all other Part D beneficiaries of the same Plan Sponsors.  Similar to Wal-Mart's program, and as expressly stated in CMS's Part D manual, offering a Federal Beneficiary a lower price at the point of sale throughout the benefit year establishes that lower price as usual and customary.

108.     Whereas Wal-Mart and other pharmacy drug discount programs were transparent in admitting Federal Beneficiaries with the consequence that the pharmacies' reimbursement was limited to the lower usual and customary price for covered Part D drugs, Defendant secretly enrolled millions of beneficiaries to falsely inflate its reimbursement for covered drugs.   Based on specific prescription and claim reimbursement data for Federal Beneficiaries enrolled in the PSC Program obtained by Relator, the Part D negotiated prices substantially exceeded Defendant's usual and customary price that it offered Federal Beneficiaries for the same drugs, as illustrated by the following examples:

a.     On October 27, 2009, Patient 395 filled a covered Part D drug (Metformin ER 500mg 24 hour Tablets, 180 quantity) with prescription number 1796327-7350 at Defendant's pharmacy located at 12145 San Jose Boulevard, Jacksonville, Florida.   The price was $48.93 for the

53

prescription under his Part D plan (UHCMPD). Patient 395, a known Federal Beneficiary as documented on Defendant's computer system, was a member of the PSC Program (Card No. 0015552740501). On May 13, 2011, Patient 395 filled another prescription for the same drug, dose, and quantity (Metformin ER 500mg 24 hour Tablets) at the same pharmacy. The price was $12.00 for the prescription which was filled under the PSC Program, and not his Part D plan. On August 23, 2011, Patient 395 filled another prescription for the same drug, dose, and quantity (Metformin ER 500mg 24 hour Tablets) at the same pharmacy. The price was $12.00 for the prescription, which was filled under the PSC Program and not his Part D plan.

b. On October 27, 2010, Patient 395 filled a covered Part D drug (Metoprolol ER Succinate 100mg Tablets, 90 quantity) with prescription number 1848647-7350 at Defendant's pharmacy located at 12145 San Jose Boulevard, Jacksonville, Florida. The price was $114.88 for the prescription under his Part D plan (AARPMPD). Patient 395, a known Federal Beneficiary as documented on Defendant's computer system, was a member of the PSC Program (Card No. 0015552740501). On July 26, 2011, Patient 395 filled another prescription for the same drug, dose, and quantity (Metoprolol ER Succinate 100mg Tablets) at the same pharmacy. The price was $97.59 for the prescription, which was filled under the PSC Program and not his Part D plan.

c.     On June 22, 2010, Patient 273 filled a covered Part D drug
(Citalopram 20mg Tablets, 90 quantity) with prescription number 640885-
6372 at Defendant's pharmacy located at 780 North Glynn, Fayetteville,
Georgia.  The price was $18.00 for the prescription under her Part D plan
(UHCMPD).  Patient 273, a known Federal Beneficiary as documented on
Defendant's computer system, was a member of the PSC Program (Card
No. 003969239100).  On September 21, 2010, Patient 273 filled another
prescription for the same drug, dose, and quantity at the same pharmacy.
The price was $12.00 for the prescription which was filled under the PSC
Program, and not her Part D plan.  On December 21, 2010, March 22,
2011, and June 21, 2011, Patient 273 filled prescriptions for the same
drug, dose, and quantity at the same pharmacy, and the price was $12.00
for each prescription filled under the PSC Program, and not her Part D
plan.

d.     On January 15, 2010, Patient 273 filled a covered Part D drug
(Clonidine 0.2mg Tablets, 180 quantity) with prescription number
612262-6372 at Defendant's pharmacy located at 780 North Glynn,
Fayetteville, Georgia.  The price was $18.00 for the prescription under her
Part D plan (UHCMPD).  Patient 273, a known Federal Beneficiary as
documented on Defendant's computer system, was a member of the PSC
Program (Card No. 003969239100).  On April 29, 2010, and July 31,
2010, Patient 273 filled prescriptions for the same drug, dose, and quantity
at the same pharmacy, and the price was $18.00 for each prescription

filled under her Part D plan coverage. On October 30, 2010, January 7, 2011, April 13, 2011, and July 14, 2011, Patient 273 filled prescriptions for the same drug, dose, and quantity at the same pharmacy, and the price was $12.00 for each prescription filled under the PSC Program and not her Part D plan.

e. On November 1, 2010, Patient 192 filled a covered Part D drug (Carvedilol 6.25mg Tablets, 180 quantity) with prescription number 1477474-10204 at Defendant's Pharmacy located at 2200 9th Street North, Naples, Florida. Based on payer information in Defendant's computer system, Patient 192 was a Part D beneficiary of PAIDMD, as well as a beneficiary of other Federal payers (including Tricare) at the time. Patient 192, a known Federal Beneficiary as documented on Defendant's computer system, was a member of the PSC Program (Card No. 001468440500). Defendant filled the prescription for Carvedilol under the PSC Program at a price of $12.00. On January 28, 2011, Patient 192 filled a prescription for the same drug, dose, and quantity at the same pharmacy. The price was $24.00 for the prescription, which was filled under his Part D Plan Sponsor, PAIDMD. On April 7, 2011, Patient 192 filled a prescription for the same drug, dose, and quantity at the same pharmacy. The price was again $24.00 for the prescription, which was filled under his Part D Plan Sponsor, PAIDMD.

f. On November 18, 2009, Patient 192 filled a covered Part D drug (Pravastatin 40mg Tablets, 90 quantity) with prescription number

1411680-10204 at Defendant's pharmacy located at 2200 9th Street North, Naples, Florida. Based on payer information in Defendant's computer system, Patient 192 was a Part D beneficiary of PAIDMD, as well as a beneficiary of other Federal payers (including Tricare) at the time. Patient 192, a known Federal Beneficiary as documented on Defendant's computer system, was a member of the PSC Program (Card No. 001468440500). Defendant filled the prescription for Pravastatin under the PSC Program at a price of $12.00. On January 10, 2010, Patient 192 filled a prescription for the same drug and dose (quantity 180) at the same pharmacy. The price was $24.00 for the prescription, which was filled under the PSC Program. On February 13, 2011, Patient 192 filled a prescription for the same drug and dose (quantity 90) at the same pharmacy. The price was $12.00 for the prescription, which was filled under the PSC Program. On May 12, 2010, Patient 192 filled a prescription for the same drug and dose (quantity 180) at the same pharmacy (prescription number 1450317-10204). The price was $45.00 for the prescription, which was filled under his Part D coverage, PAIDMD. On September 27, 2010, Patient 192 filled a prescription for the same drug and dose (quantity 180) at the same pharmacy (prescription number 1450317-10204). The price was $45.00 for the prescription, which was filled under his Part D coverage, PAIDMD.

g.      On October 25, 2009, Patient 474 filled a covered Part D drug (Metformin 1000mg Tablets, 180 quantity) with prescription number

Case: 1:20-cv-00300-MPO Document #: 392 Filed: 11/04/23 Page 96 of 172 PageID #:10895

875442-3808 at Defendant's pharmacy located at 901 22nd Avenue South, St. Petersburg, Florida. Based on payer information in Defendant's computer system, Patient 474 was a Part D beneficiary of HUMNAMPD, as well as a beneficiary of other Federal payers at the time. Patient 474, a known Federal Beneficiary as documented on Defendant's computer system, was a member of the PSC Program (Card No. 0002370161200). Defendant filled the prescription for Metformin under the PSC Program at a price of $10.99. On February 3, 2010, Patient 474 re-filled the prescription for the same drug, dose, and quantity at the same pharmacy. The price was $14.31 for the prescription, which was filled under her Part D plan, HUMNAMPD.

h. On March 1, 2010, Patient 255 filled a covered Part D drug (Lisinopril 10mg Tablets, 90 quantity) with prescription number 1216368-2206 at Defendant's pharmacy located at 300 East Jackson Street, Macomb, Illinois. Based on payer information in Defendant's computer system, Patient 255 was a Part D beneficiary of HAMPMPD, as well as a beneficiary of other Federal payers at the time. Patient 255, a known Federal Beneficiary as documented on Defendant's computer system, was a member of the PSC Program. Defendant filled the prescription for Lisinopril under the PSC Program at a price of $12.00. On June 4, 2010, Patient 255 re-filled the prescription for the same drug, dose, and quantity at the same pharmacy. The price was $20.00 for the prescription, which was filled under her Part D plan, HAMPMPD.

> i.  On December 13, 2009, Patient 426 filled a covered Part D drug (Lisinopril 20mg Tablets, 90 quantity) with prescription number 302871-6592 at Defendant's pharmacy located at 1560 Warwick Avenue, Warwick, Rhode Island 02889. Based on payer information in Defendant's computer system, Patient 426 was a Part D beneficiary of AARPMPD, as well as a beneficiary of other Federal payers at the time. Patient 426, a known Federal Beneficiary as documented on Defendant's computer system, was a member of the PSC Program (Card No. 002879709400). Defendant filled the prescription for Lisinopril under the PSC Program at a price of $12.00. On March 1, 2010, Patient 426 re-filled the prescription for the same drug, dose, and quantity at the same pharmacy. The price was $15.00 for the prescription, which was filled under her Part D plan, AARPMPD.

109.  Relator has direct and independent knowledge of Defendant's systemic overbilling of Part D covered drugs. To document Defendant's overbilling scheme, Relator gathered prescription and reimbursement claims data, including patient histories, for more than 3,000 patient prescriptions for 475 patients nationwide from Defendant's internal computer systems, StoreNet and Intercom Plus. The information includes patient names, phone numbers, addresses, dates of birth, sex, language, third party payer information and identification, PSC program membership, designations of primary plan, drug names and strengths, average wholesale prices, quantities, transaction dates, store locations, plan payment information, co-payments, customer prices, claim reference numbers, claim numbers, and payment types.

110.    Relator also obtained drug acquisition information for specific covered Part D drugs based on data gathered by Defendant at the corporate level, including drug names, strengths, quantities, and manufacturers; acquisition costs; store numbers; effective dates; and last cost and retail changes.

111.    Based on Defendant's prescription and reimbursement claims data, as well as drug acquisition information, Relator has identified specific overbilled drugs in particular claims, the amount overbilled for each drug, the date of overbilling, and payer information.   The Overbilled Drugs challenged include Lisinopril, Simvastatin, Metformin HCL, Metoprolol Tartrate, Warfarin Sodium, Lovastatin, Carvedilol, Citalopram Hydrobromide, Pravastatin Sodium, and Spironolactone.   To illustrate Defendant's overbilling scheme, in 2008 alone, Defendant overbilled Part D more than $546 million for the Overbilled Drugs:

| RANK BY FILL | BRAND NAME | TOTAL FILLS | TOTAL GROSS DRUG COST | Walgreens Scripts | Average Overbill per Transaction | $ Overbilled |
|---|---|---|---|---|---|---|
| 26 | CARVEDILOL | 6,931,551 | $168,492,704.51 | 1,316,994.69 | $18.67 | $24,588,290.86 |
| 35 | CITALOPRAM HYDROBROMIDE | 5,979,371 | $81,198,577.93 | 1,136,080.49 | $7.93 | $9,009,118.29 |
| 1 | LISINOPRIL | 28,462,990 | $345,049,130.75 | 5,407,968.10 | $8.60 | $46,508,525.66 |
| 18 | LOVASTATIN | 8,260,656 | $249,199,586.68 | 1,569,524.64 | $12.95 | $20,325,344.09 |
| 11 | METFORMIN HCL | 15,751,296 | $248,314,732.91 | 2,992,746.24 | $15.79 | $47,255,463.13 |
| 12 | METOPROLOL TARTRATE | 15,468,402 | $108,583,184.19 | 2,938,996.38 | $3.86 | $11,344,526.03 |
| 47 | PRAVASTATIN SODIUM | 4,883,776 | $152,255,209.47 | 927,917.44 | $17.25 | $16,006,575.84 |
| 2 | SIMVASTATIN | 27,434,149 | $694,125,350.30 | 5,212,488.31 | $63.63 | $331,670,631.17 |
| 72 | SPIRONOLACTONE | 3,745,669 | $55,473,533.58 | 711,677.11 | $15.42 | $10,974,061.04 |
| 15 | WARFARIN SODIUM | 13,822,768 | $194,910,416.94 | 2,626,325.92 | $11.08 | $29,099,691.19 |
| | Total | 130740628 | $2,297,602,427.26 | 24,840,719.32 | | $546,782,227.29 |

## J. Defendant's Fraudulent Scheme Also Resulted in False Claims for Payment for Overbilled Influenza Vaccines.

112.    Defendant administers approximately 7 million influenza vaccination shots to patients each year.  Based on Relator's direct and independent knowledge, approximately 80-percent of those patients are Federal Beneficiaries.  CMS's reimbursement ceiling of the lesser of the Plan Sponsor's negotiated price and the

pharmacy's usual and customary price applies also to Part D reimbursement for vaccines. For PSC Program members, Defendant provides deep discounts for influenza vaccines, including a 10-percent discount, to reduce the price to approximately $25.00. As such, the individual vaccination price under the PSC Program is substantially lower than the price Defendant charges the Federal Payer Programs for the same vaccine. Based on specific prescription and claims reimbursement data for Federal Beneficiaries, many of whom are also PSC Program members, Defendant knowingly charged Part D and other Federal payer programs the higher negotiated price for influenza vaccines, instead of the lower price made available to PSC Program members, as documented by the following examples:

a.     On November 3, 2011, Patient 13 purchased an influenza vaccine (Fluzone High-Dose 2011-12, 0.5ml SYR) at the Defendant's pharmacy located at 12600 Tamiami Trail, North Port, Florida. Defendant charged the Part D plan (IMMUNMPB) $48.99.

b.     On October 9, 2011, Patient 17 purchased an influenza vaccine (Fluzone High-Dose 2011-12 0.5ml SYR) from Defendant's pharmacy located at 12600 Tamiami Trail, North Port, Florida. Defendant charged the Part D plan (IMMUNMPB) $48.99.

c.     On October 3, 2011, Patient 34 purchased an influenza vaccine (Fluvirin Multidose Vial 2011-12, 0.5ml) at the Defendant's pharmacy located at 1802 West Morton Avenue, Jacksonville, Illinois. Defendant charged the Part D plan (IMMUNMPB) $31.99.

d.    On September 12, 2011, Patient 26 purchased an influenza vaccine (Fluzone High-Dose 2011-12 0.5ml SYR) from Defendant's pharmacy located at 15 South Indiana Avenue, Englewood, California. Defendant charged TRICARE $48.81.

