## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| **BCBSM, INC.,** *et al.*, | ) | Case No. 1:20-cv-01853 |
|  | ) |  |
| *Plaintiffs,* | ) | Honorable Virginia M. Kendall |
|  | ) | Honorable Daniel P. McLaughlin |
| v. | ) |  |
|  | ) | *Consolidated with*: |
| **WALGREEN CO. & WALGREENS** | ) | No. 1:20-cv-01929 |
| **BOOTS ALLIANCE, INC.,** | ) | No. 1:20-cv-03332 |
|  | ) | No. 1:20-cv-04738 |
| *Defendants.* | ) | No. 1:20-cv-04940 |
|  | ) | No. 1:22-cv-01362 |
|  | ) |  |

|  |  |
|---|---|
| **WALGREEN CO. & WALGREENS** | ) |
| **BOOTS ALLIANCE, INC.,** | ) |
|  | ) |
| *Third-Party Plaintiffs,* | ) |
|  | ) |
| v. | ) |
|  | ) |
| **PRIME THERAPEUTICS LLC,** | ) |
|  | ) |
| *Third-Party Defendant.* | ) |
|  | ) |

## MEMORANDUM SUPPORTING DEFENDANTS' MOTION FOR
## DISCOVERY SANCTIONS AGAINST INITIAL PLAINTIFFS

# TABLE OF CONTENTS

**Page**

FACTUAL BACKGROUND ..................................................................................................... 4

    A.    Initial Plaintiffs Attempted to Rush Through Document Discovery, Producing Only 18,000 Documents and Declaring Substantial Completion ........................... 4

    B.    Initial Plaintiffs' Partial Production of the CVS Documents Confirmed Critical Failures in Their Document Review and Productions ............................................. 6

    C.    The Court-Appointed Special Master Discovered "Huge Red Flag[s]" in Initial Plaintiffs' Document Review Process ..................................................................... 6

    D.    Initial Plaintiffs Delayed Necessary Remediation by Attempting to Manipulate the Diagnostic Results ................................................................................................ 8

    E.    The Remediation Protocol Revealed Tens of Thousands of Unproduced Responsive Documents ........................................................................................ 10

ARGUMENT ....................................................................................................................... 11

I.    **Initial Plaintiffs' Misconduct Merits Meaningful Sanctions** ................................ 12

    A.    Initial Plaintiffs Violated Their Most Basic Discovery Duties ........................... 14

        1.    *Initial Plaintiffs failed to make a reasonable inquiry to ensure correct and complete responses, instead actively and falsely representing they had.* ............................................................................................................ 14

        2.    *Initial Plaintiffs failed to supplement their obviously deficient responses.* .................................................................................................. 16

        3.    *Initial Plaintiffs breached their duties of candor and transparency.* ........ 17

        4.    *Initial Plaintiffs failed to conduct discovery with reasonable expedience.* ................................................................................................ 19

    B.    Initial Plaintiffs' Broader Pattern of Obfuscation and Gamesmanship Shows a Chronic Disregard for Their Duties, Warranting Material Sanctions .................. 19

        1.    *Initial Plaintiffs tried to bury key evidence about a PBM.* ....................... 20

        2.    *Initial Plaintiffs refused to answer discovery requests—even after the Court ordered responses—to try to hobble Walgreens' case.* .................. 22

        3.    *Initial Plaintiffs baselessly sought to claw back critical Cambia Plaintiff documents from discovery, probably to hide their damaging contents.* ................................................................................................ 24

    C.    Strong Sanctions Are Warranted, Given the Egregiousness and Pervasiveness of Initial Plaintiffs' Misconduct .............................................................................. 26

        1.    *Strong sanctions are necessary to cure the prejudice inflicted on Walgreens and to deter these entities and other potential wrongdoers.* .... 27

2. *Initial Plaintiffs' claims should be dismissed with prejudice.* .................. *30*

3. *In the alternative to dismissing Initial Plaintiffs' claims, the Court should issue any other sanctions the Court deems proper.* ...................... *34*

D. In Addition to All Other Sanctions the Court Deems Proper, Walgreens Should Be Awarded All of the Fees and Costs It Incurred to Secure Initial Plaintiffs' Compliance with Their Discovery Duties............................................................. 36

**II. Walgreens Is At Least Entitled to Its Attorneys' Fees and Other Costs as the Prevailing Party on Its Motion to Compel**.................................................................... **38**

**CONCLUSION** .............................................................................................................. **40**

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Aerwey Lab'ys, Inc. v. Arco Polymers, Inc.*,
    90 F.R.D. 563 (N.D. Ill. 1981)................................................................17, 39, 40

*Am. Massage Therapy Ass'n v. Folkers*,
    No. 03-CV-6820, 2005 WL 8177612 (N.D. Ill. May 3, 2005)...............................36

*Avenatti v. Gree USA, Inc.*,
    No. 22-CV-354, 2021 WL 3260348, *report & recommendation adopted*, 2021
    WL 3666540 (S.D. Ind. Aug. 18, 2021) ................................................................32

*Beach Mart, Inc. v. L&L Wings, Inc.*,
    784 F. App'x 118 (4th Cir. 2019) ..........................................................................30

*Bolyard v. Vill. of Sherman*,
    No. 19-cv-3146, 2022 WL 16738647 (C.D. Ill. Nov. 7, 2022) ..............................35

*Bos. Sci. Corp. v. Cook Grp. Inc.*,
    No. 17-CV-3448, 2022 WL 2210011 (S.D. Ind. June 21, 2022)...........................40

*Case v. Unified Sch. Dist. No. 233*,
    162 F.R.D. 147 (D. Kan. 1995)...............................................................................17

*Chambers v. NASCO, Inc.*,
    501 U.S. 32 (1991)..................................................................................................34

*Charter House Ins. Brokers, Ltd. v. N.H. Ins. Co.*,
    667 F.2d 600 (7th Cir. 1981) ..................................................................................33

*Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp.*,
    602 F.2d 1062 (2d Cir. 1979)..................................................................................32

*Clinical Wound Sols., LLC v. Northwood, Inc.*,
    No. 18-cv-7916, 2023 WL 3568624 (N.D. Ill. May 19, 2023)...............................29

*Coldwell Banker & Co. v. Eyde*,
    661 F. Supp. 657 (N.D. Ill. 1986) ..........................................................................33

*Crandall v. 4Demand, LLC*,
    No. 17-CV-4185, 2020 WL 11192553 (N.D. Ill. Aug. 6, 2020) ...........................39

*Daniels v. Brennan*,
    887 F.2d 783 (7th Cir. 1989) ..................................................................................30

*Dotson v. Bravo*,
    321 F.3d 663 (7th Cir. 2003) ........................................................................13, 33

*DR Distribs., LLC v. 21 Century Smoking, Inc.*,
    513 F. Supp. 3d 839 (N.D. Ill. 2021) .......................................................15, 18, 37

*DR Distribs., LLC v. 21 Century Smoking, Inc.*,
    No. 12-CV-50324, 2024 WL 2846035 (N.D. Ill. June 5, 2024).......................26, 33

*Drake v. Chop Hosp. LLC*,
    No. 20-CV-1574, 2021 WL 2939978 (N.D. Ill. July 13, 2021)...............................14

*Dreith v. Nu Image, Inc.*,
    648 F.3d 779 (9th Cir. 2011) ...............................................................................19

*e360 Insight, Inc. v. Spamhaus Project*,
    658 F.3d 637 (7th Cir. 2011) .........................................................2, 11, 19, 32

*Haeger v. Goodyear Tire & Rubber Co.*,
    906 F. Supp. 2d 938 (D. Ariz. 2012), *rev'd on other grounds by* 581 U.S. 101 (2017)....19, 33

*Hollis v. CEVA Logistics U.S., Inc.*,
    603 F. Supp. 3d 611 (N.D. Ill. 2022) ....................................................................36

*Houston v. C.G. Sec. Servs., Inc.*,
    820 F.3d 855 (7th Cir. 2016) .........................................................................36, 38

*Hubert v. Oswego Junction Ents. LLC*,
    No. 21-CV-3360, 2023 WL 2933052 (N.D. Ill. Apr. 13, 2023) ............................40

*Hunting Energy Servs., Inc. v. Kavadas*,
    No. 15-CV-228, 2018 WL 4539818 (N.D. Ind. Sept. 20, 2018) ...........................34

*Johnson v. GDF, Inc.*,
    668 F.3d 927 (7th Cir. 2012) ...............................................................................38

*Johnson v. Nichols*,
    No. 12-CV-5325, 2013 WL 4052468 (N.D. Ill. Aug. 12, 2013) ...........................34

*Jolly Grp., Ltd. v. Medline Indus., Inc.*,
    435 F.3d 717 (7th Cir. 2006) ...............................................................................36

*Lancelot Invs. Fund, L.P. v. TSM Holdings, Ltd.*,
    No. 07-CV-4023, 2008 WL 1883435 (N.D. Ill. Apr. 28, 2008) ............................34

*Little v. JB Pritzker for Governor*,
    No. 18-CV-6954, 2021 WL 1165097 (N.D. Ill. Mar. 26, 2021)................................12, 27, 38

*LKQ Corp. v. Kia Motors Am., Inc.*,
345 F.R.D. 152 (N.D. Ill. 2023) ........................................................18

*Lomangino v. Polaris Indus. Inc.*,
2023 WL 3737110 (S.D.W. Va. May 31, 2023) ...................................34

*Maynard v. Nygren*,
332 F.3d 462 (7th Cir. 2003) ...............................................13, 31, 37

*Melendez v. Ill. Bell Tel. Co.*,
79 F.3d 661 (7th Cir. 1996) ...............................................17, 29, 33

*Melikhov v. Drab*,
No. 16-CV-9332, 2018 WL 3190824 (N.D. Ill. May 21, 2018) ..............38

*Newman v. Metro. Pier & Exposition Auth.*,
962 F.2d 589 (7th Cir. 1992) ...........................................................26, 27

*NorthMobileTech LLC v. Simon Prop. Grp., Inc.*,
No. 11-CV-287, 2012 WL 12996103 (W.D. Wis. July 6, 2012) ..............38

*Peters v. Butler*,
No. 3:16-cv-382-MAB, 2021 WL 979272 (S.D. Ill. Mar. 16, 2021) ...................15, 16, 17, 32

*In re Phenylpropanolamine (PPA) Prod. Liab. Litig.*,
460 F.3d 1217 (9th Cir. 2006) .......................................................28

*Pickett v. Sheridan Health Care Ctr.*,
664 F.3d 632 (7th Cir. 2011) .........................................................38

*Pillay v. Millard Refrigerated Servs., Inc.*,
No. 09-CV-5725, 2013 WL 2251727 (N.D. Ill. May 22, 2013) ..............34

*Ramirez v. T&H Lemont, Inc.*,
845 F.3d 772 (7th Cir. 2016) ...............................................13, 31, 32, 34

*Raymond v. Thomas Indus. Coatings, Inc.*,
No. 20-CV-372, 2021 WL 2376380 (S.D. Ill. June 10, 2021)................36

*Rhodes v. LaSalle Bank, N.A.*,
No. 02-CV-2059, 2005 WL 281221 (N.D. Ill. Feb. 1, 2005) ...........31, 32

*Rickels v. City of S. Bend, Ind.*,
33 F.3d 785 (7th Cir. 1994) ...........................................................39, 40

*Rodesky v. Pfister*,
No. 15-CV-1002, 2023 WL 2585856 (C.D. Ill. Feb. 21, 2023) ..............40

*Rojas v. Town of Cicero*,
  775 F.3d 906 (7th Cir. 2015) ...............................................................13

*Rosenthal Collins Grp., LLC v. Trading Techs. Int'l, Inc.*,
  2011 WL 722467 (N.D. Ill. Feb. 23, 2011) ........................................37

*Schmalz v. Vill. of N. Riverside*,
  No. 13-CV-8012, 2018 WL 11198063 (N.D. Ill. Dec. 17, 2018)...........40

*Steifel Lab'ys, Inc. v. Brookstone Pharms., LLC*,
  No. 08-CV-3773, 2011 WL 13136939 (N.D. Ga. Oct. 17, 2011) ..........40

*Toyo Tire & Rubber Co., Ltd v. Atturo Tire Corp.*,
  No. 14-CV-206, 2017 WL 784990 (N.D. Ill. Feb. 8, 2017) ..................38

*Underdog Trucking, LLC v. Verizon Servs. Corp.*,
  273 F.R.D. 372 (S.D.N.Y. 2011) ...................................................17, 39

*United States v. Currency, U.S. $42,500.00*,
  283 F.3d 977 (9th Cir. 2002) ...............................................................19

*United States v. Dish Network, LLC*,
  2015 WL 5970446 (C.D. Ill. Oct. 13, 2015).........................................19

