THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BCBSM, INC, (d/b/a BLUE CROSS and BLUE SHIELD of MINNESOTA), HEALTH NEW YORK, INC, HORIZON HEALTHCARE SERVICES, INC. (d/b/a HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY), BLUE CROSS AND BLUE SHIELD OF ARIZONA, INC. (d/b/a BLUE CROSS BLUE SHIELD OF ARIZONA and d/b/a AZBLUE), ASURIS NORTHWEST HEALTH, et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> WALGREEN CO. and WALGREENS BOOTS ALLIANCE, INC., <br><br> *Defendants and Third-Party Plaintiffs*, <br><br> v. <br><br> PRIME THERAPEUTICS LLC, <br><br> *Third-Party Defendant*. | No. 20 C 1853 <br> No. 20 C 1929 <br> No. 20 C 3332 <br> No. 20 C 4940 <br> No. 20 C 4738 <br><br> Chief Judge Virginia M. Kendall |

## MEMORANDUM OPINION AND ORDER

This consolidated lawsuit stems from Initial Plaintiffs'[1] claims of common law fraud, consumer fraud, deceptive trade practices, and unjust enrichment against Defendants Walgreen

---

[1] "Initial Plaintiffs" refers to BCBSM, Inc. (d/b/a Blue Cross and Blue shield of Minnesota); HMO Minnesota (d/b/a Blue Plus); Health Options, Inc. (d/b/a Florida Blue HMO); Blue Cross and Blue Shield of North Carolina; Blue Cross Blue Shield of North Dakota; Blue Cross and Blue Shield of Florida, Inc. (d/b/a Florida Blue); Blue Cross and Blue Shield of Alabama; Blue Cross and Blue Shield of Kansas, Inc.; Blue Cross and Blue Shield of Massachusetts, Inc.; Blue Cross and Blue Shield of Massachusetts HMO Blue, Inc.; Wellmark, Inc. (d/b/a Wellmark Blue Cross and Blue Shield and d/b/a Wellmark Blue Cross and Blue Shield of Iowa); Wellmark of South Dakota, Inc. (d/b/a Wellmark Blue Cross and Blue Shield of South Dakota); Wellmark Health Plan of Iowa, Inc.; Wellmark Synergy Health, Inc.; Wellmark Value Health Plan, Inc.; Blue Cross and Blue Shield of Arizona, Inc. (d/b/a Blue Cross Blue Shield of Arizona and d/b/a AZBLUE); Blue Cross and Blue Shield of Kansas City, Inc.; HealthNow New York, Inc.; Highmark Western New York, Inc. (f/k/a Blue Cross of Western New York); Northeastern New York (f/k/a BlueShield of Northeastern New York); Horizon Healthcare Services, Inc. (d/b/a Horizon Blue Cross Blue Shield of New Jersey); and Horizon Healthcare of New Jersey, Inc. (d/b/a Horizon NJ Health). (Dkt. 636 at 1).

1

Co. and Walgreens Boots Alliance, Inc ("Walgreens"). After seven Additional Plaintiffs[2] filed a nearly identical complaint, *see CareFirst of Md., Inc., et al. v. Walgreen Co., et al.*, No. 1:22-cv-01362 (N.D. Ill.), the cases were consolidated in this action and then superseded by their operative Second Amended Complaint. (Dkt. 145); (Dkt. 272).

Pending before the Court is Third-Party Defendant Prime Therapeutics LLC's ("Prime") Motion for Protective Order, (Dkt. 693), and Walgreens' Motion to Compel. (Dkt. 697). Both motions relate to the same underlying discovery dispute concerning Prime's responses to Walgreens' requests for documents. For the following reasons, the Court grants Prime's Motion for Protective Order [693] in part and denies Walgreens' Motion to Compel [697] in part.

## BACKGROUND

This litigation centers on Walgreens allegedly falsely reporting inaccurate usual-and-customary ("U&C") prices. (Dkt. 259 at ¶ 2). U&C prices are typically defined by contract and cap the rates that health insurers pay for prescription reimbursements. (*Id.*). Initial Plaintiffs allege that Walgreens' U&C prices should have included the prices available only to members of its Prescription Savings Club ("PSC"). (*Id.*). Instead, Initial Plaintiffs assert, Walgreens submitted U&C prices that were up to twenty times higher than what Walgreens was actually charging its PSC members. (Dkt. 145 at ¶ 8). As a result, Initial Plaintiffs claim that Walgreens overcharged them on millions of claims. (*Id.* at ¶ 9).