## VII.  DEFENDANT MADE, AND CAUSED TO BE MADE, FALSE CLAIMS AND STATEMENTS IN REIMBURSEMENT CLAIMS AND FALSE CERTIFICATIONS OF PAYMENT DATA.

113.    Defendant made false statements and claims to Plan Sponsors, and caused Plan Sponsors to make false statements and claims for covered Part D drugs in violation of the FCA in electronic claims for payment submitted by Defendant pursuant to the National Council for Prescription Drug Programs ("NCPDP") requirements. NCPDP required Defendant to report its usual and customary price for each covered Part D drug in each reimbursement claim processed by Plan Sponsors and CMS.

114.    CMS reimburses Plan Sponsors and contract pharmacies from the Medicare Prescription Drug Account. 42 C.F.R. § 423.315(a). There are four types of payments: (1) direct subsidies for each Part D eligible beneficiary enrolled in a Part D plan for a month equal to the amount of the plan's approved subsidized bid, adjusted for health status and reduced by the monthly beneficiary premium for the plan; (2) reinsurance subsidy payments on a monthly basis during a year based on either estimated or incurred allowable reinsurance costs, and final reconciliation to actual allowable reinsurance costs; (3) low income cost-sharing subsidy payments, including additional coverage above the initial coverage limits, for certain subsidy-eligible individuals; and (4) lump-sum payments or adjusted monthly payments in the following payment year based on the relationship of the Part D plan's adjusted allowable risk corridor costs to

62

predetermined risk corridor thresholds in the coverage year. 42 C.F.R. § 423.315(b)-(e); 42 C.F.R. § 423.329(a) and (c). CMS reconciles payment year distributions with updated enrollment and health status data, actual low-income cost-sharing costs, and actual allowable reinsurance costs. 42 C.F.R. § 423.315(f).

115.     As an express condition of payment, CMS requires Plan Sponsors and contract pharmacies to provide accurate, complete, and truthful disclosure and provision of information and data necessary for CMS to carry out the payment provisions of Part D. 42 C.F.R. § 423.322(a) ("Payment conditional upon provision of information. Payments to a Part D sponsor are conditioned upon provision of information to CMS that is necessary to carry out this subpart, or as required by law."); Final Rule, 70 Fed. Reg. 4194, 4307 (Jan. 28, 2005). For each Part D prescription, Plan Sponsors must submit data to CMS in the form of a prescription drug event ("PDE") record. The PDE record must contain prescription drug cost and payment data that enables CMS to make payments to plans and otherwise administer the Part D benefit. The submitted data components allow for calculation of payment under the four legislated payment mechanisms. CMS uses the data to reconcile low-income cost-sharing subsidy and reinsurance payments and to implement risk sharing between the plan and the federal government through risk corridor payment adjustments, as well as verifying plan administration of TrOOP.

116.     CMS requires payment information from Plan Sponsors to verify whether claims for payment comply with Part D payment requirements. As such, CMS requires for each claim for payment adjudicated by a Plan Sponsor to include the negotiated price for the covered Part D drug and the pharmacy's usual and customary price for the drug at

the point of sale. Part D regulations require Plan Sponsors to contractually agree to (a) provide CMS with the information CMS determines is necessary to carry out payment provisions in subpart G of this part, and (b) be paid under the contract in accordance with the payment rules in subpart G of this part. 42 C.F.R. § 423.505(b)(9) & (11).

117. Plan Sponsors require contracted pharmacies to accurately report their prices on Part D prescriptions filled for beneficiaries, including both the negotiated prices and the pharmacies' usual and customary prices. As a condition of payment, Plan Sponsors must certify "the accuracy, completeness, and truthfulness of all data related to payment," and require all contractors, including contracted pharmacies such as Defendant's, to certify the accuracy, completeness, and truthfulness of the data and acknowledge that the claims data will be used for the purposes of obtaining Federal reimbursement. 42 C.F.R. § 423.505(k).

> (k) Certification of data that determine payment—**(1) General rule. As a condition for receiving a monthly payment under subpart G of this part (or for fallback entities, payment under subpart Q of this part)**, the Part D plan sponsor agrees that its chief executive officer (CEO), chief financial officer (CFO), or an individual delegated the authority to sign on behalf of one of these officers, and who reports directly to the officer, must request payment under the contract on a document that certifies (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of all data related to payment. The data may include specified enrollment information, claims data, bid submission data, and other data that CMS specifies.
>
> (2) Certification of enrollment and payment information. The CEO, CFO, or an individual delegated the authority to sign on behalf of one of these officers, and who reports directly to the officer, must certify (based on best knowledge, information, and belief) that each enrollee for whom the organization is requesting payment is validly enrolled in a program offered by the organization and the information CMS relies on in determining payment is accurate, complete, and truthful and acknowledge that this information will be used for the purposes of obtaining Federal reimbursement.

(3) Certification of claims data. The CEO, CFO, or an individual delegated with the authority to sign on behalf of one of these officers, and who reports directly to the officer, must certify (based on best knowledge, information, and belief) that the claims data it submits under § 423.329(b)(3) (or for fallback entities, under § 423.871(f)) are accurate, complete, and truthful and acknowledge that the claims data will be used for the purpose of obtaining Federal reimbursement. **If the claims data are generated by a related entity, contractor, or subcontractor of a Part D plan sponsor, the entity, contractor, or subcontractor must similarly certify (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of the data and acknowledge that the claims data will be used for the purposes of obtaining Federal reimbursement.**

42 C.F.R. § 423.505(k)(1)-(3) (emphasis added).[7]

118.    Defendant has knowingly and intentionally submitted false information to Plan Sponsors regarding its usual and customary price for covered Part D drugs, causing Plan Sponsors to adjudicate claims at a higher rate than allowed by CMS.    As documented by Relator, Defendant falsely stated that its usual and customary price for the covered Part D drugs was the full cash price for the drugs, even though the company

---

[7]    A contracted pharmacy is a "first tier, downstream, and related entity" that reports prescription information to Plan Sponsors, which then is reported by the Plan Sponsor to CMS.    CMS regulations define a "downstream entity" as "any party that enters into a written arrangement, acceptable to CMS, with persons or entities involved with the Part D benefit, below the level of the arrangement between a Part D plan sponsor (or applicant) and a first tier entity.    These written arrangements continue down to the level of the ultimate provider of both health and administrative services." 42 C.F.R. §§ 423.4 & 423.501.    A "first tier entity" is defined as "any party that enters into a written arrangement, acceptable to CMS, with a Part D plan sponsor or applicant to provide administrative services or health care services for a Medicare eligible individual under Part D." *Id.* Further, Part D regulations state that "All contracts or written agreements between Part D sponsors and first tier, downstream, and related entities, must contain the following: . . . (iii) A provision requiring that any services or other activity performed by a first tier, downstream, and related entity in accordance with a contract or written agreement are consistent and comply with the Part D sponsor's contractual obligations. . . . (v) All contracts or written arrangements must specify that first tier, downstream, and related entities must comply with all applicable Federal laws, regulations, and CMS instructions." 42 C.F.R. §§ 423.505(i)(iii) & (iv).

had few sales at that price and the company regularly sold the covered drugs to Federal Beneficiaries of Plan Sponsors at the lower PSC Program price. As admitted on the blog hosted by Mark A. Wagner, President – Community Management for Walgreens, lowering the cash price for Federal Beneficiaries required Walgreens to lower the price for its covered drugs:

> The reason we went with the WCARD instead of matching Walmart's $4 generics is because if you lower your Cash price you also have to lower what you charge insurance companies, workers comp, **and the government to the same price.**

119. Defendant has knowingly and intentionally caused Plan Sponsors to make false statements and claims to CMS, including the submission of payment data and information required as a condition of payment in the PDE record, relating to payment of Part D covered drugs.

## VIII. DEFENDANT'S VIOLATIONS UNDERMINE THE PROGRAM INTEGRITY OF PART D AND THREATEN THE FEDERAL BENEFICIARY STATUS OF PATIENTS.

120. Defendant's unlawful conduct has resulted in injury to the Federal healthcare programs. It has caused systemic Part D program violations injurious of Federal Beneficiaries and their coverage status, while causing serious Part D program problems. In no order of significance, these violations include, for example:

> a. Periodically filling covered Part D drug prescriptions under the PSC Program at higher prices than available to the beneficiaries under their Part D coverage;[8]

---

[8] To illustrate this illegal conduct, on November 3, 2010, Patient 467 filled a covered Part D drug (Simvastatin 40mg Tablets, 30 quantity) with prescription number 1609784-4171 at Defendant's pharmacy located at 1546 North Central Avenue, Chicago, Illinois 60651. The price was $1.10 for the prescription under his Part D plan

b.      Widespread TrOOP (true out of pocket costs) manipulation;[9]

c.      Undermining the negotiated prices of Plan Sponsors under Part D;

d.      Prolonging the length of time beneficiaries remain in the doughnut hole prior to reaching catastrophic coverage;

e.      Artificially inflating the co-payments paid by Federal Beneficiaries for covered drugs;

f.      Disrupting the coordination of benefits and secondary payer determinations for Federal Beneficiaries by not reporting covered drug transactions to Plan Sponsors and CMS;[10]

---

(CIGNAMPD). Defendant enrolled Patient 467, a known Federal Beneficiary based on Defendant's computer records, in the PSC Program (Card No. 1609783-4147). On December 30, 2010, Patient 467 re-filled the prescription for the same drug, dose, and quantity at the same pharmacy. The price was $1.10 for the prescription which was filled under his Part D plan. On February 1, 2011, Patient 467 re-filled the prescription for the same drug, dose, and quantity at the same pharmacy. The price was $13.34 for the prescription, which was filled under his Part D plan. On March 3, 2011, Patient 467 re-filled the prescription for the same drug, dose, and quantity at the same pharmacy. The price was $11.50 for the prescription, which was filled under his Part D plan. Finally, on April 8, 2011, Patient 467 re-filled the prescription for the same drug, dose, and quantity at the same pharmacy. This time the price was $21.99 because Defendant processed it under the PSC Program, and not the beneficiary's Part D plan.

[9]    According to CMS, an incurred cost for purposes of a Beneficiaries TrOOP calculation includes the following:

As provided in section 50.4.2 of chapter 14, costs incurred by enrollees by using a discounted cash price, and not their Part D benefit, provided the purchase is for a covered Part D drug; the purchase is made at a network pharmacy; the discounted cash price is lower than the negotiated price offered by the enrollee's Part D plan; the enrollee is in any applicable deductible or coverage gap phase of his or her benefit; and the enrollee submits appropriate documentation to his or her Part D plan to be credited for the purchase.

Prescription Drug Benefit Manual, Chapter 5: Benefits and Beneficiary Protections, 30.1.

g.     Pushing Federal Beneficiaries into the coverage gap sooner and prolonging the period of time before they reach catastrophic coverage due to the unreported prescriptions;

h.     Circumventing Plan Sponsors' drug utilization review and safety of drug interaction edits; and

i.     Imperiling beneficiaries' Part D eligibility status because of undisclosed coverage.