**Statutes**

28 U.S.C. § 1927 ..................................................................................36

**Rules**

Fed. R. Civ. P. 26(e) ...........................................................12, 13, 14, 16, 17

Fed. R. Civ. P. 26(g) ..................................................................... *passim*

Fed. R. Civ. P. 34(b)(2)(B) ......................................................................19

Fed. R. Civ. P. 37(a) .........................................................17, 36, 38, 39, 40

Fed. R. Civ. P. 37(b)(2)(A)(ii) .................................................................36

Fed. R. Civ. P. 37(c) ...................................................................... *passim*

Fed. R. Civ. P. 37(d)(1)(A) ......................................................................13

**Other Authorities**

Crowell & Moring, *Off the Edge of the E-Discovery Map, There Be Monsters*
  (Mar. 25, 2021) ............................................................................14, 15

Through this Motion, Walgreens seeks closure after an unprecedented yearslong detour into a discovery remediation process that began after the two-dozen Initial Plaintiffs, all major insurers suing Walgreens for alleged fraud, falsely declared "substantial completion" upon producing a tiny handful of 18,000 documents—while knowing full well that a subset of the same insurers had previously produced exponentially *more* responsive (even case-critical) materials to CVS in a mirror-image case.[1] Over the ensuing two years, Walgreens and a Court-appointed Special Master repeatedly demonstrated inexplicable failures in Initial Plaintiffs' document discovery, uncovering over 380,000 additional documents responsive to Walgreens' requests. At every juncture after their false declaration's debunking, Initial Plaintiffs had the option to step up, correct their discovery failures, and move expeditiously toward trial. Instead, Initial Plaintiffs misled, recriminated, prevaricated, projected, and denied at every turn. Even when the Special Master showed, using a specially designed diagnostic test, that Initial Plaintiff's discovery raised "huge red flag[s]" that had to be fixed, Initial Plaintiffs purported to re-run the test to engineer more favorable results. Meanwhile, months and years passed; millions of dollars in fees mounted; key witnesses retired and moved away; memories faded; and (in Initial Plaintiffs' view) millions of dollars in additional damages and interest allegedly continued to accrue against Walgreens.

Now, with the Court-ordered remediation of Initial Plaintiffs' discovery failings at an end, Initial Plaintiffs apparently have elected to attack the whole process as a flawed, unfair waste of time and resources for which they should receive an apology, not sanctions. That narrative is false. This is not a two-sided debate about the proper contours of discovery under the Federal Rules. Initial Plaintiffs demonstrably shirked their basic discovery obligations, tried and failed to cover it

---

[1] "Walgreens" refers to Defendants Walgreen Co. and Walgreens Boots Alliance, Inc. "Initial Plaintiffs" and "Additional Plaintiffs" have the meanings ascribed in the Joint Status Report filed on February 3, 2024, Dkt. 636. "Plaintiffs" refers to Initial Plaintiffs and Additional Plaintiffs collectively.

1

up, and forced Walgreens, the Court, and the Special Master to cut through a boundless briar patch of posturing and tactics. Looking past the inevitable armchair quarterbacking about the technical details of the remediation process overseen by Judge Finnegan and the Special Master, that process confirms an unavoidable conclusion: Initial Plaintiffs failed spectacularly to meet fundamental discovery duties and then worked relentlessly to obscure and downplay both the gravity of their malfeasance and the importance of the hundreds of thousands of additional documents they had to turn over under protest. Initial Plaintiffs' willful recalcitrance should be censured, not rewarded.

Viewed in isolation, Initial Plaintiffs' deficient discovery and effort to dodge responsibility are troubling. But courts do not view such abuses in isolation; Initial Plaintiffs' production failures are "only the straw that finally broke the camel's back." *e360 Insight, Inc. v. Spamhaus Project*, 658 F.3d 637, 643 (7th Cir. 2011). While withholding volumes of discoverable documents and needlessly complicating the Special Master's work, Initial Plaintiffs made a broader effort to obscure key facts and hamper Walgreens' case. Initial Plaintiffs tried to hide a pharmacy benefit manager ("PBM") that is captive to now-dismissed Cambia Plaintiffs[2] and whose contracts explicitly rejected Plaintiffs' core theory. When that effort failed, and when they failed to defeat Walgreens' motion to implead the PBM, Initial Plaintiffs futilely tried to claw back the Cambia Plaintiffs' entire production (including many documents undermining Plaintiff's claims) based on weak pretexts. Also, as the Court held, Plaintiffs "waited unnecessarily and unjustifiably long" to plead unintentional fraud theories, using "gamesmanship" to impede Walgreens' third-party claims. Dkt. 571. That gamesmanship included standing on unfounded objections to discovery requests after the Court had overruled the objections so completely that it awarded Walgreens costs

---

[2] "Cambia Plaintiffs" refers to Cambia Health Solutions, Inc.; Regence BlueShield of Idaho, Inc.; Regence BlueCross and BlueShield of Oregon; Regence BlueCross and BlueShield of Utah; Regence BlueShield of Washington; and Asuris Northwest Health.

from the motion practice. In each instance, Initial Plaintiffs followed the same pattern evident in their document discovery: they hid or misrepresented key facts about relevant events or their discovery efforts; when caught, they blamed Walgreens or gave evasive, misleading explanations.

While accusing Walgreens of widespread fraud and demanding hundreds of millions of dollars in damages, Initial Plaintiffs fell far short of handling discovery with a level of competence and diligence commensurate with their own case's scope and gravity. By misleading Walgreens, the Special Master, and the Court about their discovery noncompliance, Initial Plaintiffs caused Walgreens serious prejudice. The thousands of hours Walgreens has spent enforcing Initial Plaintiffs' discovery duties is time Walgreens could not spend preparing its case for trial and securing fast-fading evidence. A bare award of Walgreens' expenses, standing alone, will not remotely compensate Walgreens for these opportunity costs. Nor would such an award, by itself, deter future abuses; a few million dollars in costs is a small price to pay for the chance to improve Initial Plaintiffs' odds of recovering hundreds of millions in purported damages.

Dismissal of Initial Plaintiffs' claims is a just sanction, commensurate with the serious misconduct and repercussions at issue here and well-calibrated to deter similar abusive tactics in future cases. Indeed, courts frequently impose dismissal on parties that withhold key discovery willfully or through gross negligence. Short of that reasonable remedy, however, the Court should at least (1) preclude Initial Plaintiffs from pursuing damages, interest, or costs accrued after their false substantial-completion declaration, and (2) allow adverse inference jury instructions, exclude any improperly withheld inculpatory evidence supporting Initial Plaintiffs' claims, and permit Walgreens to show at trial and argue to the jury that Initial Plaintiffs improperly withheld certain exculpatory documents from Walgreens. In addition to any other sanctions, the Court also should order Initial Plaintiffs to pay all of Walgreens' costs, including attorneys' fees, incurred in the lengthy process of identifying, investigating, and curing Initial Plaintiffs' discovery malfeasance.

3

## FACTUAL BACKGROUND

### A. Initial Plaintiffs Attempted to Rush Through Document Discovery, Producing Only 18,000 Documents and Declaring Substantial Completion

At an early February 2021 status hearing, Initial Plaintiffs insisted that discovery in a case involving more than two dozen large insurer-plaintiffs, alleging over a decade of supposed fraud, could be completed in just seven months. Decl. of Charles D. Zagnoli ("Zagnoli Decl."), Ex. 1[3] at 7:19–21. Initial Plaintiffs derided Walgreens' request for "a whopping 20 months for fact discovery" as "pretty unreasonable" and "another stall tactic . . . to avoid the inevitable." *Id.* at 6:22–23, 7:18. In May 2021, Walgreens served its first requests for production ("RFPs") on Initial Plaintiffs. Among those RFPs, Walgreens sought documents that a subset of Initial Plaintiffs had produced (the "CVS Documents") in their case alleging highly similar claims against CVS, Walgreens' largest competitor (the "CVS Litigation"). Exs. 2–3. Initial Plaintiffs agreed to produce the CVS Documents, plus documents responsive to 50 of Walgreens' 54 other requests. Ex. 4.

Initial Plaintiffs' ensuing pattern of evading discovery obligations is well documented. Far from finishing discovery in seven months as they predicted, Initial Plaintiffs produced almost no documents for over a year. As Walgreens pushed for progress, Initial Plaintiffs' counsel explained in a June 2022 conference that the admittedly small productions reflected their desire to not "produce junk" and that "[i]t is what it is." Zagnoli Decl. ¶ 7. In July 2022, Walgreens continued to challenge the inexplicable paucity and slow pace of Initial Plaintiffs' discovery, noting that ***all 28 of them*** had at that time ***collectively*** provided fewer than 4,000 documents—less than 3% of the total produced by Walgreens—in a case alleging decade-long systemic fraud. Ex. 5 at 2. More disturbing, a ***small subset*** of Initial Plaintiffs had produced hundreds of thousands of documents to CVS—vastly more than ***all*** Initial Plaintiffs had produced here. *Id.* Walgreens demanded that

---

[3] Unless otherwise indicated, citations to "Ex." in this Motion refer to the Zagnoli Declaration's exhibits.

Initial Plaintiffs fix these patent deficiencies, including by producing the CVS Documents.[4] *Id.* at 2–3. In a response dated August 4, 2022, Initial Plaintiffs again waved off Walgreens' concerns, arguing that it was inviting a "data dump" of irrelevant material. Ex. 6 at 1. Unfazed by the tacit admission that they had violated discovery rules in the CVS Litigation, Initial Plaintiffs said it was "simply not [their] practice to . . . serve massive amounts of nonresponsive documents for mere appearances." *Id.* They nonetheless agreed to *consider* producing the CVS Documents. *Id.*

Two weeks later, on August 22, 2022, with fewer than 18,000 documents produced, Initial Plaintiffs represented to the Court in a status report that their productions were substantially complete. At the time, Initial Plaintiffs had delivered an average of only 621 documents per Plaintiff and less than 13% of the documents that a subset of them had produced in the CVS Litigation.[5] Dkt. 378 at 5. Initial Plaintiffs boasted that they took "exceptional care" to produce only "truly responsive" documents, through a review that used a "trained . . . Continuous Active Learning model." Dkt. 317 at 2–3; *see also* Decl. of Daniel L. Regard ("Regard Decl.") ¶¶ 215–230. A week later, Initial Plaintiffs finally agreed to produce some CVS Documents, but only for custodians common to both cases. Ex. 7. When Walgreens inquired about the remaining CVS Documents, Initial Plaintiffs insisted that the documents were irrelevant. Zagnoli Decl. ¶ 12. Ironically, they also claimed they owed a duty to the Court not to slow down discovery. *Id.*[6]

---

[4] At the time it sent this letter, Walgreens understood that the subset of Initial Plaintiffs had produced about 140,000 documents to CVS. During the Special Master proceedings, Initial Plaintiffs reported that they ultimately produced a total of about 210,000 CVS Documents to Walgreens—*12 times* more documents than they had produced when they declared substantial completion. Ex. 16 at 13.

[5] Initial Plaintiffs falsely declared substantial completion while delaying answering an interrogatory about employees with knowledge of relevant facts—an interrogatory designed to test Initial Plaintiffs' custodian selection. *See* Dkt. 378 at 6–7. After requesting a one-month extension, Initial Plaintiffs finally answered in October 2022, two months after declaring substantial completion. The response identified, for the first time, *49 new personnel* likely to possess relevant information, none of whom were existing custodians. *Id.*

[6] As explained in Walgreens' Motion to Compel (defined below), the common custodians yielded multiple key documents. Dkt. 379, Exs. 19–22. Similarly, Initial Plaintiffs' subsequent productions yielded numerous additional key documents. *See* Zagnoli Decl., Exs. 29–34.