On July 26, 2021, Walgreens filed a third-party complaint against Prime. (Dkt. 152). Prime is one of the pharmacy benefit managers ("PBMs") that works with Walgreens. (Dkt. 694 at 1). It is owned by several of the Initial Plaintiffs. (Dkt. 259 at ¶ 1). PBMs are claims-processing

---

[2] CareFirst of Maryland, Inc.; Group Hospitalization and Medical Services, Inc.; CareFirst BlueChoice, Inc.; Blue Cross and Blue Shield of South Carolina; BlueChoice HealthPlan of South Carolina, Inc.; Louisiana Health Service & Indemnity Company, d/b/a/ Blue Cross and Blue Shield of Louisiana, and HMO Louisiana, Inc. (Dkt. 568 at 1).

intermediaries that adjudicate Walgreens' reimbursement claims on Initial Plaintiffs' behalf and determine each claim's appropriate disposition under a particular health plan's coverage standards and criteria. (*Id.* at ¶¶ 5-6). As part of this process, Walgreens transmits U&C prices to PBMs and the PBMs transmit the prices to Initial Plaintiffs. (*Id.* at ¶ 6). Initial Plaintiffs then send reimbursement payments to Prime, which in turn sends reimbursement payments to Walgreens. (*Id.*). Walgreens asserts that Prime knew that Walgreens did not include the PSC pricing in its U&C prices but adjudicated Walgreens' claims using those alleged false prices, causing Initial Plaintiffs to overpay thereby profiting in the process. (*Id.* at ¶ 14). Walgreens is seeking contribution from Prime to hold it liable for its share of Initial Plaintiffs' alleged injuries that Prime and Walgreens jointly caused. (*Id.* at ¶ 27).

Prime and Walgreens began their discovery in 2021. (Dkt. 694 at 3). Four years later, the parties have reached an impasse over Prime's objections to adding additional custodians, running additional searches for documents from eight former Prime employees, producing documents from a Federal Trade Commission ("FTC") investigation, and producing non-party documents without consent. (*See generally* Dkt. 694; Dkt. 701). Separately, Walgreens and Initial Plaintiffs have been embroiled in their own drawn-out discovery process involving a remediation process lead by a Special Master, (Dkt. 507), and various disputes over adequate responses. (Dkt. 453); (Dkt. 586); (Dkt. 605).

### I. Origins of Parties' Discovery Disputes

In November 2021, Walgreens served its first set of discovery requests on Prime. (Dkt. 694 at 3). Relevant here, Prime objected to producing documents subject to confidentiality obligations owed to non-parties. (Ex. K, Dkt. 694-12 at 3). As discovery progressed, Prime sought consent from some non-parties to produce these documents. (Dkt. 694 at 6). In its fourth set of

Requests for Production, Walgreens requested "All Documents and Communications relating to the Federal Trade Commission ("FTC")'s inquiry into PBM practices for pharmacies' privately or commercially insured retail drug reimbursement claims, including Walgreens'." (Dkt. 702-13 at 11). In November 2024, Prime indicated that it had reviewed the FTC documents using the agreed-upon search terms and had produced relevant documents. (Dkt. 702-7 at 1-2). Prime later asserted that it would not be producing the FTC documents on the grounds that Walgreens' request was overbroad, unduly burdensome, and disproportionate to the needs of this case. (Ex. G, Dkt. 694-8 at 10).

In July and August 2022, the parties negotiated a list of custodians from whom Prime would collect and review documents using agreed upon search terms. (Dkt. 694 at 3-4). Walgreens responded to Prime's initial proposed list with fourteen additional individuals. (Ex. A, Dkt. 694-2 at 6-7). After meeting and conferring on the issue, Prime informed Walgreens that it did not have records for eight of Walgreens' proposed additions. (*Id.* at 2-3). The parties agreed on a final list of thirteen custodians. (Dkt. 694 at 3); (Dkt. 701 at 4). During the parties' negotiations over search terms, Prime expressed concern that Walgreens' proposed terms were over-inclusive but ultimately agreed to use them in their review of the approximately 1.2 million documents generated by the agreed-upon custodian and term lists. (Dkt. 694 at 5). Prime informed Walgreens that, despite the large universe of documents that hit on the search terms, the number of relevant documents would likely be smaller in comparison. (Ex. B, Dkt 694-3 at 1). Prime began its review process and produced documents on a rolling basis throughout 2023 and 2024. (Dkt. 694 at 7).