121.     The beneficiary eligibility status illustrates the program violations.  Under Part D, a Plan Sponsor must dis-enroll an individual if the individual loses eligibility for Part D, or the individual materially misrepresents information that the individual has or expects to receive reimbursement for third-party coverage.  42 C.F.R. § 423.44(b)(2)(ii), (v).  This is because a beneficiary has a legal obligation to notify the Plan Sponsor of other drug coverage.  According to the CMS, "Beneficiaries must supply Part D sponsors with information about other prescription drug coverage the beneficiaries have.  As provided in the MMA, beneficiaries are legally obligated to report this information, and any material misrepresentation of such information by a beneficiary may constitute grounds for termination of coverage from Part D." Medicare Prescription Drug Benefit Manual, Chapter 14, at 40.1 & 50.2 ("As provided in the MMA, beneficiaries are legally obligated to report information about other prescription drug coverage or reimbursement for prescription drug costs that the beneficiaries have or expect to receive; any material misrepresentation of such information by a beneficiary may constitute grounds for

---

[10]     Under Part D, a Plan Sponsor is required to report new or changed primary payer information to the CMS Coordination of Benefits Contractor.  42 C.F.R. § 423.462 (2005).

termination of coverage from a Part D plan"). CMS considers it a material misrepresentation if a beneficiary withholds or fails to disclose other reimbursement coverage. Medicare Prescription Drug Benefit Manual, Chapter 3, at 50.2.5 ("If a PDP enrollee intentionally withholds or falsifies information about third-party reimbursement coverage, CMS requires that the individual be disenrolled from the PDP.")

## IX.    DAMAGES.

122.    The United States has suffered damages as a result of the acts and practices of Defendant, as described herein, in presenting, causing to be presented, and conspiring to present false and fraudulent claims, statements, and records to the United States for covered Part D drugs that were not eligible for reimbursement as a result of systemic kickback violations and overcharging by Defendant.

123.    Defendant's false statements were material to the decision of the United States to cover and reimburse Defendant for the prescription pharmaceuticals challenged herein.

124.    Defendant profited unlawfully from the payment of the false and fraudulent claims by the United States.

125.    Damages to the United States are substantial.

### COUNT I
### VIOLATIONS OF THE FALSE CLAIMS ACT
### 31  U.S.C. § 3729(a)(1)(A)

126.    Relator restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

127.    The False Claims Act, 31 U.S.C. § 3729(a)(1)(A), provides in relevant part that any person who:

> knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval . . .
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . plus three times the amount of damages which the Government sustains because of the act of that person. . . .

128.    By virtue of the acts described herein, Defendant knowingly presented, or caused to be presented, false or fraudulent claims for payment of covered Part D prescription drugs and vaccines to which it was not entitled. Defendant knew that these claims for payment were false, fraudulent, or fictitious, or were deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

129.    Each claim presented or caused to be presented for reimbursement of the prescription pharmaceuticals challenged herein represents a false or fraudulent claim for payment under the FCA.

130.    Unaware that Defendant submitted false statements to conceal its misconduct, and unaware that Defendant routinely violated the Anti-Kickback Statute and falsely certified compliance with laws and regulations despite pervasive and substantial non-compliance, the United States paid and continues to pay the false claims submitted for Defendant's prescription drugs. These claims would not have been paid but for Defendant's fraud and false statements.

131.     In reliance on the accuracy of Defendant's statements, records, data, representations, and certifications, the United States has paid said claims and has suffered financial losses as a result of these acts by Defendant.

## COUNT II
## VIOLATIONS OF THE FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1)(B)

132.     The Relator restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

133.     The False Claims Act, 31 U.S.C. § 3729(a)(1)(B), provides in relevant part that any person who:

> knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . .

> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . plus three times the amount of damages which the Government sustains because of the act of that person. . . .

134.     By virtue of the acts described herein, Defendant knowingly presented, or caused to be presented, false or fraudulent records or statements material to false or fraudulent claims for payment of covered Part D drugs and vaccines to which it was not entitled.  Defendant knew that the records and statements were false, fraudulent, or fictitious, or were deliberately ignorant of the truth or falsity of the records and statements, or acted in reckless disregard for whether the records and statements were true or false.

135. Each false or fraudulent record or statement material to a false or fraudulent claim for payment or reimbursement of the prescription drugs challenged herein represents a false or fraudulent claim for payment under the FCA.

136. Unaware that Defendant submitted false records or statements to conceal the its misconduct, and unaware that Defendant routinely violated the Anti-Kickback Statute and falsely certified compliance with laws and regulations despite pervasive and substantial non-compliance, the United States paid and continues to pay the false claims submitted for Defendant's prescription drugs. These claims would not have been paid but for Defendant's fraud and false statements.

137. In reliance on the accuracy of Defendant's statements, records, data, representations, and certifications, the United States has paid said claims and has suffered financial losses as a result of these acts by Defendant.

## COUNT III
## VIOLATIONS OF THE FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1)(C)

138. Relator restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

139. The False Claims Act, 31 U.S.C. § 3729(a)(1)(C), provides in relevant part that any person who:

> conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G) . . .

> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . plus three times the amount of damages which the Government sustains because of the act of that person. . . .

140.    By virtue of the acts described herein, Defendants conspired to commit violations of 31 U.S.C. §§ 3729(a)(1)(A) and (B) by knowingly presenting, or causing to be presented, false or fraudulent claims for payment by knowingly making, using, or causing to be made or used, false records or statements material to false or fraudulent claims.  Defendants knew that these claims were false, fraudulent, or fictitious, or were deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false

141.    Unaware of the conspiracy to submit false records and/or statements to conceal its misconduct,  and unaware that Defendant routinely violated the Anti-Kickback Statute and falsely certified compliance with laws and regulations despite pervasive and substantial non-compliance, the United States paid and continues to pay the false claims submitted for Defendant's covered Part D drugs and vaccines.  These claims would not have been paid but for Defendant's fraud and false statements.

142.    In reliance on the accuracy of Defendant's statements, records, data, representations, and certifications, the United States have paid said claims and have suffered financial losses as a result of these acts by Defendant.

## PRAYER AS TO COUNTS I-III

WHEREFORE, Relator prays that this District Court enter judgment on behalf of Relator and against Defendant in Counts I-III, respectively, as follows:

a.    Damages in the amount of three times the actual damages suffered by the United States Government as a result of each Defendant's conduct;

b.    Civil penalties against the Defendant, respectively, equal to not less than $5,000 and not more than $10,000, adjusted for inflation according to the Federal Civil

Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, for each violation of 31 U.S.C. § 3729;

c.      The fair and reasonable sum to which Relator is entitled under 31 U.S.C. § 3730(b); additionally, Relator is entitled, in equity, to recover attorneys' fees from the fund created for non-participating beneficiaries (those not contributing material time and expense to generating any settlement or recovery from any Defendant) under the Common Fund doctrine to be paid from the recovery fund generated for such non-participatory beneficiaries from Defendant;

d.      All costs and expenses of this litigation, including statutory attorneys' fees and costs of court;

e.      Pre-judgment and post-judgment, as appropriate, interest at the highest rate allowed by law;

f.      Relator's individual damages, if any, which may be alleged; and

g.      All other relief on behalf of Relator or the United States Government to which they may be justly entitled, under law or in equity, and the District Court deems just and proper.

**COUNT IV**
**VIOLATIONS OF THE ANTI-KICKBACK STATUTE**
**42 U.S.C. § 1320a-7b**

143.    Relator restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

144.    Medicare and Medicaid Patient Protection Act of 1987, 42 U.S.C. § 1320a-7b, provides criminal penalties up to $25,000 or five years in jail or both for the following:

(1)    whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind—

    (A)    in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

    (B)    in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program

\* \* \*

(2)    whoever knowingly and willfully offers and pays any remuneration (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

    (A)    to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

    (B)    to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program.

42 U.S.C. § 1320a-7b(b).

145.    Each claim for reimbursement for prescription drugs represents a false or fraudulent claim for payment because each procedure carried with it a false certification by Defendant that the service it provided complied with the Anti-Kickback Statute.

75

146.     Defendant has violated the Anti-Kickback Statute by offering and knowingly and willfully providing a direct and substantial financial incentive in the form of kickbacks to Federal Beneficiaries to induce them to purchase covered Part D drugs and vaccines exclusively from Defendant's pharmacies. No safe harbor provisions apply.

147.     Unaware of Defendant's violations of the Anti-Kickback Statute and the falsity of the records, statements, and claims made or caused to be made by Defendant, the United States paid and continues to pay on the claims that would not have been paid but for Defendant's wrongful acts and omissions, as alleged herein.

148.     As violations of the Anti-Kickback Statute, the material misrepresentations made by Defendant to induce Federal Beneficiaries to purchase covered Part D drugs from Defendant's pharmacies constitute false claims and statements under the FCA, 31 U.S.C. § 3729 *et seq.*

## PRAYER AS TO COUNT IV

WHEREFORE, Relator prays that this District Court enter judgment on behalf of Relator and against Defendant in Count IV as follows:

a.     Damages suffered by the United States Government as a result Defendant's conduct;

b.     Civil penalties against Defendant equal to $11,000 for each violation of 31 U.S.C. § 3729;

c.     Relator be awarded the a fair and reasonable sum to which he is entitled under 31 U.S.C. § 3730(b); additionally, Relator is entitled, in equity, to recover attorneys' fees from the fund created for non-participating beneficiaries (those not contributing material time and expense to generating any settlement or recovery from any

76

Defendant) under the Common Fund doctrine to be paid from the recovery fund generated for such non-participatory beneficiaries from Defendant;

     d.     Relator be awarded all costs and expenses of this litigation, including statutory attorneys' fees and costs of court;

     e.     Pre-judgment and post-judgment, as appropriate, interest at the highest rate allowed by law;

     f.     Relator's individual damages, if any, which may be alleged; and

     g.     All other relief on behalf of Relator or the United States Government to which they may be justly entitled, under law or in equity, which the District Court deems just and proper.

## COUNT V
### UNJUST ENRICHMENT

149.     Relator restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

150.     Relator, on behalf of the United States, claims the recovery of all monies by which Walgreens has been unjustly enriched, including profits earned by Defendant because of (a) illegal kickbacks offered and provided to Federal Beneficiaries in exchange for Federal payer business and (b) overcharging Medicare Part D and other Federal Payer Programs for covered Part D drugs.

151.     By obtaining monies as a result of its violations of federal and state law, Defendant was unjustly enriched, and is liable to account and pay such amounts, which are to be determined at trial, to the United States.

## PRAYER AS TO COUNT V

WHEREFORE, Relator prays that this District Court enter judgment on behalf of Relator and against Defendant in Count V as follows:

a.     Damages sustained by the United States, including the amounts Defendant unlawfully obtained;

b.     All costs and expenses of this litigation, including statutory attorneys' fees and costs of court;

e.     Pre-judgment and post-judgment, as appropriate, interest at the highest rate allowed by law;

f.     Relator's individual damages, if any, which may be alleged; and

g.     All other relief on behalf of Relator or the United States Government to which they may be justly entitled, under law or in equity, and the District Court deems just and proper.

## DEMAND FOR JURY TRIAL

Relator demand trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure and the Seventh Amendment to the U.S. Constitution.

Respectfully submitted,

Andrew M. Beato
Robert F. Muse
Kerrie C. Dent
Ronald Kovner
Jed Wulfekotte
STEIN, MITCHELL & MUSE, LLP
1100 Connecticut Avenue, N.W.
Suite 1100
Washington, D.C.  20036
(202) 737-7777 (telephone)
(202) 296-8312 (fax)
ABeato@steinmitchell.com

*Counsel for Relator*

January 13, 2012

## CERTIFICATE OF SERVICE

I certify that on this 13th day of January, 2012, a true and correct copy of the foregoing Complaint was filed under seal with the Clerk of Court and was served on the following parties listed below by U.S. Certified Mail, Return Receipt Requested:

> The Honorable Eric H. Holder, Jr.
> United States Attorney General
> 950 Pennsylvania Avenue, N.W.
> Washington, DC 20530-0001
>
> Preet Bharara, Esq.
> United States Attorney
> United States Attorney's Office
> Southern District of New York
> One St. Andrews Plaza
> New York, New York 10007
>
> Heidi A. Wendel, Esq.
> Assistant United States Attorney
> United States Attorney's Office
> Southern District of New York
> 86 Chambers Street
> New York, New York 10007

Andrew M. Beato

JUDGE OETKEN

JS 44C/SDNY
REV. 5/2010

# CIVIL COVER SHEET

# 12 CIV 0300

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for use of the Clerk of Court for the purpose of initiating the civil docket sheet.

| PLAINTIFFS | DEFENDANTS |
|---|---|
| United States of America ex rel. Marc D. Baker | Walgreens, Inc. |

| ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| Please see attachment. | Unknown |

CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE)
(DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

This is a qui tam action under the False Claims Act, 31 U.S.C. 3729 and the Anti-Kickback Statute, 42 U.S.C 1320a-7b

Has this or a similar case been previously filed in SDNY at any time? No? [✓] Yes? [ ] Judge Previously Assigned

If yes, was this case Vol.[ ] Invol. [ ] Dismissed. No[ ] Yes [ ] If yes, give date _____ & Case No. _____

*(PLACE AN [x] IN ONE BOX ONLY)* NATURE OF SUIT

**ACTIONS UNDER STATUTES**

**TORTS**

**CONTRACT**

[ ] 110 INSURANCE
[ ] 120 MARINE
[ ] 130 MILLER ACT
[ ] 140 NEGOTIABLE INSTRUMENT
[ ] 150 RECOVERY OF OVERPAYMENT & ENFORCEMENT OF JUDGMENT
[ ] 151 MEDICARE ACT
[ ] 152 RECOVERY OF DEFAULTED STUDENT LOANS (EXCL VETERANS)
[ ] 153 RECOVERY OF OVERPAYMENT OF VETERAN'S BENEFITS
[ ] 160 STOCKHOLDERS SUITS
[ ] 190 OTHER CONTRACT
[ ] 195 CONTRACT PRODUCT LIABILITY
[ ] 196 FRANCHISE