**B.      Initial Plaintiffs' Partial Production of the CVS Documents Confirmed Critical Failures in Their Document Review and Productions**

Initial Plaintiffs' characterization of their CVS Documents as an irrelevant "data dump" proved entirely false. Even Initial Plaintiffs' partial production confirmed that the CVS Documents were, as Walgreens expected, almost entirely responsive. More profoundly, even that partial production included several ***case-critical*** documents that ***Walgreens had never before received***. These documents would have appeared in any properly run collection and review, even apart from the CVS Documents: the documents were possessed by the custodians, and hit on the search terms, that the parties had agreed upon for Initial Plaintiffs' review. Dkt. 378 at 8. When confronted with these grievous omissions, Initial Plaintiffs admitted that they failed to produce the documents. *Id* at 10. Indeed, Initial Plaintiffs confessed that their counsel had never even laid eyes on the documents; instead, the review model Initial Plaintiffs had earlier boasted about to the Court had failed to rank these critical documents sufficiently highly to raise them for attorney review. *Id.*

Walgreens demanded that Initial Plaintiffs explain how their model could have missed these key documents and provide reasonable information about the model's development. *Id.* at 9; Dkt. 379-18. Initial Plaintiffs refused, cynically painting Walgreens' requests as unjustified discovery on discovery. Ex. 9. In December 2022, after 22 months of Initial Plaintiffs' manifestly deficient productions, obfuscation, and stonewalling, Walgreens filed a Motion to Compel Document Discovery and Related Metrics, Dkt. 374 (the "Motion to Compel"). The motion sought clarity on Initial Plaintiffs' use of technology-assisted review ("TAR"), the addition of new document custodians, and the production of all remaining responsive documents. *Id.*

**C.      The Court-Appointed Special Master Discovered "Huge Red Flag[s]" in Initial Plaintiffs' Document Review Process**

In May 2023, the Court appointed Dr. Maura Grossman (the "Special Master"), over Initial Plaintiffs' objection, to investigate the circumstances raised by the Motion to Compel. Dkt. 450.

In a letter to the Special Master outlining the history of Initial Plaintiffs' production failures, Walgreens provided evidence that Initial Plaintiffs' criteria for selecting documents responsive to Walgreens' discovery requests had improperly drifted over their review's course. Ex. 10 at 7. At the Special Master's invitation, Walgreens proposed a diagnostic protocol to evaluate Initial Plaintiffs' productions. *Id.* at 10–21. Initial Plaintiffs disputed the need for the protocol, dismissing out of hand the suggestion that their criteria had drifted and complaining that "Walgreens . . . manufactured these arguments out of whole cloth to question the integrity of [Initial] Plaintiffs' process . . . and to unnecessarily impose cost, burden, and substantial delay." Ex. 11 at 2.

Again, Initial Plaintiffs' recriminations proved false. In July 2023, the Special Master ordered Initial Plaintiffs to complete a Preliminary Diagnostic Protocol ("PDP") to test their productions' adequacy. Dkt. 465. To ensure the PDP's reliability, the Special Master instructed Initial Plaintiffs to perform the exercise blinded, such that the attorneys evaluating the documents would have no knowledge of whether or how the documents had been coded previously. *Id.* at 10. On August 25, 2023, Initial Plaintiffs reported that they had finished the protocol. Three days later, the Special Master found that the results revealed "huge red flag[s]" in Initial Plaintiffs' review. Ex. 12 at 1. The Special Master wrote to Initial Plaintiffs:

> [Y]ou produced less than 10% of the responsive documents you expected to find [before declaring "substantial completion"]. This should have been a huge red flag. Please explain this discrepancy, what you did in response to it, and how you could possibly have concluded that the original production was "substantially complete" under these circumstances.

*Id.* The Special Master identified several other "red flag[s]," including that, apparently, Initial Plaintiffs' "coding criteria for responsiveness changed (*i.e.*, narrowed) . . . significantly" during their review—casting even more doubt on Initial Plaintiffs' review process. *Id.*; *see also* Regard Decl. ¶¶ 166–176 (identifying other red flags in Initial Plaintiffs' self-reported statistics).

In response, Initial Plaintiffs finally admitted—despite their earlier denials—that their

responsiveness criteria *had* changed. Ex. 13 at 5. While discussing statistical tests they performed at the start of their pre-August 2022 review, Initial Plaintiffs said that "the responsiveness coding in [that initial assessment] was substantially overbroad . . . [and] not reliable for the purpose of evaluating the effectiveness of the TAR model or the sufficiency of the document production overall." *Id.*; *see* Decl. of Shannon C. Kirk ("Kirk Decl.") ¶¶ 17–18; Regard Decl. ¶¶ 108, 191–210. The Special Master then requested information on "what appears to be a fairly marked change in the concept of responsiveness between the initial prevalence estimate and the subsequent one," and she invited both sides to propose a remedy for Initial Plaintiffs' deficiencies. Ex. 14 at 1, 2.

### D. Initial Plaintiffs Delayed Necessary Remediation by Attempting to Manipulate the Diagnostic Results

Without consulting the Special Master, Initial Plaintiffs chose to perform a "very focused," unblinded *re*-review of (a) the samples used in the PDP (the "PDP Sample"), (b) the initial statistical assessment Initial Plaintiffs' made at the start of their pre-August 2022 review (the "Initial Prevalence Estimate"), and (c) the assessment made when they certified substantial completion in August 2022 (the "Final Prevalence Estimate"). Ex. 15. Unsurprisingly, this do-over changed the PDP results in ways that ***only*** favored Initial Plaintiffs: They downgraded several documents in the PDP Sample and Initial Prevalence Estimate to "nonresponsive." *Id.* at 6. In doing so, Initial Plaintiffs retroactively reduced *their own projection* of how many responsive documents remained unproduced as of August 2022, attempting to cover up the obvious problems already identified by the Special Master. *See* Kirk Decl. ¶¶ 30–38; Regard Decl. ¶¶ 208–210.

In addition to these self-serving data manipulations and "fixes," Initial Plaintiffs tried to excuse withholding documents that *they admitted were responsive to Walgreens' requests*, unilaterally deeming those documents not "important" and not "likely to serve as a deposition or trial exhibit," *id.* at 7—as if that decision were somehow Initial Plaintiffs' to make. Ex. 15 at 7.

Still, given their oversight of highly relevant materials, Initial Plaintiffs had to concede that several unproduced documents were "**_material 'misses' . . . relating to core issues_**." *Id.* Initial Plaintiffs revealed that more than 75% of these "misses" had been miscoded by human reviewers, *id.*, calling into serious question not only Initial Plaintiffs' use of TAR, but also their reviewer training, direction, and supervision. At a conference on September 29, 2023, the Special Master declined to consider the results of Initial Plaintiffs' "very focused" do-over, dismissing it as statistically unsound. Kirk Decl. ¶ 39. The Special Master also observed that Initial Plaintiffs' review process, as they had described it, did not resemble a true Continuous Active Learning ("CAL") model—contrary to Initial Plaintiffs' prior statements to the Court. *Id.* ¶ 20; Regard Decl. ¶ 110, 150–165.

Beginning in October 2023—15 months after Initial Plaintiffs had falsely declared their productions substantially complete and 10 months after Walgreens filed its Motion to Compel—the Special Master and parties discussed how to remediate Initial Plaintiffs' inadequate document productions. On January 5, 2024, the Special Master filed an order setting a protocol (the "Remediation Protocol") through which Walgreens would perform Initial Plaintiffs' document review for them. Dkt. 507; Kirk Decl. ¶ 41. This protocol called for an iterative process that would repeat until the Special Master was satisfied that Walgreens had received the responsive documents to which it was entitled. Dkt. 507; *see* Kirk Decl. ¶ 41. On November 6, 2024, after seven rounds of iterative review pursuant to the Remediation Protocol, Walgreens elected to end the review based on a validation sample it coded—even though reporting ordered by the Special Master predicted that Initial Plaintiffs still held tens of thousands of unproduced responsive documents. Kirk Decl. ¶ 42. Walgreens made this decision in light of the enormous resources already consumed by Initial Plaintiffs' malfeasance, and the need to advance the case. *Id.* ¶ 43. On February 7, 2025, the Special Master declared the Remediation Protocol complete. Dkt. 639.

### E. The Remediation Protocol Revealed Tens of Thousands of Unproduced Responsive Documents

Between their false substantial-completion declaration and the Remediation Protocol's start, Initial Plaintiffs produced about 282,000 new documents outside of the Special Master proceedings. Of those, more than 210,000 represented the long-withheld CVS Documents. Ex. 16 at 13. Initial Plaintiffs produced another 72,000 after finishing a privilege review and allegedly adjusting their document review model outside of the Remediation Protocol—an ineffective attempt to self-remedy their defects, and a tacit admission that their substantial-completion declaration was false. Zagnoli Decl. ¶ 36. These productions came months (years in some cases) after Walgreens first raised concerns about Initial Plaintiffs' claim of substantial completion, after Walgreens was forced to file its Motion to Compel, and after the Court engaged the Special Master.

Initial Plaintiffs' belated attempts to correct their production deficiencies still fell short. The PDP also analyzed these post-August 2022 productions. Ex. 16 at 15. That analysis suggested the productions were flawed and incomplete, and that further remediation was still needed. Ex. 12 at 2 (Initial Plaintiffs' recall after their alleged "corrective action" was only 23.25%); *see also* Kirk Decl. ¶¶ 12–13. The Remediation Protocol's results validated the Special Master's analysis. The protocol uncovered another 77,003 responsive documents subject to production (yielding a total production of 170,315 including attachments)—not counting the estimated tens of thousands of responsive documents Walgreens decided to give up when ending the Remediation Protocol. Kirk Decl. ¶ 43; Regard Decl. ¶ 241. The majority of these documents came from existing custodians and were thus already in Initial Plaintiffs' possession before August 2022. Kirk Decl. ¶ 43. Astoundingly, Initial Plaintiffs declared substantial completion having produced less than *18,000 (less than 4%) of the 470,000 documents that they eventually produced* and that Walgreens was entitled to receive. Initial Plaintiffs forced Walgreens and the Court to spend two years litigating

and remediating their failures before production was even close to substantially complete. The Remediation Protocol, like the CVS Documents, also revealed that Initial Plaintiffs had withheld not only responsive, but potentially case-critical documents, including documents indicating that:

- an employee of Plaintiff Blue Cross Blue Shield of Kansas City ███████████████████ ██████████████████████████████

- Plaintiff Horizon Blue Cross knew ███████████████████████████████ ████████████████████████

- *in 2008*—12 years before this litigation was filed—one of the Cambia Plaintiff ████████ ████████████████████████████

- *in 2012*—eight years before this case was filed—employees from Plaintiff Blue Cross of Massachusetts knew ██████████████████████████████████ ████████████████████████ and

- employees of Plaintiff Blue Cross Blue Shield of Kansas were aware ████████████ ████████████████████████████ *in 2011*.

Exs. 19–23. Absent Walgreens' Motion to Compel and the Remediation Protocol, Initial Plaintiffs thus would have successfully concealed hundreds of thousands of documents to which Walgreens is entitled—evidence critical to defend against claims that Plaintiffs say support colossal damages.

## ARGUMENT

When addressing discovery violations, courts consider "not only the straw that broke the camel's back, but all the straws that the recalcitrant party piled on over the course of the lawsuit." *e360*, 658 F.3d at 643. Initial Plaintiffs have relentlessly flouted the discovery process while trying to minimize their malfeasance. They ignored the crescendo of obvious signs that they had produced a fraction of the documents due to Walgreens, including many future trial exhibits. When alerted to these failures, Initial Plaintiffs tried to cover their tracks and avoid producing the documents. They repeatedly made inaccurate, misleading statements about their discovery to Walgreens and the Court, ultimately requiring the Court to appoint a Special Master to oversee a lengthy, costly

Remediation Protocol in which Walgreens executed Initial Plaintiffs' document review for them. At the same time, Initial Plaintiffs concealed key PBM relationships, tried to retract unfavorable productions, and used gamesmanship to impede Walgreens' defenses and third-party claims.

Initial Plaintiffs' egregious discovery misconduct merits serious sanctions. Their repeated "cheat-and-retreat" strategy raises a strong inference that they willfully tried to bury critical evidence. At minimum, Initial Plaintiffs initially violated their duties due to incompetence or poor judgment and then spent two years trying to obfuscate those violations' cause and extent, including by falsely assuring Walgreens and the Court that Initial Plaintiffs' discovery met gold standards. Either scenario justifies major sanctions, including dismissal of Initial Plaintiffs' claims and an award of the attorneys' fees and other costs Walgreens incurred to enforce Initial Plaintiffs' duties. Even if the Court were to impose no sanctions despite this extreme malfeasance, Walgreens is entitled to recover its costs as the prevailing party on its Motion to Compel.

## I.     INITIAL PLAINTIFFS' MISCONDUCT MERITS MEANINGFUL SANCTIONS

"Defendants should not be required to defend a case by demanding that the discovery rules be followed." *Little v. JB Pritzker for Governor*, No. 18-CV-6954, 2021 WL 1165097, at *8 (N.D. Ill. Mar. 26, 2021) (Kendall, J.). But Initial Plaintiffs have forced Walgreens to do precisely that for years. Initial Plaintiffs violated their discovery duties—including Rules 26(e), 26(g), and 37(c)—by (1) giving evasive, at times duplicitous, and plainly deficient discovery responses and producing a fraction of the documents owed; (2) failing (even outright refusing) to investigate those defects; (3) misleading the Court and Walgreens about key facts related to Initial Plaintiffs' deficiencies; and (4) failing to timely supplement their responses once even they could no longer deny the defects. These breaches reflect a broader pattern of Initial Plaintiffs withholding key evidence, evading discovery duties, or using gamesmanship to hinder Walgreens' case. Walgreens has suffered material prejudice from this misconduct. It has forced Walgreens to divert thousands

12

of hours from preparing its trial case to enforcing Initial Plaintiffs' duties, and the conduct delayed the case while witness memories and other evidence about decades-old events continued to fade.