## II. Walgreens' Discovery Objections

On November 26, 2024, Prime indicated to Walgreens in a discovery letter that it only had a "modest number" of documents left to produce. (Dkt. 702-7 at 3-4). In response, Walgreens

4

compared Prime's production against Initial Plaintiffs' productions and identified twenty responsive documents involving Prime's custodians that Prime did not produce. (Dkt. 701 at 5). In January 2025, Walgreens raised concerns about Prime's "deficient productions." (Ex. E, Dkt. 694-6 at 3-4). Walgreens claimed that Prime's production of 16,909 documents could not satisfy its discovery obligations considering the number of documents Walgreens and Initial Plaintiffs had produced in comparison. (*Id.* at 3). Walgreens also found the number of documents produced by Prime to be low considering Prime is Walgreens' primary PBM and was in the middle of all communications between Initial Plaintiffs and Walgreens. (*Id.*). Walgreens provided examples of the missing documents it found in Initial Plaintiffs' productions and requested that Prime produce them and explain why they were not previously produced. (*Id.* at 4). Second, Walgreens asserted that Prime's current list of custodians was insufficient to capture relevant documents because Walgreens had identified "key documents" in Initial Plaintiffs' productions involving Prime employees that were not produced because they were not custodians. (*Id.*). Walgreens requested that Prime add six additional custodians–Jarrod Henshaw, Laurie Lindholm, Kim Olsen, Catherine Driscoll, Susmita Chavala and a "pharmacyops" email account. (*Id.* at 5). Next, Walgreens asked Prime to explain what steps it took to review and produce the documents from the FTC inquiry. (*Id.*). Finally, Walgreens requested that Prime obtain consent for the final documents requiring consent from non-parties to produce. (*Id.* at 3).

In February 2025, after Prime made another production, (Dkt. 701 at 6), Walgreens sent a second letter reiterating its concerns and requests and asking Prime to answer several questions about its document-review process given that Prime had still not produced some of the missing documents Walgreens had identified. (*See generally* Ex. F, Dkt. 694-7). Prime responded to Walgreens on February 14, 2025. (*See generally* Ex. G, Dkt. 694-8). Prime maintained that it

5

worked "diligently and in good faith" to respond to Walgreens' requests, (*Id.* at 1), and that its responses to Walgreens' request were complete. (*Id.* at 3). Prime responded to Walgreen's questions about its document review process and explained that it missed some of the 20 documents identified by Walgreens due to a coding error that it fixed before its most recent production. (*Id.* at 4-9). The rest of those documents were not produced because they did not hit on the search terms or did not exist in Prime's database, likely because they were not kept by the custodians. (*Id.* at 9). Additionally, Prime informed Walgreens that it was continuing to seek consent from six non-parties and would produce documents if consent was given. (*Id.* at 10). Prime also stated that it would not be producing the FTC documents because Walgreens' request was overbroad, unduly burdensome, and disproportionate to the needs of the case. (*Id.*). Finally, Prime expressed concern over Walgreens' request for additional custodians and offered to meet-and-confer on the issue. (*Id.*).

    The parties engaged in discussions over these issues through April 2025 but were largely unable to reach agreements on the contested issues. (*See generally* Ex. H, Dkt. 694-9). Prime agreed to collect, search, and produce any responsive, non-privilege documents from three of Walgreens' additional requested custodians. (*Id.* at 23). It declined to do so for the remaining four (Kim Olsen, Jarrod Henshaw, Cahterine Driscoll, and Susmit Chavala) after determining that, based on their roles at Prime, they would not have non-duplicative information. (*Id.*). Prime later informed Walgreens that it did not have any files for Chavala. (*Id.* at 12). After Prime confirmed that it did not have files for the eight employees whom Walgreens had initially proposed as custodians, Walgreens requested that Prime conduct "participant searches" on them to identify any communications in which they participated. (*Id.* at 5, 12). At the parties' final meet-and-confer, Prime maintained its objections to add additional custodians on the grounds that they were

6

duplicative, rejected Walgreens' proposed participate searches, maintained its objections to review and producing FTC documents, and indicated that it would not be producing documents for which it did not obtain non-party consent. (Dkt. 699 at 4-5).