**PERSONAL INJURY**

[ ] 310 AIRPLANE
[ ] 315 AIRPLANE PRODUCT LIABILITY
[ ] 320 ASSAULT, LIBEL & SLANDER
[ ] 330 FEDERAL EMPLOYERS' LIABILITY
[ ] 340 MARINE
[ ] 345 MARINE PRODUCT LIABILITY
[ ] 350 MOTOR VEHICLE
[ ] 355 MOTOR VEHICLE PRODUCT LIABILITY
[ ] 360 OTHER PERSONAL INJURY

**PERSONAL INJURY**

[ ] 362 PERSONAL INJURY - MED MALPRACTICE
[ ] 365 PERSONAL INJURY PRODUCT LIABILITY
[ ] 368 ASBESTOS PERSONAL INJURY PRODUCT LIABILITY

**PERSONAL PROPERTY**

[ ] 370 OTHER FRAUD
[ ] 371 TRUTH IN LENDING
[ ] 380 OTHER PERSONAL PROPERTY DAMAGE
[ ] 385 PROPERTY DAMAGE PRODUCT LIABILITY

**FORFEITURE/PENALTY**

[ ] 610 AGRICULTURE
[ ] 620 OTHER FOOD & DRUG
[ ] 625 DRUG RELATED SEIZURE OF PROPERTY 21 USC 881
[ ] 630 LIQUOR LAWS
[ ] 640 RR & TRUCK
[ ] 650 AIRLINE REGS
[ ] 660 OCCUPATIONAL SAFETY/HEALTH
[ ] 690 OTHER

**LABOR**

[ ] 710 FAIR LABOR STANDARDS ACT
[ ] 720 LABOR/MGMT RELATIONS
[ ] 730 LABOR/MGMT REPORTING & DISCLOSURE ACT
[ ] 740 RAILWAY LABOR ACT
[ ] 790 OTHER LABOR LITIGATION
[ ] 791 EMPL RET INC SECURITY ACT

**BANKRUPTCY**

[ ] 422 APPEAL 28 USC 158
[ ] 423 WITHDRAWAL 28 USC 157

**PROPERTY RIGHTS**

[ ] 820 COPYRIGHTS
[ ] 830 PATENT
[ ] 840 TRADEMARK

**SOCIAL SECURITY**

[ ] 861 HIA (1395ff)
[ ] 862 BLACK LUNG (923)
[ ] 863 DIWC/DIWW (405(g))
[ ] 864 SSID TITLE XVI
[ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**

[ ] 870 TAXES (U.S. Plaintiff or Defendant)
[ ] 871 IRS-THIRD PARTY 26 USC 7609

**OTHER STATUTES**

[ ] 400 STATE REAPPORTIONMENT
[ ] 410 ANTITRUST
[ ] 430 BANKS & BANKING
[ ] 450 COMMERCE
[ ] 460 DEPORTATION
[ ] 470 RACKETEER INFLUENCED & CORRUPT ORGANIZATION ACT (RICO)
[ ] 480 CONSUMER CREDIT
[ ] 490 CABLE/SATELLITE TV
[ ] 810 SELECTIVE SERVICE
[ ] 850 SECURITIES/COMMODITIES/EXCHANGE
[ ] 875 CUSTOMER CHALLENGE 12 USC 3410
[X] 890 OTHER STATUTORY ACTIONS
[ ] 891 AGRICULTURAL ACTS
[ ] 892 ECONOMIC STABILIZATION ACT
[ ] 893 ENVIRONMENTAL MATTERS
[ ] 894 ENERGY ALLOCATION ACT
[ ] 895 FREEDOM OF INFORMATION ACT
[ ] 900 APPEAL OF FEE DETERMINATION UNDER EQUAL ACCESS TO JUSTICE
[ ] 950 CONSTITUTIONALITY OF STATE STATUTES

**REAL PROPERTY**

[ ] 210 LAND CONDEMNATION
[ ] 220 FORECLOSURE
[ ] 230 RENT LEASE & EJECTMENT
[ ] 240 TORTS TO LAND
[ ] 245 TORT PRODUCT LIABILITY
[ ] 290 ALL OTHER REAL PROPERTY

**ACTIONS UNDER STATUTES**

**CIVIL RIGHTS**

[ ] 441 VOTING
[ ] 442 EMPLOYMENT
[ ] 443 HOUSING/ACCOMMODATIONS
[ ] 444 WELFARE
[ ] 445 AMERICANS WITH DISABILITIES - EMPLOYMENT
[ ] 448 AMERICANS WITH DISABILITIES -OTHER
[ ] 440 OTHER CIVIL RIGHTS

**PRISONER PETITIONS**

[ ] 510 MOTIONS TO VACATE SENTENCE 20 USC 2255
[ ] 530 HABEAS CORPUS
[ ] 535 DEATH PENALTY
[ ] 540 MANDAMUS & OTHER
[ ] 550 CIVIL RIGHTS
[ ] 555 PRISON CONDITION

**IMMIGRATION**

[ ] 462 NATURALIZATION APPLICATION
[ ] 463 HABEAS CORPUS-ALIEN DETAINEE
[ ] 465 OTHER IMMIGRATION ACTIONS

*Check if demanded in complaint:*

[ ] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DO YOU CLAIM THIS CASE IS RELATED TO A CIVIL CASE NOW PENDING IN S.D.N.Y.? IF SO, STATE:

DEMAND $ _____ OTHER _____ JUDGE _____ DOCKET NUMBER_____

*Check YES only if demanded in complaint*
JURY DEMAND: [✓] YES [ ] NO

NOTE: Please submit at the time of filing an explanation of why cases are deemed related.

Case 1:12-cv-00300-JPO  Document 1  Filed 01/13/12  Page 3

| (PLACE AN x IN ONE BOX ONLY) | | ORIGIN | | | | |
|---|---|---|---|---|---|---|
| ☑ 1 Original Proceeding | ☐ 2a. Removed from State Court ☐ 2b. Removed from State Court AND at least one party is pro se. | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from (Specify District) | ☐ 6 Multidistrict Litigation | ☐ 7 Appeal to District Judge from Magistrate Judge Judgment |

| (PLACE AN x IN ONE BOX ONLY) | BASIS OF JURISDICTION | | IF DIVERSITY, INDICATE |
|---|---|---|---|
| ☑ 1 U.S. PLAINTIFF   ☐ 2 U.S. DEFENDANT | ☐ 3 FEDERAL QUESTION (U.S. NOT A PARTY) | ☐ 4 DIVERSITY | *CITIZENSHIP BELOW.* *(28 USC 1322, 1441)* |

CITIZENSHIP OF PRINCIPAL PARTIES (FOR DIVERSITY CASES ONLY)

(Place an [X] in one box for Plaintiff and one box for Defendant)

| | PTF | DEF | | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|---|---|---|
| CITIZEN OF THIS STATE | [ ] 1 | [ ] 1 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | [ ] 3 | [ ] 3 | INCORPORATED and PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE | [ ] 5 | [ ] 5 |
| CITIZEN OF ANOTHER STATE | [ ] 2 | [ ] 2 | INCORPORATED or PRINCIPAL PLACE OF BUSINESS IN THIS STATE | [ ] 4 | [ ] 4 | FOREIGN NATION | [ ] 6 | [ ] 6 |

PLAINTIFF(S) ADDRESS(ES) AND COUNTY(IES)

United States of America ex rel. Marc D. Baker

Marc D. Baker
7120 St. James Court
North Port, Florida 34287
Sarasota County, Florida

DEFENDANT(S) ADDRESS(ES) AND COUNTY(IES)

Walgreens, Inc.
200 Wilmot Road
Deerfield, Illinois 60015
Lake County, Illinois

DEFENDANT(S) ADDRESS UNKNOWN
REPRESENTATION IS HEREBY MADE THAT, AT THIS TIME, I HAVE BEEN UNABLE, WITH REASONABLE DILIGENCE, TO ASCERTAIN THE RESIDENCE ADDRESSES OF THE FOLLOWING DEFENDANTS:

N/A

Check one:   THIS ACTION SHOULD BE ASSIGNED TO:   ☐ WHITE PLAINS   ☑ MANHATTAN
(DO NOT check either box if this a PRISONER PETITION.)

DATE 1/13/2012   SIGNATURE OF ATTORNEY OF RECORD

RECEIPT #   *Pro hac Vice Pending*

ADMITTED TO PRACTICE IN THIS DISTRICT
☐ NO
☑ YES (DATE ADMITTED Mo. 1   Yr. 12 )
Attorney Bar Code # DC 469097   *Pro Hac*

Magistrate Judge is to be designated by the Clerk of the Court.

Magistrate Judge _____   MAG. JUDGE GORENSTEIN   is so Designated.

Ruby J. Krajick, Clerk of Court by _____   Deputy Clerk, DATED _____.

UNITED STATES DISTRICT COURT (NEW YORK SOUTHERN)

**ATTACHMENT TO CIVIL COVER SHEET**

**Attorneys for Plaintiff-Relator**

Andrew M. Beato (Pro Hac Vice Pending)
Robert F. Muse
Kerrie C. Dent
Ron Kovner
Jed Wulfekotte
STEIN, MITCHELL & MUSE, LLP
1100 Connecticut Avenue, N.W.
Suite 1100
Washington, D.C. 20036
(202) 737-7777 (telephone)
(202) 296-8312 (fax)
ABeato@SteinMitchell.com

# Farrell Decl. Exhibit 10

# Filed Under Seal

# Farrell Decl. Exhibit 11

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA *et al. ex rel.*
MARC D. BAKER,

    Plaintiffs,

       v.

WALGREENS, INC.,

    Defendant.

12 Civ. 0300 (JPO)

---

UNITED STATES OF AMERICA,

    Plaintiff-Intervenor,

       v.

WALGREEN CO.,

    Defendant.

12 Civ. 0300 (JPO)

*(stamp)* JAN 19 2017

## STIPULATION AND ORDER OF SETTLEMENT AND DISMISSAL

WHEREAS, this Stipulation and Order of Settlement and Dismissal ("Stipulation") is entered into by and among plaintiff the United States of America ("United States" or "Government"), by its attorney, Preet Bharara, United States Attorney for the Southern District of New York; the *qui tam* relator ("Relator") in *United States* ex rel. *Baker v. Walgreens, Inc.*, 12 Civ. 0300 (JPO), by Relator's authorized representatives; and defendant Walgreen Co. ("Walgreens" and together with the Government and Relator, "Parties"), by its authorized representatives;

WHEREAS, on or about January 13, 2012, Relator filed a *qui tam* complaint against Walgreens in the United States District Court for the Southern District of New York ("Court"),

alleging, *inter alia*, that Walgreens had violated the federal Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b, and federal the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.*, in connection with its enrollment of persons receiving benefits from federally-funded healthcare programs in its Prescription Savings Club program ("PSC program") ("Relator Original Complaint"). Relator filed an amended complaint on December 30, 2013 ("Relator Amended Complaint");

WHEREAS, contemporaneous with the filing of this Stipulation, the Government, through the Office of the United States Attorney for the Southern District of New York, is filing a Notice of Election to Partially Intervene and Complaint-In-Intervention in the above-referenced *qui tam* action ("Government Complaint"), in which it alleges that from January 1, 2007 through December 31, 2010, Walgreens knowingly solicited and allowed persons receiving benefits from the Medicare Part D, Medicaid, and TRICARE programs ("government beneficiaries") to enroll in the PSC program, in order to induce such persons to self-refer their prescriptions to Walgreens' pharmacies, in violation of the AKS and the FCA. The conduct described in this paragraph is the "Government Complaint Conduct" for purposes of this Stipulation;

WHEREAS, during the course of discussing a potential resolution of the Government Complaint Conduct, Walgreens disclosed to the Government information reflecting that during the period January 1, 2011 through December 31, 2015, it had also enrolled government beneficiaries in the PSC program, and it sought to negotiate a resolution of any potential claims the Government may have for allegations that from January 1, 2011 through December 31, 2015, Walgreens knowingly enrolled government beneficiaries in the PSC program in order to induce such persons to self-refer their prescriptions to Walgreens' pharmacies in violation of the AKS and FCA ("Post-2010 Conduct") together with the Government Complaint Conduct. The Post-

2

2010 Conduct together with the Government Complaint Conduct shall collectively be referred to as the "Covered Conduct" for purposes of this Stipulation.

WHEREAS, Walgreens and various states that participate in the Medicaid program ("States") intend to enter into separate settlement agreements ("State Settlements"), to resolve claims for the Covered Conduct, and Walgreens has agreed to pay a total of $3,794,891.47 to the States pursuant to and subject to the execution of the State Settlements; and

WHEREAS, the Parties have, through this Stipulation, reached a mutually-agreeable resolution addressing claims asserted against Walgreens for the Covered Conduct;

NOW, THEREFORE, upon the Parties' agreement, IT IS HEREBY ORDERED that:

## TERMS AND CONDITIONS

1.     The Parties agree that this Court has subject matter jurisdiction over this action and consent to this Court's exercise of personal jurisdiction over each of them.