Egregious violations like these merit strong sanctions under Rules 37(c)(1), 37(d)(1)(A), and 26(g)(3) as well as the Court's inherent authority to rectify discovery abuses, *Dotson v. Bravo*, 321 F.3d 663, 667 (7th Cir. 2003). When a party improperly certifies a discovery response, as Initial Plaintiffs did here, Rule 26(g) makes sanctions *mandatory*. *See Rojas v. Town of Cicero*, 775 F.3d 906, 909 (7th Cir. 2015) (court cannot "let a delict pass without sanctions" when it violates Rule 26(g) by withholding relevant material). Rule 37(c) also permits sanctions for failing to supplement incomplete or incorrect discovery responses pursuant to Rule 26(e). *See Dotson*, 321 F.3d at 667 (affirming dismissal for Rules 37(c) and 26(e) violations; "evasive or incomplete" responses are "to be treated as a failure to . . . respond"). And through its inherent authority, the Court can impose sanctions "on a finding that the culpable party willfully abused the judicial process or otherwise conducted the litigation in bad faith." *Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772, 776 (7th Cir. 2016). Walgreens has spent thousands of hours and millions of dollars trying to correct the very kinds of violations (and worse) that courts have consistently found sanctionable.

The pervasiveness, persistence, and brazenness of Initial Plaintiffs' misconduct raises a strong inference that they willfully tried to hide key evidence. At best, Initial Plaintiffs acted with relentless, extreme disregard for their discovery duties. Either way, serious misconduct merits serious sanctions: when a party's violations suggest this sort of "willfulness, bad faith or fault," dismissal of the party's claims is appropriate. *Maynard v. Nygren*, 332 F.3d 462, 468 (7th Cir. 2003), *overruled in part on other grounds by Ramirez*, 845 F.3d at 781. Only dismissal would fully address the prejudice Walgreens suffered and send a sufficiently strong deterrent signal. But in the alternative, the Court should issue any other sanction it deems proper (such as adverse inference instructions) to at least partially counteract the harm caused by Initial Plaintiffs. In addition to any

13

other sanctions, Initial Plaintiffs must reimburse Walgreens for the millions of dollars it spent enforcing Initial Plaintiffs' duties and curing their breaches. *See Drake v. Chop Hosp. LLC*, No. 20-CV-1574, 2021 WL 2939978, at *3 (N.D. Ill. July 13, 2021) (negligence supports fee award).

### A. Initial Plaintiffs Violated Their Most Basic Discovery Duties

Rule 26(g) obligated Initial Plaintiffs to make a "reasonable inquiry" to ensure their responses were correct, complete, and consistent with the Rules. Accordingly, when Initial Plaintiffs' counsel signed their clients' written discovery responses, counsel certified pursuant to Rule 26(g) that, "to the best of [their] knowledge" after a "reasonable inquiry," their statements were "complete and correct," "consistent with these rules," and "not interposed for an improper purpose," such as to "cause unnecessary delay, or needlessly increase the cost of litigation." Further, Initial Plaintiffs had a duty to timely "supplement or correct" those responses when they learned the responses were "in some material respect . . . incomplete or incorrect." Fed. R. Civ. P. 26(e), 37(c). "Counsel must not only acquire the skills necessary to handle ESI in their matters, but also must exhibit diligence appropriate to the matter—taking mission critical steps to conduct discovery and meet professional and ethical obligations of competency and candor." Crowell & Moring, *Off the Edge of the E-Discovery Map, There Be Monsters* (Mar. 25, 2021).[7] Initial Plaintiffs egregiously violated these rules and made the certifications falsely.

#### 1. *Initial Plaintiffs failed to make a reasonable inquiry to ensure correct and complete responses, instead actively and falsely representing they had.*

Initial Plaintiffs repeatedly failed to make a reasonable inquiry to ensure that they provided "correct and complete" responses to Walgreens' requests, as Rule 26(g) required. Their document productions' incompleteness is indisputable; Initial Plaintiffs certified those productions as

---

[7] Available at https://www.crowelldatalaw.com/2021/03/off-the-edge-of-the-e-discovery-map-there-be-monsters-federal-court-issues-epic-opinion-sanctioning-counsel-for-failure-to-show-competence-and-diligence-in-meeting-esi-discovery-obligations/ (last accessed Feb. 20, 2025).

substantially complete while still holding hundreds of thousands of responsive, even case-critical documents, including the 210,000 CVS Documents and another 77,000 documents (170,000 including families) uncovered only through the Remediation Protocol. When faced with Walgreens' Motion to Compel and the PDP results, Initial Plaintiffs admitted that many of these unproduced documents were responsive to Walgreens' requests—even "material" to the case. Ex. 15 at 7. *See Peters v. Butler*, No. 3:16-cv-382-MAB, 2021 WL 979272, at *5–6 (S.D. Ill. Mar. 16, 2021) (party violated Rule 26(g) by failing for four years to produce directly relevant documents).

Initial Plaintiffs also failed to properly investigate the accuracy and completeness of their responses. Their intentional withholding of the CVS Documents for 17 months alone breached that duty. Initial Plaintiffs knew or easily could have confirmed those documents' relevance here. After all, Initial Plaintiffs produced the same documents in a parallel case asserting similar claims against CVS; Initial Plaintiffs thus had already reviewed the documents *and deemed them relevant*. When Walgreens' Motion to Compel cited examples of case-critical CVS Documents, Initial Plaintiffs had to admit the examples were responsive, Ex. 9 at 1, a conclusion they could have reached at any time by simply reviewing the CVS Documents for themselves. Similarly, the PDP identified red flags that should have been obvious to Initial Plaintiffs before they declared substantial completion. Ex. 12 at 1–2; *see* Kirk Decl. ¶ 40; Regard Decl. ¶¶ 169–173. Initial Plaintiffs either recognized these deficiencies but certified their responses as correct and complete anyway, or they failed to reasonably investigate the responses. Either way, they violated Rule 26(g). *DR Distribs., LLC v. 21 Century Smoking, Inc.*, 513 F. Supp. 3d 839, 962–65 (N.D. Ill. 2021) (failure to produce responsive documents violated Rule 26(g)); Crowell, *Off the Edge*, *supra* ("[P]leading lack of sophistication or confusion about ESI will not ward off sanctions . . . .").

The Remediation Protocol also confirmed that Initial Plaintiffs' inexplicable failures rendered their review process fundamentally broken from the start. *See* Regard Decl. ¶ 242. That

protocol confirmed, for example, Initial Plaintiffs' failure to reasonably oversee their human reviewers—a basic step to ensure their responses' completeness. Even in their flawed attempt at a PDP do-over, they reported that over 75% of their admitted "material misses" resulted from a reviewer's miscoding. Ex. 15 at 7. This alarming (but understated) error rate on such key documents strongly suggests Initial Plaintiffs performed little or no quality checking—or worse, that they trained reviewers in a way designed (or at least destined) *not* to find responsive material. *See* Kirk Decl. ¶¶ 25–28; *Peters*, 2021 WL 979272, at *6 (party's ability to identify relevant, withheld documents through remedial efforts was proof of failure to conduct reasonable inquiry). Routine checks would have caught at least some of these "material misses." For example, in two of the documents, a Plaintiff's employee discussed their knowledge that certain program prices were not being submitted as U&C—communications at the heart of Plaintiffs' fraud-based claims. Initial Plaintiffs admitted that a reviewer had marked both documents nonresponsive and Initial Plaintiffs failed to catch the error—even though the documents were so clearly relevant they had scored highly *even in Initial Plaintiffs' flawed, pre-remediation TAR model*.[8] Ex. 18 at 2. Initial Plaintiffs would have caught these errors with a quality-check review of high-scoring documents marked nonresponsive—a routine check in TAR-based reviews. *See* Regard Decl. ¶¶ 211–214.

### 2. *Initial Plaintiffs failed to supplement their obviously deficient responses.*

Initial Plaintiffs separately failed to supplement their responses as required by Rules 26(e) and 37(c). Those rules require supplementation "in a timely manner" once a party "learns that in some material respect the disclosure or response is incomplete." For the reasons noted above, Initial Plaintiffs should have recognized long before August 2022 that their productions were

---

[8] These documents are merely two of the tens of thousands of unproduced responsive documents—and the hundreds of centrally relevant documents—uncovered by the Remediation Protocol. Walgreens highlights these two examples because they represent a rare instance in which Initial Plaintiffs, in contrast to their usual pattern of obfuscation, provided clarity on the extent of the failures infecting their discovery.

incomplete, but even if they somehow failed to do so, they knew of that incompleteness once Walgreens confronted them with obvious production defects, including the massive gap between their productions here and in the CVS Litigation. Rather than honor their discovery duties, Initial Plaintiffs denied any issues existed and refused to supplement, even when confronted with their failure to produce highly relevant CVS Documents *relating to Walgreens*. Initial Plaintiffs proposed only minor technical adjustments to their TAR model that would have barely begun to address the problem. Dkt. 405 ¶ 18. They waited until Walgreens filed its Motion to Compel before they even began to *try* to produce more documents. Those productions—of the CVS Documents and 72,000 others—were too little, too late. *See Case v. Unified Sch. Dist. No. 233*, 162 F.R.D. 147, 149 (D. Kan. 1995) (party "cannot avoid the sanctions by then making the response to [the] discovery request" after filing of motion to compel); *cf.* Fed. R. Civ. P. 37(a)(5)(A) (requiring fees award when respondent produced disputed discovery after motion was filed); *Underdog Trucking, LLC v. Verizon Servs. Corp.*, 273 F.R.D. 372, 377–78 (S.D.N.Y. 2011) (awarding costs when motion to compel was "catalyst" for document productions); *Aerwey Lab'ys, Inc. v. Arco Polymers, Inc.*, 90 F.R.D. 563, 564 (N.D. Ill. 1981). Only the Remediation Protocol, which added another 170,000 produced documents despite Walgreens compromising on an atypically low estimated recall, yielded a defensible production of the responsive documents Initial Plaintiffs owed Walgreens. *See Melendez*, 79 F.3d at 671 n.13; *Peters*, 2021 WL 979272, at *5 (it was "abundantly clear" that yearslong delay in producing responsive documents violated Rule 26(e)).

### 3. *Initial Plaintiffs breached their duties of candor and transparency.*

Initial Plaintiffs' conduct also vitiated the Rules' goals of candor and good faith. "Discovery production is akin to an honor system. We trust that attorneys uphold their professional obligations and responsibilities by following the Federal Rules of Civil Procedure to produce relevant, nonprivileged information . . . ." *LKQ Corp. v. Kia Motors Am., Inc.*, 345 F.R.D. 152,

17

156 (N.D. Ill. 2023); *see also DR Distribs.*, 513 F. Supp. 3d at 906, 945 (Rule 26(g) requires parties to act in good faith; ethics rules require counsel to act with candor and good faith). Ignoring these principles, Initial Plaintiffs repeatedly mischaracterized key details of their discovery to Walgreens and the Court in an apparent effort to make their review appear more accurate, technologically advanced, and comprehensive than it actually was. Initial Plaintiffs told Walgreens and the Court that their production was substantially complete at 18,000 documents, despite knowing they actually possessed *hundreds of thousands* more presumptively responsive materials, including the CVS Documents. Dkt. 378 at 6. They then repeatedly and falsely characterized Walgreens' demand for more discovery as a request for an irrelevant "data dump," Ex. 6 at 1, when they knew their unproduced documents included much responsive, case-critical material. Initial Plaintiffs even misleadingly represented to Walgreens and the Court that they had employed a sophisticated CAL-driven review, Dkt. 317 at 4, and that their recall rate for their pre-August 2022 review was ██████ Dkt. 405 ¶ 11. The Special Master found they had *not* used CAL and their recall rate in August 2022 was an abysmal *11.32%*. Ex. 12 at 2; Kirk Decl. ¶¶ 13–14; Regard Decl. ¶¶ 161–165.