Prime now seeks a protective order declaring it need not: add additional custodians; run additional searches; and produce non-party documents without consent. (Dkt. 694 at 10). Prime also requests that Walgreens pay the fees and expenses it incurred in bringing the motion. (*Id.* at 15). Walgreens seeks to compel Prime to: produce documents from Kim Olsen, Jarrod Henshaw, and Catherine Driscoll; conduct participant searches for the eight current and former employees for whom Prime lacks files; review Prime's productions to the FTC that hit on the parties' agreed-upon search terms and produce responsive documents; and produce responsive documents that Prime has thus far withheld due to its inability to secure third-party consent. (Dkt. 701 at 15).

## LEGAL STANDARD

### I. Protective Order

The Supreme Court has long established that "Rule 26(c) confers broad discretion on the trial court to decide when a protective order is appropriate and what degree of protection is required." *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36 (1984). Federal Rule of Civil Procedure 26(b)(1) provides that:

> [p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1). Rule 26 further states that a court may issue a protective order "for good cause ... to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1). Before issuing the requested protective order, the Court must

7

independently determine whether "good cause" exists to issue the order. *See, e.g., Moglia v. Pasquinelli*, 2019 WL 13077097, at *1 (N.D. Ill. Sept. 30, 2019); *Citizens First Nat. Bank of Princeton v. Cincinnati Ins. Co.*, 178 F.3d 943, 945 (7th Cir. 1999). The burden to show good cause for a protective order is upon the party seeking the order. *See Walls v. Mershon*, 2023 WL 11931162, at *3 (N.D. Ill. Mar. 14, 2023).

## II. Motion to Compel

Under Rule 37, a party may compel discovery whenever another party fails to respond to a discovery request, or when its response is insufficient. Fed. R. Civ. P. 37(a). Courts have "extremely broad discretion" in controlling discovery, *Jones v. City of Elkhart*, 737 F.3d 1107, 1115 (7th Cir. 2013), and resolving discovery disputes, *Scott v. Chuhak & Tecson, P.C.*, 725 F.3d 772, 785 (7th Cir. 2013). The party moving to compel discovery bears the initial burden to establish a request's relevance, then the burden shifts to the objecting party to show why the request is improper. See *Mendez v. City of Chicago*, 2020 WL 4736399, at *3 (N.D. Ill. Aug. 14, 2020).

## DISCUSSION

Prime maintains that it has met its discovery obligations through a diligent review process and its production of 20,832 documents. (Dkt. 694 at 7, 9). It argues that the discovery Walgreens now seeks is either not relevant or that the burden of production is not proportionate to the needs of the case. (*Id.* at 12-15). Walgreens asserts that further discovery is needed because Prime's selected sources of collection were deficient. (Dkt. 701 at 11). It further argues that Prime overstated and miscalculated any burden it would face in complying with Walgreens' Motion. (Dkt. 710 at 2-3).

As a preliminary matter, Walgreens' argument that Prime's discovery is deficient stems from Walgreens' assertion that Prime has not produced enough documents. (Dkt. 701 at 2, 5, 11).

8

"[M]erely insisting that there must be more information than an opponent has produced in discovery will not alone be adequate to find that the discovery responses are, in fact, inadequate." *Kinon Surface Design v. Hyatt Int'l Corp.*, 2021 WL 3511312, at *3 (N.D. Ill. Aug. 10, 2021). Mere speculation that there is more to be produced is not enough. *Metcalf v. Ross*, 2021 WL 1577799, at *2 (N.D. Ill. Apr. 22, 2021). Neither is the "theoretical possibility or the clients' or lawyers' certainty that additional documents exist." *Steffan v. Cook Cnty. Sheriff*, 2020 WL 7353411, at *1 (N.D. Ill. Dec. 15, 2020). It is Walgreens' burden to show that the circumstances of the case permit a reasonable deduction that other documents exist or may have existed at the time the document request was received. *Id.* As the Seventh Circuit has recognized, "discovery must have an end point." *Stevo v. Frasor*, 662 F.3d 880, 886 (7th Cir. 2011). With these principles in mind, the Court will address each of Walgreens' requests and Prime's corresponding objections.