2.     Walgreens admits, acknowledges, and accepts responsibility for the following conduct:

        a.      Walgreens launched its Prescriptions Savings Club program ("PSC program") in 2007.

        b.      Since the inception of the PSC program in 2007, customers enrolling in the PSC program ("PSC program members" or "PSC members") have been eligible to receive discounts on thousands of generic and brand-name prescription medications.

        c.      PSC program members have also been eligible for other benefits, including a 10% bonus on purchases of Walgreens' branded products (such as household products, baby care products, most grocery items, and non-prescription medications). Whenever a PSC member makes an eligible purchase and presents his or her PSC membership card, 10% of the pre-tax purchase price of the item is credited to the PSC member's PSC card. The earned credits are then applied to the next eligible purchase the PSC member makes.

3

d. During the period January 1, 2007 through December 31, 2010, Walgreens' published materials regarding the PSC program stated that persons receiving benefits from the Medicare and Medicaid programs were not eligible to participate in the PSC program.

e. In October 2007, Walgreens identified approximately 13,000 PSC program members who it had determined were beneficiaries of the Medicare and Medicaid programs, and it removed those individuals from the PSC program. In an internal news release informing its employees of this removal, Walgreens stated that "any customer who ha[d] any type of 3rd party coverage with a Medicare or Medicaid plan was removed from the [Prescription] Savings Club database," and that "th[is] removal was necessary to comply with State/Federal regulations."

f. Subsequent to October 2007 and continuing through December 31, 2010, internal Walgreens documents reflect that its stated policy to exclude Medicare and Medicaid beneficiaries from the PSC program was based on, among other things, the prohibition on offering inducements to beneficiaries of government healthcare programs reflected in the federal Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b), and corresponding state anti-kickback laws.

g. In a June 2010 submission to one of its state regulators, Walgreens stated that, based on the prohibitions of the AKS, beneficiaries of government healthcare programs were not eligible to become PSC members.

h. Notwithstanding its stated policy to exclude Medicare and Medicaid beneficiaries from the PSC program, subsequent to October 2007 and continuing through December 31, 2010, Walgreens enrolled hundreds of thousands of Medicare and Medicaid beneficiaries in the PSC program.

i. Between November 2007 and December 31, 2010, Walgreens also enrolled more than 10,000 TRICARE beneficiaries in the PSC program.

j. Prior to December 31, 2010, pharmacists at Walgreens' stores nationwide made tens of thousands of notations in Walgreens' internal customer database reflecting that specific Medicare, Medicaid and TRICARE beneficiaries had been enrolled in the PSC program and were using the PSC program to purchase some of their prescription drugs.

k. At various times between November 2007 and December 31, 2010, Walgreens paid its employees a bonus of between $1 and $5 for each customer they enrolled in the PSC program. When paying these bonuses, Walgreens did not verify that the customers its employees had enrolled in the PSC program were not government beneficiaries.

4

l.     Prior to December 31, 2010, Walgreens did not have effective
       mechanisms in place to block government beneficiaries from enrolling in
       the PSC program or to monitor adequately whether government
       beneficiaries had been allowed to enroll in the PSC program, to ensure
       compliance with its stated policy to exclude such beneficiaries from the
       PSC program. As a result, hundreds of thousands of government
       beneficiaries were enrolled in the PSC program.

m.     Subsequent to December 31, 2010 and continuing through December 31,
       2015, Walgreens' internal company policy continued to preclude the
       enrollment of government beneficiaries in the PSC program, and
       Walgreens continued to enroll such beneficiaries in the program.

3.     Walgreens shall pay the Government $46,205,108.53 within fourteen (14)

business days of the Effective Date (defined below in Paragraph 27), plus interest, which shall be

compounded annually at a rate of 2.4% accruing from December 29, 2016, to the date of

payment ("Settlement Amount").

4.     The payment required by Paragraph 3 above shall be made in accordance with

instructions to be provided by the Financial Litigation Unit of the United States Attorney's

Office for the Southern District of New York.

5.     Walgreens agrees to cooperate fully and truthfully with the United States'

investigation relating to the Covered Conduct of individuals and entities not released in this

Agreement. Upon reasonable notice, Walgreens shall encourage, and agrees not to impair, the

cooperation of its directors, officers, and employees, and shall use its best efforts to make

available, and encourage, the cooperation of former directors, officers, and employees for

interviews and testimony relating to the Covered Conduct, consistent with the rights and

privileges of such individuals. Walgreens further agrees to furnish to the United States, upon

request, complete and unredacted copies of all non-privileged documents, reports, memoranda of

interviews, and records in its possession, custody, or control concerning any investigation of the

Covered Conduct that it has undertaken, or that has been performed by another on its behalf, as

5

well as complete and unredacted copies of any other non-privileged documents in its possession, custody, or control relating to the Covered Conduct.

6.      Subject to the exceptions in Paragraph 9 below (concerning excluded claims) and Paragraph 16 below (concerning bankruptcy proceedings), and conditioned on Walgreens' compliance with the terms of this Stipulation, including full payment of the Settlement Amount as set forth in Paragraph 3 above, the United States releases Walgreens, together with its current and former parent corporations; direct and indirect subsidiaries; brother or sister corporations; divisions; current or former corporate owners; and the corporate successors and assigns of any of them, from any civil or administrative monetary claim that the United States has for the Covered Conduct under the FCA, the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a, the Program Fraud Civil Remedies Act, 31 U.S.C. § 3801-3812, and the common law theories of fraud, payment by mistake and unjust enrichment. This Stipulation is not intended to and does not release any allegations or claims other than the Covered Conduct. For purposes of example only and without limitation, this Stipulation does not release any allegations or claims relating to

7.      Conditioned on Walgreens making the required payment set forth in Paragraph 3 above and the payment Walgreens is required to make under the State Settlements, and subject to Paragraph 16 below (concerning bankruptcy proceedings), Relator, for Relator and Relator's heirs, successors, attorneys, agents, and assigns, releases Walgreens, together with its current and former parent corporations; direct and indirect subsidiaries; brother or sister corporations;

6

divisions; current or former corporate owners, directors, officers, and employees; and the corporate successors and assigns of any of them, from: (a) any civil monetary claim that Relator has on behalf of the United States for the Covered Conduct under the FCA, and (b) any claim Relator asserted or could have asserted against Walgreens in the Relator Amended Complaint that arises out of the Covered Conduct; provided, however, that nothing in this Stipulation shall preclude Relator from seeking to recover Relator's expenses, costs, or attorney's fees from Walgreens pursuant to 31 U.S.C. § 3730(d); and provided further that this Stipulation is not intended to and does not release any allegations or claims other than the Covered Conduct. For purposes of example only and without limitation, this Stipulation does not release any allegations or claims relating to ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████

8.  In consideration of the execution of this Stipulation by Relator, and the releases by Relator as set forth in Paragraph 7 above, Walgreens, together with its current and former parent corporations, directors, officers, and employees; direct and indirect subsidiaries; brother or sister corporations; divisions; current or former corporate owners; and the corporate successors and assigns of any of them, releases Relator, and Relator's heirs, successors, attorneys, agents, and assigns, from any claims (including attorneys' fees, costs, and expenses of every kind and however denominated) that Walgreens has asserted, could have asserted, or may assert in the future against Relator, relating to the allegations in the Original Relator Complaint, the Relator Amended Complaint, or the Government Complaint, to the extent such allegations are based on the Covered Conduct; provided, however, that Walgreens reserves and does not

7

release its right to assert any defenses or claims it may have in response to any claims Relator may assert for expenses, costs or attorneys' fees pursuant to 31 U.S.C. § 3730(d).

      9.     Notwithstanding the releases given in Paragraph 6 above, or any other term of this Stipulation, the following claims of the Government are specifically reserved and are not released by this Stipulation:

          a.     any liability arising under Title 26, United States Code (Internal Revenue Code);

          b.     any criminal liability;

          c.     except as explicitly stated in this Stipulation, any administrative liability, including mandatory or permissive exclusion from Federal health care programs;

          d.     any liability to the Government (or its agencies) for any conduct other than the Covered Conduct;

          e.     any liability based upon obligations created by this Stipulation; and

          f.     any liability of individuals.

      10.     Walgreens shall be in default of this Stipulation if Walgreens fails to make the required payment set forth in Paragraph 3 above, or if it fails to comply materially with any other term of this Stipulation that applies to it ("Default"). The Government shall provide written notice of any Default in the manner set forth in Paragraph 26 below. Walgreens shall then have an opportunity to cure the Default within ten (10) calendar days from the date of delivery of the notice of Default. In the event that a Default is not fully cured within ten (10) calendar days of the delivery of the notice of Default ("Uncured Default"), interest shall accrue at the rate of 12% per annum compounded daily on the remaining unpaid principal balance of the Settlement Amount, beginning seven (7) business days after mailing of the notice of Default. In the event of

8

an Uncured Default, Walgreens agrees to the entry of the consent judgment attached hereto as

Exhibit A and that the Government may take action to collect on the consent judgment. In the

event of an Uncured Default, Walgreens further agrees that the United States, at its option, may

(a) rescind this Stipulation and reinstate the Government Complaint, as well as any claims that

could be asserted for the Covered Conduct (in the event the Government Complaint is reinstated,

Relator could also reinstate the claims in the Relator Amended Complaint that are based on the

Covered Conduct); (b) seek specific performance of this Stipulation; (c) offset the remaining

unpaid balance of the Settlement Amount (including interest) from any amounts due and owing

Walgreens by any department, agency, or agent of the United States; or (d) exercise any other

rights granted by law, or under the terms of this Stipulation, or recognizable at common law or in

equity. Walgreens shall not contest any offset imposed or any collection undertaken by the

Government pursuant to this Paragraph, either administratively or in any Federal or State court.

In addition, Walgreens shall pay the Government all reasonable costs of collection and

enforcement under this Paragraph, including attorneys' fees and expenses. In the event that the

United States opts to rescind this Stipulation pursuant to this Paragraph, Walgreens shall not

plead, argue, or otherwise raise any defenses under the theories of statute of limitations, laches,

estoppel, or similar theories, to any civil or administrative claims that relate to the Covered

Conduct.

11.     Relator, and Relator's heirs, successors, attorneys, agents, and assigns, shall not

object to this Stipulation but agree and confirm that the terms of this Stipulation are fair,

adequate, and reasonable under all the circumstances, pursuant to 31 U.S.C. § 3730(c)(2)(B).

Subject to any claims that Relator may have under 31 U.S.C. § 3730(d) and the separate

Stipulation and Order of Settlement and Release between Relator and the United States

9

addressing Relator's share of the Settlement Amount, Relator, for Relator and Relator's heirs, successors, attorneys, agents, and assigns, releases, waives, and forever discharges the United States, its agencies, officers, agents, employees, and servants, from any claims, known or unknown, arising from the filing of the Relator Amended Complaint, to the extent the Relator Amended Complaint raises claims based on the Covered Conduct, and from any claims under 31 U.S.C. § 3730, to the extent such claims are based on the Covered Conduct.

12. Walgreens waives and shall not assert any defenses Walgreens may have to any criminal prosecution or administrative action relating to the Covered Conduct that may be based in whole or in part on a contention that, under the Double Jeopardy Clause in the Fifth Amendment of the Constitution, or under the Excessive Fines Clause in the Eighth Amendment of the Constitution, this Stipulation bars a remedy sought in such criminal prosecution or administrative action. Nothing in this Paragraph or any other provision of this Stipulation constitutes an agreement by the United States concerning the characterization of the Settlement Amount for purposes of the Internal Revenue laws, Title 26 of the United States Code.

13. Walgreens fully and finally releases the United States, its agencies, officers, agents, employees, and servants, from any claims (including attorneys' fees, costs, and expenses of every kind and however denominated) that Walgreens has asserted, could have asserted, or may assert in the future against the United States, its agencies, officers, agents, employees, or servants, related to the Covered Conduct, the United States' investigation, prosecution and settlement of the Covered Conduct, and the United States' investigation (as of the Effective Date) of the Covered Conduct.

14. This Stipulation is intended to be for the benefit of the Parties only. The Parties do not release any claims against any other person or entity except as otherwise provided herein.

10

15.     Walgreens represents and warrants that it has reviewed its financial situation, that it is currently solvent within the meaning of 11 U.S.C. §§ 547(b)(3) and 548(a)(1)(B)(ii)(I), and that it reasonably believes as of the date hereof that it shall remain solvent following compliance with its obligations under this Stipulation. Further, the Parties warrant that, in evaluating whether to execute this Stipulation, they (a) have intended that the mutual promises, covenants, and obligations set forth constitute a contemporaneous exchange for new value given to Walgreens within the meaning of 11 U.S.C. § 547(c)(1); and (b) have concluded that these mutual promises, covenants, and obligations due, in fact, constitute such a contemporaneous exchange. Further, the Parties warrant that the mutual promises, covenants, and obligations set forth herein are intended to and do, in fact, represent a reasonably equivalent exchange of value that is not intended to hinder, delay, or defraud any entity to which Walgreens was or became indebted to on or after the date of this Stipulation, within the meaning of 11 U.S.C. § 548(a)(1).