Initial Plaintiffs' cover-up effort made understanding and fixing their violations much more difficult, time consuming, and expensive. Their false claim of using CAL especially obstructed the process. Facts uncovered in the Special Master proceedings showed that Initial Plaintiffs used a method closer to "TAR 1.0," a more primitive and ineffective discovery protocol, and ***not*** CAL, which is accepted as a valid, best-practice method. Kirk Decl. ¶¶ 19–23; Regard Decl. ¶¶ 150–165. Had Walgreens and the Special Master had complete, trustworthy information about the review structure, they could have better diagnosed the review's flaws. Kirk Decl. ¶ 24. Initial Plaintiffs' shifting explanations—and their frequent refusal to explain at all—made it impossible to understand exactly how they structured, executed, supervised, or validated their original review and whether a targeted cure could fix the problems. Given Initial Plaintiffs' resistance and lack of

candor, the only solution was to task *Walgreens* with retraining a new TAR model for *Initial Plaintiffs' documents*, performing their review for them at extraordinary expense and delay.

### 4. *Initial Plaintiffs failed to conduct discovery with reasonable expedience.*

Initial Plaintiffs' extreme delay in meeting their obligations violates Rule 34(b)(2)(B)'s directive that a party produce electronically stored information in a "reasonable time," prejudicing Walgreens and impacting the Court's ability to administer the case. *See United States v. Dish Network, LLC*, 2015 WL 5970446, at *5–10 (C.D. Ill. Oct. 13, 2015) (sanctioning defendant that withheld responsive documents, pursuant to court's inherent power and Rule 37). "A court is not a place to play hide-and-go-seek with relevant evidence and information." *United States v. Currency, U.S. $42,500.00*, 283 F.3d 977, 983 (9th Cir. 2002); *cf. Haeger v. Goodyear Tire & Rubber Co.*, 906 F. Supp. 2d 938, 972–73 (D. Ariz. 2012), *rev'd on other grounds by* 581 U.S. 101 (2017), *citing Dreith v. Nu Image, Inc.*, 648 F.3d 779, 790 (9th Cir. 2011) ("[D]iscovery too often has become a desultory game of hide and seek."). By treating discovery as such a game, Initial Plaintiffs have delayed this case by at least two years, and forced the Court, the Special Master, and Walgreens to spend thousands of hours and millions of dollars identifying and fixing Initial Plaintiffs' breaches. This conduct plainly violates the letter and spirit of the discovery rules.

### B. Initial Plaintiffs' Broader Pattern of Obfuscation and Gamesmanship Shows a Chronic Disregard for Their Duties, Warranting Material Sanctions

The Court should "review a sanction not in isolation but in light of the entire procedural history of the case," "weigh[ing] not only the straw that finally broke the camel's back, but all the straws that the recalcitrant party piled on over the course of the lawsuit." *e360*, 658 F.3d at 643 (cleaned up). Initial Plaintiffs' conduct throughout this case reveals a consistent campaign to impede the truth-seeking process. Beyond the document review and production failures focused on by the Remediation Protocol, Initial Plaintiffs have engaged in several other unfair and dilatory

discovery violations. When viewed holistically, this pattern merits serious sanctions.

### 1. *Initial Plaintiffs tried to bury key evidence about a PBM.*

In events strikingly similar to this document-discovery debacle, certain now-dismissed Initial Plaintiffs called the Cambia Plaintiffs (represented by the same counsel as the other Initial Plaintiffs) tried to obscure key facts about their wholly owned PBM, OmedaRx, Inc. f/k/a Regence Rx, Inc. Initial Plaintiffs' PBM relationships are of course central to all parties' claims and defenses, including Walgreens' third-party contribution claims against PBM Prime Therapeutics, LLC. *E.g.*, Dkt. 143 ¶¶ 3, 47; Dkt. 259 ¶¶ 1, 5–10, 26. Yet, the Cambia Plaintiffs only disclosed their relationship to OmedaRx after the deadline to add third parties passed, and after Walgreens spent months chasing the Cambia Plaintiffs for a straight answer to basic discovery. These tactics obscured key evidence and the existence of Walgreens' third-party claims against OmedaRx.[9]

The Cambia Plaintiffs' original complaint fleetingly referred to the fact that they had paid Walgreens through a contract between OmedaRx and third-party PBM CatalystRx. Compl. ¶ 29, Dkt. 1, *Asuris Nw. Health v. Walgreen Co.*, No. 20-CV-4940 (N.D. Ill.); *see also* Dkt. 399 at 3. Nothing about those references suggested that OmedaRx had acted as the Cambia Plaintiffs' captive PBM, or that Cambia owned OmedaRx. *See* Dkt. 314 at 8. When the Cambia Plaintiffs amended their pleadings in January and June 2021, they removed their original ambiguous, fleeting references to OmedaRx, *see* Dkts. 124, 143, and struck OmedaRx from a list of their PBMs, Dkt. 143, ¶ 74. On July 13, 2021, the Cambia Plaintiffs served an amended interrogatory response evasively describing OmedaRx merely as an entity they had "contracted with." Dkt. 315, Ex. 1.

Six months later, after Walgreens' repeated requests for clarification, and after the deadline

---

[9] The relevant facts are detailed in the Court's opinion denying Initial Plaintiffs' motion to vacate the order allowing Walgreens to file a third-party complaint against OmedaRx, Dkt. 399, and in Walgreens' related motion, Dkt. 314. Walgreens summarizes the facts here but respectfully refers the Court to these past filings.

to join parties had passed, the Cambia Plaintiffs finally amended their interrogatory responses to definitively state, for the first time, that OmedaRx had served as a PBM to at least some Cambia Plaintiffs. Dkt. 315, Ex. 2. But during a June 2022 meet-and-confer, Initial Plaintiffs reversed course *again*, now describing OmedaRx as a Cambia insurer's business unit that no longer existed and was not "technically" a PBM. Dkt. 312, ¶ 10; Zagnoli Decl. ¶ 8. When Walgreens' counsel Google searched OmedaRx mid-conference and noted that its still-active website described it as a going concern and a PBM, Initial Plaintiffs' lawyers equivocated, saying OmedaRx's business had "changed over time" and its relationship with its owners was "complicated." Zagnoli Decl. ¶ 8. Initial Plaintiffs then delayed another month before finally producing contracts that are plainly relevant and should have been turned over much earlier. Dkt. 312, ¶ 11. Those previously concealed contracts not only confirmed OmedaRx's status as the Cambia Plaintiffs' PBM; the contracts *directly refuted Plaintiffs' claims*, including their theory that an industry standard U&C definition includes prices offered to fee-paying PSC members. In 2009, about a year after PSC launched nationwide, and again in 2012, OmedaRx (then called RegenceRx) entered into contracts with Walgreens that explicitly defined U&C prices to "*exclude[] the Prescription Savings Club . . . or any other type of program requiring a membership fee to participate.*" Exs. 24 at 2, 25 at 3.

Once these facts finally came to light, Walgreens quickly moved for leave to file a third-party complaint against OmedaRx. Dkt. 309–315. Initial Plaintiffs vehemently objected, claiming Walgreens should have discovered OmedaRx's relevance from its own files despite Initial Plaintiffs' ball-hiding antics. *See* Dkt. 323 at ¶¶ 5–6; Dkt. 335 at 4–5. The Court agreed with Walgreens that Initial Plaintiffs' ambiguous statements, and Walgreens' diligence in seeking clarity, provided good cause for Walgreens to implead the PBM.[10] Dkt. 399.

---

[10] The Court gave Walgreens leave to file this third-party complaint on August 23, 2022. Dkt. 319; *see also* Dkt. 321, 322. Initial Plaintiffs quickly moved to vacate that order. *See* Dkt. 323, 331, 335. The Court

The OmexaRx incident is just one more example of Initial Plaintiffs' persistent pattern of disregard for the discovery rules. As with their document production failures, Initial Plaintiffs used incomplete, vague discovery responses to obscure facts critical to Walgreens' ability to defend itself. When confronted with gaps and inconsistencies in their responses, Initial Plaintiffs delayed and then misstated material underlying facts, attempting to convince Walgreens and the Court that the requested information was of no significance to the case. When Initial Plaintiffs finally produced the information, it proved not only relevant but case-critical. Initial Plaintiffs then sought to blame Walgreens for Initial Plaintiff's own discovery failures and the resulting delays. Initial Plaintiffs used the same playbook when trying to downplay and deny their inadequate productions.

**2.      *Initial Plaintiffs refused to answer discovery requests—even after the Court ordered responses—to try to hobble Walgreens' case.***

In another stark example of discovery gamesmanship, Initial Plaintiffs refused *for years* to clarify the basic legal contours of their claims—even after the Court ordered them to do so—in an attempt to undermine Walgreens' defenses and stop it from bringing new third-party claims.[11] Starting in September 2021, Walgreens and Prime disputed whether Initial Plaintiffs were asserting claims against Walgreens based on *non*intentional scienter theories; if they were, Walgreens would have contribution claims against Prime under the laws of states that bar contribution for intentional conduct. Dkt. 561 at 4. Though Initial Plaintiffs had a front-row view of the dispute, they stood by silently. Dkt. 571 at 4. The Court dismissed certain of Walgreens' contribution claims in April 2022; the Court read Initial Plaintiffs' complaint to assert claims premised only on alleged *intentional* conduct. *Id.* at 3. Walgreens promptly served discovery requests asking Plaintiffs to

---

denied the vacation motion in an opinion dated January 23, 2023. Dkt. 399. Walgreens later dismissed this complaint as part of a settlement with the Cambia Plaintiffs. *See* Dkt. 503, 506.

[11] The relevant facts are detailed in past filings, including the Court's opinion partly denying Plaintiffs' motion to amend their complaints, Dkt. 571, and Walgreens' opposition to that motion, Dkt. 561. Walgreens briefly summarizes those facts here but respectfully refers the Court to these past filings for more details.

admit or deny that they would seek to assert nonintentional theories. Dkt. 571 at 4. As the Court would later say, "there was a 'reasonable need at this advanced stage of the case' to understand if Plaintiffs [were] in fact asserting consumer fraud claims based on nonintentional conduct so Walgreens [could] properly litigate and defend the case." Dkt. 571 at 4, *quoting* Dkt. 453 at 21.

Initial Plaintiffs steadfastly hid behind conclusory objections, refusing to respond in a transparent attempt to protect their subsidiary, Prime, from more contribution claims while they waited to see how the discovery record turned out. *Id.* at 6; Dkt. 561 at 11–12. Walgreens moved to compel responses in January 2023, Dkt. 407, and the Court granted the motion on May 31, Dkt. 453.[12] Initial Plaintiffs served the last of their amended responses on August 25, 2023, nearly three months after the Court's ruling. Dkt. 561 at 7. In those new responses, all but one Plaintiff *again* declined to answer key requests based on objections the Court *had already overruled* in its May 31 Order. *Id.* On February 29, 2024, more than nine months after being ordered to respond—and more than 18 months after receiving the interrogatory—Initial Plaintiffs finally served amended responses admitting they did indeed intend to pursue nonintentional theories of recovery. *Id.* at 8.

Even then, Initial Plaintiffs took no steps to amend their complaint to reflect these theories. *Id.* They only sought leave to amend after Walgreens asked the Court to set a deadline for them to do so. *See id.* at 7–8; Dkt. 543–544, 554–555. The Court denied Plaintiffs' motion on August 21, 2024. Dkt. 571. Among other reasons for its holding, the Court explained that Plaintiffs waited "unnecessarily and unjustifiably long" to amend, signaling "gamesmanship or a 'wait and see' approach to discovery." *Id.* at 3; *see* Dkt. 605 at 6–8 (denying Additional Plaintiffs' motion to reconsider for similar reasons). Initial Plaintiffs again relied on their well-worn playbook to try to

---

[12] Walgreens also moved to compel Initial Plaintiffs' responses to several other discovery requests, and the Court granted Walgreens' motion in its entirety. Dkt. 453. The Court later awarded Walgreens its costs as the prevailing party on this motion to compel. Dkt. 487.

hamstring Walgreens' case: they used boilerplate objections and evasive, incomplete discovery responses to deprive Walgreens of key information relevant to its claims, even after the Court ordered them to respond. *See* Dkt. 561 at 10. Again, Initial Plaintiffs' game-playing in discovery delayed the case and forced Walgreens to expend significant resources countering their tactics.

### 3. *Initial Plaintiffs baselessly sought to claw back critical Cambia Plaintiff documents from discovery, probably to hide their damaging contents.*

Yet another chapter in Initial Plaintiffs' saga of discovery abuses involves their improper attempt to impede Walgreens' access to key documents held by the Cambia Plaintiffs (the "Cambia Documents").[13] Initial Plaintiffs first baselessly claimed that the confidentiality order required Walgreens to destroy highly relevant, already-produced materials, and then they refused to include unproduced Cambia Documents in the Remediation Protocol based on an ill-founded objection. These maneuvers came on the heels of Initial Plaintiffs' trying and failing to keep from Walgreens the critical fact that their subsidiary PBM, OmedaRx, had contractually defined U&C prices to exclude PSC prices. Their second effort to deprive Walgreens of this key evidence delayed the Remediation Protocol by weeks and threatened to upend months of work by the Special Master.