I. **Additional Custodians and Participant Searches**

The parties originally agreed upon a list of thirteen custodians in August 2022. (Dkt. 694 at 3); (Dkt. 701 at 4). Walgreens now requests that the Court compel Prime to collect, review, and produce documents from three additional custodians—Kim Olsen, Jarrod Henshaw, and Catherine Driscoll—because they possess relevant material not covered by existing custodians. (Dkt. 701 at 26). Walgreens also requests that the Court compel Prime to run "participant searches" of eight current and former Prime employees to recreate their custodial files. (Dkt. 701 at 12). Walgreens explains that these searches would require Prime to search Prime's emails to identify communications where the identified individuals are listed as a recipient or sender, run those documents against the agreed-upon search terms, and then produce any responsive documents after review. (*Id.* at 12-13). Because Walgreens is asking Prime to recreate custodial files for these eight

9

individuals and then search for and produce relevant documents from those files, the Court interprets this as a request to add eight additional custodians.

The selection of custodians "must be designed to respond fully to document requests and to produce responsive, nonduplicative documents during the relevant time period." *Kleen Products LLC v. Packaging Corp. of Am.*, 2012 WL 4498465, at *15 (N.D. Ill. Sept. 28, 2012). Courts may order additional custodians once discovery has begun upon a proper showing that the requested discovery is relevant and proportional to the needs of the case under Rule 26(b)(1). *See, e.g., Breuder v. Bd. of Trs. of Cmty. Coll. Dist. No. 502, DuPage Cnty., Illinois*, 2019 WL 3386966, at *7 (N.D. Ill. July 26, 2019) (ordering additional custodian where a search of the custodian's materials had "a reasonable prospect of producing unique and relevant documents"); *In re Outpatient Med. Ctr. Emp. Antitrust Litig.*, 2023 WL 4181198, at *10-12 (N.D. Ill. June 26, 2023) (ordering two additional custodians based on proportionality analysis and plaintiff's demonstration of information's relevancy); *City of Chicago v. DoorDash, Inc.*, at *4 (N.D. Ill. Sept. 9, 2024) (ordering three additional custodians where the discovery was relevant, non-duplicative, proportionate to needs of the case, and not unduly burdensome).

### a. Additional Custodians

The first issue is the addition of Kim Olsen, Jarrod Henshaw, and Catherine Driscoll as custodians. Walgreens argues that the addition of these custodians is warranted because it identified multiple relevant documents from Initial Plaintiffs' productions involving the proposed individuals that were not initially produced by Prime and are not covered by existing custodians. (Dkt. 701 at 11-12). Prime does not contest that these individuals may have more relevant information; instead, it argues that (1) Walgreens is too late in making this request, (2) the existing custodians have *the most* relevant information, (3) any information the proposed custodians have

10

would be duplicative, and (4) the burden of searching the documents of the proposed custodians is too high. (Dkt. 694 at 10-13).

First, Walgreens' request for additional custodians is not untimely. Walgreens requested these additional custodians on January 15, 2025, after it reviewed Initial Plaintiffs' productions and identified documents involving these three individuals that had not been produced by Walgreens. (Dkt. 694-6 at 4-5). Parties may seek discovery from additional custodians when new information is revealed through discovery that was not available when custodians were first negotiated. *See, e.g., DoorDash, Inc.*, 2024 WL 4119165, at *2 (defendants requested additional custodians after identifying documents produced from them in other cases); *Prater v. All. Coal, LLC*, at *1 (S.D. Ind. Mar. 5, 2024) (plaintiffs requested additional custodians based on new information they obtained during discovery). Next, it is uncontested that the additional custodians are relevant. Contrary to Prime's assertion, the question is not how relevant the proposed custodians are, it is whether they are "at least within the universe of people who potentially are likely to have relevant information" on the contested issues. *DoorDash, Inc.*, 2024 WL 4119165, at *2. The documents flagged by Walgreens show that each of the proposed custodians have at least some relevant information regarding U&C pricing, which is central to the matter. (Dkt. 701 at 11).