16.     If Walgreens commences, or a third party commences, any case, action, or other proceeding under any law relating to bankruptcy, insolvency, reorganization, or relief of debtors (a) seeking an order for relief of Walgreens' debts, or seeking to adjudicate Walgreens as bankrupt or insolvent; or (b) seeking appointment of a trustee, custodian, or other similar official for Walgreens or for all or any substantial part of Walgreens' assets, Walgreens agrees as follows:

a.      Walgreens' obligations under this Stipulation may not be avoided pursuant to 11 U.S.C. § 547, and Walgreens shall not argue or otherwise take the position in any such case, action, or proceeding that (i) Walgreens' obligations under this Stipulation may be avoided under 11 U.S.C. § 547; (ii) Walgreens was insolvent at the time this Stipulation was entered into;

11

or (iii) the mutual promises, covenants, and obligations set forth in this Stipulation do not

constitute a contemporaneous exchange for new value given to Walgreens.

                b.      If Walgreens' obligations under this Stipulation are avoided for any

reason, including, but not limited to, through the exercise of a trustee's avoidance powers under

the Bankruptcy Code, the Government, at its sole option, may rescind the releases in this

Stipulation and reinstate the Government Complaint or bring any civil and/or administrative

claim, action, or proceeding against Walgreens that would otherwise be covered by the releases

in Paragraph 6 above (in the event the Government Complaint is reinstated, Relator could also

reinstate the claims in the Relator Amended Complaint that are based on the Covered Conduct).

Walgreens agrees that (i) any such claim, action, or proceeding brought by the Government or

Relator would not be subject to an "automatic stay" pursuant to 11 U.S.C. § 362(a) as a result of

the case, action, or proceeding described in the first clause of this Paragraph, and Walgreens

shall not argue or otherwise contend that the claim, action, or proceeding is subject to an

automatic stay; (ii) Walgreens shall not plead, argue, or otherwise raise any defenses under the

theories of statute of limitations, laches, estoppel, or similar theories, to any claim, action, or

proceeding that is brought by the Government or Relator within 60 calendar days of written

notification that the releases in this Stipulation have been rescinded pursuant to this Paragraph,

except to the extent such defenses were available on the date Relator initially filed the above-

referenced action; and (iii) the Government has a valid claim against Walgreens for the full

Settlement Amount, and the Government may pursue the claim in the case, action, or proceeding

described in the first clause of this Paragraph, as well as in any other case, action, or proceeding.

                c.      Walgreens acknowledges that the agreements in this Paragraph are

provided in exchange for valuable consideration provided in this Stipulation.

17.     Walgreens agrees to the following:

a.      Unallowable Costs Defined: All costs (as defined in the Federal Acquisition Regulation, 48 C.F.R. § 31.205-47; and in Titles XVIII and XIX of the Social Security Act, 42 U.S.C. §§ 1395-1395kkk and 1396-1396w-5; and the regulations and official program directives promulgated thereunder) incurred by or on behalf of Walgreens, including its present or former officers, directors, employees, shareholders and agents, in connection with:

(1)     the matters covered by this Stipulation;

(2)     the United States' audit(s) and civil and/or criminal investigation(s) of matters covered by this Stipulation;

(3)     Walgreens' investigation, defense, and corrective actions undertaken in response to the United States' audit(s) and civil and/or criminal investigation(s) in connection with matters covered by this Stipulation (including attorneys' fees);

(4)     the negotiation and performance of this Stipulation; and

(5)     any payments Walgreens makes to the United States pursuant to this Stipulation and any payments Walgreens may make to Relator, including expenses, costs and attorneys' fees,

are unallowable costs for government contracting purposes and under the Medicare Program, Medicaid Program, TRICARE Program, and Federal Employees Health Benefits Program (FEHBP) (hereinafter referred to as "Unallowable Costs").

b.      Future Treatment of Unallowable Costs: Unallowable Costs shall be separately determined and accounted for by Walgreens, and Walgreens shall not charge such Unallowable Costs directly or indirectly to any contracts with the United States or

13

any State Medicaid program, or seek payment for such Unallowable Costs through any cost report, cost statement, information statement, or payment request submitted by Walgreens or any of its subsidiaries or affiliates to the Medicare, Medicaid, TRICARE, or FEHBP Programs.

      c.     Treatment of Unallowable Costs Previously Submitted for Payment: Walgreens further agrees that within 90 days of the Effective Date of this Stipulation, it shall identify to applicable Medicare and TRICARE fiscal intermediaries, carriers, and/or contractors, and Medicaid and FEHBP fiscal agents, any Unallowable Costs (as defined in this Paragraph) included in payments previously sought from the United States, or any State Medicaid Program, including, but not limited to, payments sought in any cost reports, cost statements, information reports, or payment requests already submitted by Walgreens or any of its subsidiaries or affiliates, and shall request, and agree, that such cost reports, cost statements, information reports, or payment requests, even if already settled, be adjusted to account for the effect of the inclusion of the Unallowable Costs. Walgreens agrees that the United States, at a minimum, shall be entitled to recoup from Walgreens any overpayment plus applicable interest and penalties as a result of the inclusion of such Unallowable Costs on previously-submitted cost reports, information reports, cost statements, or requests for payment.

      Any payments due after the adjustments have been made shall be paid to the United States pursuant to the direction of the Department of Justice and/or the affected agencies. The United States reserves its rights to disagree with any calculations submitted by Walgreens or any of its subsidiaries or affiliates on the effect of inclusion of

14

Unallowable Costs (as defined in this Paragraph) on Walgreens or any of its subsidiaries or affiliates' cost reports, cost statements, or information reports.

      d.     Nothing in this Stipulation shall constitute a waiver of the rights of the United States to audit, examine, or re-examine Walgreens' books and records to determine that no Unallowable Costs have been claimed in accordance with the provisions of this Paragraph.

18.     Except as set forth in Paragraph 7 above (which preserves Relator's rights against Walgreens to seek reasonable expenses, costs, and attorneys' fees), each Party shall bear its own legal and other costs incurred in connection with this matter.

19.     Any failure by the Government to insist upon the full or material performance of any of the provisions of this Stipulation shall not be deemed a waiver of any of the provisions hereof, and the Government, notwithstanding that failure, shall have the right thereafter to insist upon the full or material performance of any and all of the provisions of this Stipulation.

20.     This Stipulation is governed by the laws of the United States. The exclusive jurisdiction and venue for any dispute relating to this Stipulation is the United States District Court for the Southern District of New York. For purposes of construing this Stipulation, this Stipulation shall be deemed to have been drafted by all Parties to this Stipulation and shall not, therefore, be construed against any Party in any subsequent dispute.

21.     This Stipulation constitutes the complete agreement between the Parties with respect to the subject matter hereof. This Stipulation may not be amended except by written consent of the Parties.

22.    The undersigned counsel and any other signatories represent and warrant that they are fully authorized to execute this Stipulation on behalf of persons and the entities indicated below.

23.    This Stipulation is binding on and inures to the benefit of Walgreens and any successor entities.

24.    This Stipulation is binding on and inures to the benefit of Relator's successors, transferees, heirs, and assigns.

25.    This Stipulation may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same Stipulation. E-mails that attach signatures in PDF form or facsimiles of signatures shall constitute acceptable, binding signatures for purposes of this Stipulation.

26.    Any notices or requests pursuant to this Stipulation shall be in writing and shall be delivered by hand, express courier, or email transmission followed by postage-prepaid mail, and shall be addressed as follows:

IF TO THE UNITED STATES:

Christopher B. Harwood
Assistant United States Attorney
United States Attorney's Office
Southern District of New York
86 Chambers Street, Third Floor
New York, New York 10007
Email: christopher.harwood@usdoj.gov

IF TO WALGREENS:

Rick Robinson
Norton Rose Fulbright US LLP
799 9th Street NW, Suite 1000
Washington, D.C. 20001
Email: rick.robinson@nortonrosefulbright.com

16

27.     The Effective Date of this Stipulation is the date upon which the Stipulation is approved and entered by the Court.

28.     Upon receipt of the payment described in Paragraph 3 above and the payment Walgreens is required to make under the State Settlements, the United States and Relator shall file pursuant to Rule 41(a)(1) a notice of dismissal with prejudice of the claims released by the United States in paragraph 6 above and the claims released by Relator in paragraph 7 above, respectively. No other claims shall be deemed to be dismissed, with prejudice or otherwise, as to either party. Moreover, neither the aforementioned notice of dismissal nor this Stipulation shall be deemed to release or dismiss, or shall release or dismiss, any allegations or claims other than those set forth in paragraphs 6 and 7 above. For purposes of example only and without limitation, this Stipulation and the aforementioned notice of dismissal shall not be deemed to release or dismiss, and shall not release or dismiss, any allegations or claims relating to

17

Agreed to by:

## THE UNITED STATES OF AMERICA

Dated: New York, New York
     January **11**, 2017

PREET BHARARA
United States Attorney for the
Southern District of New York

By:

CHRISTOPHER B. HARWOOD
Assistant United States Attorney
86 Chambers Street, Third Floor
New York, New York 10007
Telephone: (212) 637-2728
Facsimile: (212) 637-2786

*Attorney for the United States of America*

**RELATOR**

Dated: January 13, 2017

By: _____

**MARC D. BAKER**

*Relator*

Dated: January 13, 2017

STEIN MITCHELL CIPOLLONE BEATO
& MISSNER LLP

By: _____

**ANDREW M. BEATO**
**JED WULFEKOTTE**
**MERYL GRENADIER**
1100 Connecticut Ave, NW Suite 1100
Washington, DC 20036
Telephone: (202) 737-7777
Facsimile: (202) 296-8312

*Attorneys for Relator*

19

WALGREEN CO.

Dated: January 17, 2017

NORTON ROSE FULBRIGHT US LLP

By: _[signature]_

RICK ROBINSON
799 9th Street NW, Suite 1000
Washington, D.C. 20001
Telephone: (202) 662-4534
Facsimile: (202) 662-4643

*Attorneys for Walgreen Co.*

Dated: January 17, 2017

By: _[signature]_

ELENA KRAUS
Senior Vice President and General Counsel
*Walgreen Co.*

SO ORDERED:

_[signature]_

UNITED STATES DISTRICT JUDGE

Dated: JAN. 18, 2017

20

# Farrell Decl.
# Exhibit 12

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA *et al. ex rel.*
MARC D. BAKER,

   Plaintiffs,

        v.

WALGREENS, INC.,

   Defendant.

12 Civ. 0300 (JPO)

---

UNITED STATES OF AMERICA,

   Plaintiff-Intervenor,

        v.

WALGREEN CO.,

   Defendant.

12 Civ. 0300 (JPO)

## STIPULATION AND ORDER OF SETTLEMENT AND DISMISSAL

WHEREAS, this Stipulation and Order of Settlement and Dismissal ("Stipulation") is entered into by and among plaintiff the United States of America ("United States" or "Government"), by its attorney, Geoffrey S. Berman, United States Attorney for the Southern District of New York; the *qui tam* relator in *United States* et al. ex rel. *Marc D. Baker v. Walgreens, Inc.*, 12 Civ. 0300 (JPO) ("Relator"), by his authorized representatives; and defendant Walgreen Co. ("Walgreens" and together with the Government and Relator, "Parties"), by its authorized representatives;

WHEREAS, on or about January 13, 2012, the Relator filed a *qui tam* complaint ("Relator Original Complaint") against Walgreens in the United States District Court for the

Southern District of New York ("SDNY"), alleging, *inter alia*, that Walgreens had violated the

False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, by submitting false claims for

reimbursement to federal health care programs for prescription drugs that it sold through a

discount drug program, which it referred to as the Prescription Savings Club program ("PSC

program"). The Relator filed an amended complaint on December 30, 2013 ("Relator Amended

Complaint");

      WHEREAS, the Government alleges that, from January 2008 through December 2017

("Covered Period"), Walgreens violated the FCA by (1) submitting claims to the Medicaid

programs of 39 states[1] and the District of Columbia (collectively, "States") in which the prices it

identified as the usual and customary ("U&C") prices for certain prescription drugs that it sold

through the PSC program were higher than the prices it charged for those drugs pursuant to the

PSC program, and thereby (2) obtaining more money in reimbursements from the States'

Medicaid programs for sales of such drugs than it was entitled to receive. The claims referenced

in the prior sentence relate to Medicaid fee-for-service claims, and do not cover Medicaid

managed care claims. The conduct described in this paragraph is the "Covered Conduct" for

purposes of this Stipulation;

      WHEREAS, contemporaneous with the filing of this Stipulation, the Government is

filing a Notice of Election to Partially Intervene and a Complaint-In-Intervention in the above-

---

[1] The 39 states referenced above consist of Alabama, Alaska, Arkansas, California, Connecticut, Colorado, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oklahoma, Oregon, Pennsylvania, Rhode Island, Tennessee, Texas, Utah, Vermont, Virginia, West Virginia, Washington, and Wisconsin.

referenced *qui tam* action ("Government Complaint"), in which it is asserting claims under the FCA and the common law for the Covered Conduct;

WHEREAS, Walgreens and the above-referenced States intend to enter into separate settlement agreements ("State Settlements"), to resolve claims asserted by the States for the Covered Conduct, and Walgreens has agreed to pay a total of $27,947,731.59 to the States pursuant to and subject to the execution of the State Settlements; and

WHEREAS, the Parties have, through this Stipulation, reached a mutually-agreeable resolution addressing claims asserted against Walgreens for the Covered Conduct;

NOW, THEREFORE, upon the Parties' agreement, IT IS HEREBY ORDERED that:

## TERMS AND CONDITIONS

1.     The Parties agree that this Court has subject matter jurisdiction over this action and consent to this Court's exercise of personal jurisdiction over each of them.