Like all Initial Plaintiffs, the Cambia Plaintiffs falsely declared their productions substantially complete in August 2022, and they—and their still-unproduced responsive documents—were part of the Special Master's review of Initial Plaintiffs' discovery. The Cambia Plaintiffs voluntarily dismissed their claims on January 2, 2024, as part of a settlement. Dkt. 506. By then, the Special Master and parties had nearly finished the Remediation Order, but the Special Master would not formally enter that order until January 5, three days later. *See* Dkt. 507.

Although Initial Plaintiffs' own actions showed that they knew the pending Remediation

---

[13] Walgreens has recounted the relevant facts in the status report on the Cambia Documents, Dkt. 527. Walgreens briefly summarizes the facts here but respectfully refers the Court to this past filing for details.

Protocol would bind the Cambia Plaintiffs, *see* Dkt. 527, Ex. 1 at 1–2, Initial Plaintiffs waited until weeks after the protocol had been filed to challenge the Cambia Documents' continued inclusion in discovery. *Id*. Initial Plaintiffs first sought to deprive Walgreens of the already-produced Cambia Documents despite their clear relevance to all Plaintiffs' claims, *id.* at 2–3 (explaining relevance). Initial Plaintiffs argued, without any support, that the confidentiality order required Walgreens to destroy the Cambia Plaintiffs' discovery when they rushed to bow out mid-case, in the midst of Walgreens' production concerns being validated, even though Walgreens needed the materials to defend against the other Plaintiffs' still-pending claims. When the Special Master and Court quickly rejected their argument, Initial Plaintiffs pivoted to trying to deprive Walgreens of any additional Cambia Documents, arguing that they should be excluded from the Remediation Protocol. According to Initial Plaintiffs, Walgreens would need to subpoena the Cambia Plaintiffs, and Walgreens could expect nothing but objections in response. Initial Plaintiffs ignored clear case law calling for this discovery's production, which the Cambia Plaintiffs owed years before they chose to abandon their case. Dkt. 527, Ex. 1 at 3–4, Ex. 3 at 2–3 (collecting cases).

The Special Master ordered that the Cambia Documents remain in the protocol because they should have been produced years ago, prior to the Cambia Plaintiffs' exit, and because they were undeniably relevant to the case's remaining claims. Kirk Decl. ¶ 51. Initial Plaintiffs appealed to Magistrate Judge Finnegan, who ordered the Cambia Documents to be included in the Remediation Protocol's first phase, and then later extended that order to remaining phases. Initial Plaintiffs responded by trying to withdraw their appeal and objection, after the Court had already ruled. Ex. 17, May 10, 2024 Hr'g Tr. at 17:10–15. The abrupt withdrawal, after dragging Walgreens, the Special Master, and the Court through four months of baseless objections, briefing, and argument, is yet another example of Initial Plaintiffs' constant gamesmanship over the course of an unprecedented two-year detour to correct their malfeasance. Initial Plaintiffs' pattern and

25

practice of discovery gamesmanship supports the inference that Initial Plaintiffs acted in bad faith, and at least recklessly, in withholding hundred of thousands of responsive documents.[14]

### C. Strong Sanctions Are Warranted, Given the Egregiousness and Pervasiveness of Initial Plaintiffs' Misconduct

On this record, Initial Plaintiffs' repeated misrepresentations and evasions about document discovery were no mere accidents. They have consistently tried to hide case-critical materials and disregarded clear discovery duties, a pattern that seems to reflect coordinated tactics and gamesmanship. For years, Initial Plaintiffs wasted Walgreens' and the Court's resources and seriously prejudiced Walgreens through these manipulations. The Court should impose a meaningful sanction matching the misconduct's breadth and gravity. Dismissal of Initial Plaintiffs' claims is the most appropriate sanction. *See, e.g.*, *Newman v. Metro. Pier & Exposition Auth.*, 962 F.2d 589, 591 (7th Cir. 1992) (affirming dismissal sanction; "as soon as a pattern of noncompliance with the [district] court's discovery orders emerges, the judge is entitled to act with swift decision"); *DR Distribs., LLC v. 21 Century Smoking, Inc.*, No. 12-CV-50324, 2024 WL 2846035, at *33 (N.D. Ill. June 5, 2024) (dismissing suit based on pattern of abuses, including "fail[ing] to search for documents"). In the alternative, and at the very least, the Court should give an adverse inference instruction at trial, bar Initial Plaintiffs from using any inculpatory documents they wrongfully withheld, permit Walgreens to show at trial and argue to the jury that Initial Plaintiffs improperly withheld exculpatory documents, and/or impose other sanctions as a partial remedy for the significant harm Initial Plaintiffs caused. The Court also should enter a case schedule that allows Walgreens time to try to catch up, while preventing Initial Plaintiffs from using the extension to their advantage, including by barring new written discovery requests from them.

---

[14] In denying Initial Plaintiffs' own motion to compel, the Court again took a dim view of their discovery conduct; it described some arguments as "border[ing] on frivolous" and "inexplicable," Dkt. 586 at 5, 15 n.6, and admonished their "troubling" violation of the Rules' meet-and-confer mandate, *id.* at 22.

### 1. Strong sanctions are necessary to cure the prejudice inflicted on Walgreens and to deter these entities and other potential wrongdoers.

Walgreens has suffered profound prejudice from Initial Plaintiffs' discovery abuses. Initial Plaintiffs' misconduct knocked discovery in this case off the rails—years after Initial Plaintiffs claimed discovery would take just seven months. After more than *three years*, Walgreens has only recently received hundreds of thousands of documents relevant to its defense, all while Initial Plaintiffs and other parties claim to want to rush the case ahead. Zagnoli Decl. ¶ 15. Even if Walgreens finally has received all the documents it was entitled to long ago, the yearslong effort to cure Initial Plaintiffs' discovery violations has prejudiced Walgreens in at least two ways. First, Walgreens has suffered severe opportunity costs. The immense time and attention Walgreens' counsel has had to devote to this process—amounting to ***4,331 hours of 34 professionals' time over more than two and a half years***—has come at the expense of completing other case-critical work.[15] *See Little*, 2021 WL 1165097, at *7 (sanctioning party whose repeated failure to respond to discovery requests "abuse[d] both . . . party and judicial time and resources"). While Walgreens' counsel was investing that time in letters, meet-and-confers, investigations, Special Master conferences, the Remediation Protocol, and other tasks required to address Initial Plaintiffs' breaches, counsel was diverted from developing facts, case theories, and strategies for trial; deposing witnesses; preparing expert discovery; and countless other projects needed for Walgreens to mount its best defense. *See Newman*, 962 F.2d at 591 (affirming dismissal where plaintiff did "not take seriously" burden on "district judges for the management of their busy calendars or the burden on defendants and their lawyers of having their schedules disrupted by plaintiffs" who breach discovery duties); *accord In re Phenylpropanolamine (PPA) Prod. Liab. Litig.*, 460 F.3d

---

[15] These figures exclude the additional time Walgreens' counsel spent curing Initial Plaintiffs' other misconduct, such as the situations described in Part I.B. Counsel has scrupulously segregated time devoted to the Remediation Protocol, as reflected in the Declaration of Timothy R. Farrell filed with this motion.

1217, 1227–28 (9th Cir. 2006) (dismissal justified when delay "impair[s] the defendant's ability to go to trial," especially in "involved, complex case" where "[e]arly preparation [is] essential").

Meanwhile, Walgreens' adversaries have benefited from the extra years to prepare their cases. Plaintiffs have held their own documents this entire time, allowing them to catalogue all their bad evidence and prepare rebuttals. They and Prime also have held Walgreens' documents during this time, allowing them extensive space to analyze that evidence, space that has been denied to Walgreens.[16] Further, Additional Plaintiffs and Prime have been uninvolved in and thus unburdened and undistracted by the remediation. Initial Plaintiffs' misconduct has thus put Walgreens at a considerable disadvantage, while perversely benefiting Plaintiffs and Prime—a disadvantage that will remain for the rest of this suit. *See* Regard Decl. ¶¶ 243–246.

Second, the years required to cure Initial Plaintiffs' breaches threaten to exacerbate the loss of key evidence to time. *See* Zagnoli Decl. ¶ 23; Kirk Decl. ¶ 50. This concern is particularly acute in this case. Central events underlying Plaintiffs' claims occurred as early as 2007 and 2008, when Walgreens launched PSC, and when insurers and PBMs (including Plaintiffs and Prime) first evaluated membership clubs like PSC and concluded their prices did not qualify as U&C. When this case started, the parties already faced substantial risk that witnesses' memories of those early core events had faded, or that witnesses had left their employers, moved beyond the Court's trial jurisdiction, or become impossible to locate. The yearslong delays caused by Initial Plaintiffs' discovery failures have compounded these issues. For example, a highly knowledgeable witness— Scott Schuler, Walgreens' former Group Vice President, Prescription Contracting, Pricing and Operations, who led a group tasked with negotiating Walgreens' PBM contracts—retired last year. Zagnoli Decl. ¶ 23. Mr. Schuler's memory of relevant information will begin to fade as this case

---

[16] Walgreens had produced over 210,000 documents by December 2022. Zagnoli Decl., ¶ 34. It declared its productions substantially complete in February 2024, after producing just under 250,000 documents. *Id.*

plods toward a trial in a year or more. Similarly, Initial Plaintiffs reported that an important witness from Blue Cross and Blue Shield of Massachusetts, Inc., left the company in 2015, only five years before this case was filed but now ten years or more before trial. Kirk Decl. ¶ 50. The more years that pass, the less these and other witnesses will remember about facts key to the parties' claims.

This prejudice cannot be cured merely by awarding Walgreens its costs and a case-schedule extension—though Walgreens is entitled to both of those remedies. Walgreens has lost time to use Initial Plaintiffs' withheld documents to develop its defenses and preserve a record of witness testimony or other evidence. Walgreens cannot recover that time. The case cannot be extended for another two years, at least without exacerbating the prejudice to Walgreens; such extensions will lead to more lost evidence and more disproportionate preparation time for Walgreens' adversaries. No amount of money or schedule extensions will restore Walgreens to the position it would have occupied if Initial Plaintiffs had honored their discovery duties years ago without waging a campaign of obfuscation and obstruction. Dismissal is most "proportionate to the circumstances" of Initial Plaintiffs' gamesmanship and the resulting harm to Walgreens. *Melendez v. Ill. Bell Tel. Co.*, 79 F.3d 661, 672 (7th Cir. 1996) (court need not select "least drastic" sanction, but rather one that is just under totality of circumstances); *see Clinical Wound Sols., LLC v. Northwood, Inc.*, No. 18-cv-7916, 2023 WL 3568624, at *16 (N.D. Ill. May 19, 2023) (dismissing when party delayed case and burdened other party and court with effort of addressing pervasive discovery breaches).

Severe sanctions like dismissal also appropriately send other would-be discovery abusers a strong deterring message that this sort of discovery gamesmanship does not pay. "[A] dismissal with prejudice [as a sanction] serves to protect defendants [but] also serves to aid courts in keeping administrative control over their own dockets and . . . deter[s] other litigants from engaging in similar dilatory behavior." *Daniels v. Brennan*, 887 F.2d 783, 789 (7th Cir. 1989). Initial Plaintiffs' strategy of trying to make their computer-aided review a work product–protected "black box"—

before the Court and Special Master opened the curtain on Initial Plaintiffs' discovery conduct—is not unique. Walgreens was fortunate to receive prior productions in similar cases filed by overlapping Plaintiffs, from which Walgreens could identify missing documents. Most other discovery-abuse victims are not so lucky and will suffer if such abuses are not curtailed. Initial Plaintiffs or future parties may conclude that paying the other side's costs is an acceptable price for obstructing an opponent's case or concealing bad evidence. Initial Plaintiffs seek hundreds of millions of dollars in damages and prejudgment interest. *See* 2d Am. Compl., Dkt. 145 ¶¶ 11, 93–96. If Initial Plaintiffs are merely ordered to pay a few million dollars of Walgreens' costs or to forego a few million dollars in damages, future parties likely will view that sanction as a small price to pay to boost their odds of winning massive judgments. The Court should send a strong, clear message that burying documents in discovery and then covering it up is ***never*** worth the risk.