The question of whether it is likely the three proposed custodians have a significant amount of non-duplicative relevant material is a closer call. Prime asserts that some of the non-produced documents flagged by Walgreens during meet-and-confer conversations show the proposed custodians seeking input on questions from existing custodians and then transmitting the information to Prime's clients. (Dkt. 694 at 11). Prime argues that, based on this, there is no reason to believe the additional custodians are likely to have unique knowledge. (*Id.*). While courts may

11

consider information about proposed custodians' roles to determine the likelihood of them having unique information, it is not determinative. *See Breuder*, 2019 WL 3386966, at *7 (custodians were not likely to have unique information because they were not decision makers and reported to individuals who were existing custodians); *Kleen Products LLC*, 2012 WL 4498465, at *14 (the fact that proposed custodians were senior executives who exchanged emails with existing custodians did not mean they would have non-cumulative information).

Prime offers no further evidence that the proposed custodians would be cumulative, such as an analysis of the data in question. *In re Outpatient Med. Ctr. Emp. Antitrust Litig.*, 2023 WL 4181198, at *10. Further, its position is weakened by the fact that, in response, Walgreens identified three documents associated with these individuals that were not covered by Prime's existing custodians, and it asserts there are more. (Dkt. 701 at 11). Walgreens, however, already has these documents from Initial Plaintiffs' productions and has obtained duplicates of at least some of them from Prime. (Dkt 701 at 11-12). As to the existence of any other non-duplicative documents, Walgreens' only argument is that the Court should doubt Prime's assertion that the addition of these custodians would be duplicative based on the unproduced documents it found. This is insufficient. *See Kleen Products LLC*, 2012 WL, 449865 at *14 ("Plaintiffs do not point to any specific, noncumulative evidence they expect to find with the additional custodians"); *In re Broiler Chicken Antitrust Litig.*, 2022 WL 621807, at *2 (N.D. Ill. Mar. 3, 2022) (denying motion to compel additional custodian where movants failed to offer evidence that custodian had documents that were not contained within movant's files or already produced by other custodians). Without more, the Court is not convinced that Prime's error leading to the unproduced documents, which was later corrected, means that there are more unique, unproduced documents in possession

of the proposed custodians. *See City of Rockford v. Mallinckrodt ARD Inc.*, 326 F.R.D. 489, 492 (N.D. Ill. 2018) ("[D]isclosure of documents need not be perfect").

While it is possible that adding these custodians would lead to Prime producing at least some additional relevant, non-duplicative material, the Court must balance the likelihood of finding responsive documents with the burden it imposes on the party. *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 681 (7th Cir. 2002). To comply, Prime estimates that it would have to review 2,360,457 documents costing $320,000 to $400,000. (Ex. A, Dkt. 707-1 at ¶ 7). This estimate is based on the average number of documents Prime collected for the thirteen initial custodians. (*Id.* at ¶ 4). Walgreens argues that Prime materially overstated its potential burden to review documents from the proposed custodians. (Dkt. 710 at ¶ 10). The Court, however, finds Prime's estimate to be reasonable. Further, while the cost is not exceedingly high, it is disproportionate to the uncertain likelihood of finding any relevant documents from the proposed custodians that have not already been produced. Accordingly, the Court grants Prime's Motion as to the request for additional custodians, (Dkt. 694 at 10-13), and denies Walgreen's Motion as to the same. (Dkt. 697 at 15).

### b. Participant Searches

Walgreens also requests that Prime conduct participant searches of eight former Prime employees and produce responsive documents, which would "essentially recreate" their custodial files. (Dkt. 701 at 12-13). The individuals requested are Casey Martin, Jaime Lehmeyer, Heather Brown, Ashley Beatty, William Lambert, Chelsea Teeters, Heidi Frandrup, and Joseph Schaff. (Dkt. 694-9 at 5). Walgreens asserts that participant searches of these eight individuals should be completed because they held "unique and important roles at Prime" and "are present on very key documents." (Dkt. 701 at 13). Prime's position is as follows: Prime told Walgreens it did not have

13

records for these eight individuals in 2022 and Walgreens did not ask why or object; in the intervening years Prime produced 20,832 documents from the agreed-upon custodians for whom Prime had files; in doing so, Prime produced emails on which some of the eight individuals were copied to the extent they fell within the agreed search parameters; consequently, any additional searches for documents involving these individuals would be unnecessary and burdensome. (Dkt. 694 13-14); (Tr. [708] 8:17-10-17; 22:3-23:17).