2.     Walgreens admits, acknowledges, and accepts responsibility for the following conduct:

   a.   Walgreens launched the PSC program in 2007.  By 2008, Walgreens was offering the PSC program at its stores across the United States.

   b.   Throughout the Covered Period, customers who enrolled in the PSC program ("PSC program members") were eligible to receive discounts on thousands of generic and brand-name prescription drugs.  The specific drugs for which PSC program members were eligible to receive discounts were identified on the PSC program formulary.  During the Covered Period, Walgreens offered a savings guarantee pursuant to which PSC program members could recoup (in the form of a store credit) the difference between the amount they paid to enroll in the program in a given year and the amount they received in discounted savings under the program in that year.

   c.   During the Covered Period, most States required that, when Walgreens — or any other pharmacy — submitted a claim for reimbursement in connection with the sale of a prescription drug, the amount that the

3

pharmacy would be reimbursed was to be the lowest of certain price points, one of which was the pharmacy's U&C price for the drug.

d.  During the Covered Period, such States had or adopted specific formulations for how pharmacies should identify their U&C prices. Certain formulations defined U&C prices as the lowest prices at which pharmacies offered or sold their drugs to the "general public." Certain formulations further specified that such lowest prices were to include special or discount prices, such as $4 generics, offered or sold to the "general public."

e.  Throughout the Covered Period, in submitting claims for reimbursement to the States, Walgreens did not identify its PSC program prices as its U&C prices for the drugs on the PSC program formulary. As a result, the States paid Walgreens more money in reimbursements than they would have paid if Walgreens had identified its PSC program prices as its U&C prices.

3.  Walgreens shall pay the Government $32,052,268.41 within fourteen (14) business days of the Effective Date (defined below in Paragraph 27) plus interest, which shall be compounded annually at a rate of 2.87% accruing from October 15, 2018, to the date of payment ("Settlement Amount"). Of the Settlement Amount $16,026,134.20, plus 50% of the accrued interest, constitutes restitution to the United States.

4.  The payment required by Paragraph 3 above shall be made in accordance with instructions to be provided by the Financial Litigation Unit of the United States Attorney's Office for the Southern District of New York.

5.  Walgreens agrees to cooperate fully and truthfully with the United States' investigation relating to the Covered Conduct of individuals and entities not released in this Agreement. Upon reasonable notice, Walgreens shall encourage, and agrees not to impair, the cooperation of its directors, officers, and employees, and shall use its best efforts to make available, and encourage, the cooperation of former directors, officers, and employees for interviews and testimony relating to the Covered Conduct, consistent with the rights and

4

privileges of such individuals. Walgreens further agrees to furnish to the United States, upon request, complete and unredacted copies of all non-privileged documents, reports, memoranda of interviews, and records in its possession, custody, or control concerning any investigation of the Covered Conduct that it has undertaken, or that has been performed by another on its behalf, as well as complete and unredacted copies of any other non-privileged documents in its possession, custody, or control relating to the Covered Conduct.

6.     Subject to the exceptions in Paragraph 9 below (concerning excluded claims) and Paragraph 16 below (concerning bankruptcy proceedings), and conditioned on Walgreens' compliance with the terms of this Stipulation, including full payment of the Settlement Amount as set forth in Paragraph 3 above, the United States releases Walgreens, together with its current and former parent corporations; direct and indirect subsidiaries; brother or sister corporations; divisions; current or former corporate owners; and the corporate successors and assigns of any of them, from any civil or administrative monetary claim that the United States has for the Covered Conduct under the FCA, the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a, the Program Fraud Civil Remedies Act, 31 U.S.C. § 3801-3812, and the common law theories of fraud, payment by mistake and unjust enrichment. This Stipulation is not intended to and does not release any allegations or claims other than the Covered Conduct. For purposes of example only and without limitation, this Stipulation does not release any allegations or claims of the United States relating to Walgreens' pricing of prescription medications, including but not limited to allegations or claims relating to the U&C prices for prescription medications, to the extent that such allegations or claims relate to Medicare or any federal healthcare program other than Medicaid.

7.     Conditioned on Walgreens making the required payment set forth in Paragraph 3 above and the payments Walgreens is required to make under the State Settlements, and subject to Paragraph 16 below (concerning bankruptcy proceedings), the Relator, for himself and his heirs, successors, attorneys, agents, and assigns, releases Walgreens, together with its current and former parent corporations; direct and indirect subsidiaries; brother or sister corporations; divisions; current or former corporate owners, directors, officers, and employees; and the corporate successors and assigns of any of them, from: (a) any civil monetary claim that the Relator has on behalf of the United States for the Covered Conduct under the FCA, and (b) any claim that the Relator asserted or could have asserted against Walgreens in the Relator Original Complaint or the Relator Amended Complaint; provided, however, that nothing in this Stipulation shall preclude the Relator from seeking to recover his expenses, costs, or attorney's fees from Walgreens pursuant to 31 U.S.C. § 3730(d).

8.     In consideration of the execution of this Stipulation by the Relator, and the releases by the Relator as set forth in Paragraph 7 above, Walgreens, together with its current and former parent corporations; direct and indirect subsidiaries; brother or sister corporations; divisions; current or former corporate owners, directors, officers, and employees; and the corporate successors and assigns of any of them, releases the Relator, and his heirs, successors, attorneys, agents, and assigns, from any claims (including attorneys' fees, costs, and expenses of every kind and however denominated) that Walgreens has asserted, could have asserted, or may assert in the future against the Relator, relating to the allegations in the Relator Original Complaint, the Relator Amended Complaint, or the Government Complaint; provided, however, that Walgreens reserves and does not release its right to assert any defenses or claims it may

6

have in response to any claims the Relator may assert for expenses, costs or attorneys' fees pursuant to 31 U.S.C. § 3730(d).

9. Notwithstanding the releases given in Paragraph 6 above, or any other term of this Stipulation, the following claims of the Government are specifically reserved and are not released by this Stipulation:

      a. any liability arising under Title 26, United States Code (Internal Revenue Code);

      b. any criminal liability;

      c. except as explicitly stated in this Stipulation, any administrative liability, including mandatory exclusion from Federal health care programs; suspension or debarment pursuant to 2 C.F.R. Part 376; or actions pursuant to, or otherwise consistent with, 42 C.F.R. § 52.9, 45 C.F.R. §§ 75.207-75.208, or 45 C.F.R. §§ 75.371-75.375;

      d. any liability to the Government (or its agencies) for any conduct other than the Covered Conduct;

      e. any liability based upon obligations created by this Stipulation; and

      f. any liability of individuals.

10. Walgreens shall be in default of this Stipulation if Walgreens fails to make the required payment set forth in Paragraph 3 above on or before the due date for such payment, or if it fails to comply materially with any other term of this Stipulation that applies to it ("Default"). The Government shall provide written notice of any Default in the manner set forth in Paragraph 26 below. Walgreens shall then have an opportunity to cure the Default within ten (10) calendar days from the date of delivery of the notice of Default. In the event that a Default is not fully cured within ten (10) calendar days of the delivery of the notice of Default ("Uncured

Default"), interest shall accrue at the rate of 12% per annum compounded daily on the remaining unpaid principal balance of the Settlement Amount, beginning seven (7) business days after mailing of the notice of Default. In the event of an Uncured Default, Walgreens agrees to the entry of the consent judgment attached hereto as Exhibit A and that the Government may take action to collect on the consent judgment. In the event of an Uncured Default, Walgreens further agrees that the United States, at its option, may (a) rescind this Stipulation and reinstate the Government Complaint, as well as any claims that could be asserted for the Covered Conduct (in the event the Government Complaint is reinstated, the Relator could also reinstate the claims in the Relator Amended Complaint that he agreed to release pursuant to this Stipulation); (b) seek specific performance of this Stipulation; (c) offset the remaining unpaid balance of the Settlement Amount (including interest) from any amounts due and owing Walgreens by any department, agency, or agent of the United States; or (d) exercise any other rights granted by law, or under the terms of this Stipulation, or recognizable at common law or in equity. Walgreens shall not contest any offset imposed or any collection undertaken by the Government pursuant to this Paragraph, either administratively or in any Federal or State court. In addition, Walgreens shall pay the Government all reasonable costs of collection and enforcement under this Paragraph, including attorneys' fees and expenses. In the event that the United States opts to rescind this Stipulation pursuant to this Paragraph, Walgreens shall not plead, argue, or otherwise raise any defenses under the theories of statute of limitations, laches, estoppel, or similar theories, to any civil or administrative claims that relate to the Covered Conduct.

11.     The Relator, and his heirs, successors, attorneys, agents, and assigns, shall not object to this Stipulation but agrees and confirms that the terms of this Stipulation are fair, adequate, and reasonable under all the circumstances, pursuant to 31 U.S.C. § 3730(c)(2)(B).

Subject to any claims that the Relator may have under 31 U.S.C. § 3730(d) and the separate Stipulation and Order of Settlement and Release between the Relator and the United States addressing the Relator's share of the Settlement Amount, the Relator, for himself and his heirs, successors, attorneys, agents, and assigns, releases, waives, and forever discharges the United States, its agencies, officers, agents, employees, and servants, from any claims, known or unknown, arising from the filing of the Relator Original Complaint and the Relator Amended Complaint, and from any claims under 31 U.S.C. § 3730.

12.     Walgreens waives and shall not assert any defenses Walgreens may have to any criminal prosecution or administrative action relating to the Covered Conduct that may be based in whole or in part on a contention that, under the Double Jeopardy Clause in the Fifth Amendment of the Constitution, or under the Excessive Fines Clause in the Eighth Amendment of the Constitution, this Stipulation bars a remedy sought in such criminal prosecution or administrative action.

13.     Walgreens fully and finally releases the United States, its agencies, officers, agents, employees, and servants, from any claims (including attorneys' fees, costs, and expenses of every kind and however denominated) that Walgreens has asserted, could have asserted, or may assert in the future against the United States, its agencies, officers, agents, employees, or servants, related to the Covered Conduct, the United States' investigation, prosecution and settlement of the Covered Conduct, and the United States' investigation of the Covered Conduct.

14.     This Stipulation is intended to be for the benefit of the Parties only.  The Parties do not release any claims against any other person or entity except as otherwise provided herein.

15.     Walgreens represents and warrants that it has reviewed its financial situation, that it is currently solvent within the meaning of 11 U.S.C. §§ 547(b)(3) and 548(a)(1)(B)(ii)(I), and

that it reasonably believes as of the date hereof that it shall remain solvent following compliance with its obligations under this Stipulation. Further, the Parties warrant that, in evaluating whether to execute this Stipulation, they (a) have intended that the mutual promises, covenants, and obligations set forth constitute a contemporaneous exchange for new value given to Walgreens within the meaning of 11 U.S.C. § 547(c)(1); and (b) have concluded that these mutual promises, covenants, and obligations due, in fact, constitute such a contemporaneous exchange. Further, the Parties warrant that the mutual promises, covenants, and obligations set forth herein are intended to and do, in fact, represent a reasonably equivalent exchange of value that is not intended to hinder, delay, or defraud any entity to which Walgreens was or became indebted on or after the date of this Stipulation, within the meaning of 11 U.S.C. § 548(a)(1).

16. If Walgreens commences, or a third party commences, any case, action, or other proceeding under any law relating to bankruptcy, insolvency, reorganization, or relief of debtors (a) seeking an order for relief of Walgreens' debts, or seeking to adjudicate Walgreens as bankrupt or insolvent; or (b) seeking appointment of a trustee, custodian, or other similar official for Walgreens or for all or any substantial part of Walgreens' assets, Walgreens agrees as follows:

a. Walgreens' obligations under this Stipulation may not be avoided pursuant to 11 U.S.C. § 547, and Walgreens shall not argue or otherwise take the position in any such case, action, or proceeding that (i) Walgreens' obligations under this Stipulation may be avoided under 11 U.S.C. § 547; (ii) Walgreens was insolvent at the time this Stipulation was entered into; or (iii) the mutual promises, covenants, and obligations set forth in this Stipulation do not constitute a contemporaneous exchange for new value given to Walgreens.