## 2.    *Initial Plaintiffs' claims should be dismissed with prejudice.*

This Court should impose a sanction commensurate with the severity of Initial Plaintiffs' discovery abuses: dismissal with prejudice. If a case for such a sanction exists, this is it. "Courts [ ] have the inherent power to dismiss a case when a party deceives the court or abuses the process at a level that is utterly inconsistent with the orderly administration of justice or undermines the integrity of the process. . . . [C]ourts consider similar factors to those under Rule 37, namely, the degree of culpability of the wrongdoer; the prejudice to the judicial process and the victim caused by the misconduct; the availability of other adequate sanctions; and the public interest." *Beach Mart, Inc. v. L&L Wings, Inc.*, 784 F. App'x 118, 124 (4th Cir. 2019) (affirming preclusive sanctions when defendant caused "substantial prejudice" to plaintiff and court, "requiring the court to reset the case," and when "monetary sanctions would be insufficient" deterrent after defendant's "willful nondisclosure and gamesmanship") (cleaned up). Dismissal is appropriate when a party's discovery violations result from "willfulness, bad faith or fault." *Maynard*, 332 F.3d at 467. In this

context, fault "presumes the sanctioned party was guilty of extraordinarily poor judgment[, ] gross negligence . . . [or] objectively unreasonable behavior." *Ramirez*, 845 F.3d at 776 (cleaned up).

No matter how one casts Initial Plaintiffs' conduct, it supports dismissal. The record raises a strong inference that Initial Plaintiffs acted willfully or in bad faith when they tried to withhold hundreds of thousands of responsive and even case-critical documents. At the very least, they acted with the gross negligence or extraordinarily poor judgment that likewise justifies dismissal.

"[C]ourts presume bad faith and prejudice where a party . . . failed to produce documents it knows or reasonably should have known are relevant . . . . [A] litigant cannot be permitted to say '[oops], you've caught me' and thereafter be allowed to continue to play the game." *Rhodes v. LaSalle Bank, N.A.*, No. 02-CV-2059, 2005 WL 281221, at *3 (N.D. Ill. Feb. 1, 2005) (cleaned up). Initial Plaintiffs declared their productions substantially complete when the CVS Documents and available review metrics gave them every reason to know that certification was false. Initial Plaintiffs then resisted Walgreens' legitimate concerns for months, falsely calling the CVS Documents a "data dump" of "nonresponsive" materials, Ex. 6 at 1, while Initial Plaintiffs knew the documents contained a high percentage of responsive (even case-critical) material. Initial Plaintiffs even misrepresented *to the Court* material facts about their review's progress, CAL use, and recall statistics—apparently to try to make the review appear more thorough than it was. And as the PDP revealed, metrics routinely evaluated by attorneys and e-discovery professionals showed that Initial Plaintiffs still held many responsive documents, both in August 2022 and when the remediation began. *See* Kirk Decl. ¶ 40. Even when caught in these patent misrepresentations and discovery violations, Initial Plaintiffs flatly refused to provide transparency into the cause or scope of their failures or any efforts to fix them, forcing Walgreens to file its Motion to Compel. Initial Plaintiffs' crass attempt to subvert and derail the Remediation Protocol, including by trying to manipulate the PDP results and extract thousands of Cambia Documents mid-process, highlights

the lengths to which Initial Plaintiffs will go to conceal evidence from Walgreens. *See* Ex. 15.

Viewed together, Initial Plaintiffs' misconduct cannot be chalked up to mere carelessness. It strains credulity that their many deficiencies, misrepresentations, and obfuscations were a string of good-faith accidents. The most plausible inference is that these acts reflect a willful strategy to throttle discovery, obscure key facts, and then cover up the scheme when Walgreens fortuitously discovered it.[17] *See Rhodes*, 2005 WL 281221, at *5. That inference only grows stronger against the backdrop of Initial Plaintiffs' other gamesmanship. *See* Part I.B; *e360*, 658 F.3d at 643. However, even if this pattern *does* reflect incompetence and a string of unintended mistakes, it would amount to precisely the sort of gross negligence, unreasonable conduct, or extraordinarily poor judgment that courts sanction with dismissal. *See Ramirez*, 845 F.3d at 776 (party seeking dismissal need not show intent, only extraordinarily poor judgment or gross negligence); *Avenatti v. Gree USA, Inc.*, No. 22-CV-354, 2021 WL 3260348, at *4 (S.D. Ind. July 26, 2021) (imposing default judgment on parties "guilty of extraordinarily poor judgment or gross negligence") (cleaned up), *report & recommendation adopted*, 2021 WL 3666540 (S.D. Ind. Aug. 18, 2021).

Either Initial Plaintiffs recognized the truth about their discovery defects and intentionally sought to mislead Walgreens when they called their unproduced discovery an irrelevant data dump, or Initial Plaintiffs never investigated the obvious warning signs and recklessly mischaracterized the discovery. Either scenario merits dismissal. *See Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1065 (2d Cir. 1979) (grossly negligent failure to produce discovery justified preclusion of damages evidence, even though sanction was "tantamount to a

---

[17] Initial Plaintiffs managed to identify many of their review's problems when the Special Master required them to do so. For example, at several points in the remediation process, Initial Plaintiffs admitted that not only was their TAR model defective, but their reviewers had made "material" errors, which exceeded the normal variance in a human review. *See, e.g.*, Ex. 15 at 7; Ex. 18 at 2. If Initial Plaintiffs did not identify these problems earlier, then their ignorance could only be explained by willful blindness to warning signs or a total failure to apply minimal quality controls. *See Peters*, 2021 WL 979272, at *6.

dismissal"); *DR Distribs.*, 2024 WL 2846035, at \*24, \*34 (imposing dismissal for misconduct, including hiding documents and misleading court and other parties); *Dotson*, 321 F.3d at 667 (affirming dismissal when party hid information from adversary and court); *Charter House Ins. Brokers, Ltd. v. N.H. Ins. Co.*, 667 F.2d 600, 602 (7th Cir. 1981) (affirming dismissal when party falsely represented that incomplete productions "substantially complied" with requests); *cf. also Haeger*, 906 F. Supp. 2d at 972–73 (court would have entered default judgment against party that withheld key evidence later revealed in related suit's discovery, if parties had not already settled).

Of the available sanctions, only total dismissal (with a fee award) fully matches the breadth and gravity of Initial Plaintiffs' misconduct, cures the prejudice to Walgreens, and deters future misconduct. *See Melendez*, 79 F.3d at 672 (court has discretion to choose sanction that fits totality of circumstances); *DR Distribs.*, 2024 WL 2846035, at \*25 (court may "consider the delay and increased costs imposed on the movant/requesting party, and the costs imposed on the judicial system"); *cf. also Haeger*, 906 F. Supp. 2d at 972–73. At a minimum, though, the Court should dismiss Initial Plaintiffs' claims for damages incurred and prejudgment interest accrued after they falsely declared substantial completion on August 22, 2022. Initial Plaintiffs seek damages for reimbursement claims that Walgreens submitted to Initial Plaintiffs' PBMs through the present. *E.g.*, 2d Am. Compl., Dkt. 145, ¶¶ 117, 128, 138. They also seek prejudgment interest on those claims, interest that continues to accrue through any final damages award. *Id.* at 84, ¶ h. And they seek to recover their attorneys' fees. *See id.*, ¶ g. By delaying the case's resolution for at least two years, Initial Plaintiffs have added years of alleged damages, prejudgment interest, and fees to their claims. Basic principles of equity and justice demand that a party not reap such a windfall from its own misconduct. *Coldwell Banker & Co. v. Eyde*, 661 F. Supp. 657, 660 n.6 (N.D. Ill. 1986).

If the Court declines to fully dismiss Initial Plaintiffs' claims—the most fitting sanction on these facts—it at least should dismiss the claims to the extent they seek (a) damages related to any

reimbursement claims submitted after Initial Plaintiffs' August 22, 2022, substantial-completion declaration, (b) prejudgment interest accruing on or after August 22, 2022, on reimbursement claims submitted at any time; and (c) attorneys' fees incurred on or after August 22, 2022.

### 3. *In the alternative to dismissing Initial Plaintiffs' claims, the Court should issue any other sanctions the Court deems proper.*

The massive disruptions, prejudice, delays, and costs caused by Initial Plaintiffs' pattern of malfeasance can be fully cured only by entirely dismissing their claims with prejudice. If the Court does not dismiss those claims, however, then it should impose other sanctions the Court deems proper. The Rules give the Court discretion in devising sanctions. *See* Fed. R. Civ. P. 26(g)(3), 37(c)(1)(A)–(C). And the Court may "impose appropriate sanctions to penalize and discourage misconduct" through its inherent power "to regulate the conduct of those appearing before it." *Ramirez*, 845 F.3d at 776, *citing Chambers v. NASCO, Inc.*, 501 U.S. 32, 46–50 (1991).

For example, the Court may grant adverse inference instructions pursuant to Rule 37(c) or its inherent powers. *See Hunting Energy Servs., Inc. v. Kavadas*, No. 15-CV-228, 2018 WL 4539818, at *7 (N.D. Ind. Sept. 20, 2018) (awarding adverse inference against party that willfully withheld documents); *Lomangino v. Polaris Indus. Inc.*, 2023 WL 3737110, at *3-4 (S.D.W. Va. May 31, 2023) (granting instruction for party's repeated failures to produce documents); *cf. Lancelot Invs. Fund, L.P. v. TSM Holdings, Ltd.*, No. 07-CV-4023, 2008 WL 1883435, at *7 (N.D. Ill. Apr. 28, 2008) (granting instruction for failure to make timely disclosure). Such instructions would partially (if imperfectly) counteract the prejudice Walgreens suffered from Initial Plaintiffs' misconduct. *See Pillay v. Millard Refrigerated Servs., Inc.*, No. 09-CV-5725, 2013 WL 2251727 at *4-5 (N.D. Ill. May 22, 2013) (granting instructions to alleviate prejudice); *Johnson v. Nichols*, No. 12-CV-5325, 2013 WL 4052468, at *3 (N.D. Ill. Aug. 12, 2013) (same).

In particular, the instructions would allow the jury to infer facts that Walgreens could have

developed more thoroughly with better access to fading testimonial or other evidence or with more available time. Walgreens' efforts to enforce Initial Plaintiffs' duties have uncovered documents directly undermining Plaintiffs' claims—documents Walgreens was entitled to receive years ago but would never have obtained if it had not uncovered Initial Plaintiffs' misconduct. Many of the most important withheld documents show that Initial Plaintiffs long knew key facts underlying the supposed fraud. *See supra*, p. 11. These documents are now several years old; in some cases, the documents date back to the earliest time periods at issue. Even assuming that key witnesses with knowledge of these documents are still available, their memories about the documents will have only faded further in the two years Walgreens has worked to fix Initial Plaintiffs' discovery, hampering Walgreens' ability to develop a record around those critical documents. That prejudice to Walgreens would be partly counteracted if the jury could infer Initial Plaintiffs' knowledge from the fact that they failed to give the documents to Walgreens for years due to their own malfeasance.

In the alternative to dismissal, then, Walgreens respectfully asks that the Court instruct the jury on one or more of the following inferences:

1. Initial Plaintiffs knew or should have known by 2011 that Walgreens deemed PSC prices to not be U&C prices and did not report PSC prices as such;

2. Initial Plaintiffs knew the terms and conditions governing, and benefits and perks available to members through, the PSC program;

3. Initial Plaintiffs failed to mitigate their alleged damages after they learned or should have known the basic facts underlying their claims.

Similarly, the Court may permit Walgreens to show at trial and argue to the jury that Initial Plaintiffs improperly withheld exculpatory documents from Walgreens, so the jury may draw its own conclusions from Initial Plaintiffs' gamesmanship. *See Bolyard v. Vill. of Sherman*, No. 19-cv-3146, 2022 WL 16738647, at *6 (C.D. Ill. Nov. 7, 2022) (allowing jury instruction that it could "consider the evidence of [party's] behavior"); *Hollis v. CEVA Logistics U.S., Inc.*, 603 F. Supp.

3d 611, 625 (N.D. Ill. 2022). The Court also may prohibit Initial Plaintiffs from relying on any documents they produced after they falsely declared substantial completion, while allowing Walgreens to use those documents to support its own case. Fed. R. Civ. P. 37(b)(2)(A)(ii). That bar would prevent Initial Plaintiffs from profiting off their gamesmanship and alleviate some of the prejudice to Walgreens. *See Am. Massage Therapy Ass'n v. Folkers*, No. 03-CV-6820, 2005 WL 8177612, at *2 (N.D. Ill. May 3, 2005) (barring parties' reliance on documents as a sanction).