To start, Walgreens waited three years to raise concerns about Prime's lack of records for these eight individuals. Walgreens was aware that Prime had no files for these eight individuals back in 2022 but waited until Prime had nearly finished its document discovery three years later to propose this plan and seek judicial intervention. (Ex. G, Dkt. 694-9 at 1-2, 23). The untimeliness of this request supports denying it. *See In re Broiler Chicken Antitrust Litig.*, 2022 WL 621807, at *1 (movants could not revisit custodian negotiations "many years later and with so much discovery water under the proverbial bridge, without a much better reason for doing so than they have presented here").

Moreover, Walgreens' one justification for waiting is that it only determined that Prime's original custodian selection was inadequate at the end of discovery. (Dkt. 701 at 13). Walgreens believes Prime's custodial coverage is inadequate because, in its view, the number of documents Prime produced is lower than expected. (*Id.* at 2). As explained above, mere speculation that Prime has more relevant documents to produce is not enough. Walgreens points to emails produced by Prime's existing custodians and by Initial Plaintiffs involving the eight individuals and argues these communications show the likelihood that other relevant documents may be recoverable through participant searches. (Dkt. 701 at 13). Walgreens does not, however, indicate which of these documents, if any, were not included in Prime's productions. In fact, Prime's corpus of

14

custodial documents includes 183,690 documents containing at least one of the eight individuals' email addresses. (Ex. A, Dkt. 707-1 at ¶ 11). Of these documents, Prime already produced 1,211 as responsive. (*Id.*). Thus, even if the participant searches did uncover relevant documents, there is no reason to believe the documents would be non-duplicative.

Finally, Walgreens' request for participant searches is costly. To complete the participant searches, Prime estimates it would have to review approximately 1,215,763 documents costing between $900,000 and $1,200,000. (Ex. A, Dkt. 707-1 at ¶¶ 8-11). Walgreens argues that Prime likely overstates the burden of the participant searches. (Dkt. 710 at ¶ 11). The Court, however, finds Prime's estimate to be reasonable. Prime already reviewed thousands of documents involving these eight individuals and produced what was responsive to the parties' agreed-upon search terms. Any further review is unnecessary and unduly burdensome. "At a certain point, one must (and should) take a party at its word that discovery obligations have been met and all that is responsive to proper requests has been produced." *Steffan*, 2020 WL 7353411, at *3. With regard to custodial discovery, that point is now. The Court grants Prime's Motion as to performing participant searches, (Dkt. 694 at 13-14), and denies Walgreen's Motion as to the same. (Dkt. 697 at 15).

## II.  FTC Documents

Walgreens' next request concerns documents Prime produced to the FTC as part of an inquiry into PBMs. Walgreens initially requested all documents Prime produced in the FTC inquiry. (Dkt. 702-13 at 11). It has since narrowed the request to require Prime to review documents in that production that hit on the parties' agreed-upon search terms and produce only what is responsive. (Dkt. 701 at 3). Walgreens argues that Prime's FTC productions likely contain relevant documents given that the FTC was focused on pharmacy reimbursement methods, and Prime's calculation of reimbursement is central to the claims against it. (*Id.* at 14). Prime does not

15

contest that the FTC productions may contain relevant documents; instead, it asserts that searching those productions would be unduly burdensome and disproportionate to the needs of the case because its custodial productions were adequate. (Dkt. 694 at 14).