10

b.    If Walgreens' obligations under this Stipulation are avoided for any

reason, including, but not limited to, through the exercise of a trustee's avoidance powers under

the Bankruptcy Code, the Government, at its sole option, may rescind the releases in this

Stipulation and reinstate the Government Complaint or bring any civil and/or administrative

claim, action, or proceeding against Walgreens that would otherwise be covered by the releases

in Paragraph 6 above (in the event the Government Complaint is reinstated, the Relator could

also reinstate the claims in the Relator Amended Complaint that he agreed to release pursuant to

this Stipulation). Walgreens agrees that (i) any such claim, action, or proceeding brought by the

Government or the Relator would not be subject to an "automatic stay" pursuant to 11 U.S.C. §

362(a) as a result of the case, action, or proceeding described in the first clause of this Paragraph,

and Walgreens shall not argue or otherwise contend that the claim, action, or proceeding is

subject to an automatic stay; (ii) Walgreens shall not plead, argue, or otherwise raise any

defenses under the theories of statute of limitations, laches, estoppel, or similar theories, to any

claim, action, or proceeding that is brought by the Government or the Relator within 60 calendar

days of written notification that the releases in this Stipulation have been rescinded pursuant to

this Paragraph, except to the extent such defenses were available on the date the Relator initially

filed the above-referenced action; and (iii) the Government has a valid claim against Walgreens

for the full Settlement Amount, and the Government may pursue the claim in the case, action, or

proceeding described in the first clause of this Paragraph, as well as in any other case, action, or

proceeding.

c.    Walgreens acknowledges that the agreements in this Paragraph are

provided in exchange for valuable consideration provided in this Stipulation.

17.    Walgreens agrees to the following:

a.      Unallowable Costs Defined:  All costs (as defined in the Office of Management and Budget ("OMB") Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards published at 2 C.F.R. § 200 *et seq*.; the Department of Health and Human Services adoption of the OMB Guidance provided at 45 C.F.R. § 75, subpart E *et seq*.; the Federal Acquisition Regulation, 48 C.F.R. § 31.205-47 where applicable; or otherwise as specified by federal statutes, regulations or the terms and conditions of a Federal award) incurred by or on behalf of Walgreens, including its present or former officers, directors, employees, shareholders and agents, in connection with:

(1)      the matters covered by this Stipulation;

(2)      the United States' audit(s) and civil and/or criminal investigation(s) of matters covered by this Stipulation;

(3)      Walgreens' investigation, defense, and corrective actions undertaken in response to the United States' audit(s) and civil and/or criminal investigation(s) in connection with matters covered by this Stipulation (including attorneys' fees);

(4)      the negotiation and performance of this Stipulation;

(5)      any payments Walgreens makes to the United States pursuant to this Stipulation and any payments Walgreens may make to the Relator, including expenses, costs and attorneys' fees, and

(6)      the negotiation of, and any obligations undertaken pursuant to, the CIA (as that term is defined in Paragraph 29 below), including to:

(i)      retain an independent review organization to perform annual reviews as described in Section III of the CIA; and

        (ii)     prepare and submit reports to the Department of Health and

             Human Services, Office of Inspector General ("OIG-HHS"),

are unallowable costs for government contracting purposes and under the Medicare

Program, Medicaid Program, TRICARE Program, and Federal Employees Health

Benefits Program (FEHBP) (hereinafter referred to as "Unallowable Costs"). However,

nothing in this paragraph 17.a.(6) that may apply to the obligations undertaken pursuant

to the CIA affects the status of costs that are not allowable based on any other authority

applicable to Walgreens.

        b.     Future Treatment of Unallowable Costs: Unallowable Costs shall be

separately determined and accounted for by Walgreens, and Walgreens shall not charge

such Unallowable Costs directly or indirectly to any contracts with the United States or

any State Medicaid program, or seek payment for such Unallowable Costs through any

cost report, cost statement, information statement, or payment request submitted by

Walgreens or any of its subsidiaries or affiliates to the Medicare, Medicaid, TRICARE,

or FEHBP Programs.

        c.     Treatment of Unallowable Costs Previously Submitted for Payment:

Walgreens further agrees that within 90 days of the Effective Date of this Stipulation, it

shall identify to applicable Medicare and TRICARE fiscal intermediaries, carriers, and/or

contractors, and Medicaid and FEHBP fiscal agents, any Unallowable Costs (as defined

in this Paragraph) included in payments previously sought from the United States, or any

State Medicaid Program, including, but not limited to, payments sought in any cost

reports, cost statements, information reports, or payment requests already submitted by

Walgreens or any of its subsidiaries or affiliates, and shall request, and agree, that such

cost reports, cost statements, information reports, or payment requests, even if already settled, be adjusted to account for the effect of the inclusion of the Unallowable Costs. Walgreens agrees that the United States, at a minimum, shall be entitled to recoup from Walgreens any overpayment plus applicable interest and penalties as a result of the inclusion of such Unallowable Costs on previously-submitted cost reports, information reports, cost statements, or requests for payment.

Any payments due after the adjustments have been made shall be paid to the United States pursuant to the direction of the Department of Justice and/or the affected agencies. The United States reserves its rights to disagree with any calculations submitted by Walgreens or any of its subsidiaries or affiliates on the effect of inclusion of Unallowable Costs (as defined in this Paragraph) on Walgreens or any of its subsidiaries or affiliates' cost reports, cost statements, or information reports.

d.    Nothing in this Stipulation shall constitute a waiver of the rights of the United States to audit, examine, or re-examine Walgreens' books and records to determine that no Unallowable Costs have been claimed in accordance with the provisions of this Paragraph.

18.    Except as set forth in Paragraph 7 above (which preserves the Relator's rights against Walgreens to seek reasonable expenses, costs, and attorney's fees), each Party shall bear its own legal and other costs incurred in connection with this matter.

19.    Any failure by the Government to insist upon the full or material performance of any of the provisions of this Stipulation shall not be deemed a waiver of any of the provisions hereof, and the Government, notwithstanding that failure, shall have the right thereafter to insist upon the full or material performance of any and all of the provisions of this Stipulation.

20.     This Stipulation is governed by the laws of the United States.  The exclusive jurisdiction and venue for any dispute relating to this Stipulation is the United States District Court for the Southern District of New York.  For purposes of construing this Stipulation, this Stipulation shall be deemed to have been drafted by all Parties to this Stipulation and shall not, therefore, be construed against any Party in any subsequent dispute.

21.     This Stipulation constitutes the complete agreement between the Parties with respect to the subject matter hereof.  This Stipulation may not be amended except by written consent of the Parties.

22.     The undersigned counsel and any other signatories represent and warrant that they are fully authorized to execute this Stipulation on behalf of persons and the entities indicated below.

23.     This Stipulation is binding on and inures to the benefit of Walgreens and any successor entities.

24.     This Stipulation is binding on and inures to the benefit of the Relator's successors, transferees, heirs, and assigns.

25.     This Stipulation may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same Stipulation.  E-mails that attach signatures in PDF form or facsimiles of signatures shall constitute acceptable, binding signatures for purposes of this Stipulation.

15

26.     Any notices or requests pursuant to this Stipulation shall be in writing and shall be delivered by hand, express courier, or email transmission followed by postage-prepaid mail, and shall be addressed as follows:

IF TO THE UNITED STATES:

Pierre G. Armand
Assistant United States Attorney
United States Attorney's Office
Southern District of New York
86 Chambers Street, Third Floor
New York, New York 10007
Email: pierre.armand@usdoj.gov

IF TO WALGREENS:

Rick Robinson
ReedSmithLLP
1301 K Street, N.W.
Suite 1100 – East Tower
Washington, D.C. 20005-3373
Email: frobinson@reedsmith.com

27.     The Effective Date of this Stipulation is the date upon which the Stipulation is approved and entered by the Court.

28.     Upon Walgreens' payment to the Government of the Settlement Amount as described in Paragraph 3 above and Walgreens' payment to the States of the amount it is required to pay under the State Settlements, the United States shall be deemed to have dismissed with prejudice the claims asserted by the United States in the Government Complaint.  No other claims of the United States shall be deemed to be dismissed, with prejudice or otherwise.  Upon Walgreens' payment to the Government of the Settlement Amount as described in Paragraph 3 above and Walgreens' payment to the States of the amount it is required to pay under the State Settlements, the Relator shall be deemed to have dismissed with prejudice the claims he asserted

16

or could have asserted in the Relator Amended Complaint, other than claims for expenses, costs or attorneys' fees pursuant to 31 U.S.C. § 3730(d).

29.     In consideration of Walgreens' obligations in this Stipulation and the separate Corporate Integrity Agreement ("CIA"), entered into between OIG-HHS and Walgreens, and conditioned upon Walgreens' compliance with the terms of this Stipulation, including full payment of the Settlement Amount as set forth in Paragraph 3 above, the OIG-HHS agrees to release and refrain from instituting, directing, or maintaining any administrative action seeking exclusion from Medicare, Medicaid, and other Federal health care programs (as defined in 42 U.S.C. § 1320a-7b(f)) against Walgreens under 42 U.S.C. § 1320a-7a (Civil Monetary Penalties Law) or 42 U.S.C. § 1320a-7(b)(7) (permissive exclusion for fraud, kickbacks, and other prohibited activities) for the Covered Conduct, except as reserved in this Paragraph and in Paragraph 9 above (concerning excluded claims). The OIG-HHS expressly reserves all rights to comply with any statutory obligations to exclude Walgreens from Medicare, Medicaid, and other Federal health care programs under 42 U.S.C. § 1320a-7(a) (mandatory exclusion) based upon the Covered Conduct. Nothing in this Paragraph precludes the OIG-HHS from taking action against entities or persons, or for conduct and practices, for which claims have been reserved in Paragraph 9 above.

Agreed to by:

## THE UNITED STATES OF AMERICA

Dated: New York, New York
       December 19, 2018

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York

By: _____

CHRISTOPHER B. HARWOOD
Assistant United States Attorney
86 Chambers Street, Third Floor
New York, New York 10007
Telephone: (212) 637-2728
Facsimile: (212) 637-2786

By: _____

LISA M. RE
Assistant Inspector General for Legal Affairs
Office of the Inspector General for the U.S.
Department of Health and Human Services

*Attorney for the United States of America*

RELATOR

Dated: December 13, 2018

By: _____
     MARC D. BAKER

     *Relator*

Dated: December 13, 2018

By: _____
     STEIN MITCHELL BEATO & MISSNER
     LLP

     ANDREW M. BEATO
     JED WULFEKOTTE
     901 15th Street N.W. Suite 700
     Washington, D.C. 20005
     Telephone: (202) 737-7777
     Facsimile: (202) 296-8312

     *Attorneys for Relator*

19

**WALGREEN CO.**

Dated: December 14, 2018

By: _____
RICK ROBINSON
SELINA COLEMAN
ReedSmithLLP
1301 K Street, N.W.
Suite 1100 – East Tower
Washington, D.C. 20005-3373
Telephone: 202-414-9200
Facsimile: 202-414-9299

*Attorneys for Walgreen Co.*

Dated: December 14, 2018

By: _____
ELENA KRAUS
Senior Vice President and General Counsel

*Walgreen Co.*

SO ORDERED:

_____
J. PAUL OETKEN
UNITED STATES DISTRICT JUDGE

Dated: 1/15/19

20

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA *et al. ex rel.* MARC D. BAKER,<br><br>   Plaintiffs,<br><br>       v.<br><br>WALGREENS, INC.,<br><br>   Defendant. | 12 Civ. 0300 (JPO) |
| UNITED STATES OF AMERICA,<br><br>   Plaintiff-Intervenor,<br><br>       v.<br><br>WALGREEN CO.,<br><br>   Defendant. | 12 Civ. 0300 (JPO) |

Upon the consent of plaintiff the United States of America and defendant Walgreen Co.

("Walgreens") it is hereby

ORDERED, ADJUDGED and DECREED:  that plaintiff the United States of America is

awarded judgment in the amount of $32,052,268.41 as against Walgreens, as well as post-

judgment interest at the rate of 12% per annum compounded daily.

Agreed to by:

### THE UNITED STATES OF AMERICA

Dated:        New York, New York
              December 19, 2018

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York

By: _____

CHRISTOPHER B. HARWOOD
Assistant United States Attorney
86 Chambers Street, Third Floor
New York, New York 10007
Telephone:  (212) 637-2728
Facsimile:  (212) 637-2786

*Attorney for the United States of America*

**WALGREEN CO.**

Dated: December _14_, 2018

By: _/s/ Reed Coleman_

RICK ROBINSON
SELINA COLEMAN
ReedSmithLLP
1301 K Street, N.W.
Suite 1100 – East Tower
Washington, D.C. 20005-3373
Telephone: 202-414-9200
Facsimile: 202-414-9299

*Attorneys for Walgreen Co.*

Dated: December _14_, 2018

By: _/s/ Elena Kraus_

ELENA KRAUS
Senior Vice President and General Counsel

*Walgreen Co.*

SO ORDERED:

_____
J. PAUL OETKEN
UNITED STATES DISTRICT JUDGE

Dated: _1/15/19_

# Farrell Decl.
# Exhibit 13

# Filed Under Seal

# Farrell Decl. Exhibit 14

# Filed Under Seal