### D. In Addition to All Other Sanctions the Court Deems Proper, Walgreens Should Be Awarded All of the Fees and Costs It Incurred to Secure Initial Plaintiffs' Compliance with Their Discovery Duties

In addition to all other sanctions imposed, the Court should award Walgreens the attorneys' fees and other costs it incurred to secure Initial Plaintiffs' discovery compliance. The Court may award monetary sanctions under Rules 26(g)(3) and 37(c)(1)(A) or pursuant to the Court's inherent powers, *see Raymond v. Thomas Indus. Coatings, Inc.*, No. 20-CV-372, 2021 WL 2376380, at *3 (S.D. Ill. June 10, 2021); *Houston v. C.G. Sec. Servs., Inc.*, 820 F.3d 855, 859–60 (7th Cir. 2016) (affirming award of sanctions and attorneys' fees).[18] Walgreens incurred millions of dollars in expenses to identify and cure Initial Plaintiffs' discovery failures, costs Walgreens should not have to bear. Initial Plaintiffs' misconduct put Walgreens in the unprecedented position of performing its opponents' document discovery for them, because they could not be trusted to discharge those duties after their flagrant misrepresentations, "material misses," responsiveness-coding volatility, and other errors. It would be unjust to allow Initial Plaintiffs to shirk their duties and then stick Walgreens with the bill for cleaning up the mess. Also, anything short of fully reimbursing

---

[18] The Court also may order Initial Plaintiffs' counsel to pay these expenses under 28 U.S.C. § 1927. *See Jolly Grp., Ltd. v. Medline Indus., Inc.*, 435 F.3d 717, 720 (7th Cir. 2006) (Section 1927 sanctions warranted "when an attorney has acted in an objectively unreasonable manner by engaging in serious and studied disregard for the orderly process of justice, . . . or pursued a path that a reasonably careful attorney would have known, after appropriate inquiry, to be unsound") (cleaned up).

Walgreens would signal to other litigants that flouting discovery rules, resisting court orders, and engaging in gamesmanship offers a cheap means to heap economic burden on an adversary while potentially hiding unfavorable evidence. *See* Part I.B. Walgreens did not choose to institute a yearslong, intensive Remediation Protocol. But the protocol was proper and necessary given Initial Plaintiffs' obstructive discovery failures and need for monitoring by a trusted third party working closely with the Court. Initial Plaintiffs should pay for that necessary process, not Walgreens.

Walgreens is entitled to recoup its expenses incurred to bring this sanctions motion and the underlying Motion to Compel, and its expenses required to identify, negotiate, and remediate Initial Plaintiffs' discovery misconduct—expenses all caused by the misconduct. Fed. R. Civ. P. 26(g)(3) ("The sanction may include an order to pay the reasonable expenses . . . caused by the violation."), 37(c)(1)(A) (same).[19] Walgreens incurred $938,644 in expenses for hundreds of hours that its counsel spent investigating Initial Plaintiffs' suspicious discovery deficiencies, drafting correspondence and conferring with opposing counsel about the deficiencies, drafting the Motion to Compel, and attending conferences on that motion with the Court and Special Master. *See* Decl. of Timothy R. Farrell ("Farrell Decl."). Walgreens incurred $2,528,897 to conduct the Special Master-ordered Remediation Protocol. *See id.* And Walgreens incurred $551,210 to prepare this sanctions motion. *See id.* All of these expenses, as well as Walgreens' $81,996 share of the Special Master's fees, were directly caused by Initial Plaintiffs' misconduct. *See Little*, 2021 WL 1165097, at *8 (awarding all costs from "efforts to engage in discovery" during period of misconduct); *Melikhov v. Drab*, No. 16-CV-9332, 2018 WL 3190824, at *5 (N.D. Ill. May 21, 2018)

---

[19] *See also Maynard*, 332 F.3d at 471 (Rule 37 allows award of fees resulting from discovery violation); *Rosenthal Collins Grp., LLC v. Trading Techs. Int'l, Inc.*, 2011 WL 722467, at *14 (N.D. Ill. Feb. 23, 2011) (imposing $1 million sanction on party and counsel who engaged in conduct that deceived opposing party and court); *cf. DR Distribs.*, 513 F. Supp. 3d at 864 (awarding costs related to creating 17 docket entries and preparing for and attending evidentiary hearing, because all were "derailed" by discovery misconduct).

(recommending award of fees for drafting sanctions motion and fee petition); *Toyo Tire & Rubber Co., Ltd v. Atturo Tire Corp.*, No. 14-CV-206, 2017 WL 784990, at *7 & n.4 (N.D. Ill. Feb. 8, 2017) (affirming award of costs incurred to prepare motions to compel, take compelled discovery, and prepare sanctions motion); *NorthMobileTech LLC v. Simon Prop. Grp., Inc.*, No. 11-CV-287, 2012 WL 12996103, at *9 (W.D. Wis. July 6, 2012) (awarding fees incurred to identify, analyze, "and otherwise deal[ ]" with responsive documents unproduced due to plaintiff's misconduct).

The fees charged by Walgreens' counsel are reasonable. Courts assess fees "based on a calculation of the 'lodestar'—the hours reasonably expended multiplied by the reasonable hourly rate—and nothing else." *Johnson v. GDF, Inc.*, 668 F.3d 927, 929 (7th Cir. 2012); *see* Dkt. 487 at 6–7; *Houston*, 820 F.3d at 859. "There is a strong presumption that the lodestar calculation yields a reasonable attorneys' fee award." *Pickett v. Sheridan Health Care Ctr.*, 664 F.3d 632, 639 (7th Cir. 2011). Courts "presume that an attorney's actual billing rate for similar litigation is appropriate to use as the market rate." *Id.* at 640. This Court has already confirmed the reasonableness of Walgreens' counsel's fees in this case, when the Court ordered Initial Plaintiffs to pay Walgreens' costs for a prior motion to compel Initial Plaintiffs' discovery. Dkt. 487 at 7–8.

## II.  WALGREENS IS AT LEAST ENTITLED TO ITS ATTORNEYS' FEES AND OTHER COSTS AS THE PREVAILING PARTY ON ITS MOTION TO COMPEL

In the alternative to awarding Walgreens' costs as a sanction, and even if the Court were to not sanction Initial Plaintiffs at all despite their clear, egregious misconduct, Walgreens is still entitled to recover its attorneys' fees and other costs under Rule 37(a)(5)(A). When a court grants a discovery motion, it "***must***, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees," except in certain scenarios absent here. *Id.* (emphasis added); *see also Rickels v. City of S. Bend*,

*Ind.*, 33 F.3d 785, 786 (7th Cir. 1994) (Rule 37 "presumptively requires every loser to make good the victor's costs."). Having prevailed on its Motion to Compel, Walgreens is entitled to recover expenses from bringing the motion and litigating related issues. *See* Farrell Decl.

The Court recognized that it granted Walgreens' Motion to Compel to the extent the Court ordered Initial Plaintiffs to perform the Remediation Protocol. *See* Dkt. 539. That motion sought transparency into Initial Plaintiffs' discovery failures, assurances that Initial Plaintiffs would produce all responsive documents, productions from additional custodians, and all other relief the Court deemed proper. Dkt. 374. The Special Master ordered Initial Plaintiffs to complete the PDP, which provided the transparency requested by Walgreens. *See* Dkt. 465. The Special Master then entered the Remediation Protocol which (1) largely granted Walgreens' request for additional custodians and (2) established a Special Master-supervised process for Initial Plaintiffs to provide all still-unproduced responsive documents. *See* Dkt. 507. The net end of Walgreens' motion is undeniable: Initial Plaintiffs were forced to produce 170,000 additional documents, including numerous case-critical ones that Initial Plaintiffs otherwise would have withheld. And critically, the Special Master's methods have confirmed that Walgreens finally received the documents to which it is entitled. The Special Master's and Court's orders thus granted the relief sought by Walgreens' Motion to Compel. Under any rational analysis, Walgreens prevailed. *See Crandall v. 4Demand, LLC*, No. 17-CV-4185, 2020 WL 11192553, at *1 (N.D. Ill. Aug. 6, 2020).[20]

Walgreens' costs are reasonable, *see* Part I.D, and also compensable. Walgreens is entitled to fees incurred to investigate and address Initial Plaintiffs' breaches and to prepare the Motion to Compel. *See Aerwey*, 90 F.R.D. at 565–566 (awarding "all expenses, whenever incurred, that

---

[20] Walgreens would be entitled to its fees even if Initial Plaintiffs' additional productions after Walgreens filed its Motion to Compel had provided all the relief the motion sought (the productions clearly did not). Rule 37(a)(5)(A) requires a fee award if the breaching party provides the requested discovery only after a motion is filed. *See also Underdog*, 273 F.R.D. at 377–78; *Aerwey*, 90 F.R.D. at 564.

would not have been sustained had the opponent conducted itself properly"); *Steifel Lab'ys, Inc. v. Brookstone Pharms., LLC*, No. 08-CV-3773, 2011 WL 13136939, at *1 (N.D. Ga. Oct. 17, 2011) (awarding costs party would not have incurred absent misconduct); *Rickels*, 33 F.3d at 787 ("The rationale of fee-shifting rules is that the victor . . . should be as well off as if the opponent had respected his legal rights in the first place."). Walgreens is also entitled to expenses incurred to prepare this motion. *Schmalz v. Vill. of N. Riverside*, No. 13-CV-8012, 2018 WL 11198063, at *4 (N.D. Ill. Dec. 17, 2018) (awarding costs of preparing fee petition); *Rodesky v. Pfister*, No. 15-CV-1002, 2023 WL 2585856, at *10 (C.D. Ill. Feb. 21, 2023) (same); *Bos. Sci. Corp. v. Cook Grp. Inc.*, No. 17-CV-3448, 2022 WL 2210011, at *2 (S.D. Ind. June 21, 2022) (same).[21]

This case presents none of the limited circumstances in which Rule 37 prevents a fee award. *See* Fed. R. Civ. P. 37(a)(5)(A). Walgreens pushed Initial Plaintiffs for months to fix their discovery failings before moving to compel; Initial Plaintiffs have no excuse for their breaches; and justice requires an award to make Walgreens whole, *Rickels*, 33 F.3d at 786. This extraordinary remediation is *not* ordinary course litigation or the cost of doing business as a corporate litigant. The entire exercise and all of its associated costs are the fault and responsibility of Initial Plaintiffs.

## CONCLUSION

For the above reasons, the Court should (a) dismiss Initial Plaintiffs' case with prejudice or alternatively impose any sanctions the Court deems proper; and (b) award Walgreens its costs.

---

[21] In awarding fees to Walgreens on a prior, entirely successful motion to compel, the Court stated that "[t]here is no binding precedent on this Court as to whether Rule 37 attorneys' fees include fees after a motion to compel is granted," such as "prod[ding] new defense counsel . . . to produce all the documents the Court ordered produced." Dkt. No. 487 at 8, *quoting Hubert v. Oswego Junction Ents. LLC*, No. 21-CV-3360, 2023 WL 2933052, at *2 (N.D. Ill. Apr. 13, 2023). The Court declined to award Walgreens' costs incurred after that motion was granted. But this holding conflated two separate types of post-motion fees: (1) fees incurred to ensure the nonmovant complies with the court order; and (2) fees incurred to prepare a Rule 37(a) fee petition. The latter fees are routinely awarded in this circuit, as shown by *Schmalz*, *Rodesky*, and *Bos. Sci.* Indeed, the Seventh Circuit has strongly signaled that such fees should be awarded, while allowing a party to recover costs of defending a fee award on appeal. *See Rickels*, 33 F.3d at 787.

Dated: February 21, 2025

Respectfully submitted,

By: */s/ Jeffery J. Bushofsky*

Jeffrey J. Bushofsky
Laura G. Hoey
Timothy R. Farrell
Charles D. Zagnoli
Nicholas W. Smith
**ROPES & GRAY LLP**
191 North Wacker Drive
32nd Floor
Chicago, IL 60606
Telephone: (312) 845-1200
Facsimile: (312) 845-5522
Jeffrey.Bushofsky@ropesgray.com
Laura.Hoey@ropesgray.com
Timothy.Farrell@ropesgray.com
Charles.Zagnoli@ropesgray.com
Nicholas.Smith@ropesgray.com

Matthew J. Corriel
**ROPES & GRAY LLP**
1211 Avenue of the Americas
New York, NY 10036
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
Matt.Corriel@ropesgray.com

*Attorneys for Defendants / Third-Party
Plaintiffs Walgreen Co. & Walgreens Boots
Alliance, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I, Charles D. Zagnoli, hereby certify that the foregoing document was electronically filed on February 21, 2025, and will be served electronically via the Court's ECF Notice system upon all registered counsel of record.

/s/ Charles D. Zagnoli
Charles D. Zagnoli
ROPES & GRAY LLP
191 North Wacker Dr.
32nd Floor
Chicago, IL 60606
Telephone: (312) 845-1200
Facsimile: (312) 845-5522
Charles.Zagnoli@ropesgray.com

*Attorney for Defendants / Third-Party Plaintiffs*
*Walgreen Co. & Walgreens Boots Alliance, Inc.*