Courts in this district disfavor "cloned discovery" requests seeking all documents produced or received during other litigation or investigations. *In re Outpatient Med. Ctr. Emp. Antitrust Litig.*, 2023 WL 4181198, at *6. Courts have found narrowed requests for only the documents within cloned discovery that hit on agreed upon search terms to be reasonable. *Id.*; *see also In re Dealer Mgmt. Sys. Antitrust Litig.*, at *3 (N.D. Ill. Aug. 14, 2018). Walgreens only seeks documents from the FTC productions that hit upon the parties' agreed search terms. Prime fails to explain why this narrowed request is not proportionate to the needs of the case. Moreover, Prime initially told Walgreens in November 2024 that it searched the FTC productions, reviewed hits to the search terms, and produce relevant documents. (Dkt. 702-7 at 1-2). Walgreens responded by requesting more information about its review of these documents. (Ex. E, Dkt. 694-6 at 2). Instead of providing that information, Prime then began asserting the objections it maintains now. If Prime has already performed the requested search and produced relevant documents, it should identify them to Walgreens. If not, by falsely claiming that it searched for and produced relevant FTC documents months ago, Prime has forfeited any current objection that doing so would be unduly burdensome or disproportionate.

Putting aside Prime's conflicting assertions regarding these documents, the Court is not persuaded that Prime's burden estimate for this request is unduly burdensome in light of proportionality considerations. Prime estimates that it would need to review 361,551 documents costing $270,000-$350,000. (Ex. A, Dkt. 707-1 at ¶ 12). This is not a prohibitively significant expense given the public importance of the case's subject matter, the amount of money at issue,

16

the resources of both parties to prosecute and defend the case, the inability for Walgreens to otherwise obtain the FTC documents, and the established relevance of those documents. Accordingly, the Court grants Walgreens' Motion as to the FTC documents, (Dkt. 697 at 15), and denies Prime's Motion as to the same. (Dkt. 694 at 14-15).

### III. Documents Subject to Third-Party Consent

The final issue involves Prime's repeated objection to producing contract-related documents between Prime and non-parties that contain non-parties' confidential business information. Prime asserts that it is contractually obligated to obtain consent from non-parties before producing that information. (Dkt. 694 at 6). There are four non-parties from whom Prime did not receive consent, and Prime seeks a protective order declaring it need not produce documents involving those non-parties because doing so would force Prime to violate its non-disclosure obligations. (Dkt. 694 at 15). It further asserts that Walgreens can subpoena information from those non-parties directly, which it has already done for two of them. (*Id.*). Walgreens argues that the Court should order Prime to produce the remaining documents because concern over confidentiality obligations to non-parties is not a basis for withholding discovery given the protective order in place. (Dkt. 701 at 15).

The Confidentiality Order currently in place covers confidential agreements with third-parties and any other information "of such sensitivity that the producing party might sustain injury by its disclosure to a party or third-party discovery respondent." (Dkt. 365 at 3-4). The Order provides appropriate protection for the documents Prime is withholding. Thus, the Court is not persuaded by Prime's argument that it cannot produce the requested information because that information is the subject of confidentiality agreements between it and non-parties. *JAB Distributors, LLC v. London Luxury, LLC*, 2010 WL 4008193, at *4 (N.D. Ill. Oct. 13, 2010)

17

(requiring defendant to produce information subject to confidentiality agreement with non-party that was covered by protective order). Additionally, the ability for Walgreens to obtain the documents through subpoenas does not preclude Prime from its obligations to produce them. Litigants should not seek discovery from non-parties if they can obtain the discovery from parties to the action. *Little v. JB Pritzker for Governor*, 2020 WL 1939358, at *7 (N.D. Ill. Apr. 22, 2020); *PrimeSource Buildings Prods., Inc. v. Felten*, 2018 WL 10425599, at *3 (N.D. Ill. Apr. 27, 2018). Prime has the documents Walgreens is requesting and can produce them pursuant to the Confidentiality Order. Prime concedes that it would face no burden in producing the documents because it has already reviewed them for privilege and responsiveness. (Ex. A, Dkt. 707 at ¶ 11). Accordingly, the Court grants Walgreens' Motion as to the remaining documents Prime has withheld pursuant to agreements with non-parties, (Dkt. 697 at 15), and denies Prime's Motion as to the same. (Dkt. 694 at 15).

## CONCLUSION

For the reasons stated above, the Court grants in part Prime's Motion for Protective Order [693] and denies in part Walgreens' Motion to Compel [697].

_____
Virginia M. Kendall
United States District Judge

Date: November 10, 